**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICARDO NATIVIDAD,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL ACTION**<br>**No. 22-cv-5061-GJP** |
| **DETECTIVE PAUL RALEY, et al.,** | : | |
| **Defendants.** | : | |

**ORDER**

**AND NOW**, this _____ day of _____________, 2025, upon consideration of Motion for Summary Judgment, filed by Defendants, Detective Paul Raley, Detective James Dougherty, Detective Arthur Mee, and the City of Philadelphia ("Moving Defendants"), it is hereby **ORDERED** that the Motion is **GRANTED**, and **JUDGMENT IS ENTERED** in favor of Moving Defendants, and against Plaintiff, as to all claims in Plaintiff's Second Amended Complaint.

**BY THE COURT:**

______________________________
**GERALD J. PAPPERT, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICARDO NATIVIDAD,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL ACTION**<br>**No. 22-cv-5061-GJP** |
| **DETECTIVE PAUL RALEY, et al.,** | : | |
| **Defendants.** | : | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Detective Paul Raley, Detective James Dougherty, Detective Arthur Mee, and the City of Philadelphia ("Moving Defendants"), hereby file this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

Moving Defendants hereby incorporate by reference the attached Memorandum of Law. Defendants respectfully request that this Court grant them summary judgment as to the claims asserted against them in Plaintiff's Second Amended Complaint for the reasons set forth therein.

Respectfully submitted:

Date: April 7, 2025

/s/ *Benjamin T. Jackal*
Benjamin T. Jackal
Deputy City Solicitor
Attorney Identification No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
(215) 683-5434
ben.jackal@phila.gov

*Counsel for Defendants, Detective Paul Raley, Detective James Dougherty, Detective Arthur Mee, and the City of Philadelphia*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERMAINE HICKS,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civil Action No. 2:22-cv-0977** |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In 1997, a jury convicted Plaintiff, Ricardo Natividad ("Plaintiff" or "Natividad"), of robbery and first-degree murder and returned a verdict of death. In 2022, after federal court vacated his judgment of sentence based on his claim that the prosecution withheld exculpatory evidence, Plaintiff returned to state court and pleaded guilty to the gunpoint robbery of one victim and the murder of a second victim by shooting him in the head with a gun during the course of a robbery. Plaintiff remains incarcerated pursuant to his guilty plea.

Notwithstanding, Plaintiff has filed this Section 1983 civil rights suit in which he claims he is innocent of the crimes to which he pleaded guilty. He asserts Defendants, Detective Paul Raley, Detective James Dougherty, and Detective Arthur Mee, who investigated his crimes, violated his constitutional rights by supposedly fabricating inculpatory evidence against him and concealing exculpatory evidence. Plaintiff also argues the City of Philadelphia ("City") is also liable pursuant to Monell for supposedly unconstitutional customs with respect to homicide investigations. For the reasons that follow, the record belies Plaintiff's claims, and the Defendants are entitled to summary judgment.

## I. INTRODUCTION

Defendants seek summary judgment on all of Plaintiff's claims against them pursuant to Federal Rule of Civil Procedure 56 and this Court's policies and procedures. Plaintiff's Second Amended Complaint brings three claims:

1. COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial under the Fourteenth Amendment by Fabrication and Deliberate Deception against the Individual Defendants;

2. COUNT II: 42 U.S.C. § 1983 Civil Rights Conspiracy Against the Individual Defendants; and

3. COUNT III: 42 U.S.C. § 1983 Municipal Liability Claim against the City of Philadelphia.

ECF 33, 29–36.

## II. FACTUAL BACKGROUND

### A. Natividad's crimes and the investigation.

At around 2:00 a.m. on November 9, 1996, Michael Havens stopped for a sandwich at Philly's Famous Cheesesteaks at the intersection of Island and Elmwood Avenues in Philadelphia. Statement of Undisputed Material Fact ("SUMF"), ¶ 1. Mr. Havens bought his sandwich and was returning to his car, a dark blue 1989 Lincoln he had recently purchased. Id. As he unlocked the car, two men—one of whom Mr. Havens later identified as Plaintiff, Ricardo Natividad—approached him. Id. Plaintiff pulled out a gun. Mr. Havens surrendered his wallet and keys. Natividad told Mr. Havens to get in the car. Id. When Mr. Havens hesitated, Natividad said, "get the fuck in the car or we'll kill you right here." Id.

Natividad shoved Mr. Havens in the back of the car and got in the front passenger's seat, while his coconspirator drove off. SUMF, ¶ 2. For the next fifteen to twenty minutes, Natividad repeatedly threatened to shoot Mr. Havens while demanding money from him. Id. Mr. Havens

gave Natividad and his accomplice the cash from his pocket and begged to be released from the vehicle. Id. Natividad requested Mr. Havens' ATM card and that Mr. Havens access the account to get them additional funds. Id. Mr. Havens responded that there was no money in the account as he had just paid bills. Id. Natividad continued to threaten Mr. Havens with the gun. Id. Natividad faced Mr. Havens throughout the time they were in the car. Id. The car's interior light was on. Id. The driver told Natividad to "waste this white mother fucker." Id. Plaintiff responded "okay, find a dark spot so I can kill him." Id. Natividad asked Mr. Havens if he was ready to die. Id.

The men pulled the car into a dark area on the side of the road. Natividad ordered Mr. Havens out of the car and told him to lie on the ground. SUMF, ¶ 3. Mr. Havens covered his head with his hands because he thought he was about to die. Id. Natividad repeatedly said, "are you ready to die, you white mother f'er [*sic*]." Id. Mr. Havens then heard the car "peel out" and his assailants were gone. Id. Mr. Havens ran to a nearby Wawa and called the police. Id.

At 7:00 p.m. that evening, Natividad picked up his friend, Mr. Price, at a store at 60th and Catherine Streets in Philadelphia. SUMF, ¶ 4. Natividad was driving a Lincoln, which Mr. Price had never seen him drive before. Id. Natividad and Mr. Price had plans to watch a boxing match. Id. Mr. Price sat in the passenger seat as Natividad drove. Id. Natividad pulled the car into an Exxon gas station at the intersection of 63rd and Vine Streets and told Mr. Price to wait in the car. Id. Mr. Price heard a gunshot. Id. He saw that a man who had been standing nearby was lying on the ground. Id. Natividad came running back to the car holding a chrome revolver in his hands. Id. Natividad turned the car around and drove south down 63rd Street toward Market Street. Id. Mr. Price asked Natividad why he shot the man, Natividad replied "He drew on me." Id.

Martin and Beth Johnson testified that they lived on the northeast corner of 63rd and Vine Streets, across the intersection from the Exxon gas station. SUMF, ¶ 5. At around 9:40 p.m., they were leaving their house when they heard a gunshot. Id.

Mr. Johnson testified that he looked toward the gas station and saw a man falling backwards with his hands in the air. SUMF, ¶ 6. the same time, he saw a man run between the pumps, get into the driver's side of a black or dark blue car. Id. The shooter was wearing a big lumberjack style plaid jacket. Id. The car turned around and sped south on 63rd Street toward Market Street. Id. Mr. Johnson thought the assailants' car looked like a Lincoln because he saw that it had a distinctive tire well with the license plate inset into it. Id. He could not see the license plate. Id. Mr. Johnson approached the gas station. Id. at 78. He saw the victim, who was later identified as Robert Campbell, a white man, lying next to a yellow Cadillac. Id. The victim had been shot on the side of face. Id. Blood was coming out of the back of his head. Id. Mr. Johnson observed that Mr. Campbell had a gun in a holster that was snapped shut. Id. The gas cap was off of the Cadillac, and Mr. Campbell's keys lay on the ground nearby. Id.

Mrs. Johnson looked toward the sound of the gunshot and saw the shooter lifted his hand and the victim fall backwards with his hands raised. SUMF, ¶ 7. The shooter appeared to be wearing a red plaid lumberjack jacket. Id. The shooter had darker skin than the victim. Id. He got into his car, which was facing north. Id. The car turned around and travelled south on 63rd Street. Id. The bulb on the license plate of the shooter's car was out. Id.

On November 11, 1996, Philadelphia police recovered a dark blue Lincoln that had been abandoned and set on fire. SUMF, ¶ 8. From the trunk of the car, the police recovered a lumberjack style jacket. Id. Mr. Havens identified the burnt Lincoln as the car appellant had stolen from him at gunpoint on the morning of November 9, 1996. Id. Mr. Havens also identified the

jacket recovered from the trunk of the car as his own jacket that he had left in the car at the time of the robbery. Id.

Detective James Dougherty was assigned to investigate the murder. SUMF, ¶ 9. In the following weeks, he and his fellow detectives obtained numerous witness statements regarding the murder. Natividad made statements to several of his acquaintances taking credit for having shot the man at the Exxon station. Id.

On December 23, 1996, Detective Arthur Mee took a statement from Carl Anthony Harris. SUMF, ¶ 10. Mr. Harris testified at trial that Natividad approached Mr. Harris while he was washing his car with Keith Smith. Exh. 2, N.T. 11/6/97, 107. Mr. Harris testified that he observed Mr. Smith and Natividad engage in a conversation, out of his hearing, and then walk around the corner from where Mr. Harris was standing. Id. at 110. When Mr. Smith returned after parting from appellant, Mr. Smith had in his possession a chrome .357–Magnum firearm. Id. at 114.

In December 1996, Mr. Smith gave a .357 revolver to his attorney, Mr. Spina. SUMF, ¶ 11. Mr. Spina notified Philadelphia homicide detectives. Id. Homicide detectives, including Defendant Detective Mee, recovered the revolver from Mr. Spina's office and turned it over to the Philadelphia crime lab for testing. Id.

In December 1996, Detective Dougherty obtained an arrest warrant for Natividad. SUMF, ¶ 12. It was not until March 17, 1997, that Natividad was apprehended. SUMF, ¶ 13. Natividad admitted in his deposition that he learned he was wanted for murder and left Pennsylvania to avoid being captured. Id.

During Natividad's flight from apprehension, on February 2, 1997, Byron Price reported to the police that Natividad's uncle, Genardo McIlwain, assaulted him. SUMF, ¶ 14. McIlwain punched Mr. Price in the face. Id. He told Mr. Price that every time he sees him, they're going to

fight because Mr. Price witnessed "nephew killing somebody." Id. Based on Mr. Price's statement, police obtained a warrant to arrest McIlwain for assault and witness intimidation. Id.

On March 17, 1997, Mr. Havens, the victim of the robbery of the Lincoln, came to the police station to view a photographic array. SUMF, ¶ 15. Upon viewing the array, Mr. Havens positively identified a photograph of Natividad. Id.

**B. Natividad's criminal trial.**

The two indictments, charging Natividad with the robbery of Mr. Havens and the murder of Mr. Campbell, were consolidated and Natividad proceeded to a jury trial in November 1997. SUMF, ¶ 16. The medical examiner testified that the results of forensic and pathology reports revealed that Mr. Campbell had been shot in the head at a distance of at least two feet causing his immediate death. Id. The fatal wound was consistent with the type of injury caused by a .357 Magnum firearm. Id. The .357 caliber handgun obtained by police from the office of Mr. Spina had been fired prior to being handed over to the police. Id. Mr. Havens identified the gun recovered from Mr. Spina's office as identical to the gun held on him by appellant during the robbery of his motor vehicle. Id. Mr. Price identified the gun appellant possessed after shooting Mr. Campbell as similar in appearance to the gun Mr. Spina delivered to the Philadelphia police. Id.

Mr. Price was subjected to extensive cross-examination regarding the circumstances of his statements to the police. SUMF, ¶ 17. He testified on cross examination that he was mistaken when he told the police Natividad's gun was a chrome revolver that "looked like a .38." Id. Mr. Price testified that Detective Dougherty told him the gun was a .357 and that he did not say the gun had black grips on it. Id. Notwithstanding Mr. Price's testimony that Detective Dougherty

told him the gun was a .357, Mr. Price's recorded statement said he saw Natividad holding a .38. Id.

Robert Golatt testified that Natividad admitted to him that he murdered the victim with a .357 magnum. SUMF, ¶ 18. When asked on cross examination whether the police told him about the gun, Mr. Golatt testified "yeah." Id. at 171. On redirect, he was impeached with his statement to Detective Raley, which contained his statement that Natividad told him he murdered the victim with a .357 magnum:

> Q: Were you asked did Rick or Byron tell you what kind of gun he had the night of the shooting? Answer: Yeah. When Rick told me that he shot the guy, I asked him if he shot the guy with the .25 automatic. He said no. He said he had a chrome .357. Did you give that answer?
>
> A: Yes.
>
> Q: And is that from what Rick told you the night before talking to homicide?
>
> A: Yes.

Id.

On November 10, 1997, a jury convicted Natividad of first degree murder for the death of Robert Campbell, 18 Pa.C.S. § 2502(a); carrying a firearm on a public street, id. § 6108; two counts of possession of an instrument of crime, id. § 907; two counts of robbery, id. § 3701; one count of robbery of a motor vehicle, id. § 3702; kidnapping, id. § 2901; and criminal conspiracy, id. § 903. SUMF, ¶ 19.

At the penalty phase, the jury found two aggravating circumstances: that the killing occurred while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and that Natividad had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9). SUMF, ¶ 20. The jury found one mitigating circumstance, the life history of the defendant, id. § 9711(e)(8). Id. The jury determined that the aggravating circumstances

outweighed the mitigating circumstance and returned a verdict of death, which the court imposed. Id.

**C. Natividad's appeals and post-conviction challenges.**

In 2001, the Pennsylvania Supreme Court affirmed Plaintiff's judgments of sentence. Commonwealth v. Natividad, 773 A.2d 167, 181 (Pa. 2001). SUMF, ¶ 21.

On November 25, 2002, Natividad filed a *pro se* petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541, *et seq.* Commonwealth v. Natividad, 200 A.3d 11, 16–17 (Pa. 2019). SUMF, ¶ 22. Counsel was appointed and filed an amended petition, raising claims of ineffective assistance of trial counsel, trial court error, and prosecutorial misconduct. Id. The PCRA court held an evidentiary hearing, at the conclusion of which it denied Plaintiff's petition. Id. The Pennsylvania Supreme Court affirmed the order denying PCRA relief on December 27, 2007. Commonwealth v. Natividad, 938 A.2d 310 (Pa. 2007).

On March 11, 2008, Natividad filed a second PCRA petition, alleging his PCRA counsel's ineffectiveness. Commonwealth v. Natividad, 200 A.3d 11, 17 (Pa. 2019). SUMF, ¶ 23. On November 14, 2011, the PCRA court dismissed the second petition as untimely. Id. Natividad did not appeal. Id.

On June 27, 2008, Natividad filed a petition for a writ of habeas corpus before the Honorable Cynthia M. Rufe in the United States District Court for the Eastern District of Pennsylvania, docketed at Natividad v. Beard, No. 08-cv-0449 (E.D. Pa.). SUMF, ¶ 24. As part of that litigation, Natividad sought discovery from the Commonwealth. Id.

On August 19, 2011, the federal court ordered the Commonwealth to produce some discovery but denied Natividad's request for access to the entire trial and investigatory files in the possession of the Commonwealth and the police. SUMF, ¶ 25. In response, the Commonwealth

turned over more than 200 pages of documents to Natividad on March 6, 2012. Id. Among those disclosed documents was a paper with handwritten notations, including:


5635 BELMAR OPEN LEFT IN SU Y LOT TAG II
727-8853 JOHN MACULLA B/M 40's STOCKY, MEDIUM 5'11" HAIR
↳ TOLD MANAGER ON SUNDAY ↳ LT COMP
THAT HE WAS ON LOT + SAW INCIDENT
PERCY GILBERT — MANAGER OF EXXON
729-0476
5914 WINDSOR AVE.
LOUIS GLENN - DEPPER
1-800-225-0256
EXT. 261180
DEBRA ROPER
6024 VINE
215-472-0160
7 x 3 MXF ATT.
? JOE MCCLELLAN
TOWN WATCH

SUMF, ¶ 25.

On June 13, 2012, an investigator hired by Natividad's counsel interviewed a man named John McCullough. SUMF, ¶ 26. On July 19, 2012, McCullough signed a declaration in which he asserted the following under penalty of perjury:

1. One day in 1996, I was driving to a laundromat on 63rd Street in West Philly. I was working as a security guard at another laundromat at 60th and Cedar and had been offered part time work at the one at 63rd and Vine. That day, my 14 year old son and I had stopped by a funeral home at 63rd and Oxford. On the way home, we stopped by the laundromat at the Exxon gas station on 63rd Street.

2. I parked my car and just as we got out of the car, I noticed three men about three cars away. One guy was tall and light skinned. He was the victim. There were two darker skinned guys there. One guy was facing the victim and had his hands on the victim's shirt. There was another guy standing to the side with a gun. I froze in my tracks so as not to draw attention to myself or my son. I stood there looking at the three men for what seemed like one and a half minutes.

3. All of a sudden, the victim pushed the guy in front of him away and I heard one or more gunshots. I then saw the two darker guys run toward an already running car. The car was dark colored.

4. After the shooting, the police came to the laundromat and I told them what I saw. At first the police were suspicious of me because I was standing so close to the crime, but did not get hurt. I was asked if I knew either of the two dark skinned men, but I said that I did not. They seemed to imply that I must have known them or else I would have been shot, too. After a while, my son and I were taken to 55th and Pine to give a statement. We sat in a hallway at the station waiting to talk to a detective. As we were waiting, we started talking to a man and woman who saw the incident and were waiting to talk to the detectives too.

5. I talked to a detective at 55th and Pine and signed a 2½ page written statement about what I saw.

6. Sometime after the incident on 63rd Street, I became ill with a heart problem. Because of this illness, I left Philadelphia for a while to visit my sister in Virginia. While I was in Virginia, I received a long distance telephone call from a neighbor who said that there had been what looked like policemen coming by my house on Belmar Terrace. I called and left a message for the police telling them where I was. I received a return call from the police and, after I explained that I was ill and would return home after I recuperated, the policeman said they would wait until I returned.

7. When I returned to Philadelphia, some police came by my house. They asked me if I had spoken to anyone about what I saw that night. I replied that I had been in Virginia and had not spoken to anyone. They told me that they had "got the guy" and that they were "looking for the second guy." They said that they took care of everything and did not need me.

8. I used to work for the Greater Philadelphia Urban Affairs Coalition running summer programs for at risk youths. During one summer, [Natividad] was in my programs. I got to know him and would recognize him if I saw him. Only recently did I find out that [Natividad] was in prison for committing the killing I saw.

9. [Natividad] was not one of the two men that I saw with the victim at the laundromat at 63rd and Vine Street[s].

SUMF, ¶ 26.

On August 9, 2012, Natividad filed a third PCRA petition, alleging the prosecution failed to turn over the "Maculla" note and the statement McCullough claimed he gave to a detective, in violation of <u>Brady</u>. SUMF, ¶ 27. He alleged this newly discovered evidence satisfied the PCRA's

time bar exceptions for governmental interference and after discovered evidence. 42 Pa.C.S. § 9545(b)(1)(i), (ii). Id.

While Natividad's PCRA petition was pending in the PCRA court, he filed a supplemental discovery motion in federal court pursuant to his pending habeas petition, seeking access to the complete trial and investigatory files of the Commonwealth and the police. SUMF, ¶ 28. On July 9, 2014, the federal court granted Natividad's request, and the Commonwealth made additional files available to Natividad on August 7, 2014. Id.

This production of documents yielded various documents implicating Ricardo Robinson as the murderer of Robert Campbell. SUMF, ¶ 29. For example, detectives took the statements of Joseph Rutherford, Cynthia Smith, and Rolston Ricardo Robinson five days after the murder on November 14, 1996. Id. Rutherford and Smith described Robinson's drug dealing activity, his threatening behavior, and stated they heard Robinson say he had murdered Mr. Campbell. See id. Rutherford Statement (asserting Robinson said he would "do [Rutherford] like he did Bob down at the gas station."); id. Smith Statement (telling Defendant Detective Arthur Mee that Robinson said in reference to the murder of Mr. Campbell "Yeah — I did it," that's what happens to snitches," and that he "had to teach somebody a lesson."). Robinson claimed he drove past the scene of the murder on November 9, 1996, where he saw police at the gas station and a man lying on the ground. Id.

Officer Rita Wilson described in a statement that she responded to the dispute between Rutherford and Robinson at the bar on 66th and Lebanon Streets. SUMF, ¶30. She noted Rutherford told her that "Rob" had stated "we're going to do to you what we did to the guy at 63rd and Vine." Id. Officer Shane Darden gave a statement explaining that Rutherford told him

Robinson had been telling people he "was there when Campbell was shot" and that he had seen a gun and handcuffs in the victim's belt. Id.

Detective Dougherty's police activity sheet from dated November 13, 1996, also referenced Robinson:

> The assigned was contacted by a retired Detective who related that he had been contacted by an old informant who related that persons in 929 Wynnewood Rd. may have information as to the identity of the perpetrator and that he may be named ROB and was a Jamaican male. Det. DiBlasi & the assigned set up a surveillance of this location and noted that a B/M left the location and drove away in a 1988 Acura painted gray. The license tag was checked thru [*sic*] BMV and it was registered to a RUPERT ROBINSON at [redacted]. This male fit the general description of the male called ROB. It was also noted that adults aged 20 to 40 both white and black were coming and going from this location. The Detectives stopped one of these persons and learned that ROB does operate the gray Acura and several persons in the location were upset with him over drug matters.

SUMF, ¶ 31.

On November 14, 1996, Tracie Durham gave a statement in which she said she did not know about the killing but "was told by [Rutherford] . . . that a guy name[d] Rob . . . did it." SUMF, ¶ 32. She said she was on a pay phone outside the gas station around 9:50 p.m. on November 9, 1996, when she saw a car that "looked like Rob's silver Lexus and a gentleman that looked like Rob driving it." Id. She said she did not see the victim at the gas station. Id.

On November 12, 1996, Richard Anderson gave a statement to police in which he stated he heard from a woman named Tish that another man told her people who lived at "the house at [929 Wynnewood Road] . . . [and] call themselves the Junior Black Mafia had something to do with the shooting of Mr. Campbell." SUMF, ¶ 33.

Also on November 12, 1996, Detective Dougherty took a statement from Trish Ann Ambrosine, in which she relayed rumors that people associated with two drug houses, who called themselves "Junior Black Mafia," were responsible for murdering Mr. Campbell. SUMF, ¶ 34.

Natividad amended his third PCRA petition to include an additional Brady claim based on these Robinson documents. SUMF, ¶ 35.

The PCRA court conducted an evidentiary hearing over the course of three days. On April 28, 2016, McCullough testified for Plaintiff. SUMF, ¶ 36. He said that on November 9, 1996, he was with his son, walking to 63rd and Vine Streets. Id. As he was walking down 63rd Street approaching Vine, the gas station was on his right. Id. He heard one or two gunshots and ducked. Id. He saw two men run across the street and get into a car that sped away. Id. McCullough testified that neither man was Natividad. Id. According to McCullough, officers took him and other witnesses to the police station at 55th and Pine Streets. Id. He was later taken to 8th and Race, where he gave a signed statement. Id. Detectives permitted him to take a copy of the statement he gave at 8th and Race with him but he then misplaced it. Id. McCullough testified that he had been involved in town watch in 1996. Id.

On May 20, 2016, contrary to his father's statement, John McCullough, III, testified that he was eighteen years old in November 1996, that he was not with his father in the area of 63rd and Vine Streets on November 9, 1996, and that he did not witness a murder at that time and location. SUMF, ¶ 37. Mr. McCullough's father never told him that he witnessed a murder. Id. at 6. Mr. McCullough III was arrested for stealing copper, taken by Det. Dougherty from the 25th District to 8th and Race, and provided a statement. Id. He checked to make sure it was accurate, and that he signed it. Id. When he got back to SCI-Graterford, McCullough III wrote a letter to his father, reporting that he told the police not to believe a word Mr. McCullough was saying. Id. He wrote, "[m]y advice to you is to let Detective Dougherty know you were persuaded by the people who are backing Ricardo Natividad to say these things." McCullough III testified that no one, including Det. Dougherty, promised him anything in exchange for his statement in this case.

Id. Mr. McCullough III was subject to cross examination from Natividad's attorney. Id. He described the circumstances pursuant to which Detective Dougherty questioned him, his relationship with his father, and his criminal record. Id.

On May 20, 2016, and July 7, 2016, Detective Dougherty testified. He described the circumstances of recording the "Maculla" note in 1996. SUMF, ¶ 38. He testified that McCullough not listed on crime scene log. Id. Detective Dougherty spoke to John McCullough at a town watch meeting in November 1996, and McCullough told the detective he was not a witness to the murder. Id. Detective Dougherty testified "[n]o one in this homicide case was ever taken to 55th and Pine for an interview of any kind whatsoever regarding this matter." Id.

Detective Dougherty explained he sought to speak to McCullough in 2014 but he was difficult to track down. SUMF, ¶ 39. Detective Dougherty finally spoke to McCullough at his home. Id. McCullough told Detective Dougherty he was in a hurry, and the detective tried to record the statement as quickly as possible. Id. McCullough provided an entirely different account of the murder:

> [McCullough and his son] were then walking somewhere on or near 63rd Street about one or two blocks below Lansdowne or Jefferson and they were on the east side of 63rd when he saw the victim walk out of the laundromat and two black males walked up to him. They looked like they were talking at first but the voices got louder. Then a woman yelled out from the second floor window behind him for them to leave the man alone. Then one of the two men had a gun and was pointing it at the victim. There was a quick gunshot and the victim fell down. The two males then ran across 63rd and passed by John McCullough and his son and he watched as they ran up towards Jefferson Street. He lost site of them around 63rd and Jefferson. They were still running. A female and male came out of the house behind John McCullough and across the street and saw the victim laying on the pavement outside of the laundromat. Police and ambulance came and an ambulance took the victim to the hospital. He told the police he saw the shooting. John McCullough and the man and the woman were taken to 55th and Pine. They were there about two hours. He gave a statement to detectives.
>
> Later, he was taken to Center City and signed a statement he gave detectives at 55th and Pine. The statement was only about a paragraph long. About all he can

> remember -- it was a long time ago, was wondering why anyone was caring about this now.

Id. McCullough told Detective Dougherty that his son was "maybe 12 to 14 then." Id. Detective Dougherty asked McCullough whether the victim was black or white, McCullough said "he was positive" the victim was Chinese and that the victim was the owner of the laundromat whom McCullough was going to see about a job. Id. Detective Dougherty testified "I asked Mr. McCullough if he would read what I had here. He declined. That's why I asked him also if I could type it up and bring it back to him, like the other people had done, and that's when he told me he would call me." McCullough never called Detective Dougherty back. Id.

Detective Dougherty testified that he located McCullough III, who was on parole. SUMF, ¶ 40. When the detective learned McCullough III was arrested on April 8, 2014, he interviewed him. Id.

Assistant District Attorney Jason Harmon testified that when McCullough III was arrested on April 7, 2014, for theft of copper, he declined criminal charges. SUMF, ¶ 41. He explained that he did so because it would not have been possible to prove that the owner did not give McCullough III permission to have the stolen items. Id. No one from the District Attorney's Office or the homicide unit contacted Mr. Harmon about his charging decision. Id.

On July 14, 2016, the PCRA court credited the Commonwealth's witnesses and disbelieved John McCullough's testimony and denied relief as to Natividad's Brady claim concerning the "Maculla" note. SUMF, ¶ 42. On February 14, 2017, the PCRA court dismissed Natividad's third PCRA petition. Id.

Natividad appealed the decision to the Pennsylvania Supreme Court, which, on January 23, 2019, affirmed PCRA court's order dismissing his petition. Commonwealth v. Natividad, 200

A.3d 11, 41 (Pa. 2019). The Court rejected Plaintiff's Brady claims based on both "Maculla" note and Robinson statements, reasoning the withheld material was not material:

> Although we deem it to be a close call, after a careful review of the entire record, we agree with the PCRA court that the Commonwealth's evidence against [Natividad] was so overwhelming there is no reasonable probability that if the Commonwealth had turned over the relevant evidence the result of the trial would have been different.

Natividad, 200 A.3d at 32–33.

Natividad supplemented his federal habeas petition, which had been pending before a court of this jurisdiction since 2008, to add the "MacCulla" note and the Robinson materials to his existing Brady claims. SUMF, ¶ 44. The District Attorney's Office transferred Natividad's case from its Law Department to the Conviction Integrity Unit ("CIU"). Id. The CIU filed an answer to Natividad's supplemental habeas petition that "withdrew and disavowed *all* prior pleadings and arguments and conceded that Natividad was entitled to habeas relief under Brady." Id. (emphasis in original). Plaintiff and the Commonwealth entered into a stipulation, agreeing to relief on Plaintiff's habeas petition, in exchange for which Plaintiff would plead guilty to an agreed upon term in the Court of Common Pleas. Id. Pursuant to the stipulation, Plaintiff "agree[d] to waive any further challenges in any court (state or federal) to his convictions and/or sentences in Commonwealth v. Natividad, Nos. CP-0400131-1997, CP-51-CR-0703121-1997." Id.

Judge Rufe concluded the Philadelphia Police Department generated exculpatory evidence that the prosecution did not turn over. SUMF, ¶ 45. Natividad, 2021 WL 3737201, at *14 ("The Philadelphia Police Department gathered evidence that was unmistakably favorable to Natividad, but the prosecutor failed to uphold its duty to disclose the evidence to Natividad's trial counsel."). Based on a finding that Natividad's rights under Brady had been violated, the court granted

Natividad habeas relief, vacated his death sentence, and ordered him to be retried within 180 days. Natividad v. Beard, 2021 WL 3737201, at *14.

### D. Natividad's guilty plea.

On February 8, 2022, Natividad appeared in the Court of Common Pleas before the Honorable Lillian Ransom and pleaded guilty to the robbery of Mr. Havens, the murder of Mr. Campbell, and related offenses. SUMF, ¶ 46. Natividad was represented by counsel and was placed under oath before testifying. Id. The parties agreed that Plaintiff had a prior record score of four, reflecting Natividad's prior convictions for robbery and simple assault (Docket CP-51-CR-0313921-1989) and theft and aggravated assault (Docket CP-51-CR-0338181-1989). Id. Natividad affirmed that he understood the purpose of the guilty plea hearing (id.), and that he wished to plead guilty to third degree murder (id.), robbery (id.), and related offenses (id.). Natividad affirmed that he understood the maximum penalties for each offense to which he was pleading guilty, that he had discussed with his attorney the elements of each of the offenses to which he was pleading guilty, and that he understood what the Commonwealth would be required to prove if he proceeded to trial. Id.. He affirmed that he understood by pleading guilty, he admitted to underlying facts that established his guilt of the offenses to which he was pleading guilty and waived his right to a jury trial and the chance to contest the evidence against him. Id.. Natividad affirmed that he discussed the evidence against him with his attorney and that it was his choice to plead guilty. Id.

The Commonwealth provided the following recitation of facts, which had been included in a December 2021 letter to the court:

> On or about November 9, 1996, at approximately 2:00 a.m., first victim, Michael Haven, was trying to unlock his dark blue Lincoln Continental near the intersection of Island Avenue and Elmwood Avenue in the Southwest section in the city and county of Philadelphia. . . . [Natividad] and another person approached the victim

> another person approached the victim. The victim [*sic*] produced a handgun, which had been concealed on his person. At point of gun, [Natividad] forced the victim into the back seat of his car and drove off. After driving a substantial distance to the area where Island Avenue turns into Cobbs Creek Parkway, with the victim inside the car, [Natividad] and the other person stopped and ordered the victim out of the car. [Natividad] and the other person fled, taking the victim's car, wallet and car keys without the victim's permission. The defendant intentionally placed Michael Haven in fear of immediate serious bodily injury. [Natividad] did this while possessing a firearm with intent to employ it criminally.

SUMF, ¶ 47. Natividad affirmed that he heard the summary of facts, that he did not wish to make any corrections to it. Id. He then pleaded guilty to robbery, kidnapping, violation of the Uniform Firearms Act, possessing an instrument of crime, conspiracy, and robbery of a motor vehicle. Id.

The Commonwealth continued:

> Later that same day, on November 9, 1996, at approximately 9:40 p.m., [Natividad] drove a Lincoln to a gas station near the intersection of 63rd and Vine Street in the city and county of Philadelphia. Another individual named Byron Price was in the car with [Natividad]. [Natividad]parked the car and got out. [Natividad] approached the decedent, Robert Campbell, who had been standing near a gas pump. [Natividad] produced a handgun that had been concealed on his person and at point of gun attempted to take Campbell's possessions.
>
> [Natividad] discharged his handgun striking Mr. Campbell in the head and cause a death. [Natividad] acted with malice that that is an extreme indifference to the value of human life when he shot and killed Mr. Campbell, and did so while possessing a handgun with the intent to employ it criminally.
>
> Robert Campbell's remains were subsequently transferred to the offices of the medical examiner where he was formally pronounced and deceased. He was 49 years old at the time.

SUMF, ¶ 48. Again, Natividad affirmed that he heard the summary of facts, that he did not wish to make any corrections to it. Id. He pleaded guilty to murder of the third degree, violation of the Uniform Firearms Act, and possessing an instrument of crime. Id.

The court accepted Natividad's guilty pleas and entered verdicts of guilty on both criminal dockets. SUMF, ¶ 49. Members of Mr. Campbell's family attended the hearing and provided victim impact statements. Id. The court imposed the agreed-upon, aggregate sentence of twenty-

five to fifty years of imprisonment, calculated to run from March 17, 1997, the date of Plaintiff's arrest. Id. Plaintiff did not appeal or otherwise challenge his guilty plea. Id. As of the date of this filing, Plaintiff remains incarcerated.

Natividad initiated this lawsuit by filing a complaint on December 20, 2022. SUMF, ¶ 50. Notwithstanding his guilty plea, Plaintiff claimed that he was innocent and wrongly convicted. See, e.g., ECF 1, ¶ 1 ("On November 12, 1997, Plaintiff, Ricardo Natividad, was wrongfully convicted and sentenced to death for a crime he did not commit."). Natividad named as defendants Detectives Raley, Mee, and Dougherty, the City of Philadelphia, and former prosecutors Richard Sax and Charles Gallagher. Id.

The Honorable Eduardo C. Robreno denied Defendants' motion to dismiss Plaintiff's claims as barred by Heck, reasoning that the facts before the court were "indistinguishable" from the court's decision in Dennis v. City of Philadelphia, 379 F. Supp. 3d 420, 430 (E.D. Pa. 2019). SUMF, ¶ 51.

Plaintiff testified under oath at his deposition that he is innocent and that he lied when he pleaded guilty before the Court of Common Pleas in 2022. SUMF, ¶ 52.

In the operative Second Amended Complaint, Plaintiff's alleged facts recount the "Maculla" note and the Robinson statements discussed above. ECF 33, ¶¶ 14–67. On the basis of those allegations, Plaintiff brings three counts: Count I asserts the individual defendants violated Plaintiff's due process rights under the Fourteenth Amendment by fabricating and concealing evidence. ECF 33, ¶¶ 82–92. Count II alleges civil rights conspiracy against the individual defendants. Id. ¶¶ 99–106. Count III asserted a municipal liability claim against the City. Id. ¶¶ 99–106.

For the reasons that follow, Defendants are entitled to judgment in their favor.

## III. STANDARD OF REVIEW

The Court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. Id. All inferences must be drawn and all doubts resolved in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

On a motion for summary judgment, the moving party bears the initial burden of identifying these portions of the record that it believes demonstrate the absence of material fact disputes. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the moving party and may not rest on mere denials. Id. at 321, n.3; First Natl. Bank of Pa. v. Lincoln Natl. Life Ins. Co., 824 F.2d 277, 282 (3d Cir. 1987).

In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, the non-moving party must, by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." Celotex, 477 U.S. at 322-24. The non-moving party must adduce more than a mere scintilla of evidence in its favor to defeat the moving party's summary judgment motion. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989). Although all justifiable inferences must be drawn in favor of the non-moving party, the "moving party is entitled to

summary judgment where no reasonable resolution of conflicting evidence and inferences therefrom could result in a judgment for the non-moving party." Schwartz v. Hospital of Univ. of Pa., 1993 WL 153810 at *2 (E.D. Pa. May 7, 1993) (internal cite omitted). Furthermore, the "[p]laintiff cannot simply reassert factually unsupported allegations in its pleadings." Poles v. St. Joseph's Univ., 1995 WL 542246 at *5 (E.D. Pa. Sept. 11, 1995) (citing Celotex, 477 U.S. at 325). Instead, the plaintiff "must present affirmative evidence in order to defeat [a] properly supported motion for [summary] judgment." Id.

## IV. ARGUMENT

### A. Plaintiff's claims are barred under Heck pursuant to his guilty plea.

Defendants recognize that Judge Robreno declined to dismiss Plaintiff's claims pursuant to Heck at the motion to dismiss stage. ECF 18, n.3. However, the record developed in discovery provides ample reason to distinguish the case upon which Judge Robreno relied, Dennis v. City of Philadelphia, 379 F. Supp. 3d 420, 430 (E.D. Pa. 2019). Because Plaintiff's claims squarely undermine the guilty plea he entered into in the Court of Common Pleas of Pennsylvania, they are barred.

The Supreme Court explained in Heck that "an action seeking damages for an unconstitutional . . . conviction or imprisonment under section 1983 is not cognizable if a judgment in favor of the plaintiff would necessarily imply the invalidity of a conviction or sentence." Curry v. Yachera, 835 F.3d 373, 377-378 (3d Cir. 2016) (granting motion to dismiss section 1983 suit based on Heck). This rule exists to promote "finality and consistency," and because "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." Id. at 378.

Courts in this jurisdiction have considered the application of Heck in the context of what are colloquially referred to as "two-conviction cases." Dennis v. City of Philadelphia, 379 F. Supp. 3d 420 (E.D. Pa. 2019) (Robreno, J.); Gladden v. City of Philadelphia, No. 21-4986, 2022 WL 605445 (E.D. Pa. Feb. 28, 2022) (Kearny, J.). Dennis's first-degree murder conviction was vacated pursuant to a grant of habeas relief. He returned to state court and entered into a no contest plea to third-degree murder. Id. at 426. The Dennis opinion does not reveal whether the Court conducted a guilty plea colloquy or whether Dennis acknowledged his guilt to a specific set of facts. In determining that Heck did not bar Dennis's claims of fabrication and deliberate deception, Judge Robreno reasoned, "if a plaintiff brings a § 1983 claim *that does not depend upon his ultimate guilt or innocence of the underlying conviction*, it does not matter even if after the first criminal conviction is vacated, he is convicted a second time for the same conduct." Id. at 430 (emphasis added).

Here, Plaintiff's theory of relief depends on demonstrating his innocence. ECF 33, ¶ 1 ("On November 12, 1997, Plaintiff, Ricardo Natividad, was wrongfully convicted and sentenced to death for a crime he did not commit. On August 24, 2021, almost 24 years later, the Honorable Cynthia M. Rufe, vacated the conviction, finding that constitutional violations by police detectives and Assistant District Attorneys had undermined the fairness of Plaintiff's trial and the validity of the jury's verdict."). Granting Plaintiff the relief he seeks in this case would necessarily undermine the guilty plea he entered into, in which he accepted responsibility for robbing Mr. Havens of his car at gunpoint and murdering Mr. Campbell by shooting him in the head during the course of a robbery. For example, one of Plaintiff's fabrication claims is that the detectives coerced Byron Price into identifying the gun they believed Plaintiff used to murder Mr. Campbell. But Plaintiff

cannot claim—without undermining his extant convictions in state court—that he did not possess a gun and that he did not use a gun to murder Mr. Campbell.

In sum, Plaintiff pleaded guilty to a detailed recitation of the facts of both offenses. Plaintiff could have challenged his guilty plea by filing an appeal in the Pennsylvania appellate courts. He elected not to do so and remains convicted of those offense. Accordingly, because Plaintiff has chosen to proceed with a civil rights action in federal court that directly calls into question his guilt of the offenses to which he remains legally guilty, his claims are necessarily barred under Heck.

**B. Summary Judgment is appropriate as to Defendants, Dougherty, Raley, and Mee because Plaintiff has failed to adduce any evidence they fabricated or concealed any evidence or participated in a conspiracy to do the same.**

Count I of Plaintiff's Second Amended Complaint alleges the detectives violated Plaintiff's Due Process rights by fabricating and concealing evidence.

i. Fabrication

Plaintiff claims the detectives fabricated evidence by:

> a) hiding witness statements, b) coaching and intimidating cooperating witness Byron Price to cooperate against Plaintiff for consideration, and c) the intimidation to dissuade exculpatory witness, McCullough, from cooperating with Plaintiff's PCRA counsel – violated Plaintiff's right to due process of law and a fair trial.

ECF 33, ¶ 45.

To prove a violation of the Fourteenth Amendment based on a fabrication of evidence claim, Plaintiff is required to prove he was convicted at trial at which the prosecution used fabricated evidence and that "there is a reasonable likelihood that, without the use of that evidence, [he] would not have been convicted." Halsey v. Pfeiffer, 750 F.3d 273, 294 (3d Cir. 2014). Moreover, to survive a summary judgment motion on a fabrication claim, a plaintiff must "demonstrate that the record supports a conclusion that the allegedly fabricated evidence was ***so***

***significant*** that it could have affected the outcome of the criminal case." Id. at 295 (emphasis added). Plaintiff's specific attempts to prove fabrication fail.

***Byron Price's testimony with respect to the caliber of the gun.***

Plaintiff claims the individual detectives coerced Mr. Price and Mr. Golatt into saying he had a .357 caliber handgun instead of a .38 caliber handgun. ECF 33, ¶¶ 12–13, 48. But the trial record makes clear that Mr. Price made that claim to the jury, the jury heard that Mr. Price's statement actually identified the gun as a .38, and the jury convicted Natividad of murder anyway. Likewise, Mr. Golatt clarified in his trial testimony that Natividad told him he used a .357 handgun to murder Mr. Campbell. Accordingly, the trial court record establishes that there was no fabrication of evidence and the claim would not have altered the outcome of the trial in any event.

***The evidence demonstrating Plaintiff stole a car from Michael Havens.***

Plaintiff claims "All defendants manufactured a story whereby Plaintiff was alleged to have stolen a two-door Lincoln Continental from Michael Havens in the early hours of November 9, 1996. ECF 33, ¶ 45. Mr. Havens identified Plaintiff in a photo array as the person who stole his car at gunpoint and threatened to murder him. Plaintiff makes no specific allegation—and has adduced no evidence—that the police did anything to "fabricate" Mr. Havens' statements. His reference to the statement of Beth Johnson, who told the detective the shooter got into a four-door car, is not sufficient to prove fabrication.

***Detective Dougherty's investigation during the PCRA proceeding.***

Plaintiff claims Detective Dougherty "fabricated" evidence with respect to McCullough at the PCRA stage in 2016. ECF 33, ¶ 38. The record from the PCRA proceeding refutes the claim. McCullough and Detective Dougherty both testified and were subject to cross examination. At the conclusion of the hearing, the PCRA court credited Detective Dougherty's testimony and

discredited McCullough's. Plaintiff has adduced no evidence to call PCRA court's credibility determinations into question.

Accordingly, Plaintiff cannot prove that the outcome of his criminal proceedings would have been different but for the supposedly fabricated evidence. Halsey, 750 F.3d at 294.

ii. Concealment

Plaintiff relies on the evidence the federal district court considered when it granted habeas relief based to assert Brady claims against Detectives Dougherty, Raley, and Mee. Those consist of the "Maculla" note and the Robinson files. Judge Rufe found "[t]he Philadelphia Police Department gathered evidence that was unmistakably favorable to Natividad, but the prosecutor failed to uphold its duty to disclose the evidence to Natividad's trial counsel." Natividad v. Beard, No. CV 08-449, 2021 WL 3737201, at *14.

Plaintiff has adduced no evidence in discovery that would call into question Judge Rufe's assessment that the police gathered the favorable evidence, turned it over to the prosecution, which in turn did not turn it over to Natividad. Detective Dougherty wrote the Maculla note in 1996. He and his fellow detectives took the witness statements and recorded the activity sheets that consist of the Robinson files. Those records were disclosed to Natividad by the District Attorney's Office ("DAO") in 2012 and 2014 respectively. The fact Maculla note or the Robinson files were disclosed by the DAO more than fifteen years after the conclusion of Natividad's trial supports the inference that the Detectives Dougherty, Raley, and Mee disclosed those records to the prosecution, consistent with their legal obligations. Plaintiff has not adduced any evidence suggesting that Detectives Dougherty, Raley, and Mee withheld any evidence from the prosecution.

iii. Conspiracy

Plaintiff's conspiracy claim, Count II of his Second Amended Complaint, fails for the same reasons. The Third Circuit has explained:

> The elements of a claim of conspiracy to violate federal civil rights are that (1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States, with the added gloss under § 1983 that the conspirators act under the color of state law.

Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 294 (3d Cir. 2018) (quotations omitted).

Here, Plaintiff has failed to adduce any evidence of a conspiracy or that any of the Defendant Detectives engaged in an overt act in furtherance of it. Indeed, the only reason Plaintiff obtained relief on habeas review in 2021 was because the detectives documented evidence regarding John McCullough and Robinson and caused those records to be preserved for more than a decade, where they were discovered by the District Attorney's Office's search of its files. True conspirators would destroyed this evidence. Plainly, Plaintiff may not obtain monetary damages from the defendant detectives who permitted him to obtain habeas relief in federal court.

Accordingly, because Plaintiff has adduced no evidence of fabrication or concealment, the Defendant Detectives are entitled to judgment in their favor as to Counts I and II of his Second Amended Complaint.

**C. Defendants, Dougherty, Raley, and Mee are entitled to qualified immunity with respect to Plaintiff's claims of Brady violations.**

Qualified immunity shields public officials from liability unless it is "beyond debate" that the federal right they allegedly violated was "clearly established at the time of the challenged conduct." See George v. Rehiel, 738 F.3d 562, 579 (3d Cir. 2013). A right only qualifies as clearly established if its "contours . . . are sufficiently clear that every reasonable official would have

understood that what he is doing violates that right." See Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011) (citations and quotations omitted). And thus conversely, "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009). And critically, a right must be clearly established "in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (further explaining that courts must "not define clearly established law at a high level of generality" but rather must ask "whether the violative nature of the *particular* conduct is clearly established") (emphasis in original).

The attachment of Brady disclosure obligations to police officers was not clearly established until 2005. Although not explicitly labeled as such, Count I of Plaintiff's Second Amended Complaint alleges a Brady violation (*i.e.*, that Detectives Dougherty, Raley, and Mee withheld material exculpatory evidence from Natividad). Because this right was not clearly established when Plaintiff was prosecuted in 1997, Detectives Dougherty, Raley, and Mee are entitled to qualified immunity and judgment in their favor as to this claim.

The attachment of Brady obligations to police officers was not clearly established until 2005, when the Third Circuit Court of Appeals issued its decision in Gibson v. Superintendent of New Jersey Dep't of Law & Public Safety – Division of Police, 411 F.3d 427, 443 (3d Cir. 2005). Because that right was not established until eight years after Plaintiff's criminal prosecution, the detectives are entitled to qualified immunity and this claim should be dismissed. Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 384-86 (E.D. Pa. 2018); Gilyard v. Dusak, No. 16-2986, 2018 WL 2144183, at *4-5 (E.D. Pa. May 8, 2018); Berry v. City of Philadelphia, No. 19-3699, ECF No. 11 (Nov. 12, 2019); see, e.g., Lewis v. City of Philadelphia, No. 19-2847, 2020 WL 1683451, at *9 (E.D Pa. Apr. 6, 2020) (holding that the detective defendants were entitled to

qualified immunity because their "duty to turn over the exculpatory evidence was not clearly established until 2005"); Outlaw v. City of Phila., No. 21-cv-1290, 2021 WL 3471168, *6 (E.D. Pa. Aug. 6, 2021) (holding that constitutionality of detectives' conduct in withholding exculpatory evidence was not "beyond debate" in 2004); Ogrod v. City of Phila., No. 21-cv-2499, 2022 WL 1093128, at *8 (E.D. Pa. Apr. 12, 2022) ("[T]he individual Defendants' duty under the due process clause and Brady to disclose exculpatory evidence was not clearly established in 1996").

Accordingly, the Defendant Detectives are entitled to qualified immunity with respect to Plaintiff's Brady claim. They are entitled to summary judgment of extent Count II to the extent it proceeds on that theory.

**D. The City is entitled to summary judgment as to Plaintiff's Monell claim.**

A municipality "may not be sued under [42 U.S.C.] § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). Rather, "it is when execution of a government's policy . . . inflicts the injury that the government as an entity is responsible under § 1983." Id.; see also Mulholland v. Gov't Cnty. of Berks, Pa., 706 F.3d 227, 237 (3d Cir. 2013) (holding that § 1983 does not permit a municipality to be held vicariously liable for the acts of its employees). To prevail against the City in a § 1983 claim, a plaintiff must demonstrate that (1) a constitutionally-protected right of his has been violated and (2) the alleged violation resulted from a municipal policy or custom that exhibits deliberate indifference to rights of citizens. Monell, 436 U.S. at 694-95.

Because Plaintiff does not identify any specific policy of the City, he must proceed on a theory that his constitutional injury was the result of a municipal custom. While "[c]ustom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law," Bielevicz v.

Dubinon, 915 F.2d 845, 850 (3d Cir.1990), the plaintiff must adduce proof that unconstitutional practices are "so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011). "Custom may be established by proof of knowledge and acquiescence." Fletcher v. O'Donnell, 867 F.2d 791, 793–94 (3d Cir. 1990).

A plaintiff must also prove that the municipal practice was the proximate cause of his alleged injuries. Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984). "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Bielevicz, 915 F.2d at 850–51.

Plaintiff claims his conviction was the result of the City's alleged:

> policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

ECF 33, ¶ 68. Plaintiff points to other cases, which supposedly demonstrate "Manipulation of Evidence," "Supplying Information to Witnesses and Witness Coercion," and "Concealing and/or suppressing exculpatory evidence." Id. ¶ 71.

Here, for the reasons discussed in the foregoing sections, Plaintiff has failed to adduce any evidence of constitutional injury attributable to the conduct of any City employee. Absent such evidence, his Monell claim fails.

Secondly, Plaintiff has not developed any evidence through discovery in this case that could establish the City had an unconstitutional custom. Plaintiff's reliance on the report of his police practices expert Timothy Dixon does not advance his case. Mr. Dixon apparently did not review records relating to the cases Plaintiff identified in his Second Amended Complaint at ECF

33 ¶ 71. Dixon Report, 9–12 (listing materials reviewed). His report includes no analysis of those cases. To the extent he refers to any other homicide cases that could have placed the City on notice of the alleged misconduct in this case, Mr. Dixon asserts in generalities that "[i]n *The Homicide Files*, there are over 100 cases of alleged misconduct involving Homicide Unit detectives. The allegations of misconduct range from ***rape and sexual assault of witnesses and informants***. Such behavior over the years should have caused great concern and a change of behavior and organizational culture." Dixon Report, 79 (emphasis added). These claims are conclusory, not supported by any analysis, and in no way similar to any conduct that occurred in Natividad's case. As such, Mr. Dixon's report identifies no evidence from which a jury could conclude the City was aware of earlier instances of police misconduct that occurred in Plaintiff's case and acquiesced to it. Fletcher, 867 F.2d at 793–94.

Moreover, Mr. Dixon's specific claims about this case are belied by the record, and/or irrelevant. He asserts the individual Defendant Detectives withheld the Mcculla note and the Robinson files. As discussed above, Plaintiff has adduced no evidence to support that claim.

Mr. Dixon also advances entirely new theories of alleged misconduct. For example on page 73 of his report, he claims Detective Dougherty improperly omitted evidence from the affidavit of probable cause seeking an arrest warrant for Plaintiff. Dixon Report, 73. This claim is not relevant to Plaintiff's assertions of fabrication and concealment. ECF 33, ¶¶ 83.

Mr. Dixon asserts the PPD had a custom of not recording interviews with audio or video technology. Dixon Report, 75. Again, this is a new claim that is nowhere found in Plaintiff's Second Amended Complaint. In any event, Mr. Dixon makes no effort to explain how the existence of audio or video recording of witness interviews in Natividad's case could have resulted in a different outcome. See Dixon Report, 75 ("Had Philadelphia PD followed generally accepted

policing practices of audio and/or video recording interviews and interrogations this behavior may have been prevented."). His assertion is entirely speculative. Accordingly, Mr. Dixon's report does not establish that the City had a custom of violating constitutional rights.

Finally, Plaintiff cannot meet his burden of proving "a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Bielevicz, 915 F.2d at 850–51. Plaintiff pleaded guilty to third degree murder, was sentenced to a term of twenty-five to fifty years of imprisonment, and remains incarcerated. Thus, any period of confinement he has experienced as a result of murdering Mr. Campbell is attributable to his own criminal conduct, for which he pleaded guilty plea and not attributable to the Defendant Detectives or any other municipal employee.

To the extent Plaintiff would claim that the constitutional violations he asserts resulted in his death sentence, that claim would be entirely speculative. Plaintiff pleaded guilty to robbing Mr. Havens at gunpoint and murdering Mr. Campbell by shooting him in the head with a gun. The jury found two aggravating circumstances: that the killing occurred while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and that Natividad had a significant history of felony convictions involving the use or threat of violence, id. § 9711(d)(9). Those factual predicates would have been established by the facts to which Plaintiff pleaded guilty and in no way depended on the evidence he claims the detectives coerced or withheld. Any argument to the contrary would be speculative and cannot be relied upon in opposition to summary judgment. See Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995) (non-movant in the face of summary judgment motion "must point to concrete evidence in the record;" mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment).

Accordingly, Plaintiff has identified no evidence to support his claim that his alleged injuries were the result of a municipal policy. The City is therefore entitled to judgment in its favor with respect to Plaintiff's Monell claim.

## V. CONCLUSION

For the reasons set forth herein, Defendants, the City of Philadelphia, Detectives Dougherty, Raley, and Mee, request that this Court grant summary judgment and dismiss Plaintiff's claims against them with prejudice.

Respectfully submitted:

Date: April 7, 2025

/s/ *Benjamin T. Jackal*
Benjamin T. Jackal
Deputy City Solicitor
Attorney Identification No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
(215) 683-5434
ben.jackal@phila.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICARDO NATIVIDAD,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DETECTIVE PAUL RALEY, et al.,**<br><br>**Defendants.** | **CIVIL ACTION**<br>**No. 22-cv-5061-GJP** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS OF DEFENDANTS, DETECTIVE PAUL RALEY, DETECTIVE JAMES DOUGHERTY, DETECTIVE ARTHUR MEE, AND THE CITY OF PHILADLEPHIA**

1. Michael Havens testified that at around 2:00 a.m. on November 9, 1996, Michael Havens stopped for a sandwich at Philly's Famous Cheesesteaks at the intersection of Island and Elmwood Avenues in Philadelphia. N.T. 11/5/97, 146, attached hereto as Exhibit 1. Mr. Havens bought his sandwich and was returning to his car, a dark blue 1989 Lincoln he had recently purchased. Id. at 146. As he unlocked the car, two men—one of whom Mr. Havens later identified as Plaintiff, Ricardo Natividad—approached him. Id. at 148–49. Plaintiff pulled out a gun. Mr. Havens surrendered his wallet and keys. Natividad told Mr. Havens to get in the car. When Mr. Havens hesitated, Natividad said, "get the fuck in the car or we'll kill you right here." Id. at 149.

2. Michael Havens testified Natividad shoved Mr. Havens in the back of the car and got in the front passenger's seat, while his coconspirator drove off. Exh. 1, 149–50. For the next fifteen to twenty minutes, Natividad repeatedly threatened to shoot Mr. Havens while demanding money from him. Id. at 150–54. Mr. Havens gave Natividad and his accomplice the cash from his pocket and begged to be released from the vehicle. Id. at 152. Natividad requested Mr. Havens' ATM card and that Mr. Havens access the account to get them additional funds. Id. Mr. Havens

responded that there was no money in the account as he had just paid bills. Id. Natividad continued to threaten Mr. Havens with the gun. Id. Natividad faced Mr. Havens throughout the time they were in the car. Id. at 154. The car's interior light was on. Id. The driver told Natividad to "waste this white mother fucker." Id. at 152. Plaintiff responded "okay, find a dark spot so I can kill him." Id. Natividad asked Mr. Havens if he was ready to die. Id. at 152.

3. Michael Havens testified the men pulled the car into a dark area on the side of the road. Natividad ordered Mr. Havens out of the car and told him to lie on the ground. Exh. 1, 153. Mr. Havens covered his head with his hands because he thought he was about to die. Id. Natividad repeatedly said, "are you ready to die, you white mother f'er [*sic*]." Id. Mr. Havens then heard the car "peel out" and his assailants were gone. Id. Mr. Havens ran to a nearby Wawa and called the police. Id. at 154.

4. Byron Price testified that at 7:00 p.m. that evening, Natividad picked up his friend, Mr. Price, at a store at 60th and Catherine Streets in Philadelphia. N.T. 11/6/97, 7–8, attached hereto as Exhibit 2. Natividad was driving a Lincoln, which Mr. Price had never seen him drive before. Id. at 8. Natividad and Mr. Price had plans to watch a boxing match. Id. at 9. Mr. Price sat in the passenger seat as Natividad drove. Id. at 10. Natividad pulled the car into an Exxon gas station at the intersection of 63rd and Vine Streets and told Mr. Price to wait in the car. Id. at 9. Mr. Price heard a gunshot. Id. He saw that a man who had been standing nearby was lying on the ground. Id. at 13. Natividad came running back to the car holding a chrome revolver in his hands. Id. at 9, 13. Natividad turned the car around and drove south down 63rd Street toward Market Street. Id. at 14. Mr. Price asked Natividad why he shot the man, Natividad replied "He drew on me." Id. at 15.

5. Martin and Beth Johnson testified that they lived on the northeast corner of 63rd and Vine Streets, across the intersection from the Exxon gas station. Exh. 2, 77, 94. At around 9:40 p.m., they were leaving their house when they heard a gunshot. Id. at 78, 94.

6. Martin Johnson testified that he looked toward the gas station and saw a man falling backwards with his hands in the air. Exh. 2, 78. At the same time, he saw a man run between the pumps, get into the driver's side of a black or dark blue car. Id. The shooter was wearing a big lumberjack style plaid jacket. Id. at 85. The car turned around and sped south on 63rd Street toward Market Street. Id. at 78. Mr. Johnson thought the assailants' car looked like a Lincoln because he saw that it had a distinctive tire well with the license plate inset into it. Id. at 82. He could not see the license plate. Id. Mr. Johnson approached the gas station. Id. at 78. He saw the victim, who was later identified as Robert Campbell, a white man, lying next to a yellow Cadillac. Id. The victim had been shot on the side of face. Id. Blood was coming out of the back of his head. Id. Mr. Johnson observed that Mr. Campbell had a gun in a holster that was snapped shut. Id. at 84. The gas cap was off of the Cadillac, and Mr. Campbell's keys lay on the ground nearby. Id. at 83.

7. Beth Johnson testified that she looked toward the sound of the gunshot and saw the shooter lifted his hand and the victim fall backwards with his hands raised. Exh. 2, 94. The shooter appeared to be wearing a red plaid lumberjack jacket. Id. at 95. The shooter had darker skin than the victim. Id. He got into his car, which was facing north. Id. at 98. The car turned around and travelled south on 63rd Street. Id. The bulb on the license plate of the shooter's car was out. Id. at 99.

8. Evidence was introduced at trial establishing that on November 11, 1996, Philadelphia police recovered a dark blue Lincoln that had been abandoned and set on fire. Exh.

1, 197. From the trunk of the car, the police recovered a lumberjack style jacket. Id. Mr. Havens identified the burnt Lincoln as the car appellant had stolen from him at gunpoint on the morning of November 9, 1996. Id. at 157. Mr. Havens also identified the jacket recovered from the trunk of the car as his own jacket that he had left in the car at the time of the robbery. Id.

9. Detective James Dougherty was assigned to investigate the murder. In the following weeks, he and his fellow detectives obtained numerous witness statements regarding the murder. Natividad made statements to several of his acquaintances taking credit for having shot the man at the Exxon station. Exh. 2, N.T. 11/6/97, 156, 163, 182.

10. On December 23, 1996, Detective Arthur Mee took a statement from Carl Anthony Harris. Harris Statement, attached as Exhibit 5. Mr. Harris testified at trial that Natividad approached Mr. Harris while he was washing his car with Keith Smith. Exh. 2, N.T. 11/6/97, 107. Mr. Harris testified that he observed Mr. Smith and Natividad engage in a conversation, out of his hearing, and then walk around the corner from where Mr. Harris was standing. Id. at 110. When Mr. Smith returned after parting from appellant, Mr. Smith had in his possession a chrome .357–Magnum firearm. Id. at 114.

11. Evidence was introduced at trial establishing that sometime in December of 1996, Mr. Smith gave a .357 revolver to his attorney, Mr. Spina. N.T. 11/7/97, attached hereto as Exhibit 3, 15. Attorney Spina immediately notified Philadelphia homicide detectives that he had the gun in his possession. Id. at 16. Homicide detectives, including Defendant Detective Arthur Mee, recovered the revolver from Mr. Spina's office and turned it over to the Philadelphia crime lab for testing. Id. at 15–17, 20–21.

12. In December 1996, Detective Dougherty obtained an arrest warrant for Natividad. Exh. 3, N.T. 11/7/97, 128; Affidavit of Probable Cause, attached hereto as Exhibit 6.

13. It was not until March 17, 1997, that Natividad was apprehended. Deposition of Plaintiff Ricardo Natividad, attached hereto as Exhibit 7, 120. Natividad admitted in his deposition that he learned he was wanted for murder and left Pennsylvania to avoid being captured. Id. 118–19.

14. During Natividad's flight from apprehension, on February 2, 1997, Byron Price reported to the police that Natividad's uncle, Genardo McIlwain, assaulted him. McIlwain Arrest Records, attached hereto as Exhibit 8, at CITY 1465–67. McIlwain punched Mr. Price in the face. He told Mr. Price that every time he sees him, they're going to fight because Mr. Price witnessed "nephew killing somebody." Id. at CITY 1494–96. Based on Mr. Price's statement, police obtained a warrant to arrest McIlwain for assault and witness intimidation. Id. at 1516–22.

15. Mr. Havens testified that, following Natividad's arrest on March 17, 1997, Mr. Havens, the victim of the robbery of the Lincoln, came to the police station to view a photographic array. Exh. 1. N.T. 11/5/97, 173. Upon viewing the array, Mr. Havens positively identified a photograph of Natividad. Id.

16. The two indictments, charging Natividad with the robbery of Mr. Havens and the murder of Mr. Campbell, were consolidated and Natividad proceeded to a jury trial in November 1997. The medical examiner testified that the results of forensic and pathology reports revealed that Mr. Campbell had been shot in the head at a distance of at least two feet causing his immediate death. Exh. 1., N.T. 11/5/97, 230. The fatal wound was consistent with the type of injury caused by a .357 Magnum firearm. Id. at 232. The .357 caliber handgun obtained by police from the office of Mr. Spina had been fired prior to being handed over to the police. Exh. 3, N.T. 11/7/97, 41–42. Mr. Havens identified the gun recovered from Mr. Spina's office as identical to the gun held on him by appellant during the robbery of his motor vehicle. Exh. 1, N.T. 11/5/97, 170. Mr.

Price identified the gun appellant possessed after shooting Mr. Campbell as similar in appearance to the gun Mr. Spina delivered to the Philadelphia police. Exh. 2, N.T. 11/6/97, 13.

17. Mr. Price was subjected to extensive cross-examination regarding the circumstances of his statements to the police. Exh. 2, N.T. 11/6/97, 37–67. He testified on cross examination that he was mistaken when he told the police Natividad's gun was a chrome revolver that "looked like a .38." Id. at 66. Mr. Price testified that Detective Dougherty told him the gun was a .357 and that he did not say the gun had black grips on it. Id. at 66–67. Notwithstanding Mr. Price's testimony that Detective Dougherty told him the gun was a .357, Mr. Price's recorded statement said he saw Natividad holding a .38. Id. at 75.

18. Robert Golatt testified that Natividad admitted to him that he murdered the victim with a .357 magnum. Exh. 2, N.T. 11/6/97, 165. When asked on cross examination whether the police told him about the gun, Mr. Golatt testified "yeah." Id. at 171. On redirect, he was impeached with his statement to Detective Raley, which contained his statement that Natividad told him he murdered the victim with a .357 magnum:

> Q: Were you asked did Rick or Byron tell you what kind of gun he had the night of the shooting? Answer: Yeah. When Rick told me that he shot the guy, I asked him if he shot the guy with the .25 automatic. He said no. He said he had a chrome .357. Did you give that answer?
>
> A: Yes.
>
> Q: And is that from what Rick told you the night before talking to homicide?
>
> A: Yes.

Id. at 175–76.

19. On November 10, 1997, a jury convicted Natividad of first degree murder for the death of Robert Campbell, 18 Pa.C.S. § 2502(a); carrying a firearm on a public street, id. § 6108; two counts of possession of an instrument of crime, id. § 907; two counts of robbery, id. § 3701;

one count of robbery of a motor vehicle, id. § 3702; kidnapping, id. § 2901; and criminal conspiracy, id. § 903. Commonwealth v. Natividad, 200 A.3d 11, 16 (Pa. 2019).

20. At the penalty phase, the jury found two aggravating circumstances: that the killing occurred while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and that Natividad had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9). Commonwealth v. Natividad, 938 A.2d 310, 319–20 (Pa. 2007). The jury found one mitigating circumstance, the life history of the defendant, id. § 9711(e)(8). Id. The jury determined that the aggravating circumstances outweighed the mitigating circumstance and returned a verdict of death, which the court imposed. Id.

21. In 2001, the Pennsylvania Supreme Court affirmed Plaintiff's judgments of sentence. Commonwealth v. Natividad, 773 A.2d 167, 181 (Pa. 2001).

22. On November 25, 2002, Natividad filed a *pro se* petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541, *et seq.* Commonwealth v. Natividad, 200 A.3d 11, 16–17 (Pa. 2019). Counsel was appointed and filed an amended petition, raising claims of ineffective assistance of trial counsel, trial court error, and prosecutorial misconduct. Id. The PCRA court held an evidentiary hearing, at the conclusion of which it denied Plaintiff's petition. Id. The Pennsylvania Supreme Court affirmed the order denying PCRA relief on December 27, 2007. Commonwealth v. Natividad, 938 A.2d 310 (Pa. 2007).

23. On March 11, 2008, Natividad filed a second PCRA petition, alleging his PCRA counsel's ineffectiveness. Commonwealth v. Natividad, 200 A.3d 11, 17 (Pa. 2019). On November 14, 2011, the PCRA court dismissed the second petition as untimely. Id. Natividad did not appeal. Id.

24. On June 27, 2008, Natividad filed a petition for a writ of habeas corpus before the Honorable Cynthia M. Rufe in the United States District Court for the Eastern District of Pennsylvania, docketed at Natividad v. Beard, No. 08-cv-0449 (E.D. Pa.). Natividad, 200 A.3d at 17. As part of that litigation, Natividad sought discovery from the Commonwealth. Id.

25. On August 19, 2011, the federal court ordered the Commonwealth to produce some discovery but denied Natividad's request for access to the entire trial and investigatory files in the possession of the Commonwealth and the police. Natividad, 200 A.3d at 17. In response, the Commonwealth turned over more than 200 pages of documents to Natividad on March 6, 2012. Id. Among those disclosed documents was a paper with handwritten notations, including:


5635 BELMAR
727-8853 JOHN "MACULLA" B/M 40'S 5'11" STOCKY, HAM
TOLD MANAGER ON SUNDAY
THAT HE WAS ON LOT + SAW INCIDENT
PERCY GILBERT — MANAGER OF EXON
729-0476
5914 WINDSOR AVE.
LOUIS GLENN
1-800-225-0256
EXT. 26110
6024 VINE
215-472-0160
7 x 3
? JOE MCCLELLAN
TOWN WATCH

"Maculla" note, attached hereto as Exhibit 9.

26. On June 13, 2012, an investigator hired by Natividad's counsel interviewed a "John McCullough." Natividad, 200 A.3d at 17. On July 19, 2012, McCullough signed a declaration in which he asserted the following under penalty of perjury:

> 10. One day in 1996, I was driving to a laundromat on 63rd Street in West Philly. I was working as a security guard at another laundromat at 60th and Cedar and had been offered part time work at the one at 63rd and Vine. That

day, my 14 year old son and I had stopped by a funeral home at 63rd and Oxford. On the way home, we stopped by the laundromat at the Exxon gas station on 63rd Street.

11. I parked my car and just as we got out of the car, I noticed three men about three cars away. One guy was tall and light skinned. He was the victim. There were two darker skinned guys there. One guy was facing the victim and had his hands on the victim's shirt. There was another guy standing to the side with a gun. I froze in my tracks so as not to draw attention to myself or my son. I stood there looking at the three men for what seemed like one and a half minutes.

12. All of a sudden, the victim pushed the guy in front of him away and I heard one or more gunshots. I then saw the two darker guys run toward an already running car. The car was dark colored.

13. After the shooting, the police came to the laundromat and I told them what I saw. At first the police were suspicious of me because I was standing so close to the crime, but did not get hurt. I was asked if I knew either of the two dark skinned men, but I said that I did not. They seemed to imply that I must have known them or else I would have been shot, too. After a while, my son and I were taken to 55th and Pine to give a statement. We sat in a hallway at the station waiting to talk to a detective. As we were waiting, we started talking to a man and woman who saw the incident and were waiting to talk to the detectives too.

14. I talked to a detective at 55th and Pine and signed a 2½ page written statement about what I saw.

15. Sometime after the incident on 63rd Street, I became ill with a heart problem. Because of this illness, I left Philadelphia for a while to visit my sister in Virginia. While I was in Virginia, I received a long distance telephone call from a neighbor who said that there had been what looked like policemen coming by my house on Belmar Terrace. I called and left a message for the police telling them where I was. I received a return call from the police and, after I explained that I was ill and would return home after I recuperated, the policeman said they would wait until I returned.

16. When I returned to Philadelphia, some police came by my house. They asked me if I had spoken to anyone about what I saw that night. I replied that I had been in Virginia and had not spoken to anyone. They told me that they had "got the guy" and that they were "looking for the second guy." They said that they took care of everything and did not need me.

17. I used to work for the Greater Philadelphia Urban Affairs Coalition running summer programs for at risk youths. During one summer, [Natividad] was

> in my programs. I got to know him and would recognize him if I saw him. Only recently did I find out that [Natividad] was in prison for committing the killing I saw.
>
> 18. [Natividad] was not one of the two men that I saw with the victim at the laundromat at 63rd and Vine Street[s].

Declaration of John McCullough, attached hereto as Exhibit 10.

27. On August 9, 2012, Natividad filed a third PCRA petition, alleging the prosecution failed to turn over the "Maculla" note and the statement McCullough claimed he gave to a detective, in violation of Brady. Natividad, 200 A.3d at 18. He alleged this newly discovered evidence satisfied the PCRA's time bar exceptions for governmental interference and after discovered evidence. 42 Pa.C.S. § 9545(b)(1)(i), (ii). Natividad, 200 A.3d at 18.

28. While Natividad's PCRA petition was pending in the PCRA court, he filed a supplemental discovery motion in federal court pursuant to his pending habeas petition, seeking access to the complete trial and investigatory files of the Commonwealth and the police. Natividad, 200 A.3d at 20. On July 9, 2014, the federal court granted Natividad's request, and the Commonwealth made additional files available to Natividad on August 7, 2014. Id.

29. This production of documents yielded various documents implicating Ricardo Robinson as the murderer of Robert Campbell. Natividad, 200 A.3d at 20. For example, detectives took the statements of Joseph Rutherford, Cynthia Smith, and Rolston Ricardo Robinson five days after the murder on November 14, 1996. See Statements of Joseph Rutherford, attached hereto as Exhibit 11; Statement of Cynthia Smith, attached hereto as Exhibit 12, Statement of Rolston Ricardo Robinson, attached hereto as Exhibit 13. Rutherford and Smith described Robinson's drug dealing activity, his threatening behavior, and stated they heard Robinson say he had murdered Mr. Campbell. See Exh. 11, Rutherford Statement, 4 (asserting Robinson said he would "do [Rutherford] like he did Bob down at the gas station."); Exh. 12, Smith Statement, 3, 4 (telling

Defendant Detective Arthur Mee that Robinson said in reference to the murder of Mr. Campbell "Yeah — I did it," that's what happens to snitches," and that he "had to teach somebody a lesson."). Robinson claimed he drove past the scene of the murder on November 9, 1996, where he saw police at the gas station and a man lying on the ground. Exh. 13, Robinson Statement, .

30. Officer Rita Wilson described in a statement that she responded to the dispute between Rutherford and Robinson at the bar on 66th and Lebanon Streets. Natividad, 200 A.3d at 21. She noted Rutherford told her that "Rob" had stated "we're going to do to you what we did to the guy at 63rd and Vine." Id. Officer Shane Darden gave a statement explaining that Rutherford told him Robinson had been telling people he "was there when Campbell was shot" and that he had seen a gun and handcuffs in the victim's belt. Officer Darden Statement, attached hereto as Exhibit 14.

31. Detective Dougherty's police activity sheet from dated November 13, 1996, also referenced Robinson:

> The assigned was contacted by a retired Detective who related that he had been contacted by an old informant who related that persons in 929 Wynnewood Rd. may have information as to the identity of the perpetrator and that he may be named ROB and was a Jamaican male. Det. DiBlasi & the assigned set up a surveillance of this location and noted that a B/M left the location and drove away in a 1988 Acura painted gray. The license tag was checked thru [*sic*] BMV and it was registered to a RUPERT ROBINSON at [redacted]. This male fit the general description of the male called ROB. It was also noted that adults aged 20 to 40 both white and black were coming and going from this location. The Detectives stopped one of these persons and learned that ROB does operate the gray Acura and several persons in the location were upset with him over drug matters.

Activity Sheet, 11/13/96, 1, attached hereto as Exhibit 15.

32. On November 14, 1996, Tracie Durham gave a statement in which she said she did not know about the killing but "was told by [Rutherford] . . . that a guy name[d] Rob . . . did it." Durham Statement, attached hereto as Exhibit 16, 1. She said she was on a pay phone outside the

gas station around 9:50 p.m. on November 9, 1996, when she saw a car that "looked like Rob's silver Lexus and a gentleman that looked like Rob driving it." Id. She said she did not see the victim at the gas station. Id. at 2.

33. On November 12, 1996, Richard Anderson gave a statement to police in which he stated he heard from a woman named Tish that another man told her people who lived at "the house at [929 Wynnewood Road] . . . [and] call themselves the Junior Black Mafia had something to do with the shooting of Mr. Campbell." Anderson Statement, attached hereto as Exhibit 17, 3.

34. Also on November 12, 1996, Detective Dougherty took a statement from Trish Ann Ambrosine, in which she relayed rumors that people associated with two drug houses, who called themselves Junior Black Mafia, were responsible for murdering Mr. Campbell. Ambrosine Statement, attached hereto as Exhibit 18, 2.

35. Natividad amended his third PCRA petition to include an additional Brady claim based on these Robinson documents. Natividad, 200 A.3d at 22–23.

36. The PCRA court conducted an evidentiary hearing. On April 28, 2016, McCullough testified for Plaintiff. He said that on November 9, 1996, he was with his son, walking to 63rd and Vine Streets. N.T. 4/28/16, attached hereto as Exhibit 19, 18–19. As he was walking down 63rd Street approaching Vine, the gas station was on his right. Id. He heard one or two gunshots and ducked. Id. at 19. He saw two men run across the street and get into a car that sped away. Id. at 21, 47. McCullough testified that neither man was Natividad. Id. at 21. According to McCullough, officers took him and other witnesses to the police station at 55th and Pine Streets. Id. at 27. He was later taken to 8th and Race, where he gave a signed statement. Id. at 29. Detectives permitted him to take a copy of the statement he gave at 8th and Race with him but he

then misplaced it. Id. at 51. McCullough testified that he had been involved in town watch in 1996. Id. at 53.

37. On May 20, 2016, contrary to his father's statement, John McCullough, III, testified that he was eighteen years old in November 1996, that he was not with his father in the area of 63rd and Vine Streets on November 9, 1996, and that he did not witness a murder at that time and location. N.T. 5/20/16, attached hereto as Exhibit 20, 5–6. Mr. McCullough's father never told him that he witnessed a murder. Id. at 6. Mr. McCullough III was arrested for stealing copper, taken by Det. Dougherty from the 25th District to 8th and Race, and provided a statement. Id. at 9. He checked to make sure it was accurate, and that he signed it. Id. at 7. When he got back to SCI-Graterford, McCullough III wrote a letter to his father, reporting that he told the police not to believe a word Mr. McCullough was saying. Id. at 12; McCullough III Letter, attached as Exhibit 21. He wrote, "[m]y advice to you is to let Detective Dougherty know you were persuaded by the people who are backing Ricardo Natividad to say these things." Exh. 20, 12. McCullough III testified that no one, including Det. Dougherty, promised him anything in exchange for his statement in this case. Exh. 20, 14. Mr. McCullough III was subject to cross examination from Natividad's attorney. He described the circumstances pursuant to which Detective Dougherty questioned him, his relationship with his father, and his criminal record. Exh. 20, 23–41.

38. On May 20, 2016, and July 7, 2016, Detective Dougherty testified. He described the circumstances of recording the "Maculla" note in 1996. Exh. 20, 5/20/16, 44–47. He testified that McCullough not listed on crime scene log. Id. at 53. Detective Dougherty spoke to John McCullough at a town watch meeting in November 1996, and McCullough told the detective he was not a witness to the murder. N.T. 7/7/16, attached as Exhibit 22, 14, 56; Activity Sheet 11/12/96, attached hereto as Exhibit 23. Detective Dougherty testified "[n]o one in this homicide

case was ever taken to 55th and Pine for an interview of any kind whatsoever regarding this matter." Exh. 22, 59.

39. Detective Dougherty explained he sought to speak to McCullough in 2014 but he was difficult to track down. Exh. 22, N.T. 7/7/16, 14, 22. Detective Dougherty finally spoke to McCullough at his home. Id. at 14, 56. McCullough told Detective Dougherty he was in a hurry, and the detective tried to record the statement as quickly as possible. Id. at 31. McCullough provided an entirely different account of the murder:

> [McCullough and his son] were then walking somewhere on or near 63rd Street about one or two blocks below Lansdowne or Jefferson and they were on the east side of 63rd when he saw the victim walk out of the laundromat and two black males walked up to him. They looked like they were talking at first but the voices got louder. Then a woman yelled out from the second floor window behind him for them to leave the man alone. Then one of the two men had a gun and was pointing it at the victim. There was a quick gunshot and the victim fell down. The two males then ran across 63rd and passed by John McCullough and his son and he watched as they ran up towards Jefferson Street. He lost site of them around 63rd and Jefferson. They were still running. A female and male came out of the house behind John McCullough and across the street and saw the victim laying on the pavement outside of the laundromat. Police and ambulance came and an ambulance took the victim to the hospital. He told the police he saw the shooting. John McCullough and the man and the woman were taken to 55th and Pine. They were there about two hours. He gave a statement to detectives.
>
> Later, he was taken to Center City and signed a statement he gave detectives at 55th and Pine. The statement was only about a paragraph long. About all he can remember -- it was a long time ago, was wondering why anyone was caring about this now.

Exh. 20, 5/20/16, 65–66. McCullough told Detective Dougherty that his son was "maybe 12 to 14 then." Id. at 66. Detective Dougherty asked McCullough whether the victim was black or white, McCullough said "he was positive" the victim was Chinese and that the victim was the owner of the laundromat whom McCullough was going to see about a job. Id. at 69. Detective Dougherty testified "I asked Mr. McCullough if he would read what I had here. He declined. That's why I asked him also if I could type it up and bring it back to him, like the other people had done, and

that's when he told me he would call me." McCullough never called Detective Dougherty back. Id. at 32.

40. Detective Dougherty testified that he located McCullough III, who was on parole. Exh. 20, 5/20/16, 72. When the detective learned McCullough III was arrested on April 8, 2014, he interviewed him. Id. 73.

41. Assistant District Attorney Jason Harmon testified that when McCullough III was arrested on April 7, 2014, for theft of copper, he declined criminal charges. Exh. 22, N.T. 7/7/16, 48. He explained that he did so because it would not have been possible to prove that the owner did not give McCullough III permission to have the stolen items. Id. at 49. No one from the District Attorney's Office or the homicide unit contacted Mr. Harmon about his charging decision. Id. at 50–51.

42. On July 14, 2016, the PCRA court credited the Commonwealth's witnesses and disbelieved John McCullough's testimony and denied relief as to Natividad's Brady claim concerning the "Maculla" note. N.T. 7/14/2016, 60–61. On February 14, 2017, the PCRA court dismissed Natividad's third PCRA petition. Natividad, 200 A.3d at 25.

43. Natividad appealed the decision to the Pennsylvania Supreme Court, which, on January 23, 2019, affirmed PCRA court's order dismissing his petition. Commonwealth v. Natividad, 200 A.3d 11, 41 (Pa. 2019). The Court rejected Plaintiff's Brady claims based on both "Maculla" note and Robinson statements, reasoning the withheld material was not material:

> Although we deem it to be a close call, after a careful review of the entire record, we agree with the PCRA court that the Commonwealth's evidence against [Natividad] was so overwhelming there is no reasonable probability that if the Commonwealth had turned over the relevant evidence the result of the trial would have been different.

Natividad, 200 A.3d at 32–33.

44. Natividad supplemented his federal habeas petition, which had been pending before a court of this jurisdiction since 2008, to add the "MacCulla" note and the Robinson materials to his existing Brady claims. Natividad v. Beard, No. CV 08-449, 2021 WL 3737201, at *1 (E.D. Pa. Aug. 24, 2021). The District Attorney's Office transferred Natividad's case from its Law Department to the Conviction Integrity Unit ("CIU"). Id. The CIU filed an answer to Natividad's supplemental habeas petition that "withdrew and disavowed *all* prior pleadings and arguments and conceded that Natividad was entitled to habeas relief under Brady." Id. (emphasis in original). Plaintiff and the Commonwealth entered into a stipulation, agreeing to relief on Plaintiff's habeas petition, in exchange for which Plaintiff would plead guilty to an agreed upon term in the Court of Common Pleas. See Stipulation, attached hereto as Exhibit 24. Pursuant to the stipulation, Plaintiff "agree[d] to waive any further challenges in any court (state or federal) to his convictions and/or sentences in Commonwealth v. Natividad, Nos. CP-0400131-1997, CP-51-CR-0703121-1997." Id. ¶ 6.

45. Judge Rufe concluded the Philadelphia Police Department generated exculpatory evidence that the prosecution did not turn over. Natividad, 2021 WL 3737201, at *14 ("The Philadelphia Police Department gathered evidence that was unmistakably favorable to Natividad, but the prosecutor failed to uphold its duty to disclose the evidence to Natividad's trial counsel."). Based on a finding that Natividad's rights under Brady had been violated, the court granted Natividad habeas relief, vacated his death sentence, and ordered him to be retried within 180 days. Natividad v. Beard, 2021 WL 3737201, at *14.

46. On February 8, 2022, Natividad appeared in the Court of Common Pleas before the Honorable Lillian Ransom and pleaded guilty to the robbery of Mr. Havens, the murder of Mr. Campbell, and related offenses. Natividad was represented by counsel and was placed under oath

before testifying. N.T. 2/8/22, attached hereto as Exhibit 25, 3. The parties agreed that Plaintiff had a prior record score of four, reflecting Natividad's prior convictions for robbery and simple assault (Docket CP-51-CR-0313921-1989, attached hereto as Exhibit 26) and theft and aggravated assault (Docket CP-51-CR-0338181-1989, attached hereto as Exhibit 27). Exh. 25, 4. Natividad affirmed that he understood the purpose of the guilty plea hearing (id. at 5), and that he wished to plead guilty to third degree murder (id. at 7–8), robbery (id. at 8), and related offenses (id. at 8–9). Natividad affirmed that he understood the maximum penalties for each offense to which he was pleading guilty, that he had discussed with his attorney the elements of each of the offenses to which he was pleading guilty, and that he understood what the Commonwealth would be required to prove if he proceeded to trial. Id. at 7–14. He affirmed that he understood by pleading guilty, he admitted to underlying facts that established his guilt of the offenses to which he was pleading guilty and waived his right to a jury trial and the chance to contest the evidence against him. Id. at 15–17. Natividad affirmed that he discussed the evidence against him with his attorney and that it was his choice to plead guilty. Id. at 19.

47. The Commonwealth provided the following recitation of facts, which had been included in a December 2021 letter to the court (attached hereto as Exhibit 28):

> On or about November 9, 1996, at approximately 2:00 a.m., first victim, Michael Haven, was trying to unlock his dark blue Lincoln Continental near the intersection of Island Avenue and Elmwood Avenue in the Southwest section in the city and county of Philadelphia. . . . [Natividad] and another person approached the victim another person approached the victim. The victim [*sic*] produced a handgun, which had been concealed on his person. At point of gun, [Natividad] forced the victim into the back seat of his car and drove off. After driving a substantial distance to the area where Island Avenue turns into Cobbs Creek Parkway, with the victim inside the car, [Natividad] and the other person stopped and ordered the victim out of the car. [Natividad] and the other person fled, taking the victim's car, wallet and car keys without the victim's permission. The defendant intentionally placed Michael Haven in fear of immediate serious bodily injury. [Natividad] did this while possessing a firearm with intent to employ it criminally.

Exh. 25, N.T. 2/8/22, 24–25. Natividad affirmed that he heard the summary of facts, that he did not wish to make any corrections to it. Id. He then pleaded guilty to robbery, kidnapping, violation of the Uniform Firearms Act, possessing an instrument of crime, conspiracy, and robbery of a motor vehicle. Id. at 26–27.

48. The Commonwealth continued:

> Later that same day, on November 9, 1996, at approximately 9:40 p.m., [Natividad] drove a Lincoln to a gas station near the intersection of 63rd and Vine Street in the city and county of Philadelphia. Another individual named Byron Price was in the car with [Natividad]. [Natividad]parked the car and got out. [Natividad] approached the decedent, Robert Campbell, who had been standing near a gas pump. [Natividad] produced a handgun that had been concealed on his person and at point of gun attempted to take Campbell's possessions.
>
> [Natividad] discharged his handgun striking Mr. Campbell in the head and cause a death. [Natividad] acted with malice that that is an extreme indifference to the value of human life when he shot and killed Mr. Campbell, and did so while possessing a handgun with the intent to employ it criminally.
>
> Robert Campbell's remains were subsequently transferred to the offices of the medical examiner where he was formally pronounced and deceased. He was 49 years old at the time.

Exh. 25, N.T. 2/8/22, 27–28. Again, Natividad affirmed that he heard the summary of facts, that he did not wish to make any corrections to it. Id. He pleaded guilty to murder of the third degree, violation of the Uniform Firearms Act, and possessing an instrument of crime. Id. at 28–29.

49. The court accepted Natividad's guilty pleas and entered verdicts of guilty on both criminal dockets. Exh. 25, N.T. 2/8/22, 30. Members of Mr. Campbell's family attended the hearing and provided victim impact statements. Id. at 30–43. The court imposed the agreed-upon, aggregate sentence of twenty-five to fifty years of imprisonment, calculated to run from March 17, 1997, the date of Plaintiff's arrest. Id. at 44–46. Plaintiff did not appeal or otherwise challenge his guilty plea. See Criminal Docket CP-51-CR-0703121-1997, attached hereto as Exhibit 29. As

of the date of this filing, Plaintiff remains incarcerated. Inmate Locator, attached hereto as Exhibit 30.

50. Natividad initiated this lawsuit by filing a complaint on December 20, 2022. Notwithstanding his guilty plea, Plaintiff claimed that he was innocent and wrongly convicted. See, e.g., ECF 1, ¶ 1 ("On November 12, 1997, Plaintiff, Ricardo Natividad, was wrongfully convicted and sentenced to death for a crime he did not commit."). Natividad named as defendants Detectives Raley, Mee, and Dougherty, the City of Philadelphia, and former prosecutors Richard Sax and Charles Gallagher. Id. ¶¶ 4–7.

51. The Honorable Eduardo C. Robreno denied Defendants' motion to dismiss Plaintiff's claims as barred by Heck, reasoning that the facts before the court were "indistinguishable" from the court's decision in Dennis v. City of Philadelphia, 379 F. Supp. 3d 420, 430 (E.D. Pa. 2019). ECF 18, n3.

52. Plaintiff testified under oath at his deposition that he is innocent and that he lied when he pleaded guilty before the Court of Common Pleas in 2022. Exh. 7, 69.

53. On March 18, 2025, Plaintiff propounded a report prepared by Timothy Dixon. Report, attached hereto as Exhibit 31.

Respectfully submitted:

Date: April 7, 2025

*/s/ Benjamin T. Jackal*
Benjamin T. Jackal
Deputy City Solicitor
Attorney Identification No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
(215) 683-5434
ben.jackal@phila.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICARDO NATIVIDAD,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL ACTION**<br>**No. 22-cv-5061-GJP** |
| **DETECTIVE PAUL RALEY, et al.,** | : | |
| **Defendants.** | : | |

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below, the foregoing Motion for Summary Judgment has been filed on ECF and is available for viewing and downloading.

Respectfully submitted:

Date: April 7, 2025

/s/ *Benjamin T. Jackal*

Benjamin T. Jackal
Deputy City Solicitor
Attorney Identification No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
(215) 683-5434
ben.jackal@phila.gov