IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYVLANIA

| | |
|---|---|
| RICARDO NATIVIDAD,<br>Plaintiff,<br>v.<br>DETECTIVE PAUL RALEY, et al.,<br>Defendants. | CIVIL ACTION NO.: 2:22-cv-05061-GJP<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS** |

Plaintiff, Ricardo Natividad ("Plaintiff"), by and through his attorneys, O'Hanlon Schwartz, P.C., responds as follows to the statement of material facts submitted by Detective Paul Raley, Detective James Dougherty, Detective Arthur Mee in support of their motion for summary judgment.

1. Michael Havens testified that at around 2:00 a.m. on November 9, 1996, Michael Havens stopped for a sandwich at Philly's Famous Cheesesteaks at the intersection of Island and Elmwood Avenues in Philadelphia. N.T. 11/5/97, 146, attached hereto as Exhibit 1.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 146, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Havens bought his sandwich and was returning to his car, a dark blue 1989 Lincoln he had recently purchased. Id. at 146.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 146, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

As he unlocked the car, two men—one of whom Mr. Havens later identified as Plaintiff, Ricardo Natividad—approached him. Id. at 148–49.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at pp. 148-49, does not support Defendants' proposition that Plaintiff "approached" Mr. Havens. and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Plaintiff pulled out a gun.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

Mr. Havens surrendered his wallet and keys.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

Natividad told Mr. Havens to get in the car.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

When Mr. Havens hesitated, Natividad said, "get the fuck in the car or we'll kill you right here." Id. at 149.

**RESPONSE:** Admitted that Mr. Havens so testified.

2. Michael Havens testified Natividad shoved Mr. Havens in the back of the car and got in the front passenger's seat, while his coconspirator drove off. Exh. 1, 149–50.

**RESPONSE:** Admitted that Mr. Havens so testified.

For the next fifteen to twenty minutes, Natividad repeatedly threatened to shoot Mr. Havens while demanding money from him. Id. at 150–54.

**RESPONSE:** Denied. Mr. Havens testified that this event took place over "anywhere from 15 to 25 minutes." Exhibit 1, 154.

Mr. Havens gave Natividad and his accomplice the cash from his pocket and begged to be released from the vehicle. Id. at 152.

**RESPONSE:** Denied. Admitted in part and denied in part. Admitted to the extent Mr. Havens testified that he gave Plaintiff cash from his pocket. Denied to the extent Mr. Havens did not testify here that he "begged."

Natividad requested Mr. Havens' ATM card and that Mr. Havens access the account to get them additional funds. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 152, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Havens responded that there was no money in the account as he had just paid bills. Id.

**RESPONSE:** Admitted that Mr. Havens so testified.

Natividad continued to threaten Mr. Havens with the gun. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 152, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Natividad faced Mr. Havens throughout the time they were in the car. Id. at 154.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 154, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The car's interior light was on. Id.

**RESPONSE:** Admitted that Mr. Havens so testified.

The driver told Natividad to "waste this white mother fucker." Id. at 152.

**RESPONSE:** Admitted that Mr. Havens so testified.

Plaintiff responded "okay, find a dark spot so I can kill him." Id.

**RESPONSE:** Admitted that Mr. Havens so testified.

Natividad asked Mr. Havens if he was ready to die. Id. at 152.

**RESPONSE:** Admitted that Mr. Havens so testified.

3. Michael Havens testified the men pulled the car into a dark area on the side of the road.

**RESPONSE:** The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

Natividad ordered Mr. Havens out of the car and told him to lie on the ground. Exh. 1, 153.

**RESPONSE:** Admitted that Mr. Havens so testified.

Mr. Havens covered his head with his hands because he thought he was about to die. Id.

**RESPONSE:** Admitted that Mr. Havens so testified.

Natividad repeatedly said, "are you ready to die, you white mother f'er [*sic*]." Id.

**RESPONSE:** Admitted that Mr. Havens so testified.

Mr. Havens then heard the car "peel out" and his assailants were gone. Id.

**RESPONSE:** Admitted that Mr. Havens so testified.

Mr. Havens ran to a nearby Wawa and called the police. Id. at 154.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 154, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

4. Byron Price testified that at 7:00 p.m. that evening, Natividad picked up his friend, Mr. Price, at a store at 60th and Catherine Streets in Philadelphia. N.T. 11/6/97, 7–8, attached hereto as Exhibit 2.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 7-8, makes no mention that Plaintiff picked up Mr. Price at any place or that they were friends and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Natividad was driving a Lincoln, which Mr. Price had never seen him drive before. Id. at 8.

**RESPONSE:** Admitted that Mr. Price so testified.

Natividad and Mr. Price had plans to watch a boxing match. Id. at 9.

**RESPONSE:** Admitted that Mr. Price so testified.

Mr. Price sat in the passenger seat as Natividad drove. Id. at 10.

**RESPONSE:** Admitted that Mr. Price so testified.

Natividad pulled the car into an Exxon gas station at the intersection of 63rd and Vine Streets and told Mr. Price to wait in the car. Id. at 9.

**RESPONSE:** Admitted that Mr. Price so testified.

Mr. Price heard a gunshot. Id.

**RESPONSE:** Admitted that Mr. Price so testified.

He saw that a man who had been standing nearby was lying on the ground. Id. at 13.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 13, makes no mention that "a man who had been standing nearby was lying on the ground" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Natividad came running back to the car holding a chrome revolver in his hands. Id. at 9, 13.

**RESPONSE:** Admitted that Mr. Price so testified.

Natividad turned the car around and drove south down 63rd Street toward Market Street. Id. at 14.

**RESPONSE:** Admitted that Mr. Price so testified.

Mr. Price asked Natividad why he shot the man, Natividad replied "He drew on me." Id. at 15.

**RESPONSE:** Admitted that Mr. Price so testified.

5. Martin and Beth Johnson testified that they lived on the northeast corner of 63rd and Vine Streets, across the intersection from the Exxon gas station. Exh. 2, 77, 94.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 77 and 94 , do not state that "Martin and Beth

Johnson testified that they lived on the northeast corner of 63rd and Vine Streets, across the intersection from the Exxon gas station" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

At around 9:40 p.m., they were leaving their house when they heard a gunshot. Id. at 78, 94.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 77 and 94 , do not identify who "they" is nor does either quoted portion of Exhibit 2 state that "At around 9:40 p.m., they were leaving their house when they heard a gunshot" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

6. Martin Johnson testified that he looked toward the gas station and saw a man falling backwards with his hands in the air. Exh. 2, 78.

**RESPONSE:** Admitted that Mr. Price so testified.

At the same time, he saw a man run between the pumps, get into the driver's side of a black or dark blue car. Id.

**RESPONSE:** Denied. Contrary to the statement here, Mr. Price said that "almost" at the same time "you saw a man run from between the pumps, get in to a car, car was like black or dark blue or something like that." Exhibit 2 at p. 78.

The shooter was wearing a big lumberjack style plaid jacket. Id. at 85.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 85 , does not state anything about a "shooter" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The car turned around and sped south on 63rd Street toward Market Street. Id. at 78.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 78 , does not state that "[t]he car turned around and sped south on 63rd Street toward Market Street" and, accordingly, Plaintiff has demonstrated that "the

materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Johnson thought the assailants' car looked like a Lincoln because he saw that it had a distinctive tire well with the license plate inset into it. Id. at 82.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 82 , does not state anything about an "assailants' car" or that anything was "distinctive" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

He could not see the license plate. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 82 , does not state anything whether Mr. Johnson was able to "see the license plate" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Johnson approached the gas station. Id. at 78.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 78 , does not state anything about Mr. Johnson approaching a gas station and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

He saw the victim, who was later identified as Robert Campbell, a white man, lying next to a yellow Cadillac. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 78 , does not state that Mr. Johnson saw "the victim" or that the "victim" was "later identified as Robert Campbell, a white man" or that Mr. Johnson saw a "victim" "near a yellow Cadillac" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The victim had been shot on the side of face. Id.

**RESPONSE:** Admitted that Mr. Johnson so testified.

Blood was coming out of the back of his head. Id.

**RESPONSE:** Admitted that Mr. Johnson so testified.

Mr. Johnson observed that Mr. Campbell had a gun in a holster that was snapped shut. Id. at 84.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 84 , does not state that "Mr. Johnson observed that Mr. Campbell had a gun in a holster that was snapped shut" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The gas cap was off of the Cadillac, and Mr. Campbell's keys lay on the ground nearby. Id. at 83.

**RESPONSE:** Admitted in part and denied in part Denied to the extent the within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 83 , does not reference a "gas cap" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B). Admitted that Mr. Johnson testified that "Mr. Campbell's keys lay on the ground nearby."

7. Beth Johnson testified that she looked toward the sound of the gunshot and saw the shooter lifted his hand and the victim fall backwards with his hands raised. Exh. 2, 94.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 94 , does not state the order of events as to whether she heard a gunshot first and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The shooter appeared to be wearing a red plaid lumberjack jacket. Id. at 95.

**RESPONSE:** Admitted that Mrs Johnson so testified.

The shooter had darker skin than the victim. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 95 , does not state that the "shooter had darker skin than the victim," only that she may have been seeing skin or a hat or mask which were darker than the man who was shot's skin and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

He got into his car, which was facing north. Id. at 98.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 98 , makes no statement with regard to who "he" is, or whose car is being referenced or in what direction the referenced vehicle travelled and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The car turned around and travelled south on 63rd Street. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 98 , does not say that any car "turned around," only that it "turned south" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The bulb on the license plate of the shooter's car was out. Id. at 99.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at pp. 99 , makes no reference to a bulb being "out" and only that Ms. Johnson "did not see the little bulb that illuminates the back" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

8. Evidence was introduced at trial establishing that on November 11, 1996, Philadelphia police recovered a dark blue Lincoln that had been abandoned and set on fire. Exh.1, 197.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 197, makes no mention of the testimony cited and,

accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

From the trunk of the car, the police recovered a lumberjack style jacket. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 197, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Havens identified the burnt Lincoln as the car appellant had stolen from him at gunpoint on the morning of November 9, 1996. Id. at 157.

**RESPONSE:** Plaintiff can neither admit nor deny the within statement because "appellant" is not defined. Moreover, the within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 152, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Havens also identified the jacket recovered from the trunk of the car as his own jacket that he had left in the car at the time of the robbery. Id.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 152, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

9. Detective James Dougherty was assigned to investigate the murder.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

In the following weeks, he and his fellow detectives obtained numerous witness statements regarding the murder.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

Natividad made statements to several of his acquaintances taking credit for having shot the man at the Exxon station. Exh. 2, N.T. 11/6/97, 156, 163, 182.

**RESPONSE:** Admitted that Natasha Catlett testified that Plaintiff told her that he killed Mr. Campbell but does not state where. (156). Denied that Robert Golatt testified at page 163 that Plaintiff killed Mr. Campbell. Admitted that Eugene Wilson testified that Plaintiff "got that body" but does not state where (182). Plaintiff denies having killed Mr. Campbell. Exhibit 7 at 68:1-69:24.

10. On December 23, 1996, Detective Arthur Mee took a statement from Carl Anthony Harris. Harris Statement, attached as Exhibit 5.

**RESPONSE:** Admitted that Exhibit 5 purports to be a statement taken by Defendant Mee from Carl Anthony Harris.

Mr. Harris testified at trial that Natividad approached Mr. Harris while he was washing his car with Keith Smith. Exh. 2, N.T. 11/6/97, 107.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at p. 107, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Harris testified that he observed Mr. Smith and Natividad engage in a conversation, out of his hearing, and then walk around the corner from where Mr. Harris was standing. Id. at 110.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at p. 110, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

When Mr. Smith returned after parting from appellant, Mr. Smith had in his possession a chrome .357– Magnum firearm. Id. at 114.

**RESPONSE:** Plaintiff can neither admit nor deny the within statement because "appellant" is not defined. Moreover, the within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at p. 114, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

11. Evidence was introduced at trial establishing that sometime in December of 1996, Mr. Smith gave a .357 revolver to his attorney, Mr. Spina. N.T. 11/7/97, attached hereto as Exhibit 3, 15.

**RESPONSE:** Admitted that Frank Spina did so testify.

Attorney Spina immediately notified Philadelphia homicide detectives that he had the gun in his possession. Id. at 16.

**RESPONSE:** Admitted that Frank Spina so testified.

Homicide detectives, including Defendant Detective Arthur Mee, recovered the revolver from Mr. Spina's office and turned it over to the Philadelphia crime lab for testing. Id. at 15–17, 20–21.

**RESPONSE:** Admitted that Frank Spina so testified.

12. In December 1996, Detective Dougherty obtained an arrest warrant for Natividad. Exh. 3, N.T. 11/7/97, 128; Affidavit of Probable Cause, attached hereto as Exhibit 6.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 3 at p. 128, makes no mention of obtaining an arrest warrant and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B). Further, with regard to Exhibit 6, a document titled "Affidavit of Probable Cause for Arrest Warrant," the document makes no mention of obtaining an arrest warrant, only applying for one, and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

13. It was not until March 17, 1997, that Natividad was apprehended. Deposition of Plaintiff Ricardo Natividad, attached hereto as Exhibit 7, 120.

**RESPONSE:** Admitted that Plaintiff so testified.

Natividad admitted in his deposition that he learned he was wanted for murder and left Pennsylvania to avoid being captured. Id. 118–19.

**RESPONSE:** Admitted that Plaintiff so testified.

14. During Natividad's flight from apprehension, on February 2, 1997, Byron Price reported to the police that Natividad's uncle, Genardo McIlwain, assaulted him. McIlwain Arrest Records, attached hereto as Exhibit 8, at CITY 1465–67.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 8, a hearsay document ostensibly prepared by Detective Rossiter regarding statements made to him by Byron Price, makes no mention of a person named Genardo McIlwain and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

McIlwain punched Mr. Price in the face.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

He told Mr. Price that every time he sees him, they're going to fight because Mr. Price witnessed "nephew killing somebody." Id. at CITY 1494–96.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 8, a hearsay document ostensibly prepared by Detective Rossiter regarding statements made to him by Byron Price, makes no mention that any person told "Mr. Price that every time he sees him, they're going to fight because Mr. Price witnessed 'nephew killing somebody.'" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Based on Mr. Price's statement, police obtained a warrant to arrest McIlwain for assault and witness intimidation. Id. at 1516–22.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 8 at 1516-22, makes no mention of obtaining an arrest warrant, only applying for one and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

15. Mr. Havens testified that, following Natividad's arrest on March 17, 1997, Mr. Havens, the victim of the robbery of the Lincoln, came to the police station to view a photographic array. Exh. 1. N.T. 11/5/97, 173.

**RESPONSE:** Admitted that Mr. Havens so testified.

Upon viewing the array, Mr. Havens positively identified a photograph of Natividad. Id.

**RESPONSE:** Admitted that Mr. Havens so testified.

16. The two indictments, charging Natividad with the robbery of Mr. Havens and the murder of Mr. Campbell, were consolidated and Natividad proceeded to a jury trial in November 1997.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

The medical examiner testified that the results of forensic and pathology reports revealed that Mr. Campbell had been shot in the head at a distance of at least two feet causing his immediate death. Exh. 1., N.T. 11/5/97, 230.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 2 at p. 114, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

The fatal wound was consistent with the type of injury caused by a .357 Magnum firearm. Id. at 232.

**RESPONSE:** Admitted that Dr. Preston so testified.

The .357 caliber handgun obtained by police from the office of Mr. Spina had been fired prior to being handed over to the police. Exh. 3, N.T. 11/7/97, 41–42.

**RESPONSE:** Admitted that Officer Abdur-Rahim so testified.

Mr. Havens identified the gun recovered from Mr. Spina's office as identical to the gun held on him by appellant during the robbery of his motor vehicle. Exh. 1, N.T. 11/5/97, 170.

**RESPONSE:** Plaintiff can neither admit nor deny the within statement because "appellant" is not defined. Moreover, the within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 1 at p. 170, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Mr. Price identified the gun appellant possessed after shooting Mr. Campbell as similar in appearance to the gun Mr. Spina delivered to the Philadelphia police. Exh. 2, N.T. 11/6/97, 13.

**RESPONSE:** Plaintiff can neither admit nor deny the within statement because "appellant" is not defined.

17. Mr. Price was subjected to extensive cross-examination regarding the circumstances of his statements to the police. Exh. 2, N.T. 11/6/97, 37–67.

**RESPONSE:** The within statement is one of opinion, not fact and, accordingly, violates Fed. R. Civ. P. 56. Admitted that Mr. Price was subject to cross-examination during the 1997 trial of Plaintiff.

He testified on cross examination that he was mistaken when he told the police Natividad's gun was a chrome revolver that "looked like a .38." Id. at 66.

**RESPONSE:** Admitted that Mr. Price so testified.

Mr. Price testified that Detective Dougherty told him the gun was a .357 and that he did not say the gun had black grips on it. Id. at 66–67.

**RESPONSE:** Admitted that Mr. Price so testified.

Notwithstanding Mr. Price's testimony that Detective Dougherty told him the gun was a .357, Mr. Price's recorded statement said he saw Natividad holding a .38. Id. at 75.

**RESPONSE:** Plaintiff can neither admit nor deny the within statement because "appellant" is not defined. Moreover, the within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion

of the record, specifically Exhibit 2 at p. 75, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

18. Robert Golatt testified that Natividad admitted to him that he murdered the victim with a .357 magnum. Exh. 2, N.T. 11/6/97, 165.

**RESPONSE:** The within statement is one of opinion, not fact and, accordingly, violates Fed. R. Civ. P. 56. Defendants attempt to characterize the testimony of Mr. Golatt rather than accurately quoting it, which refers to Plaintiff "popping" Mr. Campbell "first," but makes no statement with regard to whether this apparent killing is a murder.

When asked on cross examination whether the police told him about the gun, Mr. Golatt testified "yeah." Id. at 171.

**RESPONSE:** Admitted that Mr. Golatt so testified.

On redirect, he was impeached with his statement to Detective Raley, which contained his statement that Natividad told him he murdered the victim with a .357 magnum:

> Q: Were you asked did Rick or Byron tell you what kind of gun he had the night of the shooting? Answer: Yeah. When Rick told me that he shot the guy, I asked him if he shot the guy with the .25 automatic. He said no. He said he had a chrome .357. Did you give that answer?
>
> A: Yes.

Q: And is that from what Rick told you the night before talking to homicide?

A: Yes.

Id. at 175–76.

**RESPONSE:** The within statement is one of opinion, not fact and, accordingly, violates Fed. R. Civ. P. 56. Defendants attempt to characterize the effect of the quoted testimony as "impeachment" but do not state what was being impeached nor the basis of their opinion that the testimony served as impeachment.

19. On November 10, 1997, a jury convicted Natividad of first degree murder for the death of Robert Campbell, 18 Pa.C.S. § 2502(a); carrying a firearm on a public street, id. § 6108; two counts of

possession of an instrument of crime, id. § 907; two counts of robbery, id. § 3701; one count of robbery of a motor vehicle, id. § 3702; kidnapping, id. § 2901; and criminal conspiracy, id. § 903. Commonwealth v. Natividad, 200 A.3d 11, 16 (Pa. 2019).

**RESPONSE:** Admitted.

20. At the penalty phase, the jury found two aggravating circumstances: that the killing occurred while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and that Natividad had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9). Commonwealth v. Natividad, 938 A.2d 310, 319–20 (Pa. 2007).

**RESPONSE:** Admitted.

The jury found one mitigating circumstance, the life history of the defendant, id. § 9711(e)(8). Id.

**RESPONSE:** Admitted.

The jury determined that the aggravating circumstances outweighed the mitigating circumstance and returned a verdict of death, which the court imposed. Id.

**RESPONSE:** Admitted.

21. In 2001, the Pennsylvania Supreme Court affirmed Plaintiff's judgments of sentence. Commonwealth v. Natividad, 773 A.2d 167, 181 (Pa. 2001).

**RESPONSE:** Admitted.

22. On November 25, 2002, Natividad filed a *pro se* petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541, *et seq.* Commonwealth v. Natividad, 200 A.3d 11, 16–17 (Pa. 2019).

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

Counsel was appointed and filed an amended petition, raising claims of ineffective assistance of trial counsel, trial court error, and prosecutorial misconduct. Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

The PCRA court held an evidentiary hearing, at the conclusion of which it denied Plaintiff's petition. Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

The Pennsylvania Supreme Court affirmed the order denying PCRA relief on December 27, 2007. Commonwealth v. Natividad, 938 A.2d 310 (Pa. 2007).

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

23. On March 11, 2008, Natividad filed a second PCRA petition, alleging his PCRA counsel's ineffectiveness. Commonwealth v. Natividad, 200 A.3d 11, 17 (Pa. 2019).

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

On November 14, 2011, the PCRA court dismissed the second petition as untimely. Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

Natividad did not appeal. Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

24. On June 27, 2008, Natividad filed a petition for a writ of habeas corpus before the Honorable Cynthia M. Rufe in the United States District Court for the Eastern District of Pennsylvania, docketed at Natividad v. Beard, No. 08-cv-0449 (E.D. Pa.). Natividad, 200 A.3d at 17.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

As part of that litigation, Natividad sought discovery from the Commonwealth. Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

25. On August 19, 2011, the federal court ordered the Commonwealth to produce some discovery but denied Natividad's request for access to the entire trial and investigatory files in the possession of the Commonwealth and the police. Natividad, 200 A.3d at 17.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

In response, the Commonwealth turned over more than 200 pages of documents to Natividad on March 6, 2012. Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

Among those disclosed documents was a paper with handwritten notations, including:


5635 BELMAR DOORS LEFT IN SW 7 LOT TAG II
727-8853 JOHN "MACULLA" B/M 40'S STOCKY, MEDIUM HAIR 5'11"
TOLD MANAGER ON SUNDAY LT COMP
THAT HE WAS ON LOT + SAW INCIDENT
PERCY GILBERT — MANAGER OF EXXON
729-0476
5914 WINDSOR AVE.
LOUIS GLENN - BEEPER
1-800-225-0256
EXT. 261190
GENRA ROPER
6024 VINE
215-472-0160
7x3 MxF ATT.
? JOE MCCCCLAN TOWN WATCH

"Maculla" note, attached hereto as Exhibit 9.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

26. On June 13, 2012, an investigator hired by Natividad's counsel interviewed a "John McCullough." Natividad, 200 A.3d at 17.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

On July 19, 2012, McCullough signed a declaration in which he asserted the following under penalty of perjury:

> 10. One day in 1996, I was driving to a laundromat on 63rd Street in West Philly. I was working as a security guard at another laundromat at 60th and Cedar and had been offered part time work at the one at 63rd and Vine. That day, my 14 year old son and I had stopped by a funeral home at 63rd and Oxford. On the way home, we stopped by the laundromat at the Exxon gas station on 63rd Street.
>
> 11. I parked my car and just as we got out of the car, I noticed three men about three cars away. One guy was tall and light skinned. He was the victim. There were two darker skinned guys there. One guy was facing the victim and had his hands on the victim's shirt. There was another guy standing to the side with a gun. I froze in my tracks so as not to draw attention to myself or my son. I stood there looking at the three men for what seemed like one and a half minutes.
>
> 12. All of a sudden, the victim pushed the guy in front of him away and I heard one or more gunshots. I then saw the two darker guys run toward an already running car. The car was dark colored.

13. After the shooting, the police came to the laundromat and I told them what I saw. At first the police were suspicious of me because I was standing so close to the crime, but did not get hurt. I was asked if I knew either of the two dark skinned men, but I said that I did not. They seemed to imply that I must have known them or else I would have been shot, too. After a while, my son and I were taken to 55th and Pine to give a statement. We sat in a hallway at the station waiting to talk to a detective. As we were waiting, we started talking to a man and woman who saw the incident and were waiting to talk to the detectives too.

14. I talked to a detective at 55th and Pine and signed a 2½ page written statement about what I saw.

15. Sometime after the incident on 63rd Street, I became ill with a heart problem. Because of this illness, I left Philadelphia for a while to visit my sister in Virginia. While I was in Virginia, I received a long distance telephone call from a neighbor who said that there had been what looked like policemen coming by my house on Belmar Terrace. I called and left a message for the police telling them where I was. I received a return call from the police and, after I explained that I was ill and would return home after I recuperated, the policeman said they would wait until I returned.

16. When I returned to Philadelphia, some police came by my house. They asked me if I had spoken to anyone about what I saw that night. I replied that I had been in Virginia and had not spoken to anyone. They told me that they had "got the guy" and that they were "looking for the second guy." They said that they took care of everything and did not need me.

17. I used to work for the Greater Philadelphia Urban Affairs Coalition running summer programs for at risk youths. During one summer, [Natividad] was in my programs. I got to know him and would recognize him if I saw him. Only recently did I find out that [Natividad] was in prison for committing the killing I saw.

18. [Natividad] was not one of the two men that I saw with the victim at the laundromat at 63rd and Vine Street[s].

Declaration of John McCullough, attached hereto as Exhibit 10.

**RESPONSE:** Admitted that this is a portion of the Declaration of John McCullough.

27. On August 9, 2012, Natividad filed a third PCRA petition, alleging the prosecution failed to turn over the "Maculla" note and the statement McCullough claimed he gave to a detective, in violation of Brady. Natividad, 200 A.3d at 18.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

He alleged this newly discovered evidence satisfied the PCRA's time bar exceptions for governmental interference and after discovered evidence. 42 Pa.C.S. § 9545(b)(1)(i), (ii). Natividad, 200 A.3d at 18.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

28. While Natividad's PCRA petition was pending in the PCRA court, he filed a supplemental discovery motion in federal court pursuant to his pending habeas petition, seeking access to the complete trial and investigatory files of the Commonwealth and the police. Natividad, 200 A.3d at 20.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

On July 9, 2014, the federal court granted Natividad's request, and the Commonwealth made additional files available to Natividad on August 7, 2014. Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

29. This production of documents yielded various documents implicating Ricardo Robinson as the murderer of Robert Campbell. Natividad, 200 A.3d at 20.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

For example, detectives took the statements of Joseph Rutherford, Cynthia Smith, and Rolston Ricardo Robinson five days after the murder on November 14, 1996. See Statements of Joseph Rutherford, attached hereto as Exhibit 11; Statement of Cynthia Smith, attached hereto as Exhibit 12, Statement of Rolston Ricardo Robinson, attached hereto as Exhibit 13.

**RESPONSE:** Admitted that Philadelphia Police detectives took these statements on November 14, 1996.

Rutherford and Smith described Robinson's drug dealing activity, his threatening behavior, and stated they heard Robinson say he had murdered Mr. Campbell. See Exh. 11, Rutherford Statement, 4 (asserting Robinson said he would "do [Rutherford] like he did Bob down at the gas station."); Exh. 12, Smith Statement, 3, 4 (telling Defendant Detective Arthur Mee that Robinson said in reference to the murder of Mr. Campbell "Yeah — I did it," that's what happens to snitches," and that he "had to teach somebody a

lesson."). Robinson claimed he drove past the scene of the murder on November 9, 1996, where he saw police at the gas station and a man lying on the ground. Exh. 13, Robinson Statement.

**RESPONSE:** Admitted that Defendants' partial quotes of these statements are accurate.

30. Officer Rita Wilson described in a statement that she responded to the dispute between Rutherford and Robinson at the bar on 66th and Lebanon Streets. Natividad, 200 A.3d at 21.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

She noted Rutherford told her that "Rob" had stated "we're going to do to you what we did to the guy at 63rd and Vine." Id.

**RESPONSE:** Admitted that the Pennsylvania Supreme Court so stated.

Officer Shane Darden gave a statement explaining that Rutherford told him Robinson had been telling people he "was there when Campbell was shot" and that he had seen a gun and handcuffs in the victim's belt. Officer Darden Statement, attached hereto as Exhibit 14.

**RESPONSE:** Admitted that Officer Darden so stated.

31. Detective Dougherty's police activity sheet from dated November 13, 1996, also referenced Robinson:

> The assigned was contacted by a retired Detective who related that he had been contacted by an old informant who related that persons in 929 Wynnewood Rd. may have information as to the identity of the perpetrator and that he may be named ROB and was a Jamaican male. Det. DiBlasi & the assigned set up a surveillance of this location and noted that a B/M left the location and drove away in a 1988 Acura painted gray. The license tag was checked thru [*sic*] BMV and it was registered to a RUPERT ROBINSON at [redacted]. This male fit the general description of the male called ROB. It was also noted that adults aged 20 to 40 both white and black were coming and going from this location. The Detectives stopped one of these persons and learned that ROB does operate the gray Acura and several persons in the location were upset with him over drug matters.

Activity Sheet, 11/13/96, 1, attached hereto as Exhibit 15.

**RESPONSE:** Admitted.

32. On November 14, 1996, Tracie Durham gave a statement in which she said she did not know about the killing but "was told by [Rutherford] . . . that a guy name[d] Rob . . . did it." Durham Statement, attached hereto as Exhibit 16, 1.

**RESPONSE:** Admitted that Ms. Durham so stated with the exception that "Rutherford" is identified in the statement as "Joe."

She said she was on a pay phone outside the gas station around 9:50 p.m. on November 9, 1996, when she saw a car that "looked like Rob's silver Lexus and a gentleman that looked like Rob driving it." Id.

**RESPONSE:** Admitted that Ms. Durham so stated.

She said she did not see the victim at the gas station. Id. at 2.

**RESPONSE:** Admitted that Ms. Durham so stated.

33. On November 12, 1996, Richard Anderson gave a statement to police in which he stated he heard from a woman named Tish that another man told her people who lived at "the house at [929 Wynnewood Road] . . . [and] call themselves the Junior Black Mafia had something to do with the shooting of Mr. Campbell." Anderson Statement, attached hereto as Exhibit 17, 3.

**RESPONSE:** Admitted that Mr. Anderson so stated.

34. Also on November 12, 1996, Detective Dougherty took a statement from Trish Ann Ambrosine, in which she relayed rumors that people associated with two drug houses, who called themselves Junior Black Mafia, were responsible for murdering Mr. Campbell. Ambrosine Statement, attached hereto as Exhibit 18, 2.

**RESPONSE:** Admitted that Ms. Ambrosine so stated.

35. Natividad amended his third PCRA petition to include an additional Brady claim based on these Robinson documents. Natividad, 200 A.3d at 22–23.

**RESPONSE:** Denied to the extent "these Robinson documents" is undefined and capable of several meanings. Admitted that the Pennsylvania Supreme Court stated that "[b]ased on the Commonwealth's disclosure of these various statements and documents, appellant sought leave to amend his third PCRA petition to include an additional Brady claim on October 6, 2014, and leave was subsequently granted without objection by the Commonwealth." Natividad, 200 A.3d at 22–23.

36. The PCRA court conducted an evidentiary hearing.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

On April 28, 2016, McCullough testified for Plaintiff.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

He said that on November 9, 1996, he was with his son, walking to 63rd and Vine Streets. N.T. 4/28/16, attached hereto as Exhibit 19, 18–19.

**RESPONSE:** Admitted that Mr. McCollough so testified.

As he was walking down 63rd Street approaching Vine, the gas station was on his right. Id.

**RESPONSE:** Admitted that Mr. McCollough so testified.

He heard one or two gunshots and ducked. Id. at 19.

**RESPONSE:** Admitted that Mr. McCollough so testified.

He saw two men run across the street and get into a car that sped away. Id. at 21, 47.

**RESPONSE:** Plaintiff can neither admit nor deny the within statement because "appellant" is not defined. Moreover, the within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 19 at pp. 21 and 47, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

McCullough testified that neither man was Natividad. Id. at 21.

**RESPONSE:** Admitted that Mr. McCollough so testified.

According to McCullough, officers took him and other witnesses to the police station at 55th and Pine Streets. Id. at 27.

**RESPONSE:** Admitted that Mr. McCollough so testified.

He was later taken to 8th and Race, where he gave a signed statement. Id. at 29.

**RESPONSE:** Admitted that Mr. McCollough so testified.

Detectives permitted him to take a copy of the statement he gave at 8th and Race with him but he then misplaced it. Id. at 51.

**RESPONSE:** Admitted that Mr. McCollough so testified.

McCullough testified that he had been involved in town watch in 1996. Id. at 53.

**RESPONSE:** Admitted that Mr. McCollough testified as to his involvement with town watch but denied as to the year which is not stated in the cited portion of the record.

37. On May 20, 2016, contrary to his father's statement, John McCullough, III, testified that he was eighteen years old in November 1996, that he was not with his father in the area of 63rd and Vine Streets on November 9, 1996, and that he did not witness a murder at that time and location. N.T. 5/20/16, attached hereto as Exhibit 20, 5–6.[1]

**RESPONSE:** Admitted that Mr. McCollough, III so testified.

Mr. McCullough's father never told him that he witnessed a murder. Id. at 6.

**RESPONSE:** Admitted that Mr. McCollough, III so testified.

Mr. McCullough III was arrested for stealing copper, taken by Det. Dougherty from the 25th District to 8th and Race, and provided a statement. Id. at 9.

**RESPONSE:** Admitted that Mr. McCollough, III so testified.

He checked to make sure it was accurate, and that he signed it. Id. at 7.

**RESPONSE:** Admitted that Mr. McCollough, III so testified.

When he got back to SCI-Graterford, McCullough III wrote a letter to his father, reporting that he told the police not to believe a word Mr. McCullough was saying. Id. at 12; McCullough III Letter, attached as Exhibit 21.

**RESPONSE:** Admitted that Mr. McCollough, III so testified and that Exhibit 21 says as much.

[1] Defendants' statement of material facts includes two documents designated Exhibit 19. To the extent the transcript dated May 20, 2016 was improperly designated, Plaintiff responds as if it were properly designated at Exhibit 20.

He wrote, "[m]y advice to you is to let Detective Dougherty know you were persuaded by the people who are backing Ricardo Natividad to say these things." Exh. 20, 12.

**RESPONSE:** Admitted that Mr. McCollough, III so testified.

McCullough III testified that no one, including Det. Dougherty, promised him anything in exchange for his statement in this case. Exh. 20, 14.

**RESPONSE:** Admitted that Mr. McCollough, III so testified.

Mr. McCullough III was subject to cross examination from Natividad's attorney.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

He described the circumstances pursuant to which Detective Dougherty questioned him, his relationship with his father, and his criminal record. Exh. 20, 23–41.

**RESPONSE:** Admitted that Mr. McCollough, III was subject to cross-examination which included, but was not limited to, the topic set forth here.

38. On May 20, 2016, and July 7, 2016, Detective Dougherty testified.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

He described the circumstances of recording the "Maculla" note in 1996. Exh. 20, 5/20/16, 44–47.

**RESPONSE:** Admitted that Defendant Dougherty was subject to -examination on the "Maculla" note which included, but was not limited to, the topic set forth here.

He testified that McCullough not listed on crime scene log. Id. at 53.

**RESPONSE:** Denied. The cited testimony makes no reference to a "crime scene log" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Detective Dougherty spoke to John McCullough at a town watch meeting in November 1996, and McCullough told the detective he was not a witness to the murder. N.T. 7/7/16, attached as Exhibit 22, 14, 56; Activity Sheet 11/12/96, attached hereto as Exhibit 23.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 22 at pp. 14 and 56, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B). With regard to Exhibit 22, the statement does not set forth that Mr. McCollough told Defendant Dougherty that "he was not a witness to the murder" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Detective Dougherty testified "[n]o one in this homicide case was ever taken to 55th and Pine for an interview of any kind whatsoever regarding this matter." Exh. 22, 59.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 22 at p. 59, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

39. Detective Dougherty explained he sought to speak to McCullough in 2014 but he was difficult to track down. Exh. 22, N.T. 7/7/16, 14, 22.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 22 at pp. 14 and 22, makes no mention that Mr. McCollough was "difficult to track down" and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

Detective Dougherty finally spoke to McCullough at his home. Id. at 14, 56.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 22 at pp. 14 and 56, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

McCullough told Detective Dougherty he was in a hurry, and the detective tried to record the statement as quickly as possible. Id. at 31.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 22 at pp. 14 and 56, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

McCullough provided an entirely different account of the murder:

> [McCullough and his son] were then walking somewhere on or near 63rd Street about one or two blocks below Lansdowne or Jefferson and they were on the east side of 63rd when he saw the victim walk out of the laundromat and two black males walked up to him. They looked like they were talking at first but the voices got louder. Then a woman yelled out from the second floor window behind him for them to leave the man alone. Then one of the two men had a gun and was pointing it at the victim. There was a quick gunshot and the victim fell down. The two males then ran across 63rd and passed by John McCullough and his son and he watched as they ran up towards Jefferson Street. He lost site of them around 63rd and Jefferson. They were still running. A female and male came out of the house behind John McCullough and across the street and saw the victim laying on the pavement outside of the laundromat. Police and ambulance came and an ambulance took the victim to the hospital. He told the police he saw the shooting. John McCullough and the man and the woman were taken to 55th and Pine. They were there about two hours. He gave a statement to detectives.
>
> Later, he was taken to Center City and signed a statement he gave detectives at 55th and Pine. The statement was only about a paragraph long. About all he can remember -- it was a long time ago, was wondering why anyone was caring about this now.

Exh. 20, 5/20/16, 65–66.

**RESPONSE:** The within statement is one of opinion, not fact and, accordingly, violates Fed. R. Civ. P. 56. Admitted that at this point in the hearing transcript, Defendant Dougherty recited a portion document marked C-5 as set forth here.

McCullough told Detective Dougherty that his son was "maybe 12 to 14 then." Id. at 66.

**RESPONSE:** Admitted that at this point in the hearing transcript, Defendant Dougherty recited a portion document marked C-5 as set forth here.

Detective Dougherty asked McCullough whether the victim was black or white, McCullough said "he was positive" the victim was Chinese and that the victim was the owner of the laundromat whom McCullough was going to see about a job. Id. at 69.

**RESPONSE:** Admitted that at this point in the hearing transcript, Defendant Dougherty recited a portion document marked C-5 as set forth here.

Detective Dougherty testified "I asked Mr. McCullough if he would read what I had here. He declined. That's why I asked him also if I could type it up and bring it back to him, like the other people had done, and that's when he told me he would call me."

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A).

McCullough never called Detective Dougherty back. Id. at 32.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 20 at p. 32, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

40. Detective Dougherty testified that he located McCullough III, who was on parole. Exh. 20, 5/20/16, 72.

**RESPONSE:** Admitted that Defendant Dougherty so testified.

When the detective learned McCullough III was arrested on April 8, 2014, he interviewed him. Id. 73.

**RESPONSE:** Admitted that Defendant Dougherty so testified.

41. Assistant District Attorney Jason Harmon testified that when McCullough III was arrested on April 7, 2014, for theft of copper, he declined criminal charges. Exh. 22, N.T. 7/7/16, 48.

**RESPONSE:** Denied. The within statement of fact violates Fed. R. Civ. P. 56(c)(1)(A) because the cited portion of the record, specifically Exhibit 22 at p. 48, makes no mention of the testimony cited and, accordingly, Plaintiff has demonstrated that "the materials cited do not establish the absence or presence of a genuine dispute" pursuant to Fed. R. Civ. P. 56 (c)(1)(B).

He explained that he did so because it would not have been possible to prove that the owner did not give McCullough III permission to have the stolen items. Id. at 49.

**RESPONSE:** Admitted that Mr. Harmon so testified.

No one from the District Attorney's Office or the homicide unit contacted Mr. Harmon about his charging decision. Id. at 50–51.

**RESPONSE:** Denied. Mr. Harmon testified only that he didn't "believe that anymore from the district attorney's office" the "homicide unit" contacted him and did not testify that "non one from the District Attorney's Office or the homicide unit contacted" him. Exhibit 22 at 50:19-51:1.

42. On July 14, 2016, the PCRA court credited the Commonwealth's witnesses and disbelieved John McCullough's testimony and denied relief as to Natividad's Brady claim concerning the "Maculla" note. N.T. 7/14/2016, 60–61.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A)(there is no July 14, 2016 hearing transcript as a part of the record).

On February 14, 2017, the PCRA court dismissed Natividad's third PCRA petition. Natividad, 200 A.3d at 25.

**RESPONSE:** Admitted.

43. Natividad appealed the decision to the Pennsylvania Supreme Court, which, on January 23, 2019, affirmed PCRA court's order dismissing his petition. Commonwealth v.Natividad, 200 A.3d 11, 41 (Pa. 2019).

**RESPONSE:** Admitted.

The Court rejected Plaintiff's Brady claims based on both "Maculla" note and Robinson statements, reasoning the withheld material was not material:

> Although we deem it to be a close call, after a careful review of the entire record, we agree with the PCRA court that the Commonwealth's evidence against [Natividad] was so overwhelming there is no reasonable probability that if the Commonwealth had turned over the relevant evidence the result of the trial would have been different.

Natividad, 200 A.3d at 32–33.

**RESPONSE:** Admitted. Judge Rufe criticized the Pennsylvania Supreme Court for making this determination and disagreed with their reasoning. Natividad v. Beard, 2021 U.S. Dist. LEXIS 159379, at *25-26 (E.D. Pa. Aug. 24, 2021) ("Had the Robinson evidence been available, it would have countered the testimony implicating Natividad. Moreover, "[t]here is a reasonable probability that had the jury heard an 'other person' defense, the result of the proceeding would have been different."100 The Robinson evidence is material under Brady and Natividad's constitutional rights were violated when it was withheld.")

44. Natividad supplemented his federal habeas petition, which had been pending before a court of this jurisdiction since 2008, to add the "MacCulla" note and the Robinson materials to his existing Brady claims. Natividad v. Beard, No. CV 08-449, 2021 WL 3737201, at *1 (E.D. Pa. Aug. 24, 2021).

**RESPONSE:** Admitted.

The District Attorney's Office transferred Natividad's case from its Law Department to the Conviction Integrity Unit ("CIU"). Id.

**RESPONSE:** Admitted.

The CIU filed an answer to Natividad's supplemental habeas petition that "withdrew and disavowed *all* prior pleadings and arguments and conceded that Natividad was entitled to habeas relief under Brady." Id. (emphasis in original).

**RESPONSE:** Admitted.

Plaintiff and the Commonwealth entered into a stipulation, agreeing to relief on Plaintiff's habeas petition, in exchange for which Plaintiff would plead guilty to an agreed upon term in the Court of Common Pleas. See Stipulation, attached hereto as Exhibit 24.

**RESPONSE:** Admitted.

Pursuant to the stipulation, Plaintiff "agree[d] to waive any further challenges in any court (state or federal) to his convictions and/or sentences in Commonwealth v. Natividad, Nos. CP-0400131-1997, CP-51-CR-0703121-1997." Id. ¶ 6.

**RESPONSE:** Admitted.

45. Judge Rufe concluded the Philadelphia Police Department generated exculpatory evidence that the prosecution did not turn over. Natividad, 2021 WL 3737201, at *14 ("The Philadelphia Police Department gathered evidence that was unmistakably favorable to Natividad, but the prosecutor failed to uphold its duty to disclose the evidence to Natividad's trial counsel.").

**RESPONSE:** Admitted, except Judge Rufe's full conclusion is that "[b]ecause of this, Natividad's trial was not fair, and he was unconstitutionally found guilty and sentenced to death." Natividad v. Beard, 2021 U.S. Dist. LEXIS 159379, at *33 (E.D. Pa. Aug. 24, 2021)

Based on a finding that Natividad's rights under Brady had been violated, the court granted Natividad habeas relief, vacated his death sentence, and ordered him to be retried within 180 days. Natividad v. Beard, 2021 WL 3737201, at *14.

**RESPONSE:** Admitted.

46. On February 8, 2022, Natividad appeared in the Court of Common Pleas before the Honorable Lillian Ransom and pleaded guilty to the robbery of Mr. Havens, the murder of Mr. Campbell, and related offenses.

**RESPONSE:** Denied. The within statement of fact is denied to the extent that Defendants fail to cite to any portion of the record in violation of Fed. R. Civ. P. 56 (c)(1)(A)(

Natividad was represented by counsel and was placed under oath before testifying. N.T. 2/8/22, attached hereto as Exhibit 25, 3.

**RESPONSE:** Admitted.

The parties agreed that Plaintiff had a prior record score of four, reflecting Natividad's prior convictions for robbery and simple assault (Docket CP-51-CR-0313921-1989, attached hereto as Exhibit 26) and theft and aggravated assault (Docket CP-51-CR-0338181-1989, attached hereto as Exhibit 27). Exh. 25, 4.

**RESPONSE:** Admitted.

Natividad affirmed that he understood the purpose of the guilty plea hearing (id. at 5), and that he wished to plead guilty to third degree murder (id. at 7–8), robbery (id. at 8), and related offenses (id. at 8–9).

**RESPONSE:** Admitted that Plaintiff so testified.

Natividad affirmed that he understood the maximum penalties for each offense to which he was pleading guilty, that he had discussed with his attorney the elements of each of the offenses to which he was pleading guilty, and that he understood what the Commonwealth would be required to prove if he proceeded to trial. Id. at 7–14.

**RESPONSE:** Admitted that Plaintiff so testified. Plaintiff also testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

He affirmed that he understood by pleading guilty, he admitted to underlying facts that established his guilt of the offenses to which he was pleading guilty and waived his right to a jury trial and the chance to contest the evidence against him. Id. at 15–17.

**RESPONSE:** Admitted that Plaintiff so testified. Plaintiff also testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

Natividad affirmed that he discussed the evidence against him with his attorney and that it was his choice to plead guilty. Id. at 19.

**RESPONSE:** Admitted that Plaintiff so testified. Plaintiff also testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

47. The Commonwealth provided the following recitation of facts, which had been included in a December 2021 letter to the court (attached hereto as Exhibit 28):

> On or about November 9, 1996, at approximately 2:00 a.m., first victim, Michael Haven, was trying to unlock his dark blue Lincoln Continental near the intersection of

> Island Avenue and Elmwood Avenue in the Southwest section in the city and county of Philadelphia [Natividad] and another person approached the victim another person approached the victim. The victim [*sic*] produced a handgun, which had been concealed on his person. At point of gun, [Natividad] forced the victim into the back seat of his car and drove off. After driving a substantial distance to the area where Island Avenue turns into Cobbs Creek Parkway, with the victim inside the car, [Natividad] and the other person stopped and ordered the victim out of the car. [Natividad] and the other person fled, taking the victim's car, wallet and car keys without the victim's permission. The defendant intentionally place Michael Haven in fear of immediate serious bodily injury. [Natividad] did this while possessing a firearm with intent to employ it criminally.

Exh. 25, N.T. 2/8/22, 24–25.

**RESPONSE:** Admitted that the Commonwealth provided this recitation of facts.

Natividad affirmed that he heard the summary of facts, that he did not wish to make any corrections to it. Id.

**RESPONSE:** Admitted that Plaintiff so testified. Plaintiff also testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

He then pleaded guilty to robbery, kidnapping, violation of the Uniform Firearms Act, possessing an instrument of crime, conspiracy, and robbery of a motor vehicle. Id. at 26–27.

**RESPONSE:** Admitted that Plaintiff so testified. Plaintiff also testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

48. The Commonwealth continued:

> Later that same day, on November 9, 1996, at approximately 9:40 p.m., [Natividad] drove a Lincoln to a gas station near the intersection of 63rd and Vine Street in the city and county of Philadelphia. Another individual named Byron Price was in the car with [Natividad]. [Natividad]parked the car and got out. [Natividad] approached the decedent, Robert Campbell, who had been standing near a gas pump. [Natividad] produced a handgun that had been concealed on his person and at point of gun attempted to take Campbell's possessions.
>
> [Natividad] discharged his handgun striking Mr. Campbell in the head and cause a death. [Natividad] acted with malice that that is an extreme indifference to the value of human life when he shot and killed Mr. Campbell, and did so while possessing a handgun with the intent to employ it criminally.

> Robert Campbell's remains were subsequently transferred to the offices of the medical examiner where he was formally pronounced and deceased. He was 49 years old at the time.

Exh. 25, N.T. 2/8/22, 27–28.

**RESPONSE:** Admitted that the Commonwealth "continued."

Again, Natividad affirmed that he heard the summary of facts, that he did not wish to make any corrections to it. Id.

**RESPONSE:** Admitted that Plaintiff so testified. Plaintiff also testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

He pleaded guilty to murder of the third degree, violation of the Uniform Firearms Act, and possessing an instrument of crime. Id. at 28–29.

**RESPONSE:** Admitted. Plaintiff testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

49. The court accepted Natividad's guilty pleas and entered verdicts of guilty on both criminal dockets. Exh. 25, N.T. 2/8/22, 30.

**RESPONSE:** Admitted. Plaintiff testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

Members of Mr. Campbell's family attended the hearing and provided victim impact statements. Id. at 30–43.

**RESPONSE:** Admitted.

The court imposed the agreed-upon, aggregate sentence of twenty-five to fifty years of imprisonment, calculated to run from March 17, 1997, the date of Plaintiff's arrest. Id. at 44–46.

**RESPONSE:** Admitted. Plaintiff testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

Plaintiff did not appeal or otherwise challenge his guilty plea. See Criminal Docket CP-51-CR-0703121-1997, attached hereto as Exhibit 29.

**RESPONSE:** Admitted. Plaintiff testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

As of the date of this filing, Plaintiff remains incarcerated. Inmate Locator, attached hereto as Exhibit 30.

**RESPONSE:** Admitted.

50. Natividad initiated this lawsuit by filing a complaint on December 20, 2022.

**RESPONSE:** Admitted.

Notwithstanding his guilty plea, Plaintiff claimed that he was innocent and wrongly convicted. See, e.g., ECF 1, ¶ 1 ("On November 12, 1997, Plaintiff, Ricardo Natividad, was wrongfully convicted and sentenced to death for a crime he did not commit.").

**RESPONSE:** Admitted. Plaintiff testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

Natividad named as defendants Detectives Raley, Mee, and Dougherty, the City of Philadelphia, and former prosecutors Richard Sax and Charles Gallagher. Id. ¶¶ 4–7.

**RESPONSE:** Admitted.

51. The Honorable Eduardo C. Robreno denied Defendants' motion to dismiss Plaintiff's claims as barred by Heck, reasoning that the facts before the court were "indistinguishable" from the court's decision in Dennis v. City of Philadelphia, 379 F. Supp. 3d 420, 430 (E.D. Pa. 2019). ECF 18, n3.

**RESPONSE:** Admitted.

52. Plaintiff testified under oath at his deposition that he is innocent and that he lied when he pleaded guilty before the Court of Common Pleas in 2022. Exh. 7, 69.

**RESPONSE:** Admitted. Plaintiff testified that he pleaded guilty to "something [he] didn't do" (Exhibit 7 at 71:14-72:4) and to avoid the possibility of being convicted again and possibly facing the death penalty (*Id.* at 68: 2-69:4).

53. On March 18, 2025, Plaintiff propounded a report prepared by Timothy Dixon. Report, attached hereto as Exhibit 31.

**RESPONSE:** Admitted.

**ADDITIONAL DOCUMENTS**

The deposition transcripts of Defendant Dougherty, ADA Richard Sax, Defendant Mee and Defendant Raley are attached hereto as **Exhibits A, B, C and D**, respectively.

Respectfully submitted,

Steven T. O'Hanlon (PA Bar # 208428)
Israel A. Schwartz (PA Bar # 327623)
Noah A. Schwartz (PA Bar #307835)
**O'HANLON SCHWARTZ, P.C.**
2 Penn Center, Suite 1410
1500 John F. Kennedy Blvd.
Philadelphia, PA 18102
Tel: (267) 546-9066
Fax: (215) 563-6617
steve@ohanlonschwartz.com
izzy@ohanlonschwartz.com
noah@ohanlonschwartz.com
*Attorneys for plaintiff, Ricardo Natividad*

Dated: May 1, 2025

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION
NO.: 2:22-CV-05061-GJP

| | | |
|---|---|---|
| RICARDO NATIVIDAD | ) | DEPOSITION UPON |
| Plaintiff | ) | ORAL EXAMINATION |
| - vs - | ) | OF |
| DETECTIVE PAUL RALEY, ET AL., | ) | JAMES DOUGHERTY |
| Defendants | ) | |

TRANSCRIPT OF DEPOSITION, taken by and before HEATHER K. HINES, Professional Reporter and Notary Public, via Zoom Conference, on Tuesday, March 18, 2025, commencing at 10:08 a.m.

A P P E A R A N C E S:

O'HANLON SCHWARTZ, P.C.
BY: STEPHEN T. O'HANLON, ESQUIRE
2 Penn Center Plaza, Suite 1400
1500 JFK Boulevard
Philadelphia, PA 19102
Phone No. (267) 546-9066
Counsel for the Plaintiff

CITY OF PHILADELPHIA LAW DEPARTMENT
CIVIL RIGHTS UNIT
BY: BEN JACKAL, ESQUIRE
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
Phone No. (215) 683-5434
Counsel for the Defendants

ARCHER & GREINER, P.C.
BY: CARLTON JOHNSON, ESQUIRE
BY: TANNEIKA MINOTT, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-2739
Phone No. (215) 963-3300
Counsel for the Defendants

INDEX


| WITNESS: | | PAGE |
|---|---|---|
| JAMES DOUGHERTY | | |
| | BY: MR. O'HANLON | 4 |
| | BY: MR. JOHNSON | |
| | BY: MR. JACKAL | |
| | BY: MS. MINOTT | |


EXHIBITS


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| P-1 DOUGHERTY | Affidavit of Probable Cause For Arrest Warrant | 94 |
| P-2 DOUGHERTY | Investigation Interview Record of Byron Price | 116 |
| P-3 DOUGHERTY | Handwritten Note | 107 |

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification, and filing are waived and that all objections, except as to the form of the questions, are reserved until the time of trial.)

JAMES DOUGHERTY, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. O'HANLON:

Q Good morning, Detective Dougherty. My name is Stephen O'Hanlon. I'm an Attorney. I represent the plaintiff in this case called Ricardo Natividad where you and a few other former Philadelphia Police Detectives have been sued.

Have you ever had your deposition taken before?

A Yes.

Q For what kind of cases?

A Homicide case.

Q A homicide case where you were subsequently sued?

A No, I was not one of the ones being sued.

Q Okay. So, can you explain a little bit more, please? Like --

A I had been involved in part of the investigation,

and I was called to give a deposition as to what I had done. I was not one of the ones being sued.

Q I understand. Okay. Um, was that deposition by Zoom?

A No, sir, it wasn't.

Q Okay. So, let me just explain something that's a little bit specific to Zoom. With Zoom, if one person is speaking and another person speaks over the first person, the first person cuts out. Right?

So, I would just ask that you wait until I finish my whole question even if you can anticipate where it's going before you answer. And I will try and do the same. Even if I can anticipate where your answer is like kind of trailing off, I will wait until you have fully finished as best as I can before I ask another question. Does that make sense?

A Hopefully, yes.

Q And the reason that is is that we want to have a full kind of stenographic of this deposition.

For similar reasons, I would ask that as best as possible that your answers to questions be, um, verbal rather than shakes, or nods of the head, or shrugs and so forth because it's difficult, or impossible to take those down. Does that make sense?

A Yes, sir.
Q And if there's any question that you do not understand in all likelihood because it's too long, or, um, what lawyers call a compound question, you can just ask me to break it down and I will do so to make it more simple. Okay?
A (No response.)
Q Are you frozen? I'm sorry. Is that okay?
A Somebody was frozen. I'm not sure who.
Q Okay. And then the final thing is, um, this will be a relatively short deposition, approximately -- well, I would say less than two hours. But if you want to take a break at any time, you can. Okay?
A I'm sorry. You broke up again.
Q Um, if you wish to take a break at any time, you can.
THE COURT REPORTER: His internet bars are red on his device, so he's probably having technical difficulties with the internet.
Can you hear us, Mr. Dougherty?
THE WITNESS: Yes, I can. Periodically it's -- you're breaking -- you know, you've broken up. Um, I'm not seeing any indication on my end though that --

THE COURT REPORTER: You have full bars now, but they were red. I don't know if your internet was going in and out. But let's continue. And if it happens again, I'll let you know.

THE WITNESS: Okay.

BY MR. O'HANLON:

Q Okay. What I said is, um, if you want to take a break anytime, you can. It will be a relatively short deposition. Okay? Like -- like under two hours hopefully.

A Certainly. Thank you.

Q Okay. And the other thing is, um, your attorney -- and he hasn't like relayed -- well, maybe this is a little bit confidential.

But I understand that you have had, um, eye surgery, or you're about to have a second eye surgery, or something. So, it's difficult for you to review, um, documents. So, I will try to keep that to a minimum as well. Okay?

A Thank you.

Q Okay. Detective Dougherty, how long were you employed by the Philadelphia Police Department?

A For approximately forty years.

Q When did you retire?

A 2017. November of 2017.
Q And of those approximate forty years, how long were you in Homicide?
A For approximately thirty years I was assigned to Homicide. I was detailed out several times to other investigations, but I was always at Homicide for those thirty years.
Q Okay.
A The last thirty years of my career.
Q I understand. And were you a Detective in a district, or, um, whatever the proper term is before you became a Homicide Detective?
A Yes. They're called divisions. Detective divisions. And I was --
Q Yeah.
A I was assigned to South Detective Division for six years prior to going to Homicide.
Q And whereabouts is South Detectives located?
A 24th and Wolf Streets.
Q Okay. And during your time with the Philadelphia Police Department, were you ever disciplined in anyway?
A I -- I'm not sure what you mean by disciplined in anyway.
Q Did you ever have any sustained IAB complaints, or

anything against you?
A No, everything -- any complaints were always unfounded, or -- or proved to be people lying as in -- as in this case.
Q Okay. And um -- and how many of those cases did you have where there were Internal Affairs complaints against you?
A I -- I seem to recall three, or four.
Q Who's lying in this case?
A Ricardo Natividad and yourself if you're not -- if you read -- if you read all the information.
Q Okay. So, um, do you think that the District Attorney was lying when he said that he didn't have, that he would have turned over all of the documentation if he received it?
MR. JACKAL: Objection to the form of the question. You can answer it, Detective.
THE WITNESS: Who are you referring to, counsel?
BY MR. O'HANLON:
Q Richard Sax.
A Do I think what?
Q Would you -- if the Assistant District Attorney said that he would have turned over all of the information

that, um -- that he received from the police department, um, would he have been lying?

MR. JACKAL: Objection to the form of the question. You can answer.

MR. JOHNSON: Objection.

BY MR. O'HANLON:

Q You can answer.

A Absolutely not.

Q Okay.

A I did not believe Richard Sax would lie about anything -- any legal matter.

Q Okay. So, how about the federal judge who granted a new trial? Um, did the federal judge believe liars only?

MR. JACKAL: Objection to the form --

MR. JOHNSON: Objection.

MR. JACKAL: -- of the question. You can answer, Detective.

THE WITNESS: I don't know what the federal judge was thinking, counsel.

BY MR. O'HANLON:

Q Okay. How about the two-hundred pages of discovery with, um -- with information that was eventually turned over between 2012 and 2015, um, where there was evidence of an alternative suspect, do you know where that

documentation came from?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Counselor, could you reask that question? I'm not sure what -- where -- what you're trying to --

MR. O'HANLON: Okay.

THE WITNESS: -- emphasize here.

BY MR. O'HANLON:

Q Sure. There was about two-hundred plus pages of discovery that was turned over between 2012 and 2015 that seemed to indicate, um, an alternate -- an alternate suspect by the name of Rolston -- that's, R-O-L-S-T-O-N -- Ricardo -- R-I-C-A-R-D-O -- Robinson, AKA, Rob -- Rob.

Do you know -- and -- and that -- do you know anything about the two-hundred plus pages of discovery that was turned over indicating that there was an alternate suspect in this case?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Sir, the only thing I'm aware of in that timeframe were the PCRA hearings that I had participated in regarding, um, a person by the name of McCullough.

Um, the -- the other -- the other information that you're -- you're alluding to now, I don't know when that was turned over to anyone. Um, it -- it -- I'm sure it was turned over by Richie -- Richard Sax in the normal course of business back when the trial originated.

BY MR. O'HANLON:

Q Okay. So, if the -- if the trial attorney for Mr. Natividad said that he never received any of this information and signed a declaration to that affect, would that trial attorney also be lying?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: I think that trial attorney would have been misinformed, counselor.

BY MR. O'HANLON:

Q Misinformed how?

A By saying --

MR. JACKAL: Same objection. You can answer.

THE WITNESS: By saying that he never received that -- those -- those documents. I believe Richard Sax turned over everything that was legally necessary, um, prior to the trial.

BY MR. O'HANLON:
Q What's your basis for that belief?
A Um, just that I believe Richard Sax wouldn't do anything illegal, um, to help a case.
Q Okay. You said that you were working for the Philadelphia Police Department until, um, November of 2017, correct?
A Yes, sir.
Q Um, are you aware that, um, on September of 2014 an Assistant District Attorney by the name of Tom Dolgenos -- that's, D-O-L-G-E-N-O-S -- sent over to the federal defender who represented Mr. Natividad over two-hundred page of discovery? Were you involved in that process?
A No, sir, I was not.
Q Okay. Do you remember in approximately 1996 through to 1997, were you part of Two Squad?
A Yes, sir, I was.
Q And would you have worked with Detective Raley and Detective Mee as part of Two Squad?
A On certain days, yes, sir. Not --
Q And --
A Not all the days --
Q Sorry.
A -- though.

Q Okay. Sorry. Um, I -- I thought you were done. What did you say, Detective?

A Not all the same days. We worked different schedules.

Q Okay. And for this case, for the Natividad case, do you remember working Detectives Mee and Raley?

A No, sir I don't.

Q Okay. If there were statements, um, in the Natividad case taken by Detectives Mee and Raley, would you have any reason to dispute that they both worked on the Natividad job with you?

A No, sir, I wouldn't.

Q Okay. And because they worked on the Natividad job with you, would they have, um, knowledge of what was going on in that job as well as you?

MR. JACKAL: Objection to the form --

MR. JOHNSON: Objection.

MR. JACKAL: -- of the question. You can --

MR. JOHNSON: Objection.

MR. JACKAL: -- answer.

BY MR. O'HANLON:

Q You can answer.

A They would have -- I presume that they would have

some knowledge of the job, but it's -- it's my recollection that they were not working the night of the incident itself. So --

Q Okay.

A -- what information they would have, you'd have to ask them.

Q Okay. And I did. And, um, if they took statements, they would have to have some kind of background knowledge of the investigation so that they could take statements, is that correct?

A One would hope --

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: One would hope so, counselor.

BY MR. O'HANLON:

Q Okay. So -- so, is that a yes?

MR. JACKAL: Same objection. You can answer.

THE WITNESS: Knowing those two detectives, yes, they would have had some information. Not all the information that I had because I was the assigned Detective on the case.

BY MR. O'HANLON:

Q Okay.
A They --
Q I'm sorry.
A They were not the assigned.
Q Okay. So, if they took statements on the Natividad case, it would be fair to say that they had, um, knowledge of the case, but maybe not as much knowledge as you?
MR. JACKAL: Objection. You can answer.
THE WITNESS: Yes, that would be fair to say, counselor.
BY MR. O'HANLON:
Q Okay. Do you remember during the PCRA proceedings various allegations being leveled, um, against you about concealment of evidence by Mr. Natividad's federal defenders?
A No, sir. I was not aware of any of that.
Q Okay. Do you remember going out and interviewing an individual by the name of John McCullough -- that's, M-C-C-U-L-L-O-U-G-H -- III?
A There were two John McCullough's that I interviewed, counselor. I -- I'd have to -- you'd have to show me the document so I can tell you if it was the father, or the son.

Q Sure. John McCullough was -- John McCullough, III was the son. Do you remember interviewing him?

A Yes, sir, I do.

Q And do you remember him testifying at the PCRA proceedings that he was threatened by you?

A So --

MR. JACKAL: Objection.

THE WITNESS: -- I wasn't present --

MR. JACKAL: Just let me get my objection in before answering. Objection to the form of the question. You can answer.

THE WITNESS: Sir, I was -- I was sequestered during the -- the actual testimony, so I don't know what was said by any individuals in the courtroom other than myself.

BY MR. O'HANLON:

Q Okay. And do you remember, um -- did you ever hear from the District Attorney, or by anyone else, or from anyone else that John McCullough, III said that he was threatened by you?

MR. JOHNSON: Can you specify which of the numerous District Attorneys you're talking about?

BY MR. O'HANLON:

Q By any of the PCRA Assistant District Attorneys.
A Counselor, could you tell me what -- what District Attorneys you're referring to? I don't know -- there were --
Q Yeah.
A There were a couple I believe at least.
Q Okay. How about Cari -- C-A-R-I, M-A-H-L-E-R. Do you remember her being involved in the PCRA proceedings?
A Yes, sir, I do.
Q Did she ever tell you that John McCullough, III had alleged that you threatened him when you went out to interview him prior to a PCRA evidentiary hearing?
A No, sir. And I'm not sure if John McCullough would ever have said that because I didn't threaten him.
Q Okay. How about the fact that you said that you took down a written statement from John McCullough, III? Do you remember hearing anything about that?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: Do I remember saying that, counselor that I took a written statement from John McCullough, III?
BY MR. O'HANLON:
Q Yes.

A Is that your question?
Q Do you remember saying that?
A Yes, sir, I do.
Q Okay. And do you remember him saying that when you interviewed him you didn't take any notes?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: No, sir. Counselor, I do not -- I -- John McCullough, III never said anything like that to me.
BY MR. O'HANLON:
Q Okay. Do you remember hearing from any of the Assistant District Attorneys involved in the PCRA hearings -- that would be Cari Mahler, or anyone else assisting her -- that John McCullough, III said that you didn't take any notes when you interviewed him?
A Counselor, just so we're sure we're on the same page here, you're referring to the son, John McCullough?
Q Yes.
A No, sir. You telling me that now is the first I've ever heard of any of this.
Q Okay. Do you remember interviewing John McCullough -- the father -- in 1996 around about the time of the murder?

A It's my recollection, sir, I never interviewed him back in 1996.
Q Do you ever remember receiving a note around about 1996 in relation to John McCullough? That's M-A-C-U-L-L-A?
A Are you referring to the father, or the son here, counselor?
Q The father.
A I remember writing some information down on a piece of paper with that name -- with that spelling on it.
Q Okay. What do you remember about that note?
A During the first -- the course of the first week of the investigation, I was trying to find any possible witnesses to the -- to the incident. And someone at the laundromat, which was part of the gas station where Ricardo Natividad killed Robert Campbell, um -- I was inquiring as to anybody that may have been in the laundromat at the time of the incident hopefully to -- to find any witnesses.
Um, and during that time someone -- someone that was related to the laundromat, um -- I don't remember if it was the manager, or an assistant manager, or -- but someone that had some type of function at the laundromat, um, gave me that name and I phonetically spelled it out.
And he told me that, um, this person had come the next day and claimed that he had -- he was there at the

laundromat when the, um, incident occurred. However, no one else remembered seeing him there at that point in time.
Q And the incident that you're talking about is the killing of Robert Campbell, correct?
A Yes, sir.
Q So, you remember taking down that note about -- about John McCullough -- that's, M-C-C-U-L-L-O-U-G-H -- but you spelled it, um, as, M-A-C-U-L-L-A, correct?
A Yes. I had asked the person who was giving me the information if he knew how to spell that name, and that's the spelling that he gave me.
Q Okay. And do you know why that note was not turned over until March 6th of 2012?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: I don't know that that note was not turned over, counselor.
BY MR. O'HANLON:
Q Do you know that it was formally, um, handed over by the District Attorney's Office on March 6th of 2012 during federal habeas corpus proceedings?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: No, sir. I -- I have no

knowledge of any of that.

BY MR. O'HANLON:

Q Did you subsequently learn of an Affidavit that was signed by John McCullough, the father?

A I don't remember, counselor.

Q Do you remember, um, an Affidavit from John McCullough, the father stating that Ricardo Natividad was not the shooter?

A I have recently become aware of that, yes, sir.

Q Okay. And are you aware that John McCullough, the father also said that Mr. Natividad was not present?

A The exact -- whatever Mr. McCullough was saying, um, at anytime, I -- I reduced that to writing after I had interviewed him at one point inside his residence.

And I actually took, um, Mr. McCullough -- I asked him to come with me and show me exactly where he was standing when he supposedly saw this incident. And he took me to a location on 63rd Street south of Callowhill Street, which would -- and the point where he showed me that he claimed that he and his son had seen the shooting, um, it was impossible for him to have seen physically where the shooting took place from the location he showed me.

Q And when did you take him out to this -- to this alternate scene? Do you remember what year that was?

A All I can say it was during the, um -- just prior to the PCRA hearings that were -- that were conducted in this matter.
Q And this was McCullough the son, or McCullough the father?
A This was, um, McCullough the -- the father. The son clearly told me several times that his father never saw this shooting, that his father was a liar, or just made things up to make himself think that he was an important person.
Q Okay. Do you remember an individual by the name of Rob around about the time of this murder? That's R-O-B. A Jamaican male.
A Yes, sir, I do.
Q And do you remember interviewing Rob?
A Counselor, you would have to show me the interview paper. Whatever -- if there's an interview with my name on it and his name, then, um, that is what happened. Um, I -- offhand, I don't remember the specific time if, in fact, I did interview Rob.
Q Okay. Do you ever remember anything about this individual either having the real name of Rupert Robertson, or Rolston -- that's, R-O-L-S-T-O-N -- Ricardo Robinson? Do you ever remember those names coming up?

A Not at this point in time, counselor. If you showed me some documentation where I wrote that stuff, that information down, then I would have -- whatever was written down at that point in time, then I would agree that that was written down at that time. And at that time, I would have known it. But at this point in time, I don't remember that.

Q Okay. And do you ever remember hearing, um, that Rob had admitted to being at the scene of the murder at the time of the murder?

A I remember that we -- there were -- there was some information from someone. If you showed me the documents, I -- I could refer -- I could tell you who -- where that information came from. Um -- but without looking at the documents, I -- I don't remember all of that. But his name did surface during the early parts of this -- this investigation.

However, it was after several interviews of the people that were related to a certain location, um -- it was a drug house at that point in time. Um, we -- we determined -- I determined that this was all basically somebody bragging and trying to make a name for himself. But in reality, he -- he did not actually see the killing.

Q So, this Rob individual potentially admitted to the killing, correct?

A Not to me he did not, sir. And as far as I know, um, anyone that -- I believe that it was when we reviewed everything, it was clear that he was just bragging and trying to establish his name and to keep control over the drug house where he was selling drugs from.

Q Right. So, he was just bragging to police when he said that he was at the scene of the murder?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: I don't remember that, counselor.

BY MR. O'HANLON:

Q Okay. Then, you would have no reason to dispute that this individual Ricardo, um -- sorry -- Rolston Ricardo Robinson gave a statement to police admitting that he was at the scene of the murder at the time of the murder. Would you have any reason to dispute that?

MR. JACKAL: Objection to the form of the question. You can answer.

MR. JOHNSON: Objection.

THE WITNESS: Counselor, it seems to me you're trying to -- at one point, you're saying that he admitted to the killing. Now, you just want to know if he's admitting to being at the

scene.

Could you tell me which question you want me to answer?

BY MR. O'HANLON:

Q Certainly. What I'm talking about now is his admissions to the police only. And he admitted to the police that he was at the scene of the murder at the time of the murder. Do you remember that?

A I'd have to refer -- you'd have to show me the document, sir, for -- at this point in time, I don't.

I just know that we -- we thoroughly investigated everyone that was involved in that house, and we reached -- I reached the conclusion that he did not have anything -- he may have been there shortly after the killing, or he may have gone by before the killing, but he did not have anything whatsoever o do with this killing.

Q Um-hum. Okay. And do you remember -- just one second. Actually, give me -- give me just one second and I'll see if I can pull this up. I thought that you had, um, eye issues that would prevent you from looking at documents, but let me just see if I can find it real quick.

A Counselor, just so you know, I do have eye issues. I just had laser -- corrective laser surgery last week. And I have to have another eye corrected in -- in a couple of

weeks from now. So, I -- I do have some problems with my eyes. I can try to read it with the glasses that I have though.

Q Okay. Well, let me just see if I can find it. Just one second, Mr. Dougherty. And I'll try and make it as big as possible.

Okay. So, this has been marked as P0003543 and subsequent. So, let me just see if I can, um, share this with you.

How is that, Detective? Can you see this document? Let me see if I can make it full screen as well. Just one second. Well, can you see it right now?

A Yes, I can. I see part of the statement.

Q Okay. So, this is a statement from 11/14/96 from Rolston Ricardo Robinson taken by Interviewer DiBlasi, Badge 825. Is that one of the Homicide Detectives that you worked with?

A Yes, it was.

Q Okay.

A And, counselor, am I supposed to be reading? Um, I can't read that fast.

Q Let -- let me see if I can -- I mean, you can read the whole thing, but --

A I -- would prefer before I answer any questions to

read the entire document.
Q Okay. That's fine. Let's -- let's -- let's just go up to the top and you can tell me when to scroll down.
MR. JACKAL: Is that large enough, Detective? Would it help to zoom in?
THE WITNESS: If -- if you can make it a little larger, that will be very helpful.
BY MR. O'HANLON:
Q I don't know if I can. Um, let me just see if I can try maximizing Zoom. Let me see if I can try doing this. But that -- because of the view that I have --
A That one is much better.
Q Can you see the whole document?
A Now, you're -- you're -- if you leave it right there, I believe I can read that.
Q Sure.
A Okay. You can page down.
Q (Whereupon Mr. O'Hanlon scrolls down the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls down the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls down the

document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Hold on. Hold on. Just go backwards, please.
Q Certainly. (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the

document.)
A Okay. Can you slide it a little bit to the, um, one side?
Q Is that all right?
A Yes. It's better, yes.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q And I think that's it. So, just for the record, it finishes on P3548. So, I'm just going to stop sharing, Detective. Okay?
A Sure.
Q Would you agree with me that this individual, um, Rolston Ricardo Robinson admits to being at the scene of the murder?
A Not at the time of the murder. He's obviously there after the murder when the police are already there.
Q But he says that he sees somebody with a gun in a

holster, correct?
A The victim laying on the ground.
Q Okay. So, he is at the scene of the murder very soon after the murder because the victim is -- is already -- is still laying on the ground, correct?
A Well, the police had already arrived.
Q Okay. But he's -- he's at the scene of the murder approximate to the murder, correct?
A What was your last part of that question?
Q He's at the scene of the murder soon after the murder?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: The exact time element I'm not sure. All I know is what he's saying is the fact that he stops because he sees police cars there.
And I imagine their lights were probably flashing. So, that attracted his attention along with a bunch of other people from that area.
BY MR. O'HANLON:
Q Okay. So, he is there when the police have responded to the murder and the victim is still on the ground, is that correct?

A I wouldn't phrase it that way, counselor. You're -- you're saying -- the way you're phrasing it is as if he's there when the police arrive. He clearly is not there until after the police have arrived.

Q Okay. According to him. Okay. So, let -- let -- let me put it this way.

He is at the scene of the murder son after the police arrive, um, according to his own statement, correct?

A I --

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: Counselor, I'm not sure how much time elapsed from when the murder occurred, the police arrived, and Mr. Rolston actually shows at the scene. Mr. Rolston wouldn't know how much time had lapsed from the actual killing to the time he arrived there.

BY MR. O'HANLON:

Q Okay. Did Mr. Rolston admit to being at the scene of the murder?

A In which particular point in time, counselor, are we speaking of?

Q Soon after the murder, on the same day of the murder?

A Yes --

MR. JACKAL: Objection --

THE WITNESS: -- that same day.

MR. JACKAL: For the record, objection to the form of the question.

BY MR. O'HANLON:

Q On the same day and within at least an hour of the murder he admitted to being there, correct?

A I don't --

MR. JACKAL: Objection to form of the --

THE WITNESS: -- know --

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: I don't know the time element, counselor.

BY MR. O'HANLON:

Q Okay. Okay. Um -- so, let me just close out of this document. And let me ask if you remember all of these other statements.

Do you remember, um, a police report by an Officer called Shane Dardon where he relayed that a woman by the name of Tracie -- that's, T-R-A-C-I-E -- Durham told the officer that Rob Rolston had driven to the gas station twice on November 9th of 1996, the night of the murder?

A Offhand, I don't remember that, counselor. You'd have to show it to me so I can read it.

Q Okay. But you would have no reason to dispute, um, that there is such a statement, correct?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Counselor, I don't know if there is or not unless I actually see it.

BY MR. O'HANLON:

Q Okay. Um -- well, we're going to be here a very, very long time if I have to show you every statement. So, let me just ask you. If I said that there was a statement, would you have any reason to disagree with me?

MR. JOHNSON: I -- objection.

MR. JACKAL: Same objection.

MR. JOHNSON: And my objection is based on the way you and your partner have conducted this litigation. So, I wouldn't believe anything you had to say.

MR. O'HANLON: Mr. Johnson, do you want to turn on your camera for a second?

MR. JOHNSON: No.

MR. O'HANLON: Okay. Well, first of all, I don't know what you're talking about. But

I would just ask that you, um, allow us to question the Detective, which we are doing. And all of theses --

MR. JOHNSON: Well, except it's not proper for you to say would you disbelieve anything I have to say. And I'm saying based on my own limited experience with you --

MR. O'HANLON: Okay. I -- I have not had any experience with you. I don't know who you are. You're just sitting there, um, with your camera off, and I don't know what you're talking about.

BY MR. O'HANLON:

Q So, um, Detective, if there was a statement given to a Police Officer Shane Dardon by Tracie Durham, would you have any reason to disagree with that statement?

MR. JACKAL: Objection to the form of the question. You can answer.

MR. JOHNSON: Objection.

THE WITNESS: May I answer?

BY MR. O'HANLON:

Q Yes.

MR. JACKAL: You can answer.

THE WITNESS: Counselor, I have

tremendous difficulty believing anything you would say because I know what you're purporting to -- to do with this -- this case is a terrible travesty of justice. You are trying to distort what -- you know, what a jury -- what a jury found and what other courts have found.

And unless I see the actual document and I can read it, I do not believe anything that you can tell me because I -- I know that you're purporting a tremendous lie here.

BY MR. O'HANLON:

Q Okay. Well, let's just -- let's just move on then.

Do you ever remember, um, the individual by the name of Tracie Durham telling Officer Dardon that this Rob individual had a gun the night of the killing?

A I don't remember such --

Q Do you ever remember hearing that?

A Can I finish the answer, please.

Q Yes.

A I'm trying to finish the answer. You said that I would be allowed to answer -- to finish the answer before you would interrupt.

Q I didn't hear you -- I didn't hear you speaking.

A I believe everyone else may have been hearing me speak, or trying to speak before you so -- you know, just interrupted me.
Q Okay. So, go ahead.
A Would you ask the question again, please.
Q Yes. Do you ever remember hearing of a statement from a woman by the name of Tracie Durham that was given to a Police Officer Shane Dardon stating that Rob had a gun on the night of the murder?
A Counselor, I -- I do not remember that. If you showed me the actual document, that would probably refresh my memory.
Q It's okay. You don't remember that, is that correct?
A That is correct.
Q Do you remember an individual by the name of Joseph Rutherford? That's, R-U-T-H-E-R-F-O-R-D.
A I remember that name having something to do with the Wynnewood Road location where they were selling drugs from, yes.
Q Okay. Do you remember Joseph Rutherford, um, relaying to Officer Dardon and Detective Luby -- that's, L-U-B-Y -- that Rob, a black male of Jamaican decent sold crack. And Rutherford told police that Rob stated that he

would do the same to Rutherford as he did to Campbell at the gas station. Do you ever remember hearing that statement?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: I don't remember at this point in time, counselor. You'd have to show me the document for me -- to refresh my memory.

BY MR. O'HANLON:

Q Okay. How about an individual by the name of Michael Cuapainolo? That's, C-U-A-P-A-I-N-O-L-O. Do you ever remember hearing about a statement from that individual?

A I don't recall that, counselor. Again, you'd have to show me the document to refresh my memory.

Q Do you ever remember Mr. Cuapainolo -- that's, C-U-A-P-A-I-N-O-L-O -- telling police that Rob's real name was Rolston Robinson?

A Counselor, I just told you I don't remember anything regarding an interview with that individual unless you show me the document.

Q Okay. Do you remember a woman by the name of Cynthia Smith?

A Not offhand, counselor. Once again, show me the document and refresh my memory if you'd like me to answer

any questions relating to that.
Q Okay. Do you remember a woman by the name of Cynthia Smith stating that Rob admitted that he killed the decedent because the decedent was, quote, unquote, a little town snitch?
A Counselor, once again, I just answered that question when I told you I did not remember any -- any interview from that woman unless you show me the information and the document that would refresh my memory hopefully.
Q Okay. What I'm asking you is, um, if you remember these things. If you don't remember them, that's fine. You can just say, no. Okay?
A I have tried to do that, counselor, and you continue to ask additional questions relating to the original question.
Q Okay. So, you don't remember anything about Cynthia Smith, correct?
A Not offhand, no, sir.
Q Do you remember hearing that -- do you remember that name from the investigation?
A There are many, many names involved in this investigation, counselor. I'd have to see the list of all the interviews to be able to say, yes, that name is familiar to me or not.

Please understand quite a few years have passed. I mean, we're speaking of approximately twenty-four, twenty-five years since the incident.

Q Okay. How about two individuals by the name of Martin and Beth Johnson? Do you remember taking their statements?

A Yes, sir, I do remember those people.

Q Okay. And do you remember those people stating that Ricardo Natividad was not the person that had shot the decedent?

A Counselor, I never heard those two people say that he was not the person who shot your -- where -- where ever that information is, I would -- I would -- I really would love for you to show me that because I do not believe it exists.

Q Okay. How about Carl Harris? C-A-R-L. Harris, H-A-R-R-I-S. Do you remember that individual being involved in the investigation?

A No, sir, I don't. Again, you'd have to show me the document.

Q Do you remember, um, Harris -- that's Carl Harris -- giving two statements to police stating that him and his friend, Rolston Robinson knew that somebody had been shot at the gas station on the night of the killing?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: Counselor, once again, you asked me just a moment -- two minutes ago if I knew this -- a person by that name. I explained to you I did not.

Unless you show me the documents, I do not have direct recollection at this point in time of that individual.

BY MR. O'HANLON:

Q Okay. What I'm going to do is I'm going to show you in excess of two-hundred pages of documents. Okay? And I will represent to you -- well, let's just go to the start. Okay? And these documents start at P3480.

Do you see on page one, which is P3480 this is a letter dated April 1, 2016. Do you see that?

A Yes.

Q And these -- this is a letter to the federal defender, Federal Community Defender's Office enclosing statements from John McCullough, II and John McCullough, III from March 18th of 2014 and April 8th of 2014. Do you see these statements?

A I'm just seeing them now, counselor.

Q Okay. Were these statements taken by you in 2014?

A That's the date that's recorded there, April the 8th, 2014.
Q Do you know why they weren't turned over for almost two years?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: Counselor, I don't know that they weren't turned over.
BY MR. O'HANLON:
Q Okay. But the cover letter is from April 1st of 2016. Did you do anything to turn them over?
A Turn them over to whom, sir?
Q To anyone.
A Yes, sir, I gave them to the District Attorney that was involved in the PCRA hearing.
Q Okay. Well, let's keep on going down.
A Um, counselor, please, would you -- instead of going through so fast, or -- if you're going to ask questions about this, I need to read it.
Q I'm not asking questions this document. I'm just asking you if you recognize this document. I'm not asking you specific questions about this document.
A Do I recognize the document?
Q Yes.

A Yes, it's an interview that I took on that date and it was signed by John McCullough, II.

Q Okay. Well, let's go onto --

A I'm sorry. Excuse me. Can you -- you're going so fast. It's hard for me to -- I can't read backwards, counselor.

Q Okay. I'm not asking you about the contents of this statement. I'm just asking if they were statements taken in 2014.

A But you're paging backwards now on the -- the document you have on there, you're paging backwards to me.

Q Because you asked me to. Okay. I'm going onto the next document.

A I never asked you to -- I never asked you to go backwards on the document, counselor.

Q Okay. Well, let's --

A I just asked you -- I asked you to slow it down if you want me to, you know, refer to it in anyway.

Q Okay. So, let's go down to, um, P3489. Do you recognize this document?

A Wait. Counselor, you're -- you're moving it around so -- so much. Could you please go to one location and let me read what's there before you ask me to identify something?

Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Could you page up, please, from there?
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay. You can page down now.
MR. O'HANLON: And just for the record, I'm just paging from P3488 to 3489 onto 3490.
THE WITNESS: And could you just page up to the previous page, please?
BY MR. O'HANLON:
Q (Whereupon Mr. O'Hanlon scrolls through the document.) The previous page is P3489.
A Yes, sir, I do -- I remember this now.
Q Okay. So, let's keep on going past the McCullough's because you took multiple statements from the McCullough's, correct.
A You'd have to show me what -- everything that's from the McCullough's for me to be able to answer that question. Those two -- the two statements you just showed me, yes, I did take those.
Q Okay. So, let's go down a little bit further. And here's a letter from September 10th of 2014 from, um, Tom Dolgenos. That's, D-O-L-G-E-N-O-S. Um, and it goes --

the letter itself continues onto P3504.
And this letter, um, includes discovery that was provided as a result of Judge Rufe's order on July 9th of 2014.
A Counselor, I -- I don't know how this letter resulted from anything. I was not aware of anything with Judge Rufe.
Q Okay.
A Can you go back to it so I can read it and -- you know, instead of just going through it as quickly as you are?
Q No. I want to ask you about, um, specific, um -- I'm going through, and I'll ask you about, um, specific statements that were taken by you.
Okay. I'm going to show you a statement from an individual by the name of Darius Turner that was taken by Detective Mangoni -- that's, M-A-N-G-O-N-I -- Badge Number 642, which the first page is P3522. Do you remember reviewing this statement?
A Specifically, no, sir, I don't remember reviewing this particular statement. If you give me a chance to read it, maybe that will trigger my memory.
Q Go ahead and read it, sir.
A Could you go back to the very top, please?

Q It is at the top.
A No, sir, it was not. If it was at the top, you wouldn't be moving it right now.
Q I showed you Detective Mangoni already and Badge Number 642. These --
A There's other information right below there, counselor. I would like to read what's here instead of you just pointing out to where you would prefer that I read. I rather read the entire contents so I can answer the question properly.
Q Okay.
A Can you page down, please?
Q Well, first of all, I have a question. On the first page -- that's P3522 -- at the bottom do you see the name of a person -- and I'll highlight it -- called Rolston? That's, R-O-L-S-T-O-N.
A Counselor, you didn't highlight the name Rolston.
Q It -- it's -- it's highlighted as best I can. The highlighting only -- it's right above where it's highlighted, R-O-L-S-T-O-N.
A That name is there, yes.
Q Okay.
A All right. Can you slow down? You were just going too fast, counselor. Could you please go back so I

can finish reading that paragraph?
Q Well, I thought you were finished that page. But --
A No, sir, I had not. Okay. Can you page -- you can continue down a little bit.
Q Well, would you agree with me that there's multiple references to this, um, individual Rolston on P3522 and the following page, 3523?
A If I can read it, I can answer the question.
Q Well, can you see it there? It's in the first paragraph multiple times.
A Counselor, I can't read and talk to you at the same time. If you let me please read it, then I'll answer your question.
Q The only question is if Rolston is mentioned multiple times in that paragraph?
A Counselor, you keep asking the question and speaking to me. I can't read and talk at the same time. Please let me finish reading the paragraph.
Could you page up to the very beginning again, please, sir?
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay. You can -- if you would, continue the --

the question is is the name Rolston mentioned in that paragraph several times. Yes, sir, it is.

Q Okay.

A Can I -- I didn't -- I'm sorry, sir. I -- sir, you're going way past -- I can't read that fast, counselor.

Q Listen. I asked you the question. You answered the question. All right?

A Counselor --

Q No, no, no, no. I asked you the question was Rolston mentioned in that paragraph and on this page multiple times. That's all I wanted to know.

Okay. So, I'm going to go to P3529, Joseph P. Rutherford, Junior, an interview from 11/14/96 taken by Detective Luby, Badge Number 743. Was Detective Luby involved in this investigation if you remember?

A Counselor, his name appears on the interview. So -- I mean, obviously he was involved in this interview as far as this investigation was concerned.

Q So, is that a yes?

A For this particular interview, yes, sir.

Q Okay.

A An investigation covers many, many days and months. Whether he was involved the entire time, I do not know.

Q Okay. So, are you able to read this handwriting?
A So, far, yes.
Q Okay. Tell me when you want me to scroll down and I will do so.
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay. Counsel, whatever you're doing, I -- you just blocked -- you just took -- you just wiped out the page I was reading.
Q Oh, I'm sorry. Can you see it now?
A Yes. No, if you can just hold -- I haven't had a chance to read it. You blocked that page out. Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q Well, just let me ask you a quick question, um, so you're not just reading things.

But at the bottom of page -- that's P3531 onto P3532 -- does Joseph Rutherford relay -- and I just want to go back to the top to see the detective that took the statement -- to Detective Luby that Rob threaten to kill Mr. Rutherford just like he killed the guy at the gas station, is that correct? Is that what that statement says where you were just reading?

A It seems to me, counselor, they're both saying they're going to kill each other, Rutherford and this person Rolston you're talking about. They're both saying to each other they're going to kill -- they're threatening each other to kill each other.

Q Okay. So, let's just -- let me just help you, Detective. Okay?

So, at the top of page 3532 is Rutherford saying about Rob he told me that he would do me like he did Bob down at the gas station. Did I read that correctly?

A After Rutherford tells him -- I told him I would kill him. He told me that he would do me like he did Bob down at the gas station. So, to me, they're both threatening to kill each other.

These are drug dealers and drug addicts, counselor. Please understand the lives that they lead and the type of lives that they lead. They threaten each other

constantly with -- with everything that you can imagine. Beyond what you can imagine.

Q Okay. So, all I'm asking you is if Rutherford relayed to police that Rob said that he -- and I'm quoting here -- he told me he would do me like he did Bob from at the gas station. Did I read that correctly?

A Well, please read the entire thing. It's after he tells -- after Rutherford tells Rolston that he would -- that he would kill him. Then --

Q Okay.

A -- Rolston --

Q Okay. Okay. And --

A -- said that he would kill him too. So, it's both -- it's two -- it's two -- it's two drug involved people threatening each other.

Q Okay. So, for -- I'm going to ask you for the third time if I -- if I read this correctly.

It says at the top of page -- of P3532 he told me he would do me like he did Bob from at the gas station. Did I read that correctly?

A You read one particular sentence involved with a number of sentences that you're not reading.

Q Okay. Detective Dougherty -- okay -- I'm going to ask you for the fourth time now -- okay -- did I -- did read

this correctly, okay.

He told me that he would do me like he did Bob from at the gas station. Did I read that correctly?

A That small part of that entire answer, yes, you did.

Q All right. Thank you.

A Counselor, I believe it's only fair to read the entire answer, not just the one sentence that you would like to emphasize.

But there's other information there that I believe that in order to answer that -- any questions, or any part of this should be -- to whoever is going to hear any of this testimony should be well aware that there's a lot of other information in here that you're totally disregarding.

Q Yes. And most of all wouldn't you think it would be proper that you would hand over these statements to trail counsel at the criminal trial?

A Counselor, I can --

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: Counselor, I take extreme umbrage with what you just said. I hand over everything that I develop during the course of an investigation to whoever the District Attorney is

that's handling this.

I was in Homicide for thirty years, sir. I handled -- I was involved in over thousands of murders.

BY MR. O'HANLON:

Q Okay.

A I never once kept anything from any trial attorney, um, involving any case I worked on.

Q Okay.

A So, please, sir, unless you know me better, or you have something to say -- you know, before you make an accusation as such as you just did -- once again, you've shown me your true colors here. You're not --

Q Okay.

A -- after the truth, sir.

Q Well, let --

A You're after what you believe --

Q Okay.

A -- is --

Q Okay.

A It's -- it's a method for you to obtain a lot of money.

Q Okay. So, let's go to 3 -- so, we were just at 3529, which is page forty-seven of 244. Okay? So, we've

been through the cover letter.
A No, sir, we've not been through the cover letter. I have not had a chance to read the cover letter. You told me I didn't need to read it. You past -- you moved through that very quickly.
Q So, this cover letter --
A And it was just such a cover letter and you had a date there.
Q Okay. So, the cover letter, which is P3501 was sent on September 10th of 2014. Does that look correct?
A That's on that document you're showing me. I haven't the faintest idea what's true or not in this letter. I had nothing whatsoever to do with preparing this letter.
Q Okay. And the cover letter sent over, um, discovery in 2014, which included Mr. Rutherford's statement that we just went through. All right?
A Counselor, I haven't the faintest idea if any -- what -- anything to do with this -- this particular letter that you're showing me I have no knowledge whatsoever of this letter. So, you can say whatever you want to say. I can't say either it did happen, or it did not happen.
Q All right.
A I had nothing to do with this letter, sir.
Q Okay. But this letter is -- is it not dated

September 10th of 2014?

A There is a date typed there. I have not the faintest idea if that's a true typing or not. Sir, I don't know what in this letter was produced.

Q Okay. So, Mr. Natividad's trial was in 1997, correct?

A Yes, sir.

Q Okay. So, let's go back down to page forty-four, and we can continue on from Mr. Rutherford's statement that has, um, Rob admitting to the killing. Let's go down --

A Counselor, I would not ever, ever characterize what -- what is stated in there by the person you're calling Rob, um -- that person, um -- in no way, shape, or form would I take that as an -- as an admission. It certainly wouldn't be allowable in any courtroom that I've ever been in.

Q All right. Okay. So, we've been through Joseph Rutherford's statement for the most part I believe.

Let me just go back to where, um, Rob admits to killing the person at the gas station, and we can take it from there.

A Counselor, you keep referring to him admitting to killing someone. He did not admit to killing anyone there. That's not an admission, sir. That's just someone bragging

-- it's a drug dealer that's threatening a person that owes him money, and the two of them are threatening to kill each other.
Q Okay. All right. So, the next page which is 3535, which is a little bit difficult to view.
So, we'll go onto the next statement, which is, um, P3536, which is a statement taken by Detective Mee on November 14th of 1996. Was Detective Mee involved in this investigation with you?
A At that point in time, yes, sir. He -- he prepared this interview.
Q Okay. And you can read at your -- at your pace. And we'll start on 3536.
A Go ahead. You can move down.
Q Going onto 3537.
A Okay. You can go down.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay. You can go down.
Q Okay. Well, let me just ask you about, um, this statement on page 3537 from Cynthia Smith. And tell me if you -- if I read this correctly. It's about halfway through.
It says question. Who is Rob. Answer. Rob

Rolston, or Ricardo. I'm not sure. His real name might be Ricardo. Question. When did you first hear about --

A Counselor, it says -- counselor, excuse me. But it says his real first name might be Ricardo.

Q Okay. And then the next question it says when did you first hear about the victim death. Answer. The night it happened. I was at home and Rob walked in. He walked right in and changed the channel and sat down in front of it so that no one else could see. He was blocking the set.

I asked him what he was doing and he said like yo this is important. Did you hear about the guy getting shot down at the gas station. You know, the guy -- the fucking snitch, that Town Watch guy Bobby Campbell. He kept on talking about it after. Did I read that correctly?

A Yes, sir, you did.

Q And this is Cynthia Smith again referring to somebody called Rob, is that correct?

A What do you mean again referring to somebody called Rob?

Q Well, didn't we go through Joseph Rutherford talking about somebody called Rob?

A Counselor, the way you asked the question you're asking -- you made it to me that Cynthia Smith had made previous mention of somebody named Rob.

Q Okay. Well, let's just go onto the following page so you can just finish reading that.
A Well, could you -- you went too far down.
Q So, we're on page P3538 at the top.
A Okay. You can go down.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay. You can go down.
Q Well, just one second. Um, here is Ms. Rutherford relaying to police that Rob had, um, a big gun?
A Sir, the person who's being interviewed here is named Cynthia Smith, not Ms. Rutherford.
Q I'm sorry. Cynthia Smith. Joseph Rutherford was the last person.
Um, does Cynthia Smith relay to police here on Page P3538 -- did you ever see Rob with a gun. Her answer. Yeah, a big one. Did I read that correctly?
A Yes, sir, you did. Remember, Rob is a drug dealer, sir. All drug dealers have guns, yes.
Q Question. Can you describe it. Answer. It was dark. A revolver. It had a round thing. Did I read that correctly?
A Yes, sir, you did.
Q Question. Did Rob ever say that he was involved

in -- I can't even read that -- Campbell's death. Did I read that correctly?

A I believe you did, yes.

Q And the answer was, yeah, he had been watching the news over and over again. He started to get real -- I can't read that. Can you read that?

A No, sir, I can't.

Q It looks like a word beginning with, C-A-S. He started to get real -- it looks like casual, but l could be wrong -- about the whole thing. Um, it's at the bottom of 3538 and onto 3539.

A Okay.

Q So, here we have at the top of 3539 Rob stating, yeah, I did it. Did I read that correctly? I'll see if I can high -- I -- it's at the top of, um, P3539 in quotation marks. Do we have Rob saying, yeah, I did it according to Cynthia Smith?

A Those words are there, yes, sir.

Q And then she also relays to police he kept on talking about the guy being a snitch. When he said he did it, everything just stopped. I got real nervous. Did I read that correctly?

A Yes, you did.

Q Okay. I can't remember how far down we are. Um,

it's, um, halfway down P3539.
A Okay. You can go on.
Q Well, just -- let me just ask -- just let me ask you if I read this correctly. It's halfway down P3539.
It says did Rob say anything else about the decedent. Answer by Cynthia Smith. Yeah, he said that that's what happens to snitches, that he had to teach somebody a lesson. When did Rob say that. Since it happened, he just kept on talking about it. The longer it went, the more -- I can't read that. Can you read that, sir?
A No, sir.
Q Okay. But the first part, um, did I read that correctly about Rob admitting to killing the decedent because he wanted to teach snitches a lesson?
A That's what's written on the page. Yes, sir.
Q Okay. So, let's go on a little bit further.
A Okay.
Q Okay. And that statement from Cynthia Smith appears to finish on P3540. Um, let me just scroll down.
On P3543, is the statement from Rolston Ricardo Robinson, and we've been through that. So, let's just scroll through that.
How did you first become in touch -- how did you

first come in touch with a cooperating witness by the name of Byron Price if you remember?
A During the course of the investigation, I received a phone call from the Citizen's Crime Commission. And they reported to me that a female had called them and relayed to them that her boyfriend had been with the person who did the killing of Robert Campbell at 63rd and Vine Streets.
Q Okay. And was boyfriend --
A And --
Q Go ahead.
A And her boyfriend's name was Byron.
Q Okay.
A So, I -- may I finish the answer?
Q Yes, of course.
A So, at that point in time, she gave us -- we also were provided with a name of the person who done the shooting. The actual killing was perpetrated by your client, Ricardo Natividad. And we proceeded at that point to develop information concerning Ricardo Natividad.
And it was during the course of that -- that time that we were able to establish who Byron actually was, that he was, in fact, a person by the name of Byron. And we also established who the person was that called the Citizen's Crime Commission, who was Byron Price's girlfriend.

Q Are you sure that the initial report that you had, um, on November 9th -- 10th of 1996 wasn't for someone called Brian -- that's, B-R-I-A-N -- and not Byron?
A No, sir. Offhand I'm -- not right at this point. I just -- as a result of all the information that we gathered, um, it was -- it was determined that the person's name that we were -- that, um -- who was a witness of the killing who had been in the car with Ricardo Natividad at the time of the killing was a person by the name of Byron Price.
The exact spellings of the names, that may well be true what you just told me. I -- I'm not, um -- I'm not -- I don't recall, you know, the differences in spellings at the time.
Q Okay. I'm just going to like scroll down to the next witness statement. (Whereupon Mr. O'Hanlon scrolls through the document.)
Okay. So, I'm going to direct your attention to P3573.
Um, you see this statement taken by Detective Thomas Cane, Badge Number 9277 on November 14th of 1996?
A Yes, sir, I see it.
Q Um, do you ever remember interacting with a woman by the name of Tracie Durham -- D-U-R-H-A-M?

A Can I read the entire statement, counselor? It may trigger something in my memory.

There were a number of people that, um -- you know, we interacted with, you know, during the course of this investigation. Um, if -- you know, the specific name, not offhand. But if I read the interview, it may trigger something in my memory.

Q Okay. So, the statement from Ms. Durham starts on P3573.

A Okay.

Q Okay. Going onto P3574.

A Okay.

Q Okay. And do you see that Ms. Durham identifies Rob as having a gun on the night that decedent Robert Campbell was killed on November 9th of 1996?

A It appears to me, counselor, she describes a very small semiautomatic type of handgun, which was much smaller than the actual weapon that was used to kill Robert Campbell.

Q Okay. But, um --

A She even says it was cute and that she wanted to buy it.

Q Sure. But is, um -- I mean, is Ms. Durham relating to police that Rob was in the area of the shooting

on the night of the shooting and that he had ha gun?
A Essentially, yes, he is. That's what his -- I take that to be what she is saying here.
Q Okay. That's fair enough. So, that's the end of that statement. Let's, um, go down and see, um, when the next statement is. I mean, there's other activity sheets and so forth, but I want to just go through the statements.
A Counselor, let me point out that, again, the last interview you showed me, um, that woman is making reference to a very small semiautomatic handgun, which was not the kind of weapon that was used to kill Robert Campbell.
Q Um-hum. I'm just looking for actual statements. Just one second, Detective.
A You past by one statement already. You just, you know, quickly went through it right there.
Q Yes, I saw that. There's no identifications from any of that statement.
A If I'm not mistaken that statement from what I just saw may have been taken by one of the detectives at the scene. That could be very relevant to what you're seeking.
Q Just one second, sir. I'm just going through this.
THE COURT REPORTER: Would I be able to take a quick bathroom break?

MR. O'HANLON: Yeah, yeah, yeah.

THE COURT REPORTER: One second. I'll be right back.

MR. O'HANLON: Absolutely. Yeah, yeah, yeah.

THE COURT REPORTER: Okay.

MR. O'HANLON: Let's take a -- let's take a break until 12:00.

THE WITNESS: Can we make it a little longer? It's 11:55. Can we make it 12:15?

MR. O'HANLON: Yes, absolutely.

THE WITNESS: I'd like to check on my wife to make sure everything is okay.

MR. O'HANLON: Okay. Sure. 12:15 then.

(Whereupon a short break was taken.)

THE COURT REPORTER: We're back on the record.

BY MR. O'HANLON:

Q Let me just, um, go back to the share screen again. Okay? Just one second, Detective.

So, now I'm going to P3681, which is a statement from somebody called Richard Anderson. I cannot read that, um, detective's name on the top right. Can you read that, sir?

A No, I can't.
Q Is it Detective P. McKelby, or something like that?
A Perhaps.
Q McKelby? Did you know a detective by that name?
A Not by the name McKelby, no.
Q Anything close to that?
A It could be McKelvie.
Q Yeah, that would seem to make sense. M-C-H-E-L-V-I-E? Is that how you spell that if you remember, Detective?
A It's with a K, not a -- not an H.
Q Oh. I see. So, that --
A I believe. That's -- you know, it -- it could be -- now that you're -- that could be an H, or K I believe.
Q All right. Well, one of the two. Was there a Detective by the name of P. McKelvie who worked with you on the Ricardo Natividad investigation?
A At this time, I don't recall, um, that he actually worked with me on this. But if his -- if his name is here on the interview, then it speaks for itself.
Q Okay.
A And he did take this interview, and he was in Homicide at -- you know, on the date of the incident -- or

at least on the date of the interview, which looks to be November the 12th, 1996.

Q And do you know what the P stands for?

A It was Paul. Paul.

Q Okay. And this is, um, a statement of, um, Richard Anderson in relation to the death of Robert Campbell on 11/9/1996. And you can tell me how quickly, or slowly you'd like me to scroll down.

A You can keep going.

Q Okay. (Whereupon Mr. O'Hanlon scrolls through the document.) On P3681, it appears to just be preliminary questions. So, I'll go on --

A Hold on. You're going too fast.

Q Yeah, just hold on one second. I'm just, um -- so, I can reference the Bates number, I need to scroll down to the bottom of the page first. So, it's P3682, and then I'll go right back up to the top. All right?

A Okay.

Q (Whereupon Mr. O'Hanlon scrolls through the document.)

A Okay.

Q Okay. Going onto the following page, which is P3683.

A Okay.

Q All right. Let me just ask you, um, these questions. Um, this is a question from the Detective to Mr. Anderson.

Since the shooting of Mr. Campbell, have you spoke to anyone who may have information into the shooting. The answer is, yes. A white female -- that's, W/F -- Tish. I think her last name is Ambersini, A-M-B-E-R-S -- I'm sorry -- A-M-B-E-R-N-I-S-I. She is here with me.

What information did she give you about the shooting. She stated that a male came to her house last night and told her that the house at 922 Wynnewood Road -- I can't read that next word. Can you?

A Well, first of all, you gave -- you read the wrong address, counselor. You said 9 twenty-something. 921, or --

Q 929.

A It's 929. Okay.

Q Yes. Wynnewood Road. And can you read that next --

A Who?

Q You. Can you read that --

A No, no. I'm saying --

Q Oh. I'm sorry.

A I'm reading the word that you're asking me to

read.
Q Oh, okay. So -- so, it says who?
A It's, W-H-O, counselor.
Q Oh, I see. Okay. The H is broken up. Okay. So, it says she stated that a male came to her house, um, last night and told her that the house at 929 Wynnewood Road, who took the house over a short time ago and called themselves the Junior Black Mafia had something to do with the shooting of Mr. Campbell. Did I read that correctly?
A Yes.
Q Do you ever remember during this investigation hearing anything about the Junior Black Mafia being involved in the killing of Mr. Campbell?
A This document -- I would have read this document, so -- at the time shortly after it was taken. So -- and I would have read it at that point. Specifically I don't remem -- I don't remember, um, the situation.
But if it's there, then I would have been made aware of it at the time.
Q Okay. And then it says did she give you the name of the male that came to her house. Answer. No.
Going onto the following page, which is P3684. Did she say it was a friend of hers, or how her house -- I'm sorry. Can you read that, that first question at the top of

P3684?

A It says did she say it was a friend of hers, or how her house was picked out.

Q And the answer is, no. And then it says are you familiar with the location at 929 Wynnewood Road. And the answer is, no.

Have you had any other instances where the Junior Black Mafia was involved -- I'm sorry -- have you had other instances where the Junior Black Mafia was involved in this shooting. And then his answer was on Sunday night at about 6:30 I was walking past 64th and Callowhill Street where I past a group of males fourteen to eighteen years both black and white males. I overheard one of the males saying they think it was one of the JBM who did it. I took it to be the shooting at the gas station.

Um, question. Do you know any of these males. And it says, no, but I think they are from the neighborhood. Did I read that correctly?

A Yes.

Q Okay. So, going onto the next statement, which is, um -- which begins at P3685, which is from, um, Tish Ann Ambrosine, A-M-B-R-O-S-I-N-E. And this time, um, this is a statement taken from -- by yourself on November 12th of 1996, correct?

A Yes, it is.
Q Okay. And, again, I will just go through this slowly with you.
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q And Ms. Ambrosine halfway through that statement also references -- and I mean also in addition to Mr. Anderson the JBM, correct?
A Yes.
Q And tell me when you want me to scroll up and I will do so.
A Okay.
Q And do you see at the bottom of, um, P3686 Ms. Ambrosine talking about Rob -- I think that -- and here it's Rob, the decedent being a member of the Town Watch?
A No, counselor. Rob is the individual you've been trying to mention from before. This is the name Bob, and he's --
Q Oh. I'm sorry.
A -- he's talking about Bob Campbell.
Q Okay. So, this is Bob rather than Rob, correct?
A That is the word that's printed there, yes.

Q Okay. And you would be able to read your writing, um, better than me. Um --
A Hopefully, counselor. It's been a while.
Q Okay. So, the quotation that, um -- which is just in this paragraph at the bottom after, um -- well, can you just read from according to about halfway down?
A According to this male, those at -- and that's 929 Wynnewood -- were bragging how they -- there was a drug demonstration at 52nd and Haverford where the group Hard Hats were there. And some drug dealers told the Hard Hats you might have shut us down tonight, but we'll get yous.
Those at 929 Wynnewood were supposed to be bragging that they got Bob Campbell because he was one of the Hard Hats, but Bob wasn't. He was a member of Town Watch.
Q Okay. And can -- can you just keep reading? I'm sorry to -- to trouble you, but just so it's clear because it is your handwriting so hopefully you can read it better than anyone else.
A Question. Why would this male come and tell you all of this. Her answer. Because he knew Bob Campbell and knew I knew him too. He was afraid to go directly to the police and came to me because he trust me. He said he wanted the police to know about this so they could find Bob

Campbell's killer.

Q Okay. Can you keep going if possible?

A Question. Have you told anyone else about this. Her answer. Yeah, Rick Anderson, Pat Hoban. Diane, Rich's mother-in-law -- Diane told me to go and talk to the cops today -- and my husband, John Ambrosine. Do you want me to continue?

Q Yes, please, if possible. I'm sorry.

A Question. Do you believe the male told you the truth. Her answer. Yes, I do, or I wouldn't have come here. Question. Is there anything else you can add. Answer. That's pretty much everything. I'll let you know if I learn anything else.

Q Okay. As you sit here today, Detective, do you have any evidence, um, whatsoever about Ricardo Natividad having been a member of the Junior Black Mafia?

A No, nor do I have any -- nor was I ever able to develop any evidence that anyone at 929 Wynnewood Road had anything to do with the Junior Black Mafia either.

The police department had extensive dealings especially Homicide with the Junior Black Mafia. That location and the names of the individuals that we found at that location were never part of the Junior Black Mafia as far as I know.

Q Okay. How about, um, Rolston Ricardo Robinson, AKA Rob, was he connected to the property at 929 Wynnewood?
A Yes. He is the one that -- that -- it was my understanding after we conducted all these interviews and the investigation that he is the one that took the house over and was selling drugs from that house and controlling all of the drug deal -- well, the drug addicts that were living there along with a couple of the drug dealers that he had working for him.
Q Okay. And Bob, that's Robert Campbell, the decedent, he was involved in Town Watch in that area, correct?
A Yes, sir, he was.
Q Okay. So, let's go onto, um, Patrick Hoban's statement that begins on P3688. Um, and there's an interviewer by the name of Detective Piree -- that's, P-I-R-E-E -- Badge Number 638. And, um, the interview is November 12th of 1996.
And, um, again, I'll scroll through this at whatever pace you want me to, Detective.
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.) So, going onto P3689.
A Okay.

Q So, here on P3689 does Mr. Hoban to be relaying information regarding a prior altercation between the decedent Robert Campbell and the drug dealers including Rob?

A Not at all, counselor. If you would read the words, it's very plain that this is an entirely different group from Wynnewood Road. This is not Wynnewood Road group. This is another location. And it clearly states here that Robert Campbell wasn't even there on the night of the confrontation there.

Q This Robert -- this Robert that he's referencing here where I've highlighted R-O-B-T, do you believe that that's Robert Campbell?

A One-hundred percent, sir. If you would go up to the very next -- just the previous line, sir, all you have to do is read the question there. And it says was R-O-B-T Campbell present and if -- and if any confrontations were made concerning these two locations.

Q I see. Okay. So, let's go down to P3690, which is the following page. Tell me when to go forward.

A You can go down.

Q (Whereupon Mr. O'Hanlon scrolls through the document.)

A Can you -- you went too fast.

Q I'm sorry. (Whereupon Mr. O'Hanlon scrolls

through the document.)
A Okay.
Q Let's go back to the first page of this statement, which is -- I'm sorry -- to the second -- to the first page of substance, which is P3689.
Um, Mr. Hoban was -- he worked for this Town Watch with, um -- with Robert Campbell. Does that sound right?
A Yes.
Q And does, um, Mr. Hoban relay to -- sorry -- Detective Piree that him -- that -- that Town Watch was monitoring two houses in the area. And this is halfway, um, down P3689?
A Yes.
Q Okay. Going to P3690, which is a statement taken by W. Cross. Do you know who that individual is?
A It's probably Gross. W. Gross.
Q Oh. I'm sorry. There's a line through the G. Who's W. Gross?
A He's the Detective that took this statement.
Q Okay. And what's his first name? Is it William?
A There would be -- there were two of them. This one looks like it was William Gross.
Q Okay. And there's an interview of a Police Officer by the name of Shane Dardon from November 14th of

1996. Do you remember reviewing this statement previously?
A I would have reviewed it. Um, I don't recall it though at this point in time. But I -- I -- if it was taken and it had something to do with my case, I certainly would have reviewed it.
Q Okay. And it says, um, we are questioning you concerning the shooting of Bill Campbell on November 9th of 1996. That must be Bob Campbell, correct?
A Yes. Detective Gross wasn't in my squad, so he probably had very little information as to the particulars of this case?
Q Okay. I understand. Okay. (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q Okay. Just at the bottom of, um, P3699, Officer Dardon relays to Detective Gross that Michael Cuapainolo owns a property, and that Rob whose real name is Rolston Robinson and Rob was tell him that people in the house that he, Rob was there when Campbell was shot at 63rd and Vine.
Did I read that fairly accurately? Not one-hundred percent, but there's a -- there's a typo.
A Yes. And what exactly are you saying about this now?
Q Did I read that accurately?

A Would you say what -- I'm sorry. I -- I missed -- as you were reading it, I lost where you were reading.
Q Okay. Here is Officer Dardon relaying to Detective Cross that Michael --
A Gross.
Q Gross. I'm sorry -- that Michael Cuapainolo had relayed that Rob, whose real name is Rolston Robinson admitted that he was at the scene when Campbell was shot. Is that what is relayed on P3699?
A That -- that he -- it says that he was -- it's -- it's a little hard to understand.
But it seems that he's saying there Rob was tell him that people in the house that he, Rob was there when Campbell was shot at 63rd and Vine Street.
Q Okay. Let's go onto the following page, which is P3700. (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q All right. And here the police officer is relaying to the Detective that Tracie Durham said to the police officer that, um, she saw Rob Rolston drive by the gas station ten minutes to prior to the shooting, correct?
A No, sir. It says there -- the exact words are, um -- that you tried to just read I believe was she had seen

Rob Rolston drive by the gas station twice in a gray sedan, which is a very significant -- very, very significant report as far as I'm concerned because nowhere at no time was it ever described that the vehicle used by the perpetrator, who was Ricardo Natividad was a gray sedan, nor -- so, that was a very significant information as far as I was concerned that -- that we learned from these people.

Q Hmm. But my question is is the police officer relaying to the Detective that Tracie Durham told the police officer that Rob Rolston was at the scene of the shooting around about ten minutes prior to the shooting?

A No. She's saying that he drove by the gas station twice in a gray sedan.

Q Um-hum.

A That's not meaning at the gas station. And -- that's driving by the gas station twice in a gray sedan, which is extremely, extremely important information if you are a good investigator and not trying to frame someone.

Q Okay. So, again, is Ms. Durham relaying to police that Rob Rolston was in the scene of the shooting -- was at the scene of the shooting at least once, possibly twice ten minutes prior to the shooting?

A Counselor, it says he drove by the gas station twice in a gray sedan. It does not say that he is there.

Q Okay. Okay. Let's just read it out, okay. Tracie Durham -- D-U-R-H-A-M -- said to me that the night of the shooting she was on a payphone about ten minutes prior to the shooting. She seen Rob Rolston drive by the gas station twice in a gray Sedan. Did I read that correctly?
A This time you did, sir, yes.
Q All right. Thank you.
A Thank you.
Q Okay. Let's go onto P3781, Police Officer Rita Wilson giving a statement to Detective Hoffner -- that's, H-O-F-F-N-E-R -- Badge Number 9001 on November 14th of 1996. Do you remember reviewing this statement?
A I don't remember reviewing it. But if the statement was taken on that date, I would have reviewed it.
Q Okay. So, let's go through this statement. And we're --
A And once again --
Q -- almost done.
A And once again to clarify things, Detective Hoffner was not in my squad. So, he would not have had the -- the -- tremendous information -- number of -- amount of information concerning this killing.
Sir, please understand at that point in time we were dealing -- in Homicide alone, we were dealing with

anywhere from four to five-hundred killings per year in the City of Philadelphia.
Q Um-hum.
A So, it's -- it's very, very hard for people to gain information of -- about a job -- cases that involved other squads. It's -- that was -- that's very, very difficult because everyone was pretty much extremely busy with their own cases and their own squad. And he was in a different -- these two last Detectives that you mentioned were in a different squad.
Q All right. Thank you. But let's just go through P3701. Whenever, um, you want me to scroll up, I will scroll up further.
A Okay.
Q So, here is a mention of Joseph Rutherford, who we talked about earlier. But let's go onto -- is that correct, we talked about Joseph Rutherford earlier?
A Um, yes, we did. We talked about a Joseph Rutherford. And this particular thing is -- once again, these -- these are -- he's relating -- this information is all relating over to about a drug debt.
Q Okay. So, we're going onto P3702. And, um, it's a continued answer, um, by -- by Officer Wilson.
A Okay.

Q All right. Let's read that. So, at the top of, um, P0003702, um, Officer Wilson gives this information relayed to her by Joseph Rutherford. It says answer, um, said that one of the males named Robinson, nicknamed Rob said to him we're going to do you what we did to that guy at 63rd and Vine.

The complainant got in my car and said the males live at either -- and it's blacked out. I drove over there and Rutherford got out of the car and ran to the corner of 64th and Wynnewood. A black Acura pulled off. Then, I observed a gray Acura with three black males in it with the same PA -- sorry -- the same partial tag at -- can you read that, Detective? Is it 6900 Wynnewood?

A It appears to be -- it appears to at least be 900 Wynnewood.

Q Okay. Rutherford then identified them as the males who threatened him and Rolston Robinson as the male who made the remark about 63rd and Vine. Rutherford also stated that he saw Robinson in a black Lincoln before. All three males were transported to Homicide, and I brought Rutherford here to be interviewed.

Um, what kind of car was involved in the shooting?

A It was a, um, Lincoln Town Car.

Q Okay. Was it a dark colored Lincoln?

A Yes, it was.
Q Okay. So, here in Anita Wilson's statement, is she, in fact, linking Rob to a Lincoln, a dark Lincoln vehicle?
A No. She's not linking him there. The person named Rutherford is linking him to this black Lincoln.
Q Okay. But --
A And she is the Police Officer. The Police Officer is only repeating what she heard from -- from Rutherford.
Q Okay. So, that's on P3702. So, we'll end -- I believe that's it. So, we can stop sharing, um, at least for a minute.
Okay. You said that you worked for Homicide for approximately thirty of your forty years with the Philadelphia Police Department, is that correct?
A I was assigned to Homicide for thirty -- thirty years. I was detailed out several times for other investigations, um, that, um -- and then I would come back -- and then I would come back to Homicide once I was finished those investigations.
Q Okay. So, can you tell me, um, about how -- about your training in relation to, um, forming Affidavit's of Probable Cause? How -- what were you trained?
A Well, before you became a Detective, you go to --

you know, they have approximately a three-week class, and you're trained in the paperwork that you'll prepare as a Detective, um, the preliminary paperwork.

You then go to a division. And I worked six years at South Detective Division during which time, um, I prepared many, many Affidavit's of Probable Cause, um, for arrest warrants and search warrants, um, for persons involved in criminal activity.

And we -- we -- basically it's, um, you were taught initially how to prepare them. And when you go to a Division, you're taught -- your shown by other detectives who had been there for a number of years. And your -- your work is always reviewed by supervisors, and then subsequently reviewed by, um, District Attorney's, who review all -- all the Affidavit's of Probable Cause prior to issuing any type of, um, warrant whether it's a search warrant, or an arrest warrant.

Q Okay. And in an arrest warrant for a murder, um, what -- are you given any specific training in that regard?

A Well, as I said, it's -- it's the -- you learn from -- from all the time that -- from when you first go to a detective division and you're handling numerous types of crimes, all crimes except homicides and sex crimes that -- you're learning that all -- every -- every time you prepare

one, it's a new experience. You learn from the critiques that you get from District Attorneys and also your supervisors and fellow detectives.

And periodically there would be, um, classes at the Police Academy to -- to go over how the certain documents are prepared. And then when you went to Homicide, the same -- it was the same format again. There were older detectives. They would review anything that you prepared. The supervisors would review it. They would go over it with you.

And then you would present it to whoever -- whatever District Attorney was available and they would critique these things. And that would -- it was a constant learning process.

Q Okay. And once you submit an Affidavit of Probable Cause and it's signed off by your supervisor and approved by the District -- and signed off by the District Attorney, where does it go?

A Well, it's actually not signed off by a supervisor. It's -- the supervisor reviews it and -- and then, um, once they approve of you getting it, then you present that document to the District Attorney. It's the District Attorney that signs the -- that signs the, um -- the arrest warrant and also the -- and the Affidavit.

Q And were does it go for final approval?
A At one time, we took it to the District Attorney's trailer, which was right -- located in the -- the parking lot of the PAB. And then subsequently, um, it would just be faxed to them.
And then you would take it to a Bail Commissioner, um, who initially sat in the PAB, but then was moved over to the Justice Center once that building was completed. So, you had to take it over there and present it to, um, the District Attorney that was over there. Um, and then also the, um, Bail Commissioner, who was sitting in -- in the Justice Center, um, next door to where the District Attorney sat.
Q And the Bail Commissioner, um, ultimately signs off on it, is that correct?
A They do sign -- yes. To make it a legal document, they do sign off on it, yes.
Q Okay. And in your training, are you encouraged to leave out pertinent information in your Affidavit of Probable Cause?
A Absolutely not. And I would -- I would never do that. Counselor, you have to understand my job is to find the truth as oppose to certain other people's jobs. My job is to find out the truth of an incident. I would never hold

out anything that's pertinent to an investigation in an Affidavit of Probable Cause.

Q Okay. So, you wouldn't leave out an alternate suspect, correct?

MR. JACKAL: Objection to the form of the question.

MR. JOHNSON: Objection.

MR. JACKAL: You can answer, Detective.

THE WITNESS: Counselor, there would be no reason to present that information in an Affidavit of Probable Cause. That would have been -- that -- all of that information would have been explored prior to it being prepared by both my -- by the assigned detective and also by the supervisors involved in the incident.

And also with the -- the District Attorney, um, if -- if it was felt that that was a -- that was a pertinent -- in anyway, shape, or form if that was pertinent to an investigation. Otherwise, we would be accused of hiding things, and that was not something that I would ever do.

BY MR. O'HANLON:

Q Okay.

A In fact, it's -- as you can see, if I were that

type of person, the information that we -- you just showed me, all of those things you showed me, it would have been very easy if I was so inclined to accuse that person Rolston that you described here so many times as -- as admitting -- supposedly admitting to killing Bob Campbell.

And you can clearly see that at no time whatsoever was there ever any Affidavit prepared in anyway, shape, or form accusing Rolston of being the actual shooter.

Q Okay. So, getting back to my question. Um, are you supposed to leave out alternate suspects from an Affidavit of Probable Cause from your training?

MR. JACKAL: Objection to the form --

MR. JOHNSON: Objection.

MR. JACKAL: -- of the question.

MR. JOHNSON: Objection as well.

BY MR. O'HANLON:

Q You can answer.

A Counselor, you're trained to put the information that is -- that would lead you to believe that the person you are charging is the person responsible for the crime you are charging them with.

There is no reason to bring in anything -- it's -- there's so many cases where people come in and talk -- tell you stories about all types of different things. Your job

is to determine whether or not who is the truthful persons, the people, and who is not.

So, therefore, in an Affidavit you prepare charging with the documents that -- with the documentation showing your investigation that lead you to believe that the person you're charging is the one responsible for the crime they are being charged with.

Q Okay. And the Neutral Magistrate, or the Bail Commissioner in this case is supposed to be involved of -- informed of all pertinent facts, correct?

MR. JACKAL: Objection to the form of the question. You can answer.

MR. JOHNSON: Objection.

THE WITNESS: Counselor, many times the Bail Commissioner would have questions for you, and you would answer those questions. And -- and you would be truthful in whatever you said because the moment -- if you ever -- if you ever lied and it was determined that you had lied, it would be the end of your career.

BY MR. O'HANLON:

Q Okay. So, the same question, again, is isn't the Neutral Magistrate, or the Bail Commissioner in this case supposed to be informed of all pertinent facts before he, or

she signs off on an arrest warrant for a homicide?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: All of the pertinent facts pertain to the person you are charging, counselor. That is what you -- that is what you present.

BY MR. O'HANLON:

Q Okay. So, again, it -- do you -- do you see -- the Affidavit of Probable Cause that you submit, is it supposed to be a persuasive document?

MR. JACKAL: Objection to --

MR. JOHNSON: Objection.

MR. JACKAL: -- the form of the question. You can answer the question, Detective.

THE WITNESS: No, sir. It's a very simple matter, sir. You state the facts of the case as you discovered them and as they pertain to charging that individual who you are charging.

It has nothing -- there are no -- you just keep it very simple and to the point. Um, it's -- it's a very limited document. There are hearings that would determine all of these other matters that you're speaking of that --

BY MR. O'HANLON:

Q Okay.
A -- that can occur.
Q Okay. So, in -- in the -- in this case, we just spent a couple of hours going through, um, various statements, correct?
A Yes, we did.
Q And we have various people relaying to police that Rob, or Rolston Ricardo Robinson admitted to killing Robert Campbell, correct?
A I wouldn't characterize it as him admitting, counselor. These -- this is what certain people are reporting to tell us. You have to consider when you talk to people that you -- number one, almost all the individuals we were dealing with out of that Wynnewood Road location were either drug addicts, or drug dealers.
Anything that a drug addict, or a drug dealer tells you as a Police Officer you take with many grains of salt. You thoroughly investigate whether or not they're telling the truth, or if it's something that they heard and they're passing it off as -- as if something that they saw.
It's -- it's a painstaking time consuming process, but it's something that we all do as detectives. It's what we're -- it's -- it's in our very nature not to present lies.

Q Okay. And in addition to, um, Rob, or Rolston Ricardo Robinson, you also had at least two people relay to police that the Junior Black Mafia was involved in the killing of Robert Campbell, correct?

A Again, counselor, they were -- that was information that came -- and in every homicide that has to be investigated, there is a number of suppositions that people try to present to us as police officers, as detectives.

And, in fact, once you investigate it, you find that it -- that they did not -- it was not truthful. And they may have -- may have had their best -- the people's best interest at heart, but, in fact, they -- it was just not true.

Q Okay. So, um, do you believe that it's, um, your role to decide upon what is true and not true? Is it your role only?

A No, sir. But at --

MR. JACKAL: Objection to the form of the question. I'm sorry, Detective. Objection to the form of the question. You can answer.

THE WITNESS: No, sir, I don't. You have to understand, sir, at the time of an invest -- you know, an incident, and then an

investigation, the detective is the one that's responsible for putting the case together and presenting that case and that information to the District Attorney's Office.

And it's -- and at that point if the warrant is approved and we are able to, or finally do arrest someone, then that case will obviously go to a preliminary hearing, and that case will be greatly explored by -- by District Attorneys and other -- and defense attorneys and everyone else.

And any question about the validity of anything will certainly be brought to light during the course of those -- that -- those things.

BY MR. O'HANLON:

Q Okay.

A And in this case, I -- there is no doubt in my mind Ricardo Natividad killed Robert Campbell. I would not arrest someone if I did not truly believe that they were the person that did the killing. It will serve me no purpose, counselor, whatsoever to arrest the wrong individual.

There had been a case that I was -- that I was very much apart of where a Police Officer was killed because a drug dealer was killed by another drug dealer, who happened to be part of the Junior Black Mafia. And because

of cutbacks in the police department, we were ordered not to conduct any overtime on drug related killings.

The killing happened on a Saturday morning, and we had to stop working on the case at 4:00 that afternoon and we were off for the next two days. So, nothing was done on the case.

Ten days later the individual who had murdered the drug dealer in North Philadelphia was driving a car, a stolen car. The Police Officer saw the stolen car and chased the -- what he believed was a stolen car.

Unbeknownst to him, the individual driving the car had been the person who had committed the murder ten days prior. And when the car crashed that the Police Officer was chasing, the individuals jumped out, fired through the window shield, and the officer ultimately died.

It would behoove me to -- it -- I would be -- I should -- I should be fired if I were ever to lock up the wrong person that had done a killing and I allowed the right person to walk the streets of Philadelphia.

Q All right. I'm going to show you something, Detective, that has been marked -- that I will mark as Exhibit P-1 Dougherty and I will share my screen.

(Whereupon the court reporter marked Exhibit P-1 Dougherty for identification.)

BY MR. O'HANLON:

Q Do you recognize this document? Let me see if I can make it any bigger. Just one second.

A No. I, um -- I can read. As far as what you've shown there, yes. But there's -- there's something written on the sides that I cannot -- I don't know what's written on the side.

Q All right. Neither do I. Um, but tell me when to stop scrolling down. (Whereupon Mr. O'Hanlon scrolls through the document.)

A Okay.

Q (Whereupon Mr. O'Hanlon scrolls through the document.)

A Okay.

Q (Whereupon Mr. O'Hanlon scrolls through the document.)

A Okay.

Q All right. Is that your signature on each page of that document?

A Yes, it is.

Q And so that is Exhibit P-1 Dougherty. And is that the Affidavit of Probable Cause that you submitted for the arrest of Ricardo Natividad?

A Yes, it is.

Q Okay. Anywhere in that document do you see the name of Rolston Ricardo Robinson, or Rob?
A No, sir.
Q Anywhere in that document do you see any reference to the Junior Black Mafia?
A No, sir.
Q Anywhere in that document do you see any reference to any statement by John McCullough?
A No, sir. I never even spoken to John McCullough at the time of this arrest warrant.
Q Okay. And do you see any reference to Tish Ann Ambrosine?
A No, sir. None of that information -- none of those questions you asked would be relevant to this Affidavit of Probable Cause.
Q Do you see any reference to Patrick Hoban?
A No, sir. Again -- once again, any information from them would not be necessary, or relevant for an Affidavit of Probable Cause for an arrest warrant.
Q How about Joseph Rutherford?
A No, sir. Once again, anything from Joseph Rutherford would not be relevant in the arrest warrant.
Q Cynthia Smith?
A No, sir. Once again, nothing from Cynthia Smith

would be relevant for this arrest warrant.
Q Police Officer Dardon?
A No, sir. Once again, nothing from Officer Dardon would have been relevant for the probable cause for the arrest warrant.
Q Police Officer Wilson?
A No, sir. Once again, nothing from Officer Wilson would have been relevant for the probable cause for this particular arrest warrant.
Q Tracie Durham?
A No, sir. Once again, nothing from Tracie Durham would have been relevant for the probable cause for this arrest warrant.
Q Okay. Richard Anderson? I'm not sure if I've already asked you.
A No, sir. Nothing from Richard Anderson would have been relevant for this probable cause for the arrest warrant.
Q Okay. So, how is the assigned Assistant District Attorney, or the Neutral Magistrate supposed to sign off on an arrest warrant where you have omitted all of the information about a potential alternative suspect?
A Because, counselor --
MR. JACKAL: Objection -- excuse me,

Detective. Let me just get my objection in. Thank you.

Objection to the form of the question. And, Detective, you can answer the question.

MR. JOHNSON: And I join in the objection.

THE WITNESS: Counselor, at the time I prepared that probable cause for the arrest warrant, I related all the facts as I had learned them to be. Facts, and not just conjecture, or braggadocio, or hearsay.

These were bona fide one-hundred percent facts that I had determined were the reasons that I had probable cause to arrest Ricardo Natividad for the murder of Robert Campbell.

BY MR. O'HANLON:

Q So, my question, again, is how is the Assistant District Attorney, or the Neutral Magistrate supposed to have, um, a proper objective view of an Affidavit of Probable Cause if you decide to omit, um, at least ten witnesses as well as an alternate suspect and a gang with motive to kill the decedent?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

MR. JOHNSON: I join in the objection.

THE WITNESS: Counselor, once again, it was my investigation. And as a result of reading all of the information that had been gathered that I believe -- and that's what it says there, that I believe. And I -- and I take an oath and I swear to that, that I believe what was in there was the truth.

And the truth was that Ricardo Natividad was the person responsible for killing Robert Campbell. No one else was responsible for killing Robert Campbell expect Ricardo Natividad.

BY MR. O'HANLON:

Q Okay. But do you understand from your training the purpose of an Affidavit of Probable Cause?

MR. JACKAL: Objection to the form of the question. You can answer.

MR. JOHNSON: I join in the objection. Do you understand it?

THE WITNESS: Counselor, I understand probable cause are those facts that a person, mainly detectives put together to establish what occurred and who was responsible for what occurred. And that information is put together in

the Affidavit of Probable Cause, and then is sworn to by a detective.

And if, in fact, the detective is found to be not telling the truth, it would be the end of his career.

BY MR. O'HANLON:

Q Okay. So, do you remember having a motion to suppress hearing in relation to the identification of Ricardo Natividad by, um -- just one second -- by Michael Havens?

A No, sir, I don't recall that, that particular, um, motion. If you show me documents, or a transcript of it, then I -- it may refresh my mind.

Q Okay.

A As I said, counselor, please understand I was working on hundreds of homicides. Over -- probably over two-thousand homicides in my career. To remember each and every one is -- is not an easy -- it's -- it's impossible for me to do that.

Q And at that motion to suppress hearing, again, you didn't mention, um, Rob, or Rolston Ricardo Robinson if you remember?

MR. JACKAL: Objection to the form of the question. He's already testified that he

doesn't remember. It's an improper question.

BY MR. O'HANLON:

Q Do you remember mentioning Rolston Ricardo Robinson at a motion to suppress hearing?

MR. JACKAL: Same objection. You can answer.

THE WITNESS: I don't remember what was testified to at any motion. Counselor, you'd have to show me the transcripts to refresh my memory.

BY MR. O'HANLON:

Q Okay. Do you remember mentioning, um, Rolston Ricardo Robinson, or Rob when you testified at Mr. Natividad's criminal trial?

MR. JACKAL: Objection. You can answer.

THE WITNESS: Counselor, I don't remember what I testified to at the trial. I would have to be shown the transcript to refresh my memory.

BY MR. O'HANLON:

Q Okay. Do you remember mentioning the Junior Black Mafia when you testified at Mr. Natividad's criminal trial?

MR. JACKAL: Objection. You can answer.

THE WITNESS: No, sir. Um, there would have been no -- there would have been no reason

for me to mention -- to even mention the Junior Black Mafia at Natividad's trial because it been my determination that the Junior Black Mafia had nothing to do with the killing of Ricardo Natividad.

BY MR. O'HANLON:

Q Okay. So, it's your determination -- so, a jury should not hear about the Junior Black Mafia's alleged involvement. Is that your testimony now?

MR. JACKAL: Objection. It's not his testimony. You're misstating testimony. You can answer the question, Detective.

THE WITNESS: Could you repeat the question, counselor?

BY MR. O'HANLON:

Q Yes. Um, is it your testimony that because you believed that the Junior Black Mafia was not involved in the killing of Mr. Campbell that a jury, or defense counsel does not have the right to hear about the alleged involvement of the Junior Black Mafia?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: Counselor, all I'm able to do is answer the questions that are asked of me

when I'm on the witness stand.

I cannot add information that has nothing whatsoever to do with the case. I just answer the questions that are asked of me by either the prosecutor, or the defense attorney, or the judge.

BY MR. O'HANLON:

Q Do you know why Rolston Ricardo Robinson, or Rob was never mentioned at Mr. Natividad's criminal trail?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: Personally, I do not know why. The only thing I can surmise -- I was not in the room during the test -- any of the testimony.

The only thing I can surmise is because this individual you just mentioned had nothing whatsoever to do with the killing of -- of Robert Campbell. The person that was responsible for the killing was Ricardo Natividad. Not anyone else.

BY MR. O'HANLON:

Q Okay. Do you know why the Junior Black Mafia were never mentioned at Mr. Natividad's criminal trial?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: Counselor, once again, I was not in the courtroom during the testimony. I don't know if they -- if that -- if that organization, that group was mentioned or not.

The only thing I can say is they had nothing whatsoever -- the result of my investigation showed they had nothing whatsoever to do with the killing of Robert Campbell, that it was the sole function of Ricardo Natividad who killed Robert Campbell.

BY MR. O'HANLON:

Q And do you think that it's your ultimate determination to decide who is responsible for the killing of Robert Campbell?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

MR. JOHNSON: I join in the objection.

THE WITNESS: Absolutely not, counselor. It is not in my power to make that determination.

All that I can do is present the facts that I learned during the course of an investigation to the District Attorney's Office for approval of an arrest warrant, and then subsequently at any court hearing present exactly

what l found during the course of the investigation.

That is not my determination to determine. It was a jury that found Ricardo Natividad responsible ultimately for killing Robert Campbell and gave him a death sentence.

BY MR. O'HANLON:

Q Yes. Um, do you know why your first interview of Byron Price was conducted at his attorney's office on December 30th of 1996 at 100 South Broad Street?

A Yes.

Q Why did it occur at his attorney's office?

A Because that was the arrangement that was made with his attorney.

Q Okay. Was he arrested at his attorney's office?

A No, sir, he was not.

Q Why not?

A Because he was a witness at that point in time, sir. And I had clear indication that only one individual got out of the car and fired one shot into the head of Robert Campbell killing him.

Q What about, um, earlier on the same day of November 9th of 1996, did Byron Price admit to you that he was involved, um, in a robbery of an individual called

Michael Havens in the area of Island and Elmwood Avenues?
A Counselor, I don't remember -- I -- I don't have an answer for that question. I -- I do not remember. I'd have to review all the documents in order to give you an honest answer.
Q Okay. Let's, um -- let's have a look -- I just want to have a look at one statement very quickly. Just one second.
I'll mark this as, um -- just one second. I'm sorry. I -- I didn't have this premarked, but I just want to show you something very quickly if I may. Um, and I'll -- I'll mark this as -- as, um, P-3 Dougherty. And, um, let me share my screen. And you can tell me if you can see this properly.
THE COURT REPORTER: I'm sorry. Did we have Exhibit P-2 Dougherty?
MR. O'HANLON: Um -- oh. Sorry. Yes. This will -- this will be P-3. I'll show you, um --
THE COURT REPORTER: Okay.
MR. O'HANLON: I'll show you P-2 in a second.
THE COURT REPORTER: That's fine. I was just checking.

(Whereupon the court reporter marked Exhibit P-3 Dougherty for identification.)

BY MR. O'HANLON:

Q Okay. Who's that -- who's this individual at the top here, this interviewer?

A That appears to be, um, Detective Centano.

Q Okay. And this statement is from February 2nd of '97. It's not the statement at, um -- at his attorney's office.

Um -- and I'll go down to -- this one is Bates-stamped with City01430.

A Is there a question about this?

Q Yes. If you want to just read it, then I'll -- I'll --

A Can you -- hold on. You're going too fast for me. You have to go back to the beginning, please.

Q Yes. Sorry. Where? The first page?

A Yes, please. I didn't know what -- if you were having a question, or you were just showing it to me.

Q Okay. Tell me when to scroll down, Detective.

A You can go down.

Q You know what, while, um -- while you're reading it, what I'll do is I'll print it and mark it.

All right. (Whereupon Mr. O'Hanlon scrolls through

the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q (Whereupon Mr. O'Hanlon scrolls through the document.)
A Okay.
Q So, I'll stop sharing. Um, do you know if Mr. Price was ever charged with anything stemming from either the gunpoint robbery of Michael Havens, or the killing of Robert Campbell?
A Not to my -- he was not charged with anything as far as I -- to my knowledge.
Q Do you remember him having any open cases at the

time?
A No, I do not remember.
Q Do you know why the -- do you know why detectives have to had to take at least three witness statements from Mr. Price?
A Counselor, that's a mis -- whatever you're saying there, that -- that I believe is definitely a -- you're -- you're misstating whatever happened. You have to show me those statements so I can give you an answer.
But three -- that -- you know, that's -- I don't know, um, the answer to if -- whatever that question is, I'm not sure what you're speaking of. So, if you can show me three statements, I maybe able to answer that question.
Q Okay. Well, let's start with the two statements. There's the one that I just showed you. Do you remember -- do you remember reviewing that statement?
A Yes, sir, I do.
Q And there was the statement that you took at his lawyer's office at 100 South Broad Street, correct?
A Yes, sir, there was.
Q Okay. And --
A Which you have not -- by the way, which you have not shown me, so --
Q I have not shown --

A I have --
Q -- you yet.
A I have trouble, you know, trying to remember anything that was put in that -- that was in that statement. I would have difficulty without reading it.
Q Sure. Um -- but now we've gotten to two statements. So, why was it necessary to take two statements?
A Well, the first statement, counselor -- the first statement was in the very -- in the initial stages of the investigation.
The second statement would have been impossible to have taken until the incident occurred where Byron Price was assaulted by a member of Ricardo Natividad's family for the family learning that he was possibly, or probably a witness -- that he was speaking to the police about what had happened that night that Ricardo killed Robert Campbell.
So, it would be impossible not to -- if I had it all in one statement it would be -- counselor, that would be in -- that would be incredible.
Q Um-hum. Detective, do you know -- do you remember, um, at the first interview with Byron Price him telling you that Ricardo Natividad carried either a 38 special, or a beretta? Do you remember him telling you

that?

A No, sir. I don't remember anything he said in the statement other than Ricardo Natividad was the person who shot and killed Robert Campbell at the gas station at 63rd and Vine Streets.

Without you having me review -- allowing me to review the interview, I cannot answer any questions regarding that. I don't have direct memory of any of those things.

Q Okay. And do you remember subsequently learning that, um, a gun was handed over, a 357 Magnum with distinctive grips at the bottom of the handle of the gun. Do you ever remember hearing about that?

A I do recall that a weapon was surrendered, um, that had been bought from Ricardo Natividad. And that sounds -- it sounds like the description of the weapon that was bought from Ricardo Natividad by one of his friends.

If you can show me the interview, I can -- I can answer the question in -- you know, more fully for you.

Q And then at a subsequent statement given -- it was only at a subsequent statement given by, um, Mr. Price that he said that Mr. Natividad may have had a 357 Magnum. Do you remember that?

A No, sir, I don't. I -- again, I would have to be

shown all of these interviews so my -- I can recollect in my memory how things transpired.

Q Okay. Do you ever remember an individual by the name of Robert Golatt? That's, G-O-L-A-T-T.

A I believe that was one of the associates of Ricardo Natividad.

Q Did you ever remember hearing that, um, Mr. Golatt -- sorry. Just one second. Let me just see another document very quickly.

Do you ever remember hearing about Mr. Golatt -- that's, G-O-L-A-T-T. Do you ever remember hearing about his testimony at trial that he was told by defendants in this case including you to, um, attribute the 357 Magnum to Ricardo Natividad in order to make Mr. Natividad seem guilty? Do you ever remember hearing about that?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: No, sir. I do not remember any of that. You'd have -- as I -- once again, I was sequestered during the course of the trial. So, I do not know what Mr. Golatt testified to.

BY MR. O'HANLON:

Q Did you tell Mr. Golatt to attribute a 357 Magnum

to Mr. Natividad even though there was no connection between a 357 Magnum and Mr. Natividad?

A Absolutely not. I would never tell anyone to attribute something to another individual that didn't.

Q Do you remember originally hearing from, um, Mr. Price -- that's Byron Price -- that Mr. Natividad was in possession of a 38 special when Mr. Campbell was killed?

A No, counselor, I don't -- I don't remember anything -- I have no recollection of what specifically Mr. Price would have said about any kind of weapons without reviewing the documents that you're referring to.

Q Okay. And if Mr. McCullough, III said that he was threatened by you, he would be lying, correct?

A One-hundred percent, counselor, he would be lying. That's not my style, to threaten people.

Q Okay.

A You don't threaten people and find out the truth at the same time.

Q Okay. And if he said that you didn't take any notes, or have any paper when you interviewed him, he would also be lying, correct?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: No, counselor. I did not

-- when I spoke to him, I did not write anything down in his presence. He refused to talk to me if I was going to write anything down.

That -- the information that I learned from him, I went out after the -- one day I had found keys in his house in his door lock. And I left a note, and he never returned -- he never returned my call. And I went out there several times before I finally found him.

And then when I did find him to give him his keys, um, he basically told me he was in a real big rush, that he had to get somewhere. And I spoke to him briefly, maybe for about twenty to thirty minutes at the most.

And at the time that he had to leave, I -- I then left his location, went outside, sat in the car and wrote down as best as I can recollect the conversation that he and I had just had during that previous thirty minutes. And that is the document that you briefly showed me at some point today.

BY MR. O'HANLON:

Q Okay. Do you remember, um, a prosecution of a defendant called Amar -- that's, A-M-A-R -- Green?

A Not off -- no. No, counselor, I don't offhand.

Q Um, the docket number -- and this will not help you remember, but just for the record is CP51-CR-1203321 of 2003.

Do you remember three individuals -- that's Amar Green, Marcus Franklin, and Marcus Moore -- all saying that you had threatened them prior to trial?

A Counselor, it's the first -- I do not recall that at all. It's the first I've heard of such an accusation.

Q Okay. Do you ever remember any of those three individuals saying that you had preprepared statements for them to sign?

A Counselor, if they said -- I do not recall any of that. And, counselor, I can absolutely tell you I have never prepared a statement first, and then gone to someone to have them sign it. That would be -- you know. That -- that is -- that would be -- once again, it would be -- that is not the way you conduct an investigation. It's not the way I conduct an investigation.

My investigations -- if someone signed something, it's -- the entire document is prepared in front of them, and then they're asked to read it, and then sign it if they will. I would never ever do what you just insinuated these individuals said. If they said that, they are not telling

the truth.

Q Just one second. I just want to read some note very quickly, Detective, and then -- all right.

I want to show you Plaintiff's Exhibit 2, that's P-2 Dougherty. Let me just close out of a couple of open documents. And I will share my screen with you. This is much shorter. I promise.

(Whereupon the court reporter marked Exhibit P-2 Dougherty for identification.)

BY MR. O'HANLON:

Q Do you recognize this handwritten note?

A Yes. I seem to -- I seem to recall this note, yes.

Q Is this the note that you were talking about earlier -- and I'll -- you see where my cursor is that says John Maculla, M-A-C-U-L-L-A? Do you see that?

A Yeah, I see that. And what -- what is your question?

Q Is this the note that you took about, um, Mr. McCullough being on the lot and saw the incident all the way back in 1996?

A Yes, it is.

Q Okay. And do you think -- it's your testimony about Mr. McCullough that he just made everything up to make

himself seem important?

MR. JACKAL: Objection to the form of the question.

BY MR. O'HANLON:

Q Is that what you testified -- is that what you testified to earlier?

MR. JACKAL: Same objection. You can answer, Detective.

THE WITNESS: Counselor, you asked what I believed about McCullough? Am I correct in -- am I correct in that, that you're asking --

BY MR. O'HANLON:

Q I'm -- I'm -- I'm asking if you remember what you said?

A I believe John McCullough -- I -- I know for a fact that John McCullough did not witness this killing. I took John McCullough -- as I said, I took him -- I had him come -- go out, and he took me to the middle of -- of 63rd Street south of Callowhill where it was impossible to have seen where the incident occurred.

And he also said that he had been with his son. I ascertained from his son that that, in fact, never happened. His son told me several times that his father exaggerates and is a bona fide liar.

Also, I believe as time went on -- I don't -- that John McCullough became an instrument of the Natividad family in order to -- for you people to start all of this -- this process by which you -- you -- you are -- you are creating a terrible injustice especially to the Robert Campbell family and the victim, Robert Campbell.

Q Okay. When you were at trial, at the Natividad criminal trial, did you ever see John McCullough at court for that trial?

A Sir, at that point in time, I did not know what John McCullough looked like.

Q Okay.

A I had never encountered John McCullough at that time of the trial.

Q And did you ever see Tish Ann Ambrosine at the criminal trial?

A I don't recall, counselor.

Q How about Patrick Hoban?

A I don't recall, counselor.

Q Joseph Rutherford?

A I don't recall.

Q Cynthia Smith?

A I don't recall.

Q Michael Cuapainolo?

A I don't recall.
Q Police Officer Dardon?
A I don't recall.
Q Police Officer Wilson?
A I don't recall.
Q Tracie Durham?
A I don't recall.
Q Richard Anderson?
A I don't recall.
Q Okay. So, I just want to show you something one final time. And I'll share my screen with you. Um, just wait. Let me close out of this first and open the document.
Well, let me ask you a preliminary question. All of the people and all of the statements that we've been through today, is it your testimony that they were turned over to the District Attorney's Office by you?
A Yes, sir. Every -- every item I had would -- was turned over to -- every item I had relating to this investigation was turned over to the District Attorney's Office by me.
Q And it's your belief that Mr. Sax would have turned over every single document that, um -- that you gave him that was exculpatory in relation to Mr. Natividad, correct?

A My belief is Richard Sax would turn over -- every document that was legally mandated for him to turn over to the defense would have been turned over.

Q Okay. So, I want to share my screen one final time, and I'll just ask you this question. Um -- sorry. Wait. I have to reopen the document and close another couple of documents. No, it's here.

So, my question to you, Detective Dougherty, is do you know why the District Attorney's Office on September 10th of 2014 is sending all of this discovery that we've been through today?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: Counselor, I believe that right in the very first -- if you go back up to the very beginning, perhaps that is why, because this individual who's writing the letter states there that I am forwarding copies of various documents you flagged while going though our trial file and office file relating to the above-captioned defendant.

So, I believe that is -- if -- if -- if there's anything truthful in the document, that's probably the reason why this was -- this

information was all sent to, um -- to whoever it was sent to and by whomever sent it.

BY MR. O'HANLON:

Q Okay. And here it -- it includes all of the statements from Cynthia Smith, Rolston Ricardo Robinson, Tracie Durham, and so forth, correct?

A It -- according -- according to this document you're showing me, there's -- there are many, many people's names there that you never mention.

Q Okay. And while you were going through the PCRA proceedings, did you ever, um, encounter trial counsel, criminal defense trial counsel, Donald Padova?

A Encounter him in what way, counselor?

Q Did you ever see him testify, or did you ever meet him?

A I did not, no, sir.

Q And are you aware that --

A I don't recall -- I don't recall ever, you know, encountering him.

Q And are you aware that he signed a declaration stating that he had never received any of this information in relation to, um, Rob, or Rolston Ricardo Robinson?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: I have no information whatsoever concerning any of that matter that you're speaking about, counselor. I -- and I was not part and parcel of anything with, um, Mr. Padova.

BY MR. O'HANLON:

Q Okay. All right. I believe that that's all the questions I have for you. Some of these attorneys might have some questions as well.

MR. JACKAL: Thank you, Detective. I don't have any questions for you. The attorneys for Richard Sax might have questions for you.

MR. JOHNSON: I have no questions. Thank you so much.

MR. O'HANLON: All right.

THE COURT REPORTER: Mr. Jackal, would you like a copy of the deposition transcript?

MR. JACKAL: Yes, please. An electronic only is fine.

THE COURT REPORTER: Okay. And, Mr. Johnson, would you like a copy of the deposition transcript?

MR. JOHNSON: Yes, please. And the same.

THE COURT REPORTER: Thank you so much.

(Whereupon the witness was excused and the deposition was concluded at 1:51 p.m.)

C E R T I F I C A T I O N

I, Heather K. Hines, Notary Public and Court Reporter, certify that the foregoing is a true and accurate transcript of the foregoing deposition, that the witness was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Heather Hines

Heather K. Hines
Court Reporter
and Notary Public.
My commission expires
August 22, 2027.

MAGNA LEGAL SERVICES

Web: MagnaLS.com Phone: 866.624.6221

# Magna Litigation Screen Grab Preview




*The video of this deposition may be available to order through our Magna VOD program. If this deposition was **not noticed** for video, all parties must approve of the production for it to be released to any party. Admissibility will ultimately be determined by a judge. Please visit magnals.com/vod to order.*



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**A-M-A-R** 115:24
**A-M-B-E-R-N-I-S-I** 69:8
**A-M-B-E-R-S** 69:7
**A-M-B-R-O-S-I-N-E** 71:22
**a.m** 1:14
**able** 40:23 45:19 50:1 62:21 65:23 73:1 74:17 94:6 103:23 110:13
**above-captioned** 121:21
**absolutely** 11:8 66:4,11 87:21 105:18 114:3 116:14
**Academy** 86:5
**accurate** 125:7
**accurately** 78:20,24
**accusation** 54:12 116:9
**accuse** 89:3
**accused** 88:20
**accusing** 89:8
**action** 1:2 125:12,15
**activity** 65:6 85:8
**actual** 18:13 33:16 37:7 38:11 62:17 64:18 65:12 89:8
**Acura** 83:10,11
**add** 74:11 104:2
**addict** 92:16
**addicts** 51:22 75:7 92:15
**addition** 72:9 93:1
**additional** 40:14
**address** 69:14
**admission** 56:14,24
**admissions** 27:6
**admit** 33:19 56:23 106:23
**admits** 31:20 56:19
**admitted** 25:8,23 26:23 27:6 34:8 40:3 79:8 92:8
**admitting** 26:15,24 56:10,22 61:14 89:4,5 92:10
**Affairs** 10:6
**affect** 13:10
**Affidavit** 4:14 23:3,6 86:15,24 87:19 88:2,11 89:7 89:11 90:3 91:9 96:22 97:15,19 99:19 100:15 101:1
**Affidavit's** 84:22 85:6,15
**afraid** 73:22
**afternoon** 95:4
**ago** 42:4 70:7
**agree** 25:4 31:19 48:6
**agreed** 5:1
**ahead** 38:4 46:23 57:14 62:10
**AKA** 12:14 75:2
**AL** 1:8
**allegations** 17:14
**alleged** 19:11 103:8,19
**allow** 36:1
**allowable** 56:15
**allowed** 37:22 95:18
**allowing** 112:6
**alluding** 13:2
**altercation** 76:2
**alternate** 12:12,12,17 23:24 88:3 89:10 99:21
**alternative** 11:24 98:22
**Amar** 115:24 116:5
**Ambersini** 69:7
**Ambrosine** 71:22 72:8,16 74:6 97:12 119:15
**amount** 81:21
**Anderson** 66:22 68:6 69:3 72:10 74:4 98:14,16 120:8
**Anita** 84:2
**Ann** 71:21 97:11 119:15
**answer** 6:12,13 10:17 11:4,7 11:17 12:3,20 13:13 13:20 15:21,23 16:13,19 17:9 18:11 19:19 20:7 22:15,23 26:9,19 27:3 28:24 32:13 33:11 34:13 35:6 36:18,20,23 37:19,21,22,22 39:4 39:24 42:2 43:6 45:19 47:9 48:9,13 53:4,8,11,20 57:24 58:6 59:16,20 60:4 61:6 62:13 69:6 70:21 71:4,6,10 73:21 74:4,10,12 82:23 83:3 88:8 89:17 90:12,16 91:3 91:14 93:21 99:4,24 100:17 102:6,14,22 103:12,22,24 104:4 104:11,24 105:16 107:3,5 110:9,11,13 112:7,19 113:17 114:23 118:8 121:13 122:24
**answered** 40:6 49:6
**answering** 18:10
**answers** 6:21
**anticipate** 6:11,13
**anybody** 21:16
**anytime** 8:9 23:13
**anyway** 9:21,23 44:18 88:18

89:7
**apart**
94:22
**appears**
49:16 61:20 64:16 68:11 83:14,14 108:6
**approval**
87:1 105:23
**approve**
86:21
**approved**
86:17 94:6
**approximate**
9:2 32:8
**approximately**
7:11 8:23 9:4 14:15 41:2 84:14 85:1
**April**
42:16,21 43:1,10
**Arch**
2:10,16
**ARCHER**
2:14
**area**
32:20 64:24 75:11 77:11 107:1
**arrangement**
106:13
**arrest**
4:15 85:7,17,18 86:24 91:1 94:7,18 94:20 96:23 97:10 97:19,22 98:1,5,9 98:13,17,21 99:8,14 105:23
**arrested**
106:15
**arrive**
33:3,8
**arrived**
32:6 33:4,14,17
**ascertained**
118:22
**asked**
22:9 23:15 42:4 44:12,14,14,17,17 49:6,9 58:10,22 97:14 98:15 103:24 104:4 116:22 118:9
**asking**
40:10 43:20,21,21 44:7,8 48:17 52:3 58:23 69:24 118:11 118:13
**assaulted**
111:14
**assigned**
9:4,16 16:23 17:4 84:16 88:14 98:19
**assistant**
10:23 14:10 19:1 20:13 21:20 98:19 99:17
**assisting**
20:14
**associates**
113:5
**attention**
32:19 63:18
**attorney**
5:12 8:12 10:13,23 13:8,11,15 14:10 18:18 43:14 53:24 54:8 86:12,18,22,23 87:10,12 88:17 98:20 99:18 104:5 106:14 125:11,14
**attorney's**
22:20 85:14 87:2 94:4 105:22 106:9 106:12,15 108:8 120:16,19 121:9
**attorneys**
18:22 19:1,3 20:13 86:2 94:9,10 123:8 123:11
**attracted**
32:19
**attribute**
113:13,24 114:4
**August**
125:21
**available**
86:12
**Avenues**
107:1
**aware**
12:22 14:9 17:17 23:9,10 46:6 53:13 70:19 122:17,20

**B**

**B-R-I-A-N**
63:3
**back**
13:6 21:2 46:9,24 47:24 51:3 56:8,19 66:3,16,19 68:17 77:3 84:18,19 89:9 108:16 117:21 121:15
**background**
16:8
**backwards**
30:20 44:5,10,11,15
**Badge**
28:15 46:17 47:4 49:14 63:21 75:17 81:11
**Bail**
87:6,11,14 90:8,15 90:23
**bars**
7:17 8:1
**based**
35:16 36:6
**basically**
25:20 85:9 115:11
**basis**
14:2
**Bates**
68:15
**Bates-stamped**
108:11
**bathroom**
65:24
**beginning**
48:20 60:8 108:16 121:16
**begins**
71:21 75:15
**behoove**
95:16
**belief**
14:2 120:21 121:1
**believe**
11:10,13 13:23 14:3 19:6 26:2 29:15 35:18 37:8 38:1 41:14 53:7,10 54:17 56:18 60:3 67:14,15 74:9 76:11 79:24 84:11 89:19 90:5 93:15 94:18 100:5,6 100:7 110:7 113:5 118:15 119:1 121:14,22 123:7
**believed**
95:10 103:17 118:10
**believing**
37:1
**BEN**
2:10
**beretta**
111:24
**best**
6:15,20 47:18 93:12 93:13 115:17
**Beth**
41:5
**better**
29:12 31:5 54:10 73:2,18
**Beyond**
52:2
**big**
28:6 59:10,17 115:12
**bigger**
96:3

**Bill**
78:7
**bit**
5:22 6:7 8:14 31:2 45:22 48:5 57:5 61:17
**black**
38:23 70:8,12 71:8,9 71:12 74:16,19,21 74:23 83:10,11,19 84:6 93:3 94:24 97:5 102:20 103:2,3 103:8,17,20 104:21
**blacked**
83:8
**blocked**
50:9,13
**blocking**
58:9
**Bob**
51:16,19 52:5,19 53:2 72:19,22,23 73:13,14,21,24 75:10 78:8 89:5
**Bobby**
58:13
**bona**
99:12 118:24
**bottom**
47:14 51:1 60:10 68:16 72:15 73:5 78:15 112:12
**bought**
112:15,17
**Boulevard**
2:5
**boyfriend**
62:6,8
**boyfriend's**
62:11
**braggadocio**
99:11
**bragging**
25:21 26:3,6 56:24 73:8,13
**break**
7:5,13,15 8:9 65:24 66:8,15
**breaking**
7:22
**Brian**
63:3
**briefly**
115:13,20
**bring**
89:22
**Broad**
106:10 110:19
**broke**
7:14
**broken**
7:22 70:4
**brought**
83:20 94:12
**building**
87:8
**bunch**
32:20
**business**
13:6
**busy**
82:7
**buy**
64:22
**Byron**
4:17 62:2,11,21,22 62:24 63:3,9 106:9 106:23 111:13,22 114:6

**C**

**C**
2:1 125:2,2
**C-A-R-I**
19:7
**C-A-R-L**
41:16
**C-A-S**
60:8
**C-U-A-P-A-I-N-O-...**
39:10,16
**call**
7:4 62:4 115:8
**called**
5:13 6:1 9:13 34:21 47:15 58:17,19,21 62:5,23 63:3 66:22 70:7 106:24 115:24
**calling**
56:12
**Callowhill**
23:18 71:11 118:19
**camera**
35:21 36:11
**Campbell**
21:15 22:4 39:1 58:13 62:7 64:15,19 65:11 68:6 69:4 70:9,13 72:22 73:13 73:21 75:10 76:3,8 76:12,16 77:7 78:7 78:8,19 79:8,14 89:5 92:9 93:4 94:17 99:15 100:11 100:12 103:18 104:18 105:8,10,14 106:6,21 109:21 111:17 112:4 114:7 119:5,6
**Campbell's**
60:1 74:1
**Cane**
63:21
**car**
63:8 83:7,9,22,23 95:8,9,9,10,11,13 106:20 115:17
**career**
9:9 90:20 101:5,17
**Cari**
19:7 20:14
**Carl**
41:16,21
**CARLTON**
2:15
**carried**
111:23
**cars**
32:16
**case**
5:13,19,20 10:4,9 12:18 14:4 15:5,5,9 16:23 17:6,7 37:3 54:8 78:4,11 90:9 90:23 91:17 92:3 94:2,3,7,8,16,21 95:4,6 104:3 113:13 125:14
**cases**
5:18 10:5 82:5,8 89:23 109:24
**casual**
60:9
**cause**
4:14 84:23 85:6,15 86:16 87:20 88:2,11 89:11 91:9 96:22 97:15,19 98:4,8,12 98:17 99:8,14,20 100:15,21 101:1
**Centano**
108:6
**Center**
2:4 87:8,12
**certain**
14:20 25:18 86:5 87:23 92:11
**certainly**
8:11 27:5 30:21 56:14 78:4 94:12
**certification**
5:3
**certify**
125:6,10
**chance**
46:21 50:13 55:3
**changed**
58:8
**channel**
58:8

**characterize**
56:11 92:10
**charged**
90:7 109:19,22
**charging**
89:20,21 90:4,6 91:5 91:18,18
**chased**
95:10
**chasing**
95:14
**check**
66:12
**checking**
107:24
**Citizen's**
62:4,23
**City**
2:9 82:2
**City01430**
108:11
**CIVIL**
1:2 2:9
**claimed**
21:24 23:20
**clarify**
81:19
**class**
85:1
**classes**
86:4
**clear**
26:3 73:17 106:19
**clearly**
24:7 33:3 76:7 89:6
**client**
62:18
**close**
34:17 67:7 117:5 120:12 121:6
**colored**
83:24
**colors**
54:13
**come**
21:23 23:16 62:1 73:20 74:10 84:18 84:19 89:23 118:18
**coming**
24:24
**commencing**
1:14
**commission**
62:4,24 125:21
**Commissioner**
87:6,11,14 90:9,15 90:23
**committed**
95:12
**Community**
42:19
**complainant**
83:7
**complaints**
9:24 10:2,6
**completed**
87:8
**compound**
7:4
**concealment**
17:15
**concerned**
49:18 80:3,6
**concerning**
62:19 76:17 78:7 81:22 123:2
**concluded**
124:3
**conclusion**
27:13
**conduct**
95:2 116:18,19
**conducted**
24:2 35:17 75:4 106:9
**Conference**
1:13
**confidential**
8:14
**confrontation**
76:9
**confrontations**
76:16
**conjecture**
99:10
**connected**
75:2
**connection**
114:1
**consider**
92:12
**constant**
86:13
**constantly**
52:1
**consuming**
92:21
**contents**
44:7 47:9
**continue**
8:4 40:14 48:5,24 56:9 74:7
**continued**
82:23
**continues**
46:1
**control**
26:4
**controlling**
75:6
**conversation**
115:18
**cooperating**
62:1
**copies**
121:18
**cops**
74:5
**copy**
123:17,21
**corner**
83:9
**corpus**
22:21
**correct**
14:7 16:10 22:4,8 25:24 32:1,5,8,24 33:8 34:8 35:4 38:14,15 40:17 45:17 51:6 55:10 56:6 58:17 71:24 72:10,23 75:12 78:8 79:22 82:16 84:15 87:15 88:4 90:10 92:5,9 93:4 110:19 114:13,21 118:10 118:11 120:24 122:6
**corrected**
27:24
**corrective**
27:23
**correctly**
51:17 52:6,17,20 53:1,3 57:22 58:14 59:17,22 60:2,14,22 61:4,14 70:9 71:18 81:5
**counsel**
2:6,12,18 5:2 10:19 11:19 50:8 53:17 103:18 122:11,12 125:11,14
**counselor**
12:4 13:15 16:15 17:11,22 19:2,21 20:8,17 21:6 22:17 23:5 24:16 25:1 26:11,21 27:22 28:20 33:1,12,21 34:15 35:1,7 36:24 38:10 39:6,13,18,23 40:6,13,22 41:11 42:3,23 43:7,17 44:6,15,21 46:5 47:7,17,24 48:12,17 49:5,8,16 51:8,23 53:7,18,21 55:17 56:11,22 58:3,3,22 64:1,16 65:8 69:14

70:3 72:18 73:3 76:4 80:23 87:22 88:9 89:18 90:14 91:5 92:11 93:5 94:20 98:23 99:7 100:2,20 101:15 102:8,15 103:14,23 105:1,18 107:2 110:6 111:9,19 114:8,14,24 116:1,8 116:13,14 118:9 119:17,19 121:14 122:13 123:3

**couple**
19:6 27:24 75:8 92:4 117:5 121:7

**course**
13:5 21:11 53:23 62:3,14,20 64:4 94:13 105:21 106:1 113:20

**court**
1:1 7:17 8:1 65:23 66:2,6,16 95:23 105:24 107:15,20 107:23 108:1 117:8 119:8 123:16,20 124:1 125:6,20

**courtroom**
18:15 56:15 105:2

**courts**
37:6

**cover**
43:10 55:1,2,3,6,7,9 55:14

**covers**
49:22

**CP51-CR-1203321**
116:3

**crack**
38:24

**crashed**
95:13

**creating**
119:4

**crime**
62:4,24 89:20 90:6

**crimes**
85:23,23,23

**criminal**
53:17 85:8 102:13,21 104:9,22 119:8,16 122:12

**critique**
86:13

**critiques**
86:1

**Cross**
77:15 79:4

**Cuapainolo**
39:10,15 78:16 79:6 119:24

**cursor**
117:15

**cutbacks**
95:1

**cute**
64:21

**cuts**
6:9

**Cynthia**
39:22 40:3,17 57:21 58:16,23 59:12,13 59:15 60:17 61:6,19 97:23,24 119:22 122:5

**D**

**D-O-L-G-E-N-O-S**
14:11 45:24

**D-U-R-H-A-M**
63:24 81:2

**Dardon**
34:21 36:15 37:15 38:8,22 77:24 78:16 79:3 98:2,3 120:2

**Darius**
46:16

**dark**
59:21 83:24 84:3

**date**
43:1 44:1 55:8 56:2 67:24 68:1 81:14 125:9

**dated**
42:16 55:24

**day**
21:24 33:23 34:3,7 106:22 115:5

**days**
14:20,22 15:3 49:22 95:5,7,12

**deal**
75:7

**dealer**
57:1 59:19 92:16 94:23,23 95:8

**dealers**
51:22 59:19 73:10 75:8 76:3 92:15

**dealing**
81:24,24 92:14

**dealings**
74:20

**death**
58:6 60:1 68:6 106:6

**debt**
82:21

**decedent**
40:4,4 41:10 61:6,14 64:14 72:17 75:11 76:3 99:22

**December**
106:10

**decent**
38:23

**decide**
93:16 99:20 105:13

**declaration**
13:10 122:20

**defendant**
115:24 121:21

**defendants**
1:9 2:12,18 113:12

**defender**
14:12 42:19

**Defender's**
42:19

**defenders**
17:16

**defense**
94:10 103:18 104:5 121:3 122:12

**definitely**
110:7

**demonstration**
73:9

**department**
2:9 8:22 9:21 11:1 14:6 74:20 84:15 95:1

**deposition**
1:4,11 5:16 6:1,3,19 7:11 8:10 123:17,21 124:3 125:7,12

**describe**
59:20

**described**
80:4 89:4

**describes**
64:16

**description**
4:13 112:16

**detailed**
9:5 84:17

**detective**
1:7 5:11 8:21 9:10,12 9:13,16 10:17 11:17 14:18,19 15:2 16:13 16:23 28:10 29:5 31:17 33:11 36:2,14 38:22 42:2 46:17 47:4 49:14,14 51:3 51:4,14 52:23 53:20 57:7,8 63:20 65:13 66:20 67:2,5,11,17 69:2 74:14 75:16,20 77:10,19 78:9,16 79:4,20 80:9 81:10 81:19 83:13 84:24

85:3,5,22 88:8,14 91:3,14 93:20 94:1 95:21 99:1,4,24 101:2,3 103:12,22 104:11,24 105:16 108:6,20 111:21 113:17 114:23 117:3 118:8 121:8 121:13 122:24 123:10
**detective's**
66:23
**detectives**
5:14 9:18 15:6,9 16:21 28:16 65:19 82:9 85:11 86:3,8 92:22 93:9 100:22 110:3
**determination**
103:3,7 105:13,19 106:3
**determine**
90:1 91:22 106:4
**determined**
25:19,20 63:6 90:19 99:13
**develop**
53:23 62:19 74:18
**device**
7:18
**Diane**
74:4,5
**DiBlasi**
28:15
**died**
95:15
**differences**
63:13
**different**
15:3 76:5 82:9,10 89:24
**difficult**
6:23 8:17 57:5 82:7
**difficulties**
7:19
**difficulty**
37:1 111:5
**direct**
5:9 42:8 63:18 112:8
**directly**
73:22
**disagree**
35:13 36:16
**disbelieve**
36:5
**disciplined**
9:21,22
**discovered**
91:17
**discovery**
11:22 12:11,16 14:13 46:2 55:15 121:10
**dispute**
15:10 26:13,17 35:3
**disregarding**
53:14
**distinctive**
112:12
**distort**
37:4
**district**
1:1,1 9:11 10:12,23 14:10 18:18,22 19:1 19:2 20:13 22:20 43:14 53:24 85:14 86:2,12,17,17,22,23 87:2,10,12 88:16 94:4,9 98:19 99:18 105:22 120:16,19 121:9
**division**
9:16 85:4,5,11,22
**divisions**
9:13,14
**docket**
116:2
**document**
17:23 27:10 28:11 29:1,13,19,22 30:1 30:4,7,10,13,16,19 30:22 31:1,7,10,13 34:18 37:7 38:11 39:7,14,20,24 40:9 41:20 43:20,21,22 43:23 44:11,13,15 44:20 45:2,5,13 48:23 50:7,15,18,21 55:11 57:18 59:7 63:17 68:11,20 70:14,14 72:6 75:23 76:22 77:1 78:13 79:17 86:22 87:16 91:10,21 96:2,10,13 96:16,19 97:1,4,7 109:1,4,7,10,13,16 113:9 115:20 116:21 120:12,22 121:2,6,23 122:7
**documentation**
10:14 12:1 25:2 90:4
**documents**
8:18 13:22 25:11,14 27:20 42:7,12,14 86:6 90:4 101:12 107:4 114:11 117:6 121:7,19
**doing**
29:10 36:2 50:8 58:10
**Dolgenos**
14:10 45:24
**Donald**
122:12
**door**
87:12 115:6
**doubt**
94:16
**Dougherty**
1:7 4:4,14,16,18 5:7 5:11 7:20 8:21 28:5 52:23 95:22,24 96:21 107:12,16 108:2 117:5,9 121:8
**drive**
79:21 80:1 81:4
**driven**
34:23
**driving**
80:16 95:8,11
**drove**
80:12,23 83:8
**drug**
25:19 26:5 51:22,22 52:14 57:1 59:18,19 73:8,10 75:7,7,8 76:3 82:21 92:15,15 92:16,16 94:23,23 95:2,8
**drugs**
26:5 38:19 75:6
**duly**
5:8
**Durham**
34:22 36:15 37:15 38:7 63:24 64:8,13 64:23 79:20 80:9,19 81:2 98:10,11 120:6 122:6

**E**

**E**
2:1,1 125:2
**earlier**
82:16,17 106:22 117:15 118:6
**early**
25:15
**EASTERN**
1:1
**easy**
89:3 101:18
**eighteen**
71:12
**either**
24:22 55:21 74:19 83:8 92:15 104:5 109:19 111:23
**elapsed**
33:13
**electronic**

123:18
**element**
32:14 34:15
**Elmwood**
107:1
**emphasize**
12:8 53:9
**employed**
8:22 125:11,14
**employee**
125:13
**enclosing**
42:19
**encounter**
122:11,13
**encountered**
119:13
**encountering**
122:19
**encouraged**
87:18
**entire**
29:1 47:9 49:23 52:7 53:4,8 64:1 116:21
**entirely**
76:5
**especially**
74:21 119:5
**ESQUIRE**
2:4,10,15,15
**Essentially**
65:2
**establish**
26:4 62:21 100:22
**established**
62:23
**ET**
1:8
**eventually**
11:22
**evidence**
11:24 17:15 74:15,18
**evidentiary**
19:12
**exact**
23:12 32:14 63:11 79:23
**exactly**
23:16 78:22 105:24
**exaggerates**
118:23
**EXAMINATION**
1:5 5:9
**examined**
5:8
**excess**
42:12
**exculpatory**
120:23
**excuse**
44:4 58:3 98:24
**excused**
124:2
**Exhibit**
95:22,24 96:21 107:16 108:2 117:4 117:9
**EXHIBITS**
4:12
**exists**
41:15
**expect**
100:12
**experience**
36:7,9 86:1
**expires**
125:21
**explain**
5:22 6:6
**explained**
42:5
**explored**
88:13 94:9
**extensive**
74:20
**extreme**
53:21
**extremely**
80:17,17 82:7
**eye**
8:15,16 27:20,22,24
**eyes**
28:2

**F**

**F**
125:2
**fact**
19:15 24:19 32:16 62:22 84:3 88:24 93:10,13 101:3 118:16,22
**facts**
90:10,24 91:4,16 99:9,10,13 100:21 105:20
**faintest**
55:12,17 56:3
**fair**
17:6,10 53:7 65:4
**fairly**
78:20
**familiar**
40:23 71:5
**family**
111:14,15 119:2,5
**far**
26:1 49:18 50:2 59:3 60:24 74:24 80:3,6 96:4 109:23
**fast**
28:21 43:18 44:5 47:24 49:5 68:13 76:23 108:15
**father**
17:23 20:23 21:5,7 23:4,7,11 24:5,6,7,8 118:23
**faxed**
87:5
**February**
108:7
**federal**
11:12,13,19 14:11 17:15 22:21 42:18 42:19
**fellow**
86:3
**felt**
88:17
**female**
62:5 69:6
**fide**
99:12 118:24
**file**
121:20,20
**filing**
5:4
**final**
7:10 87:1 120:11 121:4
**finally**
94:6 115:9
**financially**
125:15
**find**
21:12,17 27:21 28:4 73:24 87:22,24 93:10 114:17 115:10
**fine**
29:2 40:11 107:23 123:19
**finish**
6:10 37:19,21,22 48:1,19 59:2 61:20 62:13
**finished**
6:14 48:2 84:20
**finishes**
31:16
**fired**
95:14,17 106:20
**first**
5:7 6:8,9 20:20 21:11 21:11 35:23 46:18 47:13,14 48:10 58:2 58:4,6 61:13,24 62:1 68:16 69:13 70:24 77:3,4,20

85:21 106:8 108:17 111:9,9,22 116:8,9 116:15 120:12 121:15 125:8
**five-hundred** 82:1
**flagged** 121:19
**flashing** 32:19
**Floor** 2:10
**following** 48:8 59:1 68:22 70:22 76:19 79:15
**follows** 5:8
**foregoing** 125:6,7
**form** 5:5 10:16 11:3,14 12:2,19 13:12 15:16 16:12 18:11 19:18 20:6 22:14,22 26:8 26:18 32:12 33:10 34:5,10,12 35:5 36:17 39:3 42:1 43:5 53:19 56:13 88:5,19 89:8,12 90:11 91:2,13 93:19 93:21 99:3,23 100:16 101:23 103:21 104:10,23 105:15 113:16 114:22 118:2 121:12 122:23
**formally** 22:19
**format** 86:7
**former** 5:14
**forming** 84:22
**forth** 6:23 65:7 122:6 125:9
**forty** 8:23 9:2 84:14
**forty-four** 56:8
**forty-seven** 54:24
**forward** 76:19
**forwarding** 121:18
**found** 37:5,6 74:22 101:3 106:1,4 115:6,9
**four** 10:8 82:1
**fourteen** 71:12
**fourth** 52:24
**frame** 80:18
**Franklin** 116:6
**friend** 41:23 70:23 71:2
**friends** 112:17
**front** 58:8 116:21
**frozen** 7:8,9
**fucking** 58:12
**full** 6:19 8:1 28:11
**fully** 6:14 112:19
**function** 21:21 105:9
**further** 45:22 61:17 82:13 125:10,13

**G**

**G** 77:17
**G-O-L-A-T-T** 113:4,11
**gain** 82:5
**gang** 99:21
**gas** 21:14 34:23 39:2 41:24 51:5,17,20 52:6,19 53:3 56:20 58:12 71:15 79:22 80:1,12,15,16,23 81:4 112:4
**gathered** 63:6 100:4
**getting** 58:11 86:21 89:9
**girlfriend** 62:24
**give** 6:1 27:18,18 46:21 69:9 70:20 107:4 110:9 115:10
**given** 36:14 38:7 85:19 112:20,21
**gives** 83:2
**giving** 22:9 41:22 81:10
**glasses** 28:2
**go** 29:3 30:20 38:4 42:13 44:3,14,19,22 45:22 46:9,23,24 47:24 49:12 51:3 54:23 56:8,10,19 57:6,14,16,19 58:20 59:1,5,8 61:2,17 62:10 65:5,7 66:19 68:12,17 72:2 73:22 74:5 75:14 76:13,18 76:19,20 77:3 79:15 81:9,15 82:11,16 84:24 85:4,10,21 86:5,9,18 87:1 94:8 108:10,16,21 118:18 121:15
**goes** 45:24
**going** 6:12 8:3 9:17 15:15 17:18 31:16 35:10 42:11,11 43:16,18 43:18 44:4,12 45:15 46:10,13,15 47:24 49:5,12 51:9,11 52:16,23 53:12 57:15 63:15,18 64:11 65:21 66:21 68:9,13,22 70:22 71:20 74:2 75:23 77:14 82:22 83:5 92:4 95:20 108:15 115:3 121:19 122:10
**Golatt** 113:4,7,10,21,24
**good** 5:11 80:18
**gotten** 111:6
**grains** 92:17
**granted** 11:12
**gray** 80:1,5,13,16,24 81:5 83:11
**greatly** 94:9
**Green** 115:24 116:6
**GREINER** 2:14
**grips**

112:12
**Gross**
77:16,16,18,22 78:9 78:16 79:5,6
**ground**
32:2,5,24
**group**
71:12 73:9 76:6,7 105:4
**guilty**
113:15
**gun**
31:24 37:16 38:8 59:10,16 64:14 65:1 112:11,12
**gunpoint**
109:20
**guns**
59:19
**guy**
51:5 58:11,12,13 60:20 83:5

**H**

**H**
67:12,15 70:4
**H-A-R-R-I-S**
41:17
**H-O-F-F-N-E-R**
81:11
**ha**
65:1
**habeas**
22:21
**halfway**
57:22 61:1,4 72:8 73:6 77:11
**hand**
53:16,22
**handed**
22:19 112:11
**handgun**
64:17 65:10
**handle**
112:12
**handled**
54:3
**handling**
54:1 85:22
**handwriting**
50:1 73:18
**handwritten**
4:18 117:11
**happen**
55:21,21
**happened**
24:18 58:7 61:9 94:24 95:3 110:8 111:17 118:22
**happens**
8:4 61:7
**hard**
44:5 73:9,10,14 79:11 82:4
**Harris**
41:16,16,21,21
**Hats**
73:10,10,14
**Havens**
101:10 107:1 109:20
**Haverford**
73:9
**head**
6:22 106:20
**hear**
7:20 18:18 37:24,24 53:12 58:2,6,11 103:8,19
**heard**
20:21 41:11 84:9 92:19 116:9
**hearing**
19:12,17 20:12 25:7 37:18 38:1,6 39:2 39:11 40:19 43:15 70:12 94:8 101:8,20 102:4 105:24 112:13 113:7,10,11 113:15 114:5
**hearings**
12:22 20:13 24:2 91:22
**hearsay**
99:11
**heart**
93:13
**Heather**
1:12 125:5,19
**help**
14:4 29:5 51:13 116:2
**helpful**
29:7
**hiding**
88:20
**high**
60:15
**highlight**
47:15,17
**highlighted**
47:18,20 76:11
**highlighting**
47:19
**Hines**
1:12 125:5,19
**Hmm**
80:8
**Hoban**
74:4 76:1 77:6,9 97:16 119:18
**Hoban's**
75:14
**Hoffner**
81:10,20
**hold**
30:20,20 50:12 68:13 68:14 87:24 108:15
**holster**
32:1
**home**
58:7
**homicide**
5:19,20 9:3,5,6,12,17 28:16 54:2 67:24 74:21 81:24 83:20 84:13,16,19 86:6 91:1 93:6
**homicides**
85:23 101:16,17
**honest**
107:5
**hope**
16:11,14
**hopefully**
6:17 8:10 21:17 40:9 73:3,18
**hour**
34:7
**hours**
7:12 8:10 92:4
**house**
25:19 26:5 27:12 69:10,11 70:5,6,7 70:21,23 71:3 75:5 75:6 78:18 79:13 115:6
**houses**
77:11
**hundreds**
101:16
**husband**
74:6

**I**

**IAB**
9:24
**idea**
55:12,17 56:3
**identification**
95:24 101:8 108:2 117:9
**identifications**
65:16
**identified**
83:16
**identifies**
64:13
**identify**
44:23
**II**

42:20 44:2
**III**
17:20 18:1,19 19:10 19:16,22 20:9,15 42:20 114:12
**illegal**
14:4
**imagine**
32:18 52:1,2
**important**
24:9 58:11 80:17 118:1
**impossible**
6:23 23:21 101:18 111:12,18 118:19
**improper**
102:1
**incident**
16:2 21:13,17 22:1,3 23:17 41:3 67:24 87:24 88:15 93:24 111:13 117:20 118:20
**inclined**
89:3
**included**
55:15
**includes**
46:2 122:4
**including**
76:3 113:13
**incredible**
111:20
**INDEX**
4:1
**indicate**
12:12
**indicating**
12:17
**indication**
7:23 106:19
**individual**
17:19 24:11,22 25:23 26:14 31:19 37:14 37:16 38:16 39:9,12 39:19 41:17 42:9 46:16 48:7 72:18 77:15 91:18 94:20 95:7,11 104:16 106:19,24 108:4 113:3 114:4 121:17
**individuals**
18:14 41:4 74:22 92:13 95:14 116:5 116:11,24
**information**
10:11,24 11:22 13:2 13:10 16:5,22,22 21:8 22:10 25:3,11 25:13 40:8 41:13 47:6 53:10,14 62:19 63:5 69:5,9 76:2 78:10 80:6,17 81:21 81:22 82:5,20 83:2 87:19 88:10,12 89:1 89:18 93:6 94:3 97:13,17 98:22 100:4,24 104:2 115:4 122:1,21 123:1
**informed**
90:10,24
**initial**
63:1 111:10
**initially**
85:10 87:7
**injustice**
119:5
**inquiring**
21:15
**inside**
23:14
**insinuated**
116:23
**instances**
71:7,9
**instrument**
119:2
**interacted**
64:4
**interacting**
63:23
**interest**
93:13
**interested**
125:15
**Internal**
10:6
**internet**
7:17,19 8:3
**interrupt**
37:23
**interrupted**
38:3
**interview**
4:16 19:12 24:16,17 24:20 39:19 40:8 44:1 49:13,16,17,20 57:11 64:6 65:9 67:21,23 68:1 75:17 77:23 106:8 111:22 112:7,18
**interviewed**
17:22 20:5,16 21:1 23:14 59:11 83:21 114:20
**interviewer**
28:15 75:16 108:5
**interviewing**
17:18 18:2 20:22 24:15
**interviews**
25:17 40:23 75:4 113:1
**invest**
93:23
**investigate**
92:18 93:10
**investigated**
27:11 93:7
**investigation**
4:16 5:24 16:9 21:12 25:16 40:20,22 41:18 49:15,18,22 53:24 57:9 62:3 64:5 67:18 70:11 75:5 88:1,19 90:5 94:1 100:3 105:7,22 106:2 111:11 116:18,19 120:19
**investigations**
9:6 84:18,20 116:20
**investigator**
80:18
**involved**
5:24 14:13 19:8 20:13 27:12 40:21 41:17 43:15 49:15 49:17,23 52:14,21 54:3 57:8 59:24 70:12 71:8,9 75:11 82:5 83:22 85:8 88:15 90:9 93:3 103:17 106:24
**involvement**
103:9,19
**involving**
54:8
**Island**
107:1
**issues**
27:20,22
**issuing**
85:16
**item**
120:17,18

**J**

**Jackal**
2:10 4:7 10:16 11:3 11:14,16 12:2,19 13:12,19 15:16,18 15:21 16:12,18 17:9 18:7,9 19:18 20:6 22:14,22 26:8,18 29:4 32:12 33:10 34:2,4,10,12 35:5 35:15 36:17,23 39:3 42:1 43:5 53:19 88:5,8 89:12,14

90:11 91:2,11,13 93:19 98:24 99:23 100:16 101:23 102:5,14,22 103:10 103:21 104:10,23 105:15 113:16 114:22 118:2,7 121:12 122:23 123:10,16,18
**Jamaican**
24:13 38:23
**JAMES**
1:7 4:4 5:7
**JBM**
71:14 72:10
**JFK**
2:5
**job**
15:11,14,15 16:1 82:5 87:22,23 89:24
**jobs**
87:23
**John**
17:19,21 18:1,1,19 19:10,13,16,22 20:9 20:15,18,22 21:4 22:7 23:4,6,10 42:20,20 44:2 74:6 97:8,9 117:16 118:15,16,17 119:2 119:8,11,13
**Johnson**
2:15 4:6 11:5,15 15:17,20 18:21 26:20 35:14,16,20 35:22 36:4,19 41:5 88:7 89:13,15 90:13 91:12 99:5 100:1,18 105:17 123:13,21 123:23
**join**
99:5 100:1,18 105:17
**Joseph**
38:17,21 49:12 51:2 56:17 58:20 59:13
82:15,17,18 83:3 97:20,21 119:20
**judge**
11:12,13,19 46:3,7 104:6
**July**
46:3
**jumped**
95:14
**Junior**
49:13 70:8,12 71:7,9 74:16,19,21,23 93:3 94:24 97:5 102:20 103:1,3,8,17,20 104:21
**jury**
37:5,5 103:7,18 106:4
**justice**
37:4 87:8,12

**K**

**K**
1:12 67:12,15 125:5 125:19
**keep**
8:18 26:4 43:16 45:15 48:17 56:22 68:9 73:16 74:2 91:20
**kept**
54:7 58:13 60:19 61:9
**keys**
115:6,11
**kill**
51:4,9,11,12,19,21 52:9,13 57:2 64:18 65:11 99:22
**killed**
21:15 40:3 51:5 64:15 94:17,22,23 105:10 111:17 112:4 114:7
**killer**
74:1
**killing**
22:4 25:22,24 26:23 27:14,15,16 33:17 37:16 41:24 56:10 56:20,23,23 61:14 62:7,17 63:8,9 70:13 81:22 89:5 92:8 93:4 94:19 95:3,18 100:10,11 103:4,18 104:17,19 105:8,13 106:5,21 109:20 118:16
**killings**
82:1 95:2
**kind**
5:18 6:13,19 16:8 65:11 83:22 114:10
**knew**
22:10 41:23 42:5 73:21,22,22
**know**
7:22 8:2,5 11:18,24 12:15,15 13:3 18:14 19:3 22:12,16,19 26:1,24 27:11,22 29:9 32:15 33:16 34:11,14 35:7,24 36:9,11 37:2,5,9 38:2 43:3,7 44:18 46:5,10 49:11,24 54:10,11 56:4 58:12 63:13 64:4,4,5 65:15 67:5,14,24 68:3 71:16 73:24 74:12,24 77:15 85:1 93:24 96:6 104:8,12 104:21 105:3 106:8 108:18,22 109:18 110:3,3,10,11 111:3 111:21 112:19 113:21 116:16 118:15 119:10 121:9 122:18
**Knowing**
16:20
**knowledge**
15:14 16:1,9 17:7,7 23:1 55:19 109:23
**known**
25:6

**L**

**l**
60:9 106:1
**L-U-B-Y**
38:23
**lapsed**
33:16
**large**
29:4
**larger**
29:7
**laser**
27:23,23
**laundromat**
21:14,16,19,21 22:1
**LAW**
2:9
**lawyer's**
110:19
**lawyers**
7:4
**laying**
32:2,5
**lead**
51:23,24 89:19 90:5
**learn**
23:3 74:13 85:20 86:1
**learned**
80:7 99:9 105:21 115:4
**learning**
85:24 86:14 111:15 112:10
**leave**
29:14 87:19 88:3 89:10 115:15
**left**

115:7,16
**legal**
11:11 87:16
**legally**
13:24 121:2
**lesson**
61:8,15
**let's**
8:3 29:2,2,2 37:12,12 42:13 43:16 44:3,16 44:19 45:15,22 51:13 54:23 56:8,10 59:1 61:17,22 65:5 66:7,7 75:14 76:18 77:3 79:15 81:1,9 81:15 82:11,16 83:1 107:6,6 110:14
**letter**
42:16,18 43:10 45:23 46:1,2,5 55:1,2,3,6 55:7,9,12,13,14,18 55:20,23,24 56:4 121:17
**leveled**
17:14
**liar**
24:8 118:24
**liars**
11:13
**lie**
11:10 37:10
**lied**
90:18,19
**lies**
92:24
**light**
94:12
**lights**
32:18
**likelihood**
7:3
**limited**
36:7 91:21
**Lincoln**
83:19,23,24 84:3,3,6
**line**
76:14 77:17
**linking**
84:3,5,6
**list**
40:22
**Listen**
49:6
**litigation**
35:18
**little**
5:22 6:7 8:14 29:7 31:2 40:4 45:22 48:5 57:5 61:17 66:9 78:10 79:11
**live**
83:8
**lives**
51:23,24
**living**
75:8
**located**
9:18 87:3
**location**
23:18,22 25:18 38:19 44:22 71:5 74:22,23 76:7 92:14 115:16
**locations**
76:17
**lock**
95:17 115:6
**Logan**
2:16
**long**
7:3 8:21 9:2 35:11
**longer**
61:9 66:10
**look**
55:10 107:6,7
**looked**
119:11
**looking**
25:13 27:20 65:12
**looks**
60:8,9 68:1 77:22
**lost**
79:2
**lot**
53:13 54:21 87:4 117:20
**love**
41:14
**Luby**
38:22 49:14,14 51:4
**lying**
10:3,9,13 11:2 13:11 114:13,14,21

**M**

**M-A-C-U-L-L-A**
21:4 22:8 117:16
**M-A-H-L-E-R**
19:7
**M-A-N-G-O-N-I**
46:17
**M-C-C-U-L-L-O-...**
17:20 22:7
**M-C-H-E-L-V-I-E**
67:10
**Maculla**
117:16
**Mafia**
70:8,12 71:8,9 74:16 74:19,21,23 93:3 94:24 97:5 102:21 103:2,3,17,20 104:21
**Mafia's**
103:8
**Magistrate**
90:8,23 98:20 99:18
**Magnum**
112:11,22 113:13,24 114:2
**Mahler**
20:14
**making**
65:9
**male**
24:13 38:23 69:10 70:5,21 73:7,20 74:9 83:17
**males**
71:12,13,13,16 83:4 83:7,11,17,20
**manager**
21:20,20
**mandated**
121:2
**Mangoni**
46:17 47:4
**March**
1:14 22:13,20 42:21
**Marcus**
116:6,6
**mark**
95:21 107:9,12 108:23
**marked**
4:13 28:7 95:21,23 108:1 117:8
**marks**
60:16
**Martin**
41:5
**matter**
11:11 24:3 91:16 123:2
**matters**
91:23
**maximizing**
29:10
**McCullough**
12:24 17:19 18:1,1 18:19 19:10,13,16 19:22 20:9,15,18,23 21:4 22:7 23:4,7,10 23:12,15 24:4,4,6 42:20,20 44:2 97:8 97:9 114:12 117:20 117:24 118:10,15 118:16,17 119:2,8 119:11,13
**McCullough's**
17:21 45:16,17,19

**McKelby**
67:2,5,6
**McKelvie**
67:8,17
**mean**
9:22 28:22 41:2 49:17 58:18 64:23 65:6 72:9
**meaning**
80:15
**Mee**
14:19 15:6,9 57:7,8
**meet**
122:14
**member**
72:17 73:14 74:16 111:14
**memory**
38:12 39:7,14,24 40:9 46:22 64:2,7 102:9,18 112:8 113:2
**mention**
58:24 72:19 82:15 101:21 103:1,1 122:9
**mentioned**
48:15 49:1,10 82:9 104:9,16,22 105:4
**mentioning**
102:3,11,20
**method**
54:21
**Michael**
39:10 78:16 79:4,6 101:9 107:1 109:20 119:24
**middle**
118:18
**mind**
94:17 101:13
**minimum**
8:18
**MINOTT**
2:15 4:8
**minute**
84:12
**minutes**
42:4 79:22 80:11,22 81:3 115:14,19
**mis**
110:6
**misinformed**
13:15,17
**missed**
79:1
**misstating**
103:11 110:8
**mistaken**
65:18
**moment**
42:4 90:18
**money**
54:22 57:2
**monitoring**
77:11
**months**
49:23
**Moore**
116:6
**morning**
5:11 95:3
**mother-in-law**
74:5
**motion**
101:7,12,20 102:4,8
**motive**
99:22
**move**
37:12 57:14
**moved**
55:4 87:7
**moving**
44:21 47:3
**multiple**
45:16 48:7,11,16 49:11
**murder**
20:24 24:12 25:8,9 26:7,16,16 27:7,8 31:21,22,23 32:3,4 32:7,8,10,11,23 33:7,13,20,23,24 34:8,24 38:9 85:18 95:12 99:15
**murdered**
95:7
**murders**
54:4

**N**

**N**
2:1 125:2
**name**
5:11 12:13,24 14:10 17:19 21:9,22 22:10 24:11,17,18,22 25:14,21 26:4 34:22 37:15 38:7,16,18 39:9,16,21 40:2,20 40:23 41:4 42:5 46:16 47:15,17,21 49:1,16 58:1,4 62:1 62:11,16,22 63:7,9 63:24 64:5 66:23 67:5,6,17,20 69:7 70:20 72:19 75:16 77:20,24 78:17 79:7 97:2 113:4
**named**
58:24 59:12 83:4 84:6
**names**
24:24 40:21 63:11 74:22 122:9
**Natividad**
1:4 5:13 10:10 13:9 14:12 15:5,9,11,13 17:6 21:15 23:7,11 41:9 62:18,19 63:8 67:18 74:15 80:5 94:17 96:23 99:14 100:9,12 101:9 103:5 104:19 105:9 106:5 111:23 112:3 112:15,17,22 113:6 113:14,14 114:1,2,6 119:2,7 120:23
**Natividad's**
17:15 56:5 102:13,21 103:2 104:9,22 111:14
**nature**
92:23
**necessary**
13:24 97:18 111:7
**need**
43:19 55:4 68:15
**neighborhood**
71:17
**neither**
96:8 125:10
**nervous**
60:21
**Neutral**
90:8,23 98:20 99:18
**never**
13:9,21 20:9 21:1 24:7 41:11 44:14,14 54:7 74:23 87:21,24 97:9 104:9,22 114:3 115:7,7 116:15,23 118:22 119:13 122:9,21
**new**
11:13 86:1
**news**
60:5
**nicknamed**
83:4
**night**
16:2 34:24 37:16 38:9 41:24 58:6 64:14 65:1 69:11 70:6 71:10 76:8 81:2 111:17
**nods**
6:22
**normal**
13:5

**North**
95:8
**Notary**
1:13 125:5,20
**note**
4:18 21:3,10 22:6,12 22:17 115:7 117:2 117:11,12,14,19
**notes**
20:5,16 114:20
**November**
9:1 14:6 34:24 57:8 63:2,21 64:15 68:2 71:23 75:18 77:24 78:7 81:11 106:23
**number**
4:13 46:17 47:5 49:14 52:22 63:21 64:3 68:15 75:17 81:11,21 85:12 92:13 93:7 116:2
**numerous**
18:22 85:22

**O**

**o**
27:16 125:2
**O'Hanlon**
2:3,4 4:5 5:10,12 8:7 10:20 11:6,20 12:7 12:9 13:7,16 14:1 15:22 16:16,24 17:12 18:16,24 19:23 20:11 22:18 23:2 26:12 27:4 29:8,18,21,24 30:3 30:6,9,12,15,18,21 30:24 31:6,9,12 32:21 33:18 34:6,16 35:9,20,23 36:8,13 36:21 37:11 39:8 42:10 43:9 45:1,4,7 45:11,12 48:22 50:6 50:14,17,20 54:5 57:17 59:6 63:16 66:1,4,7,11,14,18 68:10,19 72:5 75:22 76:21,24 78:13 79:16 88:22 89:16 90:21 91:7,24 94:14 96:1,9,12,15 99:16 100:13 101:6 102:2 102:10,19 103:6,15 104:7,20 105:11 106:7 107:17,21 108:3,24 109:3,6,9 109:12,15 113:23 115:22 117:10 118:4,12 122:3 123:6,15
**oath**
100:6
**objection**
10:16 11:3,5,14,15 12:2,19 13:12,19 15:16,17,20 16:12 16:18 17:9 18:7,10 18:10 19:18 20:6 22:14,22 26:8,18,20 32:12 33:10 34:2,4 34:10,12 35:5,14,15 35:16 36:17,19 39:3 42:1 43:5 53:19 88:5,7 89:12,13,15 90:11,13 91:2,11,12 93:19,20 98:24 99:1 99:3,6,23 100:1,16 100:18 101:23 102:5,14,22 103:10 103:21 104:10,23 105:15,17 113:16 114:22 118:2,7 121:12 122:23
**objections**
5:4
**objective**
99:19
**observed**
83:11
**obtain**
54:21
**obviously**
31:22 49:17 94:7
**occur**
92:2 106:12
**occurred**
22:1 33:14 100:23,24 111:13 118:20
**offhand**
24:19 35:1 39:23 40:18 63:4 64:6 116:1
**office**
22:20 42:19 94:4 105:22 106:9,12,15 108:9 110:19 120:16,20 121:9,20
**officer**
34:20,23 36:15 37:15 38:8,22 77:24 78:15 79:3,19,21 80:8,10 81:9 82:23 83:2 84:8,8 92:17 94:22 95:9,13,15 98:2,3,6 98:7 120:2,4
**officers**
93:8
**oh**
50:11 67:13 69:23 70:2,4 72:21 77:17 107:17
**okay**
5:22 6:3,6 7:6,8,10 7:13 8:6,8,10,12,19 8:21 9:8,20 10:5,12 11:9,12,21 12:7 13:8 14:5,15 15:1,5 15:8,13 16:4,7,17 17:1,5,13,18 18:17 19:7,15 20:4,12,22 21:10 22:12 23:10 24:11,21 25:7 26:13 27:17 28:4,7,14,19 29:2,17,20,23 30:2 30:5,8,11,14,17,23 31:2,8,11,14,17 32:3,7,22 33:5,5,19 34:17,17 35:3,10,23 36:8 37:12 38:4,13 38:21 39:9,21 40:2 40:10,12,16 41:4,8 41:16 42:11,12,14 42:24 43:10,16 44:3 44:7,12,16,19 45:6 45:15,22 46:8,15 47:11,22 48:4,24 49:3,12,21 50:1,3,5 50:8,13,16,19,22 51:13,14 52:3,10,12 52:12,16,23,23,24 53:1 54:6,9,14,18 54:20,23,24 55:9,14 55:24 56:5,8,17 57:4,12,16,19,20 58:5 59:1,5,8 60:12 60:24 61:2,13,17,18 61:19 62:8,12 63:15 63:18 64:8,10,11,12 64:13,20 65:4 66:6 66:13,14,20 67:22 68:5,10,18,21,22,24 69:17 70:2,4,4,20 71:20 72:2,4,7,14 72:23 73:1,4,16 74:2,14 75:1,10,14 75:21,24 76:18 77:2 77:14,20,23 78:6,12 78:12,14,15 79:3,15 79:18 80:19 81:1,1 81:1,9,15 82:14,22 82:24 83:16,24 84:2 84:7,10,13,21 85:18 86:15 87:18 88:3,23 89:9 90:8,22 91:8 92:1,3 93:1,15 94:15 96:11,14,17 97:1,11 98:14,19 100:14 101:7,14 102:11,20 103:7 104:21 106:15

107:6,20 108:4,7,20 109:2,5,8,11,14,17 110:14,21 112:10 113:3 114:12,16,19 115:23 116:10 117:23 119:7,12 120:10 121:4 122:4 122:10 123:7,20
**older**
86:7
**omit**
99:20
**omitted**
98:21
**once**
39:23 40:6 42:3 54:7 54:12 80:21 81:17 81:19 82:19 84:19 86:15,21 87:8 93:10 97:17,21,24 98:3,7 98:11 100:2 105:1 113:19 116:17
**one-hundred**
76:13 78:21 99:12 114:14
**ones**
5:21 6:2
**open**
109:24 117:5 120:12
**oppose**
87:23
**ORAL**
1:5
**order**
46:3 53:11 107:4 113:14 119:3
**ordered**
95:1
**organization**
105:4
**original**
40:15
**originally**
114:5
**originated**
13:6
**outside**
115:16
**overheard**
71:13
**overtime**
95:2
**owes**
57:1
**owns**
78:17

**P**

**P**
2:1,1 49:12 67:2,17 68:3
**P-1**
4:14 95:22,24 96:21
**P-2**
4:16 107:16,21 117:5 117:9
**P-3**
4:18 107:12,18 108:2
**P-I-R-E-E**
75:17
**P.C**
2:3,14
**p.m**
124:3
**P0003543**
28:7
**P0003702**
83:2
**P3480**
42:14,15
**P3488**
45:8
**P3489**
44:19 45:13
**P3501**
55:9
**P3504**
46:1
**P3522**
46:18 47:14 48:7
**P3529**
49:12
**P3531**
51:1
**P3532**
51:2 52:18
**P3536**
57:7
**P3538**
59:4,16
**P3539**
60:15 61:1,4
**P3540**
61:20
**P3543**
61:21
**P3548**
31:16
**P3573**
63:19 64:9
**P3574**
64:11
**P3681**
66:21 68:11
**P3682**
68:16
**P3683**
68:23
**P3684**
70:22 71:1
**P3685**
71:21
**P3686**
72:15
**P3688**
75:15
**P3689**
75:23 76:1 77:5,12
**P3690**
76:18 77:14
**P3699**
78:15 79:9
**P3700**
79:16
**P3701**
82:12
**P3702**
82:22 84:10
**P3781**
81:9
**PA**
2:5,11,17 83:12
**PAB**
87:4,7
**pace**
57:12 75:20
**Padova**
122:12 123:5
**page**
4:3 14:12 20:18 29:17 42:15 45:3,6 45:9,10,13 46:18 47:12,14 48:2,4,8 48:20 49:10 50:9,13 51:1,15 52:18 54:24 56:8 57:4,21 59:1,4 59:16 61:16 68:16 68:22 70:22 76:19 77:3,4 79:15 96:18 108:17
**pages**
11:21 12:10,16 42:12
**paging**
44:10,11 45:8
**painstaking**
92:21
**paper**
21:9 24:17 114:20
**paperwork**
85:2,3
**paragraph**
48:1,11,16,19 49:2 49:10 73:5
**parcel**
123:4
**parking**
87:3
**part**
5:24 14:16,19 21:14 28:13 32:9 53:4,11

56:18 61:13 74:23 94:24 123:4
**partial**
83:12
**participated**
12:23
**particular**
33:21 46:21 49:20 52:21 55:18 82:19 98:9 101:11
**particulars**
78:10
**parties**
5:2 125:12
**partner**
35:17
**parts**
25:15
**passed**
41:1
**passing**
92:20
**Pat**
74:4
**Patrick**
75:14 97:16 119:18
**Paul**
1:7 68:4,4
**payphone**
81:3
**PCRA**
12:22 17:13 18:4 19:1,8,12 20:13 24:2 43:15 122:10
**Penn**
2:4
**PENNSYLVANIA**
1:1
**people**
10:3 25:18 32:20 41:7,8,11 52:14 64:3 78:18 79:13 80:7 82:4 89:23 90:2 92:7,11,13 93:2,8 114:15,17 119:3 120:14
**people's**
87:23 93:12 122:8
**percent**
76:13 78:21 99:12 114:14
**periodically**
7:21 86:4
**perpetrated**
62:17
**perpetrator**
80:4
**person**
6:7,8,8,9 12:23 21:23 22:9 24:10 41:9,12 42:5 47:15 51:9 56:12,13,20 57:1 59:11,14 62:6,16,22 62:23 63:9 84:5 89:1,3,19,20 90:6 91:5 94:19 95:12,18 95:19 100:10,21 104:18 112:3
**person's**
63:6
**Personally**
104:12
**persons**
85:7 90:1
**persuasive**
91:10
**pertain**
91:5,17
**pertinent**
87:19 88:1,18,19 90:10,24 91:4
**Philadelphia**
2:5,9,11,17 5:14 8:22 9:20 14:6 82:2 84:15 95:8,19
**phone**
2:6,11,17 62:4
**phonetically**
21:22
**phrase**
33:1
**phrasing**
33:2
**physically**
23:21
**picked**
71:3
**piece**
21:9
**Piree**
75:16 77:10
**place**
23:22 125:8
**plain**
76:5
**plaintiff**
1:5 2:6 5:13
**Plaintiff's**
117:4
**Plaza**
2:4
**please**
5:23 30:20 37:19 38:5 41:1 43:17 44:22 45:3,10 46:24 47:12,24 48:13,19 48:21 51:23 52:7 54:10 74:8 81:23 101:15 108:16,18 123:18,23
**plus**
12:10,16
**point**
22:2 23:14,19 25:1,4 25:6,19 26:22 27:10 33:21 39:6 42:8 57:10 62:15,18 63:4 65:8 70:16 78:3 81:23 91:20 94:5 106:18 115:20 119:10
**pointing**
47:8
**police**
5:14 8:22 9:21 11:1 14:6 26:6,15 27:6,7 31:23 32:6,16,22 33:3,4,8,14 34:20 36:15 38:8,24 39:16 41:22 52:4 59:10,15 60:19 64:24 73:23 73:24 74:20 77:23 79:19,21 80:8,9,19 81:9 84:8,8,15 86:5 92:7,17 93:3,8 94:22 95:1,9,13 98:2,6 111:16 120:2 120:4
**possession**
114:7
**possible**
6:21 21:12 28:6 74:2 74:8
**possibly**
80:21 111:15
**potential**
98:22
**potentially**
25:23
**power**
105:19
**prefer**
28:24 47:8
**preliminary**
68:11 85:3 94:8 120:13
**premarked**
107:10
**prepare**
85:2,10,24 90:3
**prepared**
57:11 85:6 86:6,8 88:13 89:7 99:8 116:15,21
**preparing**
55:13
**preprepared**
116:11
**presence**
115:2

**present**
18:8 23:11 76:16 86:11,22 87:9 88:10 91:6 92:23 93:8 105:20,24
**presenting**
94:3
**presume**
15:24
**pretty**
74:12 82:7
**prevent**
27:20
**previous**
45:10,13 58:24 76:14 115:19
**previously**
78:1
**Price**
4:17 62:2 63:10 106:9,23 109:19 110:5 111:13,22 112:21 114:6,6,10
**Price's**
62:24
**print**
108:23
**printed**
72:24
**prior**
9:17 13:24 19:12 24:1 76:2 79:22 80:11,22 81:3 85:15 88:13 95:13 116:7
**probable**
4:14 84:23 85:6,15 86:16 87:20 88:2,11 89:11 91:9 96:22 97:15,19 98:4,8,12 98:17 99:8,14,20 100:15,21 101:1
**probably**
7:18 32:18 38:11 77:16 78:10 101:16 111:15 121:24
**problems**
28:1
**proceeded**
62:18
**proceedings**
17:13 18:5 19:8 22:21 122:11
**process**
14:13 86:14 92:21 119:4
**produced**
56:4
**Professional**
1:12
**promise**
117:7
**proper**
9:11 36:5 53:16 99:19
**properly**
47:10 107:14
**property**
75:2 78:17
**prosecution**
115:23
**prosecutor**
104:5
**proved**
10:3
**provided**
46:3 62:16
**Public**
1:13 125:5,20
**pull**
27:19
**pulled**
83:10
**purporting**
37:2,10
**purpose**
94:19 100:15
**put**
33:6 89:18 100:22,24 111:4
**putting**
94:2

**Q**

**question**
6:11,15 7:2,4 10:17 11:4,16 12:3,5,20 13:13 15:18 16:13 18:11 19:19 20:1,7 22:15,23 26:9,19 27:2 32:9,13 33:11 34:5,13 35:6 36:2 36:18 38:5 39:4 40:7,15 42:2 43:6 45:20 47:9,13 48:9 48:14,15,17 49:1,6 49:7,9 50:23 53:20 57:24 58:2,5,22 59:20,24 69:2 70:24 71:16 73:20 74:3,9 74:11 76:15 80:8 88:6 89:9,14 90:12 90:22 91:3,14,14 93:20,21 94:11 99:3 99:4,17,24 100:17 101:24 102:1 103:12,14,22 104:11,24 105:16 107:3 108:12,19 110:11,13 112:19 113:17 114:23 117:18 118:3 120:13 121:5,8,13 122:24
**questioning**
78:6
**questions**
5:5 6:21 28:24 40:1 40:14 43:19,20,22 53:11 68:12 69:2 90:15,16 97:14 103:24 104:4 112:7 123:8,9,11,12,13
**quick**
27:21 50:23 65:24
**quickly**
46:10 55:5 65:15 68:7 107:7,11 113:9 117:3
**quite**
41:1
**quotation**
60:15 73:4
**quote**
40:4
**quoting**
52:4

**R**

**R**
2:1 125:2
**R-I-C-A-R-D-O**
12:14
**R-O-B**
24:12
**R-O-B-T**
76:11,15
**R-O-L-S-T-O-N**
12:13 24:23 47:16,20
**R-U-T-H-E-R-F-O...**
38:17
**Raley**
1:7 14:18 15:6,9
**ran**
83:9
**reached**
27:12,13
**read**
10:11,11 28:2,21,22 29:1,15 35:2 37:8 43:19 44:5,23 46:9 46:21,23 47:7,8,9 48:9,12,13,18 49:5 50:1,13 51:17 52:6 52:7,17,20,21,24 53:3,7 55:3,4 57:12 57:22 58:14 59:17 59:21 60:1,2,6,6,14 60:22 61:4,10,10,13 64:1,6 66:22,23 69:12,13,18,21 70:1

70:9,14,16,24 71:18 73:1,6,18 76:4,15 78:20,24 79:24 81:1 81:5 83:1,12 96:4 108:13 116:22 117:2
**reading** 5:3 28:20 48:1,19 50:10,24 51:7 52:22 59:2 69:24 73:16 79:2,2 100:3 108:22 111:5
**real** 24:22 27:21 39:16 58:1,4 60:5,9,21 78:17 79:7 115:12
**reality** 25:22
**really** 41:13
**reask** 12:4
**reason** 6:18 15:10 26:13,17 35:3,13 36:16 88:10 89:22 102:24 121:24
**reasons** 6:20 99:13
**recall** 10:8 39:13 63:13 67:19 78:2 101:11 112:14 116:8,13 117:12 119:17,19 119:21,23 120:1,3,5 120:7,9 122:18,18
**received** 10:15 11:1 13:9,22 62:3 122:21
**receiving** 21:3
**recognize** 43:21,23 44:20 96:2 117:11
**recollect** 113:1 115:17
**recollection** 16:1 21:1 42:8 114:9
**record** 4:17 31:15 34:4 45:7 66:17 116:3
**recorded** 43:1
**red** 7:18 8:2
**reduced** 23:13
**refer** 25:12 27:9 44:18
**reference** 65:9 68:15 97:4,7,11 97:16
**references** 48:7 72:9
**referencing** 76:10
**referring** 10:18 19:3 20:18 21:5 56:22 58:16,18 114:11
**refresh** 38:11 39:7,14,24 40:9 101:13 102:9 102:17
**refused** 115:2
**regard** 85:19
**regarding** 12:23 39:19 76:2 112:8
**related** 21:19 25:18 95:2 99:9 125:11
**relating** 40:1,14 64:24 82:20 82:21 120:18 121:20
**relation** 21:4 68:6 84:22 101:8 120:23 122:22
**relative** 125:13
**relatively** 7:11 8:9
**relay** 51:2 59:15 77:9 93:2
**relayed** 8:13 34:21 52:4 62:5 79:7,9 83:3
**relaying** 38:22 59:10 76:1 79:3,20 80:9,19 92:7
**relays** 60:19 78:16
**relevant** 65:20 97:14,18,22 98:1,4,8,12,17
**remark** 83:18
**remem** 70:17
**remember** 14:15 15:6 17:13,18 18:2,4,17 19:8,17 19:20 20:2,4,12,22 21:3,8,10,19 22:6 23:5,6,24 24:11,15 24:19,21,24 25:6,7 25:10,14 26:10 27:8 27:17 34:18,20 35:1 37:14,17,18 38:6,10 38:13,16,18,21 39:2 39:5,11,15,18,21 40:2,7,10,11,16,19 40:19 41:5,7,8,17 41:21 45:14 46:18 46:20 49:15 59:18 60:24 62:2 63:23 67:11 70:11,17 78:1 81:12,13 101:7,17 101:22 102:1,3,7,11 102:16,20 107:2,3 109:24 110:2,15,16 111:3,22,24 112:2 112:10,13,23 113:3 113:7,10,11,15,19 114:5,8 115:23 116:3,5,10 118:13
**remembered** 22:2
**reopen** 121:6
**repeat** 103:13
**repeating** 84:9
**report** 34:20 63:1 80:2
**reported** 62:5
**reporter** 1:12 7:17 8:1 65:23 66:2,6,16 95:23 107:15,20,23 108:1 117:8 123:16,20 124:1 125:6,20
**reporting** 92:12
**represent** 5:12 42:13
**represented** 14:12
**reserved** 5:5
**residence** 23:14
**respective** 5:2
**responded** 32:23
**response** 7:7
**responsible** 89:20 90:6 94:2 100:10,11,23 104:18 105:13 106:5

**result**
46:3 63:5 100:3 105:6
**resulted**
46:6
**retire**
8:24
**returned**
115:7,8
**review**
8:17 85:15 86:8,9 107:4 112:6,7
**reviewed**
26:2 78:2,5 81:14 85:13,14
**reviewing**
46:19,20 78:1 81:12 81:13 110:16 114:11
**reviews**
86:20
**revolver**
59:21
**Ricardo**
1:4 5:13 10:10 12:13 21:14 23:7 24:23 26:14,14 28:15 31:20 41:9 58:1,2,4 61:21 62:18,19 63:8 67:18 74:15 75:1 80:5 92:8 93:2 94:17 96:23 97:2 99:14 100:9,12 101:9,21 102:3,12 103:4 104:8,19 105:9 106:4 111:14 111:17,23 112:3,15 112:17 113:6,14 122:5,22
**Rich's**
74:4
**Richard**
10:21 11:10 13:5,23 14:3 66:22 68:6 98:14,16 120:8 121:1 123:12
**Richie**
13:5
**Rick**
74:4
**right**
6:9 26:6 28:12 29:14 31:4 47:3,6,19,23 49:7 53:6 55:16,22 56:17 57:4 58:8 63:4 65:15 66:3,23 67:16 68:17,17 69:1 77:7 79:19 81:7 82:11 83:1 87:3 95:18,20 96:8,18 103:19 108:24 117:3 121:15 123:7 123:15
**RIGHTS**
2:9
**Rita**
81:9
**Road**
38:19 69:11,18 70:6 71:5 74:18 76:6,6 92:14
**Rob**
12:14,14 24:12,15,20 25:8,23 34:23 37:15 38:8,23,24 40:3 51:4,16 52:4 56:10 56:13,19 57:24,24 58:7,17,19,21,24 59:10,16,18,24 60:13,16 61:5,8,14 64:14,24 72:16,17 72:18,23 75:2 76:3 78:17,18,19 79:7,12 79:13,21 80:1,10,20 81:4 83:4 84:3 92:8 93:1 97:2 101:21 102:12 104:8 122:22
**Rob's**
39:16
**robbery**
106:24 109:20
**Robert**
21:15 22:4 62:7 64:14,18 65:11 68:6 75:10 76:3,8,10,10 76:12 77:7 92:8 93:4 94:17 99:15 100:10,12 104:17 105:8,10,14 106:6 106:21 109:21 111:17 112:4 113:4 119:5,6
**Robertson**
24:22
**Robinson**
12:14 24:23 26:15 28:15 31:20 39:17 41:23 61:22 75:1 78:18 79:7 83:4,17 83:19 92:8 93:2 97:2 101:21 102:4 102:12 104:8 122:5 122:22
**role**
93:16,17
**Rolston**
12:13 24:23 26:14 28:15 31:20 33:14 33:15,19 34:23 39:17 41:23 47:15 47:17 48:7,15 49:1 49:10 51:10 52:8,11 58:1 61:21 75:1 78:17 79:7,21 80:1 80:10,20 81:4 83:17 89:3,8 92:8 93:1 97:2 101:21 102:3 102:11 104:8 122:5 122:22
**room**
104:14
**round**
59:21
**Rufe**
46:7
**Rufe's**
46:3
**Rupert**
24:22
**rush**
115:12
**Rutherford**
38:17,21,24 39:1 49:13 51:2,5,9,15 51:18 52:3,8 58:20 59:9,12,13 82:15,17 82:19 83:3,9,16,18 83:21 84:6,9 97:20 97:22 119:20
**Rutherford's**
55:15 56:9,18

**S**

**S**
2:1
**salt**
92:18
**sat**
58:8 87:7,13 115:16
**Saturday**
95:3
**saw**
23:17 24:7 65:16,19 79:21 83:19 92:20 95:9 117:20
**Sax**
10:21 11:10 13:5,23 14:3 120:21 121:1 123:12
**saying**
13:18,21 19:20 20:2 20:4 23:12 26:22 32:15 33:2 36:6 51:8,10,15 60:16 65:3 69:22 71:13 78:22 79:12 80:12 110:6 116:6,11
**says**
31:24 51:6 52:18

57:24 58:3,4,5 61:5 64:21 70:2,5,20 71:2,4,17 76:15 78:6 79:10,23 80:23 83:3 100:5 117:15
**scene**
23:24 25:8 26:7,16 27:1,7 31:20 32:3,7 32:10 33:7,15,19 65:20 79:8 80:10,20 80:21
**schedules**
15:4
**SCHWARTZ**
2:3
**screen**
28:11 66:19 95:22 107:13 117:6 120:11 121:4
**scroll**
29:3 50:3 61:20,23 63:15 68:8,15 72:12 75:19 82:12,13 108:20
**scrolling**
96:9
**scrolls**
29:18,21,24 30:3,6,9 30:12,15,18,21,24 31:6,9,12 45:1,4,12 48:22 50:6,14,17,20 57:17 59:6 63:16 68:10,19 72:5 75:22 76:21,24 78:13 79:16 96:9,12,15 108:24 109:3,6,9,12 109:15
**sealing**
5:3
**search**
85:7,16
**second**
8:16 27:18,18 28:5 28:12 35:21 59:9 65:13,21 66:2,20
68:14 77:4 96:3 101:9 107:8,9,22 111:12 113:8 117:2
**sedan**
80:1,5,13,16,24 81:5
**see**
25:22 27:19,21 28:4 28:8,10,11,12,13,22 29:9,10,13 35:8 37:7 40:22 42:15,16 42:21 47:14 48:10 50:11 51:3 58:9 59:16 60:14 63:20 63:22 64:13 65:5 67:13 70:4 72:15 76:18 88:24 89:6 91:8 96:2 97:1,4,7 97:11,16 107:13 113:8 117:15,16,17 119:8,15 122:14
**seeing**
7:23 22:2 42:23
**seeking**
65:20
**seen**
23:20,21 79:24 81:4 118:20
**sees**
31:24 32:16
**selling**
26:5 38:19 75:6
**semiautomatic**
64:17 65:10
**sending**
121:10
**sense**
6:16,24 67:9
**sent**
14:11 55:10,14 122:1 122:2,2
**sentence**
52:21 53:8 106:6
**sentences**
52:22
**September**
14:9 45:23 55:10 56:1 121:9
**sequestered**
18:13 113:20
**serve**
94:19
**set**
58:9 125:9
**sex**
85:23
**shakes**
6:22
**Shane**
34:21 36:15 38:8 77:24
**shape**
56:13 88:18 89:7
**share**
28:8 66:19 95:22 107:13 117:6 120:11 121:4
**sharing**
31:16 84:11 109:18
**sheets**
65:6
**shield**
95:15
**shooter**
23:8 89:8
**shooting**
23:20,22 24:8 62:17 64:24 65:1 69:4,5 69:10 70:8 71:10,15 78:7 79:22 80:10,11 80:20,21,22 81:3,4 83:22
**short**
7:11 8:9 66:15 70:7
**shorter**
117:7
**shortly**
27:14 70:15
**shot**
41:9,12,23 58:11 78:19 79:8,14
106:20 112:4
**show**
17:23 23:16 24:16 27:9 35:2,11 39:6 39:14,20,23 40:8 41:14,19 42:7,11 45:18 46:15 95:20 101:12 102:9 107:11,18,21 110:8 110:12 112:18 117:4 120:10
**showed**
23:19,22 25:2,11 38:11 45:20 47:4 65:9 89:1,2 105:7 110:15 115:20
**showing**
55:11,19 90:5 108:19 122:8
**shown**
54:13 85:11 96:5 102:17 110:23,24 113:1
**shows**
33:15
**shrugs**
6:22
**shut**
73:11
**side**
31:3 96:7
**sides**
96:6
**sign**
87:16,17 98:20 116:12,16,22
**signature**
96:18
**signed**
13:10 23:4 44:2 86:16,17,19 116:20 122:20
**significant**
80:2,2,6
**signing**

5:3
**signs**
86:23,23 87:14 91:1
**similar**
6:20
**simple**
7:5 91:16,20
**single**
120:22
**sir**
6:5 7:1 12:21 14:8,14 14:17,20 15:7,12 17:17 18:3,12 19:9 19:13 20:3,8,20 21:1 22:5,24 23:9 24:14 26:1 27:10 40:18 41:7,19 43:12 43:14 45:14 46:20 46:23 47:2 48:4,21 49:2,4,4,20 54:2,10 54:15 55:2,23 56:3 56:7,24 57:10 58:15 59:11,18,19,23 60:7 60:18 61:11,12,16 63:4,22 65:21 66:24 75:13 76:13,14 79:23 81:6,23 91:15 91:16 93:18,22,23 97:3,6,9,13,17,21 97:24 98:3,7,11,16 101:11 102:23 106:16,19 110:17 110:20 112:2,24 113:18 119:10 120:17 122:16
**sit**
74:14
**sitting**
36:10 87:11
**situation**
70:17
**six**
9:16 85:4
**slide**
31:2
**slow**
44:17 47:23
**slowly**
68:7 72:3
**small**
53:4 64:17 65:10
**smaller**
64:17
**Smith**
39:22 40:3,17 57:21 58:16,23 59:12,13 59:15 60:17 61:6,19 97:23,24 119:22 122:5
**snitch**
40:5 58:13 60:20
**snitches**
61:7,15
**sold**
38:23
**sole**
105:9
**somebody**
7:9 25:20 31:24 41:23 58:17,18,21 58:24 61:8 66:22
**son**
17:24 18:2 20:18 21:5 23:20 24:4,7 33:7 118:21,22,23
**soon**
32:4,10 33:23
**sorry**
7:8,14 14:23 15:1 17:3 26:14 44:4 49:4 50:11 59:13 69:7,23 70:24 71:8 72:21 73:17 74:8 76:24 77:4,9,17 79:1,6 83:12 93:20 107:10,15,17 108:17 113:8 121:5
**sound**
77:7
**sounds**
112:16,16
**south**
9:16,18 23:18 85:5 106:10 110:19 118:19
**speak**
38:2,2
**speaking**
6:8 33:22 37:24 41:2 48:18 91:23 110:12 111:16 123:3
**speaks**
6:8 67:21
**special**
111:24 114:7
**specific**
6:7 24:19 43:22 46:12,13 64:5 85:19
**specifically**
46:20 70:16 114:9
**specify**
18:21
**spell**
22:10 67:10
**spelled**
21:22 22:8
**spelling**
21:9 22:11
**spellings**
63:11,13
**spent**
92:4
**spoke**
69:4 115:1,13
**spoken**
97:9
**squad**
14:16,19 78:9 81:20 82:8,10
**squads**
82:6
**Square**
2:16
**stages**
111:10
**stand**
104:1
**standing**
23:17
**stands**
68:3
**start**
42:13,14 57:13 110:14 119:3
**started**
60:5,9
**starts**
64:8
**state**
91:16
**stated**
38:24 56:12 69:10 70:5 83:19
**statement**
19:16,21 26:15 28:13 28:14 33:8 35:4,11 35:12 36:14,16 38:6 39:2,11 44:8 46:15 46:19,21 51:4,6 55:15 56:9,18 57:6 57:7,21 61:19,21 63:16,20 64:1,8 65:5,6,14,17,18 66:21 68:5 71:20,23 72:8 75:15 77:3,14 77:19 78:1 81:10,12 81:14,15 84:2 97:8 107:7 108:7,8 110:16,18 111:4,9 111:10,12,19 112:3 112:20,21 116:15
**statements**
15:8 16:8,10 17:5 34:19 41:6,22 42:20 42:22,24 44:8 45:16 45:20 46:14 53:16 65:7,12 92:5 110:4 110:9,13,14 111:7,8 116:11 120:14 122:5

**states**
1:1 76:7 121:17
**stating**
23:7 38:8 40:3 41:8 41:22 60:13 122:21
**station**
21:14 34:23 39:2 41:24 51:5,17,20 52:6,19 53:3 56:20 58:12 71:15 79:22 80:1,12,15,16,23 81:5 112:4
**stemming**
109:19
**stenographic**
6:19
**Stephen**
2:4 5:12
**stipulated**
5:1
**stolen**
95:9,9,10
**stop**
31:16 84:11 95:4 96:9 109:18
**stopped**
60:21
**stops**
32:16
**stories**
89:24
**Street**
2:10,16 23:18,18 71:11 79:14 106:10 110:19 118:19
**streets**
9:19 62:7 95:19 112:5
**stuff**
25:2
**style**
114:15
**submit**
86:15 91:9
**submitted**
96:22
**subsequent**
28:8 112:20,21
**subsequently**
5:20 23:3 85:14 87:4 105:24 112:10
**substance**
77:5
**sued**
5:15,20,21 6:2
**Suite**
2:4,16
**Sunday**
71:10
**supervisor**
86:16,20,20
**supervisors**
85:13 86:3,9 88:15
**supposed**
28:20 73:12 89:10 90:9,24 91:10 98:20 99:18
**supposedly**
23:17 89:5
**suppositions**
93:7
**suppress**
101:8,20 102:4
**sure**
7:9 9:22 12:5,10 13:4 18:1 19:13 20:17 29:16 31:18 32:15 33:12 58:1 63:1 64:23 66:13,14 98:14 110:12 111:6
**surface**
25:15
**surgery**
8:16,16 27:23
**surmise**
104:13,15
**surrendered**
112:14
**suspect**
11:24 12:12,18 88:4 98:22 99:21
**suspects**
89:10
**sustained**
9:24
**swear**
100:6
**sworn**
5:8 101:1 125:8

**T**

**T**
2:4 125:2,2
**T-R-A-C-I-E**
34:22
**tag**
83:12
**take**
6:23 7:12,15 8:8 16:9 20:5,15 23:23 45:21 53:21 56:14,20 65:3 65:24 66:7,8 67:23 87:6,9 92:17 100:6 110:4 111:7 114:19
**taken**
1:11 5:16 15:9 28:15 42:24 44:9 46:14,16 49:13 57:7 63:20 65:19 66:15 70:15 71:23 77:14 78:3 81:14 111:13 125:13
**talk**
48:12,18 74:5 89:23 92:12 115:2
**talked**
82:16,17,18
**talking**
18:22 22:3 27:5 35:24 36:11 51:10 58:14,21 60:20 61:9 72:16,22 117:14
**TANNEIKA**
2:15
**taught**
85:10,11
**teach**
61:7,15
**technical**
7:19
**tell**
17:23 19:2,10 25:12 27:2 29:3 37:9 50:3 57:21 68:7 72:12 73:20 76:19 78:18 79:12 84:21 89:23 92:12 96:8 107:13 108:20 113:24 114:3 116:14
**telling**
20:20 37:15 39:16 92:19 101:4 111:23 111:24 116:24
**tells**
51:18 52:8,8 92:17
**ten**
79:22 80:11,21 81:3 95:7,12 99:20
**term**
9:11
**terrible**
37:3 119:5
**test**
104:14
**testified**
5:8 101:24 102:8,12 102:16,21 113:22 118:5,6
**testify**
122:14
**testifying**
18:4
**testimony**
18:13 53:13 103:9,11 103:11,16 104:14 105:2 113:12 117:23 120:15
**Thank**
8:11,20 53:6 81:7,8 82:11 99:2 123:10

123:14 124:1
**theses**
36:3
**thing**
7:10 8:12 12:21 28:23 52:7 59:21 60:10 82:19 104:13 104:15 105:5
**things**
24:9 40:11 50:24 81:19 86:13 88:20 89:2,24 94:13 112:9 113:2
**think**
10:12,22 13:14 24:9 31:15 53:15 69:7 71:14,17 72:16 105:12 117:23
**thinking**
11:19
**third**
52:17
**thirty**
9:4,7,9 54:2 84:14,16 84:16 115:14,19
**Thomas**
63:21
**thoroughly**
27:11 92:18
**thought**
15:1 27:19 48:2
**thousands**
54:3
**threaten**
19:14 51:4,24 114:15 114:17
**threatened**
18:5,20 19:11 83:17 114:13 116:7
**threatening**
51:11,21 52:15 57:1 57:2
**three**
2:16 10:8 83:11,20 110:4,10,13 116:5 116:10
**three-week**
85:1
**time**
5:6 7:13,15 9:20 20:23 21:16,18 22:2 24:12,19 25:1,4,5,5 25:6,9,19 26:16 27:7,10 31:22 32:14 33:13,16,17,21 34:14 35:11 39:6 42:8 48:13,18 49:23 52:17,24 57:10 62:15,20 63:9,14 67:19 70:7,15,19 71:22 78:3 80:3 81:6,23 85:5,21,24 87:2 89:6 92:21 93:23 97:10 99:7 106:18 110:1 114:18 115:15 119:1,10,14 120:11 121:5 125:8
**timeframe**
12:22
**times**
9:5 24:7 48:11,16 49:2,11 84:17 89:4 90:14 115:9 118:23
**Tish**
69:6 71:21 97:11 119:15
**today**
74:6,14 115:21 120:15 121:11
**told**
21:23 24:7 34:22 38:24 39:18 40:7 51:16,18,19 52:5,18 53:2 55:3 63:12 69:11 70:6 73:10 74:3,5,9 80:9 113:12 115:11 118:23
**Tom**
14:10 45:24
**tonight**
73:11
**top**
29:3 46:24 47:1,2 51:3,15 52:18 59:4 60:13,15 66:23 68:17 70:24 83:1 108:5
**totally**
53:14
**touch**
61:24 62:1
**town**
40:5 58:13 72:17 73:14 75:11 77:6,10 83:23
**Tracie**
34:22 36:15 37:15 38:7 63:24 79:20 80:9 81:2 98:10,11 120:6 122:6
**trail**
53:16 104:9
**trailer**
87:3
**trailing**
6:14
**trained**
84:23 85:2 89:18
**training**
84:22 85:19 87:18 89:11 100:14
**transcript**
1:11 101:12 102:17 123:17,22 125:7
**transcripts**
102:9
**transpired**
113:2
**transported**
83:20
**travesty**
37:3
**tremendous**
37:1,10 81:21
**trial**
5:6 11:13 13:6,8,11 13:14,24 53:17 54:7 56:5 102:13,16,21 103:2 104:22 113:12,21 116:7 119:7,8,9,14,16 121:19 122:11,12
**tried**
40:13 79:24
**trigger**
46:22 64:2,6
**trouble**
73:17 111:3
**true**
54:13 55:12 56:3 63:12 93:14,16,16 125:6
**truly**
94:18
**trust**
73:23
**truth**
54:15 74:10 87:23,24 92:19 100:8,9 101:4 114:17 117:1
**truthful**
90:1,17 93:11 121:23
**try**
6:12 8:18 28:2,5 29:10,10 93:8
**trying**
12:6 21:12 25:21 26:4,22 37:4,21 38:2 72:19 80:18 111:3
**Tuesday**
1:13
**turn**
35:21 43:11,12 121:1 121:2
**turned**
10:14,24 11:23 12:11 12:17 13:3,4,23

22:13,17 43:3,8 120:15,18,19,22 121:3
**Turner**
46:16
**twenty**
115:13
**twenty-five**
41:3
**twenty-four**
41:2
**twenty-something**
69:14
**twice**
34:23 80:1,13,16,21 80:24 81:5
**two**
7:12 8:10 14:16,19 16:20 17:21 41:4,11 41:22 42:4 43:4 45:20,20 52:14,14 52:14 57:2 67:16 76:17 77:11,21 82:9 93:2 95:5 110:14 111:6,7
**two-hundred**
11:21 12:10,16 14:12 42:12
**two-thousand**
101:17
**type**
21:21 51:24 64:17 85:16 89:1
**typed**
56:2
**types**
85:22 89:24
**typing**
56:3
**typo**
78:21

**U**

**ultimate**
105:12
**ultimately**
87:14 95:15 106:5
**um**
6:3,21 7:3,10,15,23 8:8,12,15,17 9:11 10:5,12 11:1,1,13 11:22,23 12:12,23 13:1,4,24 14:3,4,6,9 14:9 15:1,8,14 16:7 17:6,14 18:17 21:15 21:18,19,21,23 22:1 22:8,19 23:6,13,15 23:20 24:1,6,18,18 25:7,13,18,19 26:2 26:14 27:19 28:8,20 29:9 31:2,19 33:8 34:17,20 35:4,10 36:1,10,14 37:14 38:21 40:10 41:21 43:17 44:19 45:23 45:24 46:2,12,12,13 48:7 50:23 54:8 55:14 56:10,13,13 56:19 57:7,20 59:9 59:10,15 60:10,15 60:24 61:1,13,20 63:2,6,7,12,20,23 64:3,5,20,23 65:5,5 65:9 66:19,23 67:19 68:5,5,14 69:1,2 70:5,17 71:16,21,21 71:22 72:15 73:2,2 73:4,5 74:15 75:1 75:14,15,17,19 77:6 77:7,9,11 78:2,6,15 79:21,23 82:12,18 82:22,23 83:2,2,3 83:22,23 84:11,18 84:18,21,22 85:3,5 85:6,7,9,14,16,18 86:4,21,23 87:4,7,9 87:10,11,12,14 88:17 89:9 91:20 92:4 93:1,15,15 96:4,8 99:19,20 101:9,11,21 102:11 102:23 103:16 106:8,22,24 107:6,9 107:11,12,12,17,19 108:6,8,10,22 109:18 110:11 111:6,22 112:11,14 112:21 113:7,13 114:5 115:11,23 116:2 117:19 120:11,22 121:5 122:1,11,22 123:4
**Um-hum**
27:17 65:12 80:14 82:3 111:21
**umbrage**
53:22
**Unbeknownst**
95:11
**understand**
6:3 7:3 8:15 9:10 41:1 51:23 78:12 79:11 81:23 87:22 93:23 100:14,19,20 101:15
**understanding**
75:4
**unfounded**
10:3
**UNIT**
2:9
**UNITED**
1:1
**unquote**
40:4

**V**

**validity**
94:11
**various**
17:14 92:4,7 121:18
**vehicle**
80:4 84:4
**verbal**
6:21
**victim**
32:2,4,23 58:6 119:6
**view**
29:11 57:5 99:19
**Vine**
62:7 78:19 79:14 83:6,18 112:5
**vs**
1:6

**W**

**W**
77:15,16,18
**W-H-O**
70:3
**W/F**
69:6
**wait**
6:10,14 44:21 120:12 121:6
**waived**
5:4
**walk**
95:19
**walked**
58:7,7
**walking**
71:11
**want**
6:18 7:12 8:8 26:24 27:3 35:20 44:18 46:12 50:3 51:2 55:20 65:7 72:12 74:6 75:20 82:12 107:7,10 108:13 117:2,4 120:10 121:4
**wanted**
49:11 61:15 64:21 73:24
**warrant**
4:15 85:16,17,17,18 86:24 91:1 94:6 97:10,19,22 98:1,5 98:9,13,18,21 99:9

105:23
**warrants**
85:7,7
**wasn't**
6:5 18:8 63:2 73:14 76:8 78:9
**Watch**
58:13 72:17 73:15 75:11 77:6,10
**watching**
60:4
**way**
33:1,2,6 35:17 49:5 56:13 58:22 110:22 116:18,19 117:20 122:13
**we'll**
57:6,13 73:11 84:10
**we're**
20:17,17 35:10 41:2 59:4 66:16 81:16 82:22 83:5 92:23
**we've**
54:24 55:2 56:17 61:22 111:6 120:14 121:10
**weapon**
64:18 65:11 112:14 112:16
**weapons**
114:10
**week**
21:11 27:23
**weeks**
28:1
**went**
19:11 55:16 59:3 61:10 65:15 76:23 86:6 115:5,8,16 119:1
**weren't**
43:3,8
**whatsoever**
27:16 55:13,19 74:15 89:6 94:20 104:3,17 105:6,7 123:2
**whereabouts**
9:18
**white**
69:6 71:13
**wife**
66:13
**William**
77:20,22
**Wilson**
81:10 82:23 83:2 98:6,7 120:4
**Wilson's**
84:2
**window**
95:15
**wiped**
50:9
**wish**
7:15
**witness**
4:3 7:21 8:6 10:18 11:18 12:4,8,21 13:14,21 16:14,20 17:10 18:8,12 19:20 20:8 22:16,24 26:10 26:21 29:6 32:14 33:12 34:3,11,14 35:7 36:20,24 39:5 42:3 43:7 45:9 53:21 62:1 63:7,16 66:9,12 88:9 90:14 91:4,15 93:22 99:7 100:2,20 102:7,15 102:23 103:13,23 104:1,12 105:1,18 106:18 110:4 111:15 113:18 114:24 118:9,16 121:14 123:1 124:2 125:8
**witnesses**
21:13,17 99:21
**Wolf**
9:19
**woman**
34:21 38:7 39:21 40:2,8 63:23 65:9
**word**
60:8 69:12,24 72:24
**words**
60:18 76:5 79:23
**work**
85:13
**worked**
14:18 15:3,10,13 28:16 54:8 67:17,20 77:6 84:13 85:4
**working**
14:5 15:6 16:2 75:9 95:4 101:16
**wouldn't**
14:3 15:12 33:1,15 35:18 47:3 53:15 56:15 74:10 88:3 92:10
**write**
115:1,3
**writing**
21:8 23:13 73:1 121:17
**written**
19:16,21 25:3,5 61:16 96:5,6
**wrong**
60:10 69:13 94:20 95:18
**wrote**
25:2 115:17
**Wynnewood**
38:19 69:11,18 70:6 71:5 73:8,12 74:18 75:2 76:6,6 83:10 83:13,15 92:14

**X**

**Y**

**yeah**
9:15 19:5 59:17 60:4 60:14,16 61:6 66:1 66:1,1,4,4,5 67:9 68:14 74:4 117:17
**year**
23:24 82:1
**years**
8:23 9:2,4,7,9,17 41:1,3 43:4 54:2 71:12 84:14,17 85:4 85:12
**yo**
58:10
**yous**
73:11

**Z**

**zoom**
1:13 6:4,7,7 29:5,10

**0**

**1**

**1**
42:16
**1:51**
124:3
**10:08**
1:14
**100**
106:10 110:19
**107**
4:18
**10th**
45:23 55:10 56:1 63:2 121:10
**11/14/96**
28:14 49:13
**11/9/1996**
68:7
**11:55**
66:10
**116**
4:16
**12:00**
66:8
**12:15**

66:10,14
**12th**
68:2 71:23 75:18
**1400**
2:4
**14th**
2:10 57:8 63:21 77:24 81:11
**1500**
2:5
**1515**
2:10
**1717**
2:16
**18**
1:14
**18th**
42:21
**19102**
2:5
**19102-1595**
2:11
**19103-2739**
2:17
**1996**
14:15 20:23 21:2,4 34:24 57:8 63:2,21 64:15 68:2 71:24 75:18 78:1,8 81:11 106:10,23 117:21
**1997**
14:16 56:5
**1st**
43:10

**2**

**2**
2:4 117:4
**2:22-CV-05061-GJP**
1:2
**2003**
116:4
**2012**
11:23 12:11 22:13,20
**2014**
14:9 42:21,21,24 43:2 44:9 45:23 46:4 55:10,15 56:1 121:10
**2015**
11:23 12:11
**2016**
42:16 43:11
**2017**
9:1,1 14:6
**2025**
1:14
**2027**
125:21
**215**
2:11,17
**22**
125:21
**244**
54:24
**24th**
9:19
**267**
2:6
**2nd**
108:7

**3**

**3**
54:23
**30th**
106:10
**3489**
45:8
**3490**
45:8
**3500**
2:16
**3523**
48:8
**3529**
54:24
**3532**
51:15
**3535**
57:5
**3536**
57:13
**3537**
57:15,21
**3538**
60:11
**3539**
60:11,13
**357**
112:11,22 113:13,24 114:2
**38**
111:23 114:7

**4**

**4**
4:5
**4:00**
95:4

**5**

**52nd**
73:9
**546-9066**
2:6

**6**

**6:30**
71:11
**638**
75:17
**63rd**
23:18 62:7 78:19 79:14 83:6,18 112:4 118:18
**642**
46:18 47:5
**64th**
71:11 83:10
**683-5434**
2:11
**6900**
83:13
**6th**
22:13,20

**7**

**743**
49:14

**8**

**825**
28:16
**8th**
42:21 43:2

**9**

**9**
69:14
**900**
83:14
**9001**
81:11
**921**
69:14
**922**
69:11
**9277**
63:21
**929**
69:16,17 70:6 71:5 73:7,12 74:18 75:2
**94**
4:14
**963-3300**
2:17
**97**
108:8
**9th**
34:24 46:3 63:2 64:15 78:7 106:23

# EXHIBIT P3 Dougherty

P3 Buddy

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H96-373 / INTERVIEWER Centeno 916 |
|---|---|---|
| NAME Byron Edward Price | AGE 24 / RACE B/M | DOB 7-17-72 |
| ADDRESS 6038 Webster st. | APARTMENT NO. | PHONE NO. 748-1325 |
| NAME OF EMPLOYMENT/SCHOOL School Dist of Phila. | | SOC. SEC. NO. 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 |
| ADDRESS OF EMPLOYMENT/SCHOOL 21 & Parkway | DEPARTMENT — | PHONE NO. |
| DATES OF PLANNED VACATIONS — | | |
| DATES OF PLANNED BUSINESS TRIPS — | | |
| NAME OF CLOSE RELATIVE Mother: Caroline Price | | |
| ADDRESS Same | | PHONE NO. Same |
| PLACE OF INTERVIEW Room 107 P.A.B. | | DATE 2/2/97 / TIME 5:45 AM (PM) |
| BROUGHT IN BY P/O Rodgers #4992 (18th Dist.) | | DATE 2/2/97 / TIME AM PM |
| WE ARE QUESTIONING YOU CONCERNING AN ASSAULT WHICH OCCURRED EARLIER TODAY UPON | | |
| WARNINGS GIVEN BY YOURSELF DUE TO BEING A WITNESS TO A HOMICIDE | | DATE / TIME AM PM |

ANSWERS (1) (2) (3) (4) (5) (6) (7)

Q: Can you read, write & understand the English language?

A: Yes

Q: Are you presently under the influence of any drugs or alcohol?

A: No

Q: Please go on in your own words and tell me what occurred today in regards to you being assaulted.

RECORD ☐ Yes ☐ No | CHECKED BY

REVIEWED BY BYRON PRICE

CITY 01430

75-483 (Rev. 7/82)

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Byron Edward Price
PAGE: 02
CASE NO.: 496-373

A: I was with some friends at 61st + Webster. We were walking towards 61st + Catherine. We then went over Catherine to 60th street. While we were walking Bill pulled up in his car and he said "Byron can I talk to you" so I stopped. Bill parked his car and he walked up to me and my friends. I walked away from my friends because Bill wanted to talk to me in private. My friends were waiting for me. Bill started talking to me about his nephew Ricardo. Ricardo is wanted for a homicide that occurred at 63rd + Vine that I witnessed. I've already spoken to the police about the incident. Well Bill was saying to me that he heard on the street that I was doing all of the talking about his nephew Ricardo and about him (Ricardo) doing the homicide. He said he read the paper and that I was the only one who could be talking to the police. I told him that I didn't know what he was talking about. I then walked away from him

75-483A

BYRON PRICE

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Byron Edward Price | PAGE: 03 | CASE NO.: H96-373

A: and he sucker punched me in my nose, I fought back. While we were fighting my friends headed back to me and he broke off and walked away. He said to me that everytime he sees me we're gonna fight because I'm the one that is the witness to his nephew killing somebody. I went home and changed my and my mom called the police.

Q: This guy Bill how do you know that he is Ricardo's uncle?
A: Ricardo told me a long time ago. Me + Ricardo were friends, we were friends since childhood.

Q: What is Ricardo's full name?
A: Ricardo Natividad

Q: You witnessed Ricardo killing someone?
A: Yes, it was in November. He killed

-483A

CITY 01432

BYRON PRICE

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**

| NAME | PAGE | CASE NO. |
|---|---|---|
| Byron Edward Price | 04 | 1496-373 |

A: a white guy in the gas station at 63rd + Vine. The white guy was pumping gas into his car and I saw Ricardo shoot the white guy.

Q: Who were your friends that were with you who saw you fighting w/ Bill?
A: Eugene Wilson + Robert Wilson they are brothers and they live at 6123 Webster

Q: What is their phone number?
A: 476-5163

Q: What injuries occurred as a result to this assault?
A: A swollen bloody nose.

Q: Please describe Bill to me?
A: He is a B/m, around 5'10, around 175 lbs, medium build he's around 27 or 28 years old, he's got a tattoo that says "NO FEAR" on his right Bicep, light skinned, full beard + mustache, he was wearing an Orange sweatshirt, Blue jeans

75-483A

BYRON PRICE

**INVESTIGATION INTERVIEW RECORD**
*CONTINUATION SHEET*

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Byron Edward Price | PAGE: 05 | CASE NO. 1496-373

A: brown work boots.

Q: What kind of car had he been driving?
A: a gray colored Cutlass Siera, it was around a 1990 or 91 Siera, it had 4 doors.

Q: Do you know how Bill is Ricardo's uncle (e.g. Mothers Brother or Fathers brother)?
A: No I don't



BYRON PRICE

# EXHIBIT P2 Dougherty

<0139>

5635 BELMAR DOES LEFT IN SW + LOT TAG #
727-8853 JOHN P. MACULLAN B/M YO'S STOCKY, REDDISH HAIR 5'11" LT COMP
↳ TOLD MANAGER ON SUNDAY
THAT HE WAS ON LOT + SAW INCIDENT

PERCY GILBERT — MANAGER OF EXXON
729-0476
5914 WINDSOR AVE.

LOUIS GLENN — SEPPER
1-800-225-0256
EXT. 261180

DEBRA ROPER
6024 VINE
215-472-0160
→ 7x3 MXF ATT.

? JOE MCCLELLAN
TOWN WATCH

<0139>

# EXHIBIT P1 DOUGHERTY

C-48

DC# 96-19-88915

WARRANT# 222415

Commonwealth of Pennsylvania
County of Philadelphia ss:

AFFIDAVIT
of
Probable Cause for Arrest Warrant

DET. JAMES DOUGHERTY 842 HOMICIDE
(Affiant) (Badge#) (District/Unit)
being duly sworn according to law, deposes and says:

1. That after investigation I have probable cause to believe that a warrant of arrest should issue for

RICARDO NATIVIDAD, aka RICARDO SCOTT,
& ANTHONY NELSON 27/B/M 6135 CATHERINE ST.
(Name) (Address)

2502 MURDER, 907 PIC M-1, 6106 VUFA F-3, 6105 & 6108 VUFA M-1,
3701 ROBBERY F-1
(Crime/s)

2. On Saturday, 11-9-96, at about 9:44PM, 19th District Police responded to a Radio Call of Gunshots at the Exxon gas station, 6300 Vine Street. Upon their arrival the Officers found a male lying near a gas pump suffering from a gunshot wound to the head. The male was pronounced dead at the scene by O.M.E. Investigator JACKSON. The victim was identified at the scene by family members as ROBERT CAMPBELL 49/W/M.

On Sunday, 11-10-96, Dr. Bennett PRESTON, an Assistant Medical Examiner, performed the post mortem examination on the body of ROBERT CAMPBELL 49/W/M, and he determined that the cause of death was a gunshot wound to the head and the manner of death was ruled a HOMICIDE.

Det. James Dougherty 842 HOMICIDE
SIGNATURE OF AFFIANT BADGE# DISTRICT/UNIT

Sworn to (or affirmed) and subscribed before me this 31ST
day of DECEMBER, 19 96.

(SEAL)

SIGNATURE OF ISSUING AUTHORITY

CP-51-CR-0400131-1997 Comm. v. Natividad, Ricardo
Hearing Exhibits

4469133

Arrest Warrant# 222415

CONT Page# 2

Martin JOHNSON was interviewed and in summary he related that he was near the corner of 63rd & Vine Sts., when he heard a gunshot coming from the Exxon gas station and he saw 1 male falling to the ground behind a yellow car and then another male ran to a dark colored Lincoln type car and get in the driver's seat and drive off South on 63rd from Vine. The witness went to where the male had fallen to the ground and saw that the victim had suffered a gunshot wound to the head and appeared to not be breathing.

On 11-26-96 Martin JOHNSON was taken to the Police garage and he identified a 1989 Lincoln painted dark blue with a wheel well in the trunk and oversized tires and custom wheels as the same vehicle he saw the perpetrator flee in South on 63rd St., after the killing. The vehicle had been recovered in the 5200 block of Rubicam Street, in the Germantown section of the City, with the entire interior burned out.

The 1989 Lincoln had been reported stolen on 11-9-96, the date of the murder, at 2:30AM, from Elmwood & Island Aves.

During the course of the investigation it was learned that there was a passenger in the Lincoln at the time of the killing in the Exxon station. The passenger was identified as BYRON PRICE 24/B/M.

BYRON PRICE 24/B/M was located and interviewed and in summary he related that on 11-9-96 a male known to him for over 20 years, whose name is RICARDO NATIVIDAD, picked him up at 60th & Catherine Sts. NATIVIDAD was driving a dark colored Lincoln and the 2 drove around the neighborhood for about 2 hours talking and drinking some beer. When the vehicle had reached 63rd & Vine Sts., NATIVADAD pulled up to a pump and got out. PRICE remained in the passenger seat listening to the radio. Suddenly PRICE heard a loud gunshot and saw the White male, ROBERT CAMPBELL, falling to the ground and NATIVIDAD running back to the car, with a chrome plated revolver in his hand. NATIVADAD got in the driver's seat and drove the car from the station South on 63rd St. PRICE related that he only rode with NATIVIDAD for about 2 blocks from the scene and then jumped out of the car. PRICE also related that he learned that the LINCOLN had been burned up somewhere in Germantown.

Det. James Dougherty — 842 — HOMICIDE

SIGNATURE OF AFFIANT — BADGE# — DISTRICT/UNIT

Sworn to (or affirmed) and subscribed before me this 31st

day of December, 19 96

[signature]

SIGNATURE OF ISSUING AUTHORITY

(SEAL)

PRICE identified PPN 683161, that of RICARDO NATIVIDAD, as the same RICARDO NATIVIDAD who shot and killed ROBERT CAMPBELL, and that NATIVIDAD lives at 6135 Catherine St., with 2 of his brothers. PRICE also related that he believes that what caused this shooting was that NATIVIDAD was trying to rob the victim.

A check of voters registration showed the NATIVIDAD family resides at 6135 Catherine St., and RICARDO NATIVIDAD has used this address on several of his arrests.

A record check of RICARDO NATIVIDAD, PPN 683161, showed 8 prior arrests including convictions for ROBBERY, BURGLARY, & AGGRAVATED ASSAULT on separate incidents. Alias names of RICARDO SCOTT, & ANTHONY NELSON were also listed on NATIVIDAD's record.

Based on the above information it is requested that an Arrest Warrant be issued for RICARDO NATIVIDAD, 27/B/M, PPN 683161 for the murder of ROBERT CAMPBELL on 11-9-96.

Det. James Dougherty 842 HOMICIDE

SIGNATURE OF AFFIANT BADGE# DISTRICT/UNIT

Sworn to (or affirmed) and subscribed before me this 31st

day of December, 1996.

Susan E. Hall (SEAL)

SIGNATURE OF ISSUING AUTHORITY

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION
NO.: 2:22-CV-05061-GJP

| | |
|---|---|
| RICARDO NATIVIDAD ) | DEPOSITION UPON |
| ) | |
| Plaintiff ) | ORAL EXAMINATION |
| ) | |
| - vs - ) | OF |
| ) | |
| DETECTIVE PAUL RALEY, ) | RICHARD SAX |
| ET AL., ) | |
| ) | |
| Defendants ) | |

- - - - - - - - - - - - - - -

TRANSCRIPT OF DEPOSITION, taken by and before HEATHER K. HINES, Professional Reporter and Notary Public, via Zoom Conference, on Wednesday, March 12, 2025, commencing at 10:01 a.m.

A P P E A R A N C E S:

O'HANLON SCHWARTZ, P.C.
BY: NOAH SCHWARTZ, ESQUIRE
BY: STEPHEN T. O'HANLON, ESQUIRE
2 Penn Center Plaza, Suite 1400
1500 JFK Boulevard
Philadelphia, PA 19102
Phone No. (267) 546-9066
Counsel for the Plaintiff

CITY OF PHILADELPHIA LAW DEPARTMENT
CIVIL RIGHTS UNIT
BY: BEN JACKAL, ESQUIRE
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
Phone No. (215) 683-5434
Counsel for the Defendants

ARCHER & GREINER, P.C.
BY: SHELLEY R. SMITH, ESQUIRE
BY: TANNEIKA MINOTT, ESQUIRE
BY: CARLTON JOHNSON, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-2739
Phone No. (215) 963-3300
Counsel for the Defendants

INDEX


| WITNESS: | | PAGE |
|---|---|---|
| RICHARD SAX | | |
| | BY: MR. SCHWARTZ | 4, 95 |
| | BY: MR. O'HANLON | |
| | BY: MR. JACKAL | |
| | BY: MS. SMITH | 89, 97 |
| | BY: MS. MINOTT | |
| | BY: MR. JOHNSON | |


EXHIBITS


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| SAX 1 | Investigation Interview Record of Cynthia Smith | 72 |

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing sealing, certification, and filing are waived and that all objections, except as to the form of the questions, are reserved until the time of trial.)

RICHARD SAX, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCHWARTZ:

Q All right. Mr. Sax, my name is Noah Schwartz. Good morning.

A Good morning.

Q Mr. Sax, you've already mentioned that you're stationed in the EMT's office, is that correct?

A No, Ski Patrol First Aid at Elk Mountain.

Q Okay. You're, um -- we're appearing on Zoom. You're in front of your phone at the moment?

A I'm in front of a small iPad.

Q Okay. That should be fine. I'm asking because as it said in the notice, we're presenting some documents and a phone is not really conducive towards seeing them, but an iPad should be fine. So, thank you for that.

A Of course.

Q Okay. Mr. Sax, I imagine you been involved in many, many depositions, correct?
A No, that's not correct. Um, a couple.
Q As -- as an Attorney, you've only been involved in a couple depositions?
A That's correct. I probably wasn't involved in any depositions during my thirty-six and a half years as a Lawyer.
Q Okay. Very good then. I thought we can dispense with a couple of the introductory marks, but we'll go through them briefly.
So, you know that a deposition is obviously -- have you ever taken a deposition by Zoom?
A I don't believe so.
Q Okay. So, you know, we've got a Court Reporter with us as you're accustomed to. Via Zoom, um, the talking one over another becomes that much more complicated because the Zoom only -- only broadcasts one person's voice at a time.
So, I'm going to ask you to be -- try to very careful to wait for me to finish my question before you start to answer, and I'll extend to you the same courtesy. Okay?
A Absolutely.

Q Okay. Um -- and, um, with regarding -- you're under oath and you understand what that means?
A Yes, sir.
Q And you understand that all of your responses today should be oral. Yes?
A Yes.
Q As in no um-hum's, uh-huh's, things of that nature?
A Of course.
Q Okay. Are you under the influence of any drugs, or alcohol that would impact your ability to answer the questions here truthfully today?
A No, sir.
Q Okay. Um, have you ever been deposed yourself? Not taking a deposition. Have you been deposed before?
A Yes. Um, relatively recently in, um, Philadelphia. It's the first time I can ever remember being deposed?
Q Okay. What was, um -- was it involved with -- was the deposition in the context of a litigation?
A Yes, I believe so.
Q Were you a party to that litigation?
A I can't recall whether I was a named defendant or not. Mr. Johnson might be able to help on that.

MR. JOHNSON: He was not --
THE COURT REPORTER: I'm sorry, Mr. Johnson.
MR. JOHNSON: I'm sorry. No, he was not. He was a witness.
THE COURT REPORTER: Thank you.
MR. SCHWARTZ: Thank you.
BY MR. SCHWARTZ:
Q Mr. Sax, do you know what that litigation was captioned as?
A I don't recall at this time.
Q Okay. When did this deposition taken place?
A Before the Winter. In the Fall of 2004.
Q Okay. Do you remember what the nature of that litigation was? What the litigation was about?
A Um, a case that I was involved in.
Q And what capacity were you involved in that case?
A As the assigned Prosecutor in trying the case.
Q And you said you were not a party to that -- or Mr. Johnson said you were not a party to that litigation?
A I certainly accept his representation on that.
Q Um, what was the -- the underlined litigation that the litigation you were deposed in was about?
A Um, an allegation of, um, failure to turn over

exculpatory evidence potentially. Um --

Q Was there an individual, or individuals who were being accused of not turning over exculpatory evidence in that underlined case?

A Um, I don't know about individuals. Um, I've gotten accused of failure to disclose it in perhaps that case. I don't have a specific recollection at this point of the allegation, the unfounded and untrue allegation.

Q Just so I'm clear, I -- I think I just maybe hear. Did you say that you were being accused of withholding exculpatory information?

A I really don't recall at this point.

Q Okay. Um, how long --

MR. JOHNSON: Noah, off the record for a second.

MR. SCHWARTZ: Sure.

(Whereupon a short discussion was held off the record.)

THE COURT REPORTER: We're back on the record.

BY MR. SCHWARTZ:

Q Mr. Sax, we're back on the record. Um, you're a trained Attorney, correct?

A Yes.

Q Where did you go to law school?
A Duquesne in Pittsburgh.
Q When did you graduate?
A 1980 in May.
Q And, um, when you graduated in 1980 in May, did you, um, get employment?
A Yeah. I, um, worked for a civil firm during the Summer while I was studying for the bar. And when the bar results came out, I was then offered a job as an Assistant DA, which I started on December the 8th of 1980.
Q Okay. Philadelphia ADA?
A Yes, sir.
Q Okay. And you were with the Philadelphia ADA through your entire career, is that correct?
A Entire career until April the 13th of the year 2016.
Q That's, um, thirty-six years in total, correct?
A Give or take a few months, yes, sir.
Q Any other employment as an Attorney?
A No.
Q Since you retired, have you done any consulting work, or anything where you were consulting attorneys?
A No, sir.
Q Um, you said you're acting as an EMT at the -- at

a ski mountain, is that correct?
A Yeah. I've been a volunteer EMT for fifteen years and a volunteer Ski Patroller for almost thirty. But since when I retired from the DA's, um, I was able to secure, um, a more permanent position as a Ski Patroller, which is, um, an EMT on the mountain.
Q Okay. During your thirty-six years as an ADA, um, what units were you assigned to?
A I was -- globally and generally speaking I was in the trial unit for the entire time except for two years approximately as the Offices Director of Training.
Um, I left the Trial Division. I was in Homicide. Um, due to an extremely serious medical condition in the year 2005, 2006, around those years, I was the Director of Training. My health returned. I went back to Homicide.
Q Okay. So, um -- so, you said you were in the trial unit for all of the thirty-six years. Then, you started talking about being in the Homicide Unit after being two years in a Training Unit, correct?
A Yes. So, of course, um, one doesn't go directly to Homicide from being hired.
Um, the Trial Division consisted of, first, what was called the Municipal Court Unit, which was a combination of preliminary hearings and municipal court trials for about

a year, a year and a half. Then, to the Felony Waiver Unit, which were the less -- so to speak -- less serious felonies, um, for a year, a year and a half. Um, from there, I went to Major Trials, which were felonies involving, um, more serious felonies and jury trials.

The Felony Waiver Unit, as it's name would suggest were just waiver trials. And the Major Trials Unit were waiver trials and jury trials. Um, I did that for a couple of years. I did a two-year stint in what was then called the Rape Prosecution Unit in the years '80 -- late '86, '87. And in 1988, I was promoted to Homicide.

So, from 1988 until the year 2016 when I retired, um, voluntarily, um, in April as I mentioned, um, and with the exception of those two years as the Director of Training, I was a Homicide DA.

Q And, um, while you were in law school, did you receive any training in terms of your ethical responsibilities to the court?

A Absolutely.

Q Can you describe that training to me, please?

A Of course. In Professional Legal Ethics, Professional Responsibility.

Q That was a one-semester course?

A I believe so.

Q And what did you learn in terms of content with regard to your ethical obligations to the court in that Professional Responsibility course that you just described?
A Well, that would be a pretty long answer. Um, whatever the professional -- Laws of Professional Responsibility required. But that could be really narrowed down especially in the light of the special responsibilities of a Prosecutor to do the right thing.
Q So, is -- is it your testimony encapsulated the Professional Responsibility with regard to Prosecutors to do the right thing?
A Well, that's just the encapsulation of the rules and responsibilities of a Prosecutor, yes.
Q Is that different from an ordinary civil attorney in your field --
A Yes.
Q -- in terms of -- can you explain what the difference is?
A Yeah. Um, our role was to do justice, not just to, um, secure conviction, or represent a side.
Q Okay. Did you learn anything with regard to ethical obligations to defend in your, um, Professional Responsibility class in law school?
A Yes. Um, but I would say not just in that class,

but even more so in my training in the DA's office.

Q Which I'll get to in a second. I appreciate that.

A Right. Um -- I mean, most of that education came there in terms of what are responsibilities.

Q Okay. Well, would you tell me about that then please with regard to those responsibilities dependent that you learned as a -- an ADA?

A Right. To be fair, to turn over everything that we had, certainly inculpatory that one would, um, potentially present at trial so it's not to surprise anyone. And absolutely all exculpatory evidence whether, um, it was obviously exculpatory, whether it was marginally exculpatory.

Um, I remember I had a chief early on in the Municipal Court Unit who mentioned to me -- he said with respect to whether you think it is, or whether you don't think it is, um, put yourself in the, um -- in the cloths of the criminal defense attorney. Would you want that as a criminal defense attorney. So, if you would want that as a criminal defense attorney, you turn it over. And so that's how I guided myself.

Um -- now, some of that information might have been hearsay, or hearsay on hearsay, or evidence that would not necessarily in anyway, shape, or form be admissible.

But the goal was to argue that in front of the court. To turn it over and to say, judge, we turned this over, we don't think it's admissible, and here's why. And have that fight in court, which I did and we did a thousand times after turning over something that was arguably exculpatory, and then fighting in court, in open court on the record for it's admissibility, or lack there of.

Q So, while you were working as an ADA, you described your obligation to hand over inculpatory and exculpatory information. Yes?

A Yes, sir.

Q So, what would you do to make sure as in your capacity as an ADA especially in the Homicide Unit to make sure that all exculpatory information was handed over to the defense?

A Read every word and every sentence and every line of every piece of paper, document, police report, um, and, um, anything that would be -- make it's way into my file, um, that I had in my possession.

Q Um, you qualified that with a -- that I had in my possession. Does --

A Correct.

Q -- does that mean that -- so, what would determine whether or not you had a part of your file in your

possession, or not in your possession?
A What would determine it? I don't --
Q Yes.
A I'm not quite sure how I would answer that question. Um --
Q Let me -- let me try to be a little bit more precise.
Um, in the event that there's a piece of exculpatory information that's not in your file in your possession, how do you ensure that that exculpatory information is handed over to the defense when you're an ADA?
A Well, I would first have to know that it exist.
Q So, that's my question. How do you go about determining the universe of exculpatory information that relates to a particular defendant so that you would fulfill your ethical obligation to hand that over --
A I would --
Q -- to defense?
A I would certainly ask the assigned detective, or detectives on any given case to provide me with the paperwork that they had.
Q Anyone else?
A No.

Q Would there -- how about any other ADA who's on the file?
A There would be no other ADA on the file. For the most part, the homicide cases that I inherited -- or not inherited so to speak, but received to try were early on in the case. So, I would start the file.
Q So, between what was in the file -- I'm sorry. Did I talk over you? I saw your mouth move.
A No. I'm -- I'm sorry. I probably talked over you. But what would -- I can anticipate, um, sir, your question a little bit.
What was in the file was virtually nothing when it started. Maybe the criminal compliant, or a fact sheet, um, or an Affidavit of Probable Cause for Arrest. Um -- um, and preliminary hearing, maybe a couple of interviews that would have been received from the assigned detective, um, of the witnesses who we would intend to put on for, um, the preliminary hearing.
It was -- it was -- you know. It could be very, um, thin and um, thumbnail sketch pre-preliminary hearing. I might have a couple of interviews. Um, I remember a document called an H Record, which was a homicide record, which would talk about, um, cause and manner of death. We tried to get the post-mortem examination, the autopsy report

for the preliminary hearing.

But pre-preliminary hearing, it was a file that I was starting to accumulate paperwork. And it would include presumably and in most cases, um, definitely a couple of statements of witnesses we were intending to put on for the preliminary hearing.

Q Okay. So, um, between the documents that you would have in your possession and the documents that you would then ask the investigators for, would that be the entire universe of possible exculpatory information with regard to a defendant.

A Yes.

Q And were you -- did you ever have an experience where there's exculpatory information that wasn't in the file in your possession and it wasn't given to you by an investigator?

A Um, yes. The defense attorney himself, or herself would give me something.

Q Can you describe to me what that something might -- what it was in the example that you're thinking of?

A I mean, it could be anything. It could be a witness who, um -- that the -- the defense attorney on the case, um, would, um, suggested happened in some other way, suggest self-defense, um, a potential alibi, a deferential

witness. But that would come from the defense attorney. So, there would be no reason to turn it back over. They --

Q There's nothing to turn over?

A There -- there would be nothing to turn over. They're turning it over to me. Um, it -- it didn't happen in many cases until the trial, um, to be, you know, quite blunt. Um, but I, um -- the more, um, ethical defense attorneys of which there were many, um, would hand it over, um, before trial like I handed over my information before trial. So, it would come from there.

Um, but absent the assigned investigator, the assigned detectives investigative materials, I wasn't the investigator. I wasn't out on the street for the most part ninety-nine percent of the time seeking, um -- you know, seeking, um, additional evidence. I would have my detectives do that. That's the role of the detective versus the role of the lawyer.

Q So, we can agree that you had no ethical obligation to turn back over exculpatory information to defense that you received from the defense, correct?

A Um, yeah. I mean, unless they changed -- unless they changed defense lawyers. I would make sure that the new one had it. But I would --

Q Okay.

A -- presume they would get that from previous counsel. But, yes, that's correct.
Q Okay. So, the -- so, then the documents really -- the documents you had an ethical obligation to hand them over to the defense in terms of the exculpatory information was what was in your file and what the investigator gave you, correct?
A Yes.
Q Anything else?
A No.
Q So, if there's exculpatory information that's not in your file and not with the investigator, can you explain where that document might come from if it's not from one of the two -- one of -- strike that question. I lost track of where I was there.
If you have exculpatory -- if there is exculpatory information that's neither in your possession, nor in the possession of the investigator, um, have you ever had a situation where it came from a third source, or further source?
A Not that I can think of directly offhand. It's -- it's possible that someone affiliated with the defendant, defendant's family would turn something in. But I would think that they would turn that in -- they would have turned

that into the defense counsel.

But certainly had I been contacted by any civilian, or police, detective, or officer who would hand me anything, um, that was arguably exculpatory, A, it would make it's way into, um, my file. And, B, since it made it's way into my file and I was aware of it, I would turn that over to the -- to the defense attorney.

Q Had you ever been involved in a situation during your time as an ADA where the investigator did not hand over to you exculpatory information that you had a -- would otherwise have an ethical obligation to hand over to the defense?

A Not that I ever -- not that I -- not that I could possibly be aware of. How would I know if someone didn't turn over something to me?

Q Because you might find out after the fact.

A No. That didn't happen.

Q So, in your -- your thirty-six years, you were never -- you never found out about exculpatory information that had you received it during the, um -- the, um, pendency of the file you would have had an ethical obligation to hand that over to the defense?

A Correct.

Q Um --

A When you say -- when you say pendency, um, throughout trial, um, and, um, up to and including post-trial motions before the trial judge is during the pendency from my perspective. Once the case was, um -- came to either verdict, um -- um, or a guilty plea, um, that file was turned over, lock, stack and barrel.

I'm sure we're gong to talk about that. I would like to talk about that. Um, and then what happened, or what information was received by our Appeals Unit, by our PCRA Unit state and federal, um, they would have one-hundred percent, um -- um, physical possession of, control of, um, my trial file and everything that went with it, um -- and, um, responsibility for the case in everyway, shape, or form. And I --

Q So --

A -- can explain why --

THE COURT REPORTER: I'm sorry?

BY MR. SCHWARTZ:

Q I'm sorry. You can explain why what?

A Why? Once the case was over from a trial perspective, I no longer had it.

You have to understand this, sir. When I had a file starting from a pre-preliminary hearing from arrest, I might of had it for a year, or two years, or three years.

And I lived with that fuel, and it was mine. And I controlled what went in it, and I -- and I controlled what went out. And it was my responsibility.

But for every case that was disposed of by way of a trial, um, or -- or a guilty plea after two, or three years of living with it -- for everyone that I disposed of, I received two, or three more, or four, or five. And so I was all too relieved to hand that file off to where every policy and procedure dictated and demanded.

And that would be to the Appeals Unit and an Assistant DA assigned to the case in Appeals, who had their own Assistant Chief. Their own, um, Chief, whether it was Hugh Burns, or Ron Eisenberg, who had their own deputy. Okay? I gave the physical file to them to handle. They would need every last piece of paper, every interview, every sheet, every document, everything in that file.

I wasn't, um, in -- ever -- and no DA I ever knew ever photocopied the file and kept the original. It was a couple of floors away from us. We trusted them to handle and to keep our file safe just like they trusted us to keep our file. So, it would go to Appeals, and they would handle it the way they would handled it.

So, in the pleadings where it says I controlled what happened after I was done, that was not correct. That

was completely one-hundred percent inaccurate. And I think if you ask five-hundred lawyers, um, who were in the DA's office, they would tell you -- all five-hundred would tell you the same thing. None -- to pleased and happy to pass that file onto the next level because I had other ones coming in.

Q Did your obligation to hand over exculpatory information end once the trial had taken place, post-trial briefs had been filed, or a, um -- or a, um -- an agreement had been reached with regard to, um, you know, settlement?

A My obligation to turn over exculpatory evidence never ended. But I wouldn't be in receipt of it anymore. It -- the person, or people who represented the defendant on appeal, or at the PCRA level, or at any appellate level state or federal would know that the case was in Appeals and would, um, inquire of the Appellate DA, who had the entire file, who was, um, handling all the issues in court.

Um, I've never written a brief, so I never, um -- I shouldn't say never. I did some post-trial motion briefs in the court where we try the case. But, um -- yeah. That would -- you know.

If -- if something came to me after the case was already in the Appeals Unit, I would walk up to Appeals. I would hand it to them. I would say this came in as a piece

of inculpatory, additional inculpatory, or exculpatory evidence. It should be turned over. And my experience with the Appellate Unit was it would be all the time.

Q So, you still had -- even when a case was in Appeals, you agree that you still had the ethical duty to -- in your words -- do the right thing?

A One-hundred percent.

Q Okay. And do justice as well?

A Yes, sir.

Q So, that would include making sure that exculpatory information would get over to the defendant even in the context of appeal?

A I would agree with that.

Q Um, you were in something -- I want to use the word altercation, but, um, maybe that's too strong of a word.

You were in an interaction with, um, former District Attorney Krasner that was reported in the media. Do you -- do you remember that -- that incident let's call it?

A I do.

Q What was the genesis of that incident?

A Yep. So, I received a phone call from a former colleague of mine -- I wasn't in the office that long -- Pat

Blessington. And he said you're due in court, for a PCRA matter, post-conviction matter. Um, I can't recall the specifics, or the details. But I need you to come to court on Friday of a particular week.

And so from my perspective, um, when I have notice that I have to be in court, I don't need a written physical subpoena. As far as I'm concern, that's an order of the court to appear. And so I said, of course, I'll appear. Not only because it's an order of the court to appear, but because I wanted to cooperate in a case where, you know, the stakes were so high for -- for both parties and -- and explain what I did, or did not do in any given case.

So, I said, of course, I'll be there Friday. He asked me to come in a few days earlier to refresh my recollection to one of the couple thousand cases that I handled in my years, and I -- I said, of course, to that.

I had just had recent, um -- um, rotator cuff surgery. I couldn't use my left arm. I drove into town. I got two tickets in my car -- on my car. Um, and I went into the office.

And, um, I went to the front desk. They -- both detectives knew me from coming and going for the last thirty years. They said go ahead right up. I said I'm not going to go ahead right up. I'm going to wait -- the proper

procedure is to wait until somebody brings me up because I'm no longer employed.

Um, Pat Blessington came down. He brought me up. And, um, the next thing I know, Mr. Krasner is bursting into his office with a whole bunch of detectives and he wants to know why I didn't sign in because Pat Blessington, nor the detectives told me I had to, or said come on. You know, don't worry about it.

And he wanted to know where my subpoena was as opposed to coming in, um, under the circumstances that I already explained, um, to try to, um -- to try to, um, cooperate with his office and his Assistant DA in a homicide case, um, that his office and his Assistant DA told me I had to be in court for.

And he just got extremely personal, um, nasty, and, um, red-faced about why -- where's my subpoena and, um -- and why I hadn't signed it. It was absurd, sir.

Q So, with regard to the incident that you just talked about, you had -- you were retired at that point, were you not?

A Yeah. I retired April 13th. Um, I wasn't terminated as it was suggested in your pleading. Um, maybe it's semantics. But I left four, or five weeks before that primary in May of 2016 -- '17. Hold on. Yeah, my heart

attack was in 2016.

So, in 2017, um, I left in April. And -- April 13th. And the first week of May, um, Mr. Krasner was nominated. And this happened maybe some months after January 2018 when he was inaugurated.

Q Okay. So, the situation was with regard to a -- we'll call it a Miller -- Miller was the, um, defendant here. A Miller appeal.

A Stephen Miller, yep.

Q Were there any other appeals that you assisted the DA with, or an ADA with after you retired?

A Um, sir, none that come to mind. That's not to say it didn't happen. But none that come to mind at this point. It's been almost -- you know. We're coming on eight, nine years now.

But I don't -- I certainly don't recall -- oh, I did -- I do recall, um, coming back into the office at the request of one, Ms. Cummings. Um, the nature and circumstance of coming in for her and -- and what happened in that case is the subject of Federal Judge Goldberg's opinion and perhaps causing her to flee to Texas. So, that was the only other time I came in.

Q Okay. Were there -- but aside from these two instances, were there any other instances where you assisted

an ADA with an appeal after you retired?
A Not that I can recall, sir.
Q Before you were retired, um, were there any appeals that you assisted other ADA's with?
A Um, you know, very rarely would an Appeals DA come to me and say, hey, you know, what happened here, or what was this about, or can you explain something. It -- it probably happened on a couple of occasions. But, um, invariably and almost exclusively once the file went to them, they had the file. They worked on it. They knew what they had and -- you know. And they handled the case throughout appeal and PCRA.
So, um -- you know. If anyone ever asked me to cooperate, I certainly -- or -- or to explain something that happened at trial, or why I did, or didn't do something, I would certainly, um, obliged that, um, from either side actually. Um -- but, um, none specifically, sir, come to mind at this point.
Q Both before you retired and after you retired when you were helping an ADA with an appeal, did you have access to the appeal case file?
A Um -- well, um, I certainly would have. I would have had complete access to it. I don't know that I, um -- you know, I might have looked at something that I was asked

to look at. Um, not have to go through the whole file.

I can tell you with Ms. Cummings what happened was she set me up with two boxes of completely meaningless paperwork. Um -- so, when you say access to the file, I asked her when she said, you know, you -- we're going to call you to testify in front of Judge Goldberg. Um, can you look over the file.

When I realized that those two boxes, um, that took me six, or seven hours to go through, um, had none of the original discovery, interviews, paperwork, um, letters regarding what was turned over and what wasn't turned over in the boxes, and when I asked her politely, um -- as all my entire interaction with her was that day -- um, this is like a completely incomplete thing. The main part of my file is not here. She said, oh. Oh, it must be somewhere else.

And then, of course, she went running to state court, um, behind Judge Goldberg's back and did what she did, which again is the subject of the published opinion. Um, but I did not have access to that file. Um, that would have disproven everything she alleged.

Um, but other than that, if an Assistant -- if someone like Pat Blessington, um, would, um, ask me to come in, and if I had asked him can I see the file to refresh my recollection, the answer -- the long answer -- and I'm sorry

-- to your question is, of course, I would have access to that file.

Q The name again was -- was Cummings?

A Yeah, Patricia Cummings.

Q Now, um, when you were assisting Ms. Cummings with the appeal, um, you went through the file, the appeal file to make sure that all the exculpatory information was there. Did I understand that correctly?

MR. JOHNSON: Objection. That's not what he testified to.

MR. SCHWARTZ: Okay. That's the question. I'm asking what she testified to.

THE WITNESS: Well, she didn't give me the -- any part of the file. She gave me defense and, um -- and prosecution briefs, um, the new prosecution briefs that mirrored the old defense briefs one-hundred percent.

You know, our new prosecution briefs, um, read exactly like the Innocence Project briefs that were filed on behalf of the defendant, um, while the case, um, was still being handled honestly.

So, I don't understand your question at all. But she didn't give me a file. She gave me,

um, nothing even though she said she gave me the entire file. Um, and I understand that that file was missing, quote, end quote, until it was ordered returned in the last couple of weeks. So, she didn't give me a file. So, I wouldn't know what was in -- you know, what she had excised and -- and -- you know.

But, like I said, once the case went to appeals, they handled it. If I received any information, of course, I'm going to turn it over, but I wouldn't because from our perspective. I mean, I don't recall ever receiving any from my perspective, um, or -- or -- my role is to handle the trial and post-trial motions before the trial judge, and then hand it to an Appeals DA, who would have all that experience in writing brief, handling appeals, taking it to the superior court if necessary and Supreme Court and making those arguments.

I didn't see the file again. I didn't see the physical file. I didn't see the paperwork inside the file. Not because I didn't care, or want to, but because that was their job and role and responsibility, and mine was to pickup another

one of the hundreds of murders that was coming up for -- for trial.

BY MR. SCHWARTZ:

Q When you were assisting ADA's with appeals, you still had the ethical obligation to do the right thing as you described it, correct?

A So, yes. But when you say assisting Appeals DA's, mind you I tried thousands of cases. And I don't know in -- whether it was less than two handsful, or one handful that I actually was contacted by someone in the Appeals Unit asking for their help. I don't have a specific recollection of ever that happening.

It -- it probably happened on a few occasions where they asked me, you know, something about the case, to explain something factually, or, um -- you know, maybe explain some scribble that I had in the file. But whatever was in the file spoke for itself one-hundred percent of the time from their perspective, or else I probably would have been contacted a lot.

Q Okay.

A And I wasn't.

Q But the question though was when you were helping ADA's on appeal, you still had an ethical obligation to do the right thing and to do justice, correct?

A Sir, the question states something that is -- is -- was not accurate. And the question says when I was helping them with appeals. I wouldn't help them with appeals. They did their own appeals. Okay?
Q So, what were you doing for the ADA when you were assisting them with their appeals?
A I wasn't --
MR. JOHNSON: He answered he wasn't assisting them with appeals, and he said it at least five times now. And you keep rephrasing it and saying when you were assisting.
He's testified he wasn't assisting them. He turned the files over to them.
THE WITNESS: I -- I didn't assist them.
MR. SCHWARTZ: I asked several questions, and he did say that he was assisting. So, that's why I'm confused now. And I appreciate if the objections were proper under the federal rules.
THE WITNESS: All right. Let me -- let me make this clear. I can remember, um, if at all, um, on one, or two occasions, or three occasions, whatever -- less than one hand -- where someone would ask me, you know, um to explain

something like what corner the -- you know, or what scribble. But it happened almost never to help them with appeals.

I think that's a complete -- and I say this most respectfully, sir -- mischaracterization. I didn't help Appeals with their appeals.

BY MR. SCHWARTZ:

Q Okay. In -- and, again, we're going back to the Inquirer article about your, um, interaction with District Attorney Krasner.

You're quoted as saying after thirty-six years in the office, every murder case I ever prosecuted was important to me, Sax said. It was my case then, and it will be my case to the day I die. Do you remember giving that quote?

A One-hundred percent.

Q So, what did you mean when you said that?

A I meant that when, um, Ms. Campbell, or, um, Patricia Gooding, or, um, anyone of the dozens of additional murder victims' moms call me and ask me what's happening with the case, or why is this one getting out, or why was this case that was tried so, um, strongly and fairly with so many witnesses resulting in exoneration, um, I don't say

well I'm not with the DA's office anymore. I can't help you. I still care about those people. I still care about what happens to the case. And so in my mind and in my heart and in my soul, it's still my case.

But I never, um -- um, handled an appeal. Um, not to say that I don't think they were handled honestly and fairly and with a mind towards justice. But that wasn't me. I didn't do that.

Um -- so, what I meant is, um, they're my case in my heart and they will be until I die. But that doesn't mean I'm still handling it today.

Q But do you agree that your ethical obligation to secure justice continued even during the appeal?

A Well, you -- you mentioned like that I have this thing, um -- I had control over, um, the case until 2021, which is bazaar because I retired in 2017 and Krasner wouldn't even let me back in the office. So, I'm not quite sure where that allegation where I would have control over the case until 2021 is what you wrote.

Um -- um, I would agree until 2017, April the 13th that if I had come into con -- um, into possession of any exculpatory evidence, that it would be turned over to the defense and the Appeals Unit. Yes, I would do that.

Q So, it's your testimony then that after you

retired you no longer had an ethical obligation to do the right thing, or to secure justice?

MR. JOHNSON: Objection.

MR. JACKAL: Objection.

THE COURT REPORTER: I'm sorry. Who objected?

MR. JOHNSON: Carlton Johnson.

MR. JACKAL: Ben Jackal for the city.

THE COURT REPORTER: Okay. Thank you.

THE WITNESS: Yeah. Actually, I've tried -- oh. I'm sorry. I -- I should listen to my lawyers.

BY MR. SCHWARTZ:

Q Well, you still have to answer.

A Well, here's my answer. My answer is on many occasions I tried to do the right thing after I retired. And, um, I watched an office that continually, purposely, and deceitfully did the wrong thing. So, there you go.

Q So, when -- when you were assisting ADA Blessington on the Miller case, were you not there to help secure justice?

A Yeah, I was. And you saw -- you saw what Mr. Krasner wanted to do with that. Throw me out of the office, harass me, intimidate me, and come in there with a whole

bunch of detectives with, um -- um, swinging their handcuffs around after being in that office for thirty-six and a half years and -- and virtually giving my life to do the right thing. Um, having it thrown in my face. Telling me that I didn't sign in.

Um -- um, and trying to prevent me from doing the right thing was a man by the name of Larry Krasner, who had actually hired the Innocence Project as his right-hand man. And now was coming in in the ultimate -- sir, in the ultimate conflict of interest taking cases that they handled in the Innocence Project and having the result that they wanted the Innocence Project to, um -- um, win. Now, he could do it as a Prosecutor.

So, would I still try to do the right thing, absolutely one-hundred percent then and now.

Q Um, you mentioned you were in the Homicide Unit. Um, before you retired, did you ever handle any of your own appeals?

A No.

Q Appeals were purely within the province of the Appeals Division?

A Sir, that is correct.

Q Um, understanding your distinction when you say that you didn't assist ADA's, um, in their appeals, did you

ever help in any capacity with regard to, um, ADA appeals while you were employed?

A No.

Q Even if you weren't in charge of them?

A No.

Q While you were still employed, you still had that ethical obligation to do the right thing and do justice though, correct?

A I would agree.

MR. JACKAL: Objection.

BY MR. SCHWARTZ:

Q So, when you were working as an ADA still employed by, um -- still employed, um, what did you do to make sure that the appeals on the files where you would handle the trial work were continuing to proceed where the right thing was done and justice was secured?

A What I would do is know in my own mind that people like Hugh Burns and Ron Eisenberg and, um, Assistant Chiefs and other supervisors and Assistant DA's would stand by their moral, um, ethical, and legal obligations to handle the case correctly, appropriately, fairly, honestly, and with due regard for justice and -- and leave it to them to do their jobs.

I had new trials coming up. They had the appeals.

It would be impossible to do both.

Q So, it was impossible to do your caseload and make sure that justice is secured on files that you had already completed at the trial level?

MR. JOHNSON: Objection.

MR. JACKAL: Objection.

THE WITNESS: It would be impossible to be a trial DA and have also a caseload of appeals to do as well. That is correct. It is never impossible to attempt to do justice, sir.

BY MR. SCHWARTZ:

Q You were with the Homicide Unit you said between 1988 and 2016, correct?

A With the exception of a -- of a medical situation, and then followed by two years as the Offices Director of Training. Yes, sir.

Q Okay. Um, with regard to your assignment as a Hom -- as in the Homicide Unit, um, where was your office during that time period?

A Um, I think it moved once, or twice, and the entire office moved at least once, um, from 1421 Arch Street to, um -- where did we wound up -- Three South Penn Square.

But within the office Three South Penn Square where we were the majority of that time, um, I -- my office

was right next to my Assistant Chief's office. Was that the Assistant -- no, that was the Chief's office, um, who was either Charlie Gallagher, or Ann Ponterio, or Dave Webb, um, and towards the end, Ed Cameron. So, it was right next -- right next to the Chief's office.

Q Okay. So, just so I understand because I think you said that you may have moved twice during that time period, but I think I only heard one move from 1421 to 3 Three South Penn Square.

A Yeah. No, it was -- it was the one move. We moved before I was in Homicide from 1300 Chestnut to 1421 Arch Street. And while in Homicide from 1421 Arch Street to Three South Penn Square.

Q Okay. And do you know what year it was, um, that the Homicide Unit was moved from 1421 to Three South Penn Square?

A Um, late 90's.

Q Certainly before the year 2000?

A You can't hold me on -- please -- on the date. Um -- um, yeah. I met my wife in the DA's office in '95, um, and then she started to work in '97. And then at some point we moved to Three South Penn Square, but I don't remember when that was exactly.

Q Um, was it before 2005?

A Um, yes.
Q Okay. So, from 20 -- approximately 2005 through the end of your career as a Homicide ADA --
A Yes.
Q -- you were at Three South Penn Square, correct?
A Yes.
Q I'm sorry. I didn't hear the answer.
A I'm sorry. Yes.
Q I'm not as familiar with Philadelphia geography as I once was. Can you describe Three South Penn Square for me in terms of it's location?
A Um, it's the corner of Juniper and South Penn Square. It's directly across the street from the Southeast corner of City Hall and it's adjacent to what used to be Wanamaker's and it's still probably referred to as the Wanamaker Building.
Q How many stories is this building, Three South Penn Square?
A Ten.
Q So that changed while you were employed in the Homicide Unit? Did the number of stories change?
A I don't believe so, sir.
Q Okay. What, um, floor, or floors were you, um -- was your office when you were working at South Penn Square,

Three South Penn Square?
A Yep. Seven.
Q You were on seven the entire time?
A Except when I was Director of Training, um --
Q Yes.
A -- and then that was on -- it might have actually been on two, or three. We only had five through ten with the exception of the training room, which was on the mezzanine.
So, no, I think my office was not on the mezzanine with the Training Center. I think I was upstairs. But I don't remember where my -- what floor my office was on as Director of Training. I think it was -- I think it was -- I think there was a floor like eight and a half -- believe it or not -- or, um, nine and a half. It was like a little half floor. And so I had an office there, um, as the Director of Training.
But ninety-nine percent of the time during that period of time I was on seven.
Q Okay. So, I'm -- when I'm asking you these following questions, I'm going to be referring to your time in the Homicide Unit, but not the time that you were, um, assigned for your -- for your -- reassigned for your medical issue in the Training Unit. Okay?

A Yep.
Q Okay.
A Yes.
Q So -- so, again, so I'm clear. For your time in the Homicide Unit except for your time in the Training Unit, um, you were on the seventh floor?
A Yes, sir.
Q How many employees were there on the seventh floor?
A Approximately thirty Homicide Assistant DA's. The Family Violence and Sexual Unit, another twenty to thirty Assistant DA's. A support staff, um, equal to and more than that number that included, um, administrative assistants, detectives, um, paralegals, um, Victim Services.
So, literally between one-hundred and one-hundred and fifty probably give or take is my estimate.
Q Okay. And was the entire Homicide Unit on the seventh floor during your time on that unit?
A Yes, sir.
Q So, between 2005 and 2016 when you retired, um --
A And -- and for the record, I actually retired 2017. So, that was April 13th of 2017.
Q Okay. I'm --
A It's the Friday --

Q -- pretty sure you said '16 before, but either way.

A I did. I did. I -- I had -- I was on trial. Um, and in the Summer -- in August of 2016. And the day before I was supposed to close, um, in probably my three-hundredth jury trial, um -- um, I had a massive heart attack, um -- and, um, actually was clinically dead for three minutes. Um, made it. Um -- and, um, stayed with the office, um, and took whatever time I was supposed to take to recover and recuperate.

Came back to the office. And, um, stayed for another six months. But it was time to pass the baton so to speak. And so I did on April 13, 2017.

Q Okay. So, during your time in the Homicide Unit, um, did you use paper files? Electronic files? Both?

A Paper.

Q Only paper?

A Correct.

Q Later was there -- towards the end of your tenure, was there beginning to be any transfer to -- to electronic files, or had that not been in the cards at that point?

A No. Everything was on paper.

Q So, at this -- during your time in the Homicide Unit, on average how many files did you have in any given

year?
A At any given moment, um, thirty to fifty-five, or sixty.
Q And over the course of a year, how many files would be -- would you be working on?
A I mean, I would normally be working on the one that's right in front of me. The others would be in my filing cabinet in my office, but would only gather -- gain my attention if someone asks me to, um, look at something relative to a file, or a case that was not immediately on the horizon. I might look at the next two on the horizon.
But those -- when I say on the horizon, if I'm on trial next Monday, or a Monday a week, all of my focus, attention, and time would be invested in that case to know that case backward and forward. Um, it's -- it's that simple. I didn't, um, have the mental space to be doing that with all of these files when one was coming up in three days, or ten days.
So, I wouldn't necessarily -- I -- I just -- again, respect -- very respectfully take issue with working on. I would normally be working on the case, or two that was right in front of me. Um, and -- and when those were over, heavenly, thankfully pass those off to an excellent, um, Appeals Unit, and then get -- and then start looking at

the next one on -- on my plate.
Q So, let me use a different word then and see where we go.
Um, during any given year, how many files were you assigned?
A Through the year? That's a -- that's a tough one. Um, fifty to one-hundred.
Q Okay. So, if one were to ask you in 2015 as you sit at your desk how many files are you assigned to right now, your answer would be somewhere between fifty to one-hundred?
A No, it would be somewhere between thirty and fifty-five as I said. The ones that were in my filing cabinet that had, um, where the murder had occurred and an arrest had been made, but the case was not disposed of at the trial level would be at least thirty and, you know, sometimes forty, or fifty.
Q So, the files that you were working on, you had a physical file where?
A In my office.
Q Um --
A Mostly in my office. But if it got -- if I ran out of room in -- in my not very big office with a couple of filing cabinets, there was a filing cabinet outside my

office that, um, was very close that I could keep the remainder. But in, or next to my office.

Q Um, these file cabinets, were they locked?

A In my office, no. Outside my office, probably not.

Q Did you -- was your -- when you weren't in your office, did you lock your office door?

A No.

Q Um, the other ADA's in the Homicide Unit, did they have similar caseloads to you during the time period you were in Homicide?

A Yes.

Q Um, where did your fellow ADA's store their files that they were assigned to --

A In the --

Q -- during the time that you were in the Homicide Unit?

A I'm sorry for talking over, Ms. Hines. Um, similarly it -- to the extent there was room in their physical office, in their office, or immediately outside we have some filing cabinets.

Q Um, you're working in your office during this time period. Um, when you finished working on a task for that day, did you return the file to the cabinet everyday?

A The one that I was actually working on might be spread out all over my desk.
Q Would you spread out anywhere else in the office?
A In a, um, conference room that was, um -- we had two, or three of them, um, within one-hundred feet of my office.
Um, I actually was, um, kind of -- I'll use the word infamous for taking over a conference room and having my things organized and spread out and, um -- um, for me to get ready for trial. And, um, may have very well and often did leave it there overnight, or for a couple of days and never had anything ever disturbed, um -- you know, because we didn't do that. Everyone understood the importance of what we were doing.
So, I never had anything stolen out of my office. I never had anything removed from my office that I'm -- that I'm aware of. Um, I was never looking for anything that was there the day before. So, I had no reason to worry that a file that I had organized, but spread out over a conference room would be disturbed in anyway.
So, yeah, not always put back in the file and, um, put back in the cabinet. There was no need to do that when I was leaving at 9:00 at night and coming in the next morning at 7:00 to do the same work on the same file.

Q When you're using the conference room as you just described, when you weren't in the conference room, did you lock the door?
A No.
Q The other ADA's who are working during this time period, you said that they would keep their files in the file cabinets in their offices and file cabinets located close to their office, correct?
A Yeah, and similarly unlocked filing cabinets and unlocked offices.
Q Um, were the other ADA's in the habit of using conference rooms like you did to spread out as you described?
A One-hundred percent, yes.
Q So, other than files being either in your file cabinet, or -- I'm going to actually ask more broadly.
So, as to all the ADA's in your unit when you were working there, um, between 20 -- approximately 2005 to 2017 when you retired, um, other than the file cabinets in your individual offices, file cabinets outside of your offices, and conference rooms where you and the other ADA's would spread out, was there any other place where files would be stored?
A No.

Q How about not using the word stored. Same question with any files be located on a more temporary basis?
A No.
Q Same question. Located not on a temporary basis, but on a more lengthy basis?
A No.
Q During this time -- I'm sorry.
A No, sir.
Q During this time, 2005 to 2017, were you ever asked to participate in a PCRA Application?
A Um -- um, no. I mean, define participate. Like --
Q Ask for assistance by the Appeals Unit for example.
A No. Um, it would not be, um, in conceivable that I was called to testify. I just don't have a recollection of testifying in PCRA matters. Um, if -- if it happened, it happened extremely rarely.
Q But it did happen, just rarely?
A Probably. I don't -- I just -- you know. And I say probably only because I don't have a recollection of doing it. But I'm -- I'm almost pretty sure it happened.
Q Okay. Once you were finished working at the trial

level with a file, um, as you described earlier, um, what would happen to that physical file?

A Um -- so, there would be a period of time, maybe six weeks, or thirty days where a defendant would have the right to file post-trial motions before the judge in which, um -- or before whom the case was tried. And if that's the case -- and when that was the case, um, that would be my responsibility, to handle post-trial motions before the trial judge.

It didn't happen in -- in every case, and I can't give you a percentage. But I can share the judges now giving the appellate rights to a defendant where they had ten days I believe to file a post-trial motion, or thirty days to file an appeal to superior court. And so many of them went right to superior court, um, those that, you know, chose to appeal, which was, of course, most cases.

Um -- so, I would keep it for post-trial motions. But once post-trial motions were decided, or the time period past, um, to file those motions, the physical file itself, everything I had would by necessity because it would be everything that the Appeals Unit would need would be physically carried by myself to Appeals, which was -- what floor were they on. I forget. Maybe five. I think five was the Appeals Unit.

Q Okay. So, once you -- first of all, did you have any guidelines, or procedures in terms of when you would be transferring your file over to the Appeals Unit?

A Yes, as soon as --

Q What --

A As soon as possible. As soon as -- as soon as the time period, or the post-trial motions were decided, that afternoon.

Q That was -- was that a pol -- again, just so I'm clear. That was a policy that you had to follow?

A No. That was, um -- that was to help me like take a breath and, you know, start looking at my next trial.

Q Okay. So, that was your personal --

A I knew --

Q -- preference?

A It's what everybody did in terms of that's where -- I mean, I don't know that they did it the same day, or the next day. But there was only so much room in our office.

My work with the file was one-hundred percent done. It was. Not my obligation to turn over exculpatory evidence, or to do justice, but my work with the file as I had it was done. And their work was just beginning. So, they would want it sooner rather than later, and I would be

all too happy to give it to them. The sooner, the better.
Q So, again I understand that you believed it to be all the better to get it over to Appeals as soon as possible.
But my question is was there any policy with regard to timing of transfer of the file to Appeals?
A I -- I, um -- I don't know if there was any written policy. Um, there would just be no reason for anyone to hold onto it, for any of us trial DA's to hold onto a case that was disposed of at the trial level and an appellate lawyer would have to start working on at some point very quickly.
So, um -- yeah. Um, I -- I did not have to wait, um, to get a call from an Appeals DA to say Notice of Appeal was filed on such and such a case. Um, I would --
Q It was already -- it was already over to the Appeals Unit?
A It was already over to the Appeals Unit. And if someone was convicted of a serious crime, which I, um -- I had all the experience to know that they were definitely going to appeal, I was -- I would get it to Appeals. Or if the defense attorney told me what was going -- we're going right to superior court, which happened innumerable times, I gave it to Appeals. This is coming your way.

Q Okay. Were you responsible for packing the file to go over to Appeals?
A Absolutely.
Q What did you do to make sure that all of the documents from the file were in the, um -- were transferred over to Appeals?
A Um, it wasn't very difficult, or complicated. Every file, every piece of paper in my possession went back into the box and I took it upstairs.
Q It all went in a -- you said in a box?
A Sometimes two boxes.
Q And is that how you kept it in your office in the file cabinet before it went up to Appeals, in a -- in a box?
A Yes. Um, before trial -- some -- sometimes it wouldn't warrant a box yet depending on how big the file was. But we had these, um, accordion folders that, um, could hold, you know -- I don't think this is going to transfer very well, but like it could be about eight, or ten inches wide.
And in the beginning of the case and, you know, up until -- and as paperwork started to come in from the police, from whatever source, um -- um, or -- or motions filed, or defense, um, information, it would go in there. But eventually it would, um, be bigger than the limit that

an accordion file would hold, and we would get a small box to start adding to a file.

Q Okay. So, would you agree that as part of your ethical obligation to do justice and do the right thing, you had to ensure that every piece of your file was transferred to the Appeal Unit?

A Yes.

Q Um, were you involved in an appeal involving, um, the plaintiff in this case, um, Mr. Natividad?

A No.

Q Were you in contact with any member of the Appellate Unit with regard to any appeal pertaining to Mr. Natividad?

A Probably, but I have no specific recollection. But I probably was.

Q Were you -- do you have any recollection --

A And -- and --

Q I'm sorry?

A -- it would not necessarily in anyway shape, or form be to assist, but they would update me. They would tell me, um -- was it Cari Mahler who handled some of the aspects of this appeal, or some of the history. Um, whether it was her, or -- or Michael Urlick, or whomever, um, they would come and say, hey, we -- this happened in superior

court, or -- you know, this happened, or we're waiting for this, or we're waiting for that.

So, they would update me. They know I cared about the case. Tried the case. Lived with the case. Um -- and -- and so they would update me. So, would I have contact with them, would I have conversations with them, probably.

Um -- but assist in writing anything, in being involved in the litigation, the appellate litigation, sir, I was not.

Q How about assist with regard to making sure that the Appellate Unit had the complete file that you would have delivered to the Appellate Unit back when the case was, um, closed initially?

A I gave them the complete file. And, um, I would trust that they still had that which I gave them.

Q So, in terms of -- there's, um -- do you know how much time transpired between the time you were involved -- first of all, you were involved with the Natividad file as the ADA for, um, prosecuting a homicide, correct?

A Yes. I actually inherited that case from, um, someone who had left the office to go into private practice, Paul Loughlin. He actually was assigned first. Um, I think he handled the preliminary hearing. Um, left the office. And I was reassigned. So, I got his file from him.

Q But you took --
A I -- I --
Q I'm sorry.
A I got the file from him.
Q You took the Natividad homicide file to conclusion, correct?
A To trial conclusion, yes, sir.
Q Okay. And once you were complete with your work on the Natividad file, as you described earlier, you packed it up and sent it over to Appeals as quickly as humanly possible. Yes?
A Pretty much, yes.
Q And between the time you finished with the file and the appeal took place, do you know how much time had transpired? It -- it wad decades. Yes?
A Wait. I'm sorry. What was decades?
Q The time between you finished with the Natividad file and the time it was on appeal, correct?
A You mean he didn't appeal until decades?
Q I didn't -- there was actually multiple instances, so maybe that wasn't phrased correctly.
Um -- so, the application that's primarily the subject of the plate was handled by Ms. Mahler. Are you aware of that?

A That sounds familiar, yeah.
Q Okay. Do you know what year that was give or take?
A No.
Q Okay. It was more than a decade after you finished your work on the file, correct?
A I -- I -- wait. Didn't he appeal like right after he was sentenced to death?
Q Yes. There are multiple appeals, but we're talking about the one that involved Ms. Mahler.
MR. JOHNSON: Yeah. I'm sorry, counsel. Um, it would be helpful -- you used the phrase a couple times on appeal. If you could state what aspect and specifically what appeal it might help the witness.
MR. SCHWARTZ: I appreciate that.
BY MR. SCHWARTZ:
Q Um, are you -- Mr. Sax, are you aware that in 2012 a judge order production, or -- I'm sorry.
In 2014, there's a Judge Rufe who, um, issued a Discovery Order with regard to Mr. Natividad's last appeal. Can I refer to it as the last appeal? Are you aware of that order?
A No.

Q Okay.
A No, sir.
Q Did Ms. Mahler have any discussions with you at anytime with regard to any of Mr. Natividad's appeals?
A She -- she probably did, but I have no recollection of them. It's -- it's what I just said. Um, she would have updated me that, you know, this appeal was successful. This appeal was not as successful. We're at this state. We're at that stage.
So, I'm not going to say she didn't talk to me about it. I just don't have any, um, specific recollection of anything she might have said relative to the status of Mr. Natividad's appeals.
Q And you did nothing to affirmatively ensure that Ms. Mahler had a complete file that you would have put into, um, the box when you transferred it over to Appeals?
MR. JOHNSON: Objection. He -- asked and answered. He's repeatedly stated he put all the contents of the file into the box and took it to Appeals.
THE WITNESS: Yeah.
MR. JACKAL: I join that objection.
THE WITNESS: Yeah.
MR. SCHWARTZ: That wasn't the question

though.

THE WITNESS: Well, respectfully, Mr. Schwartz, the question was I did nothing to ensure. That is entirely incorrect. That is --

BY MR. SCHWARTZ:

Q No. The question is did you do anything to ensure that Ms. Mahler had the complete file that you put into a box when you moved it over to, um, the Appeals Unit?

A Yes.

MR. JOHNSON: Asked and answered.

THE WITNESS: I gave her the complete file.

BY MR. SCHWARTZ:

Q So, when she was looking at it in 2012, you know that she had the complete file, correct?

A I know that I gave --

MR. JOHNSON: Objection.

MR. JACKAL: Objection.

THE WITNESS: I know that I gave her everything I had and trusted her and anyone else in Appeals including Hugh Burns and Ron Eisenberg and anyone else in the Law Division to not do anything other than maintain that file like they did hundreds and thousands and tens of thousands

of other cases.

BY MR. SCHWARTZ:

Q So, in short, if there was any document missing from the -- from the file that Ms. Mahler had, you had no part in that document being missing, correct?

A I had no part in any document being missing.

Q When Ms. Mahler was handling the appeal, did you have access to the file?

A If I wanted it.

Q Where was the file when Ms. Mahler was handling the last appeal?

A I would presume in her office, or in a similar, um, filing cabinet with her cases.

Q Like your filing cabinet, was Mr. Mahler's filing cabinet unlocked?

A You'd have to ask her.

Q Like, um, your filing cabinet out in the hall, was Ms. Mahler's filing cabinet unlocked?

A You would have to ask her, sir. And I -- and I say that respectfully.

Q Just to be clear, I'm not taking anything you say with anything other than respect. I hope there's mutual respect here. And nothing you've done to this point has indicated anything less than full respect.

A Fair enough.
Q All right. Um, I'd like to show you a document. And I'm going to be candid with everybody on this Zoom that I've never done this before. So, bear with me, please.
MR. JOHNSON: You've never shared a document?
THE WITNESS: On Zoom.
MR. JOHNSON: Right. Neither have I. So, good luck.
MR. SCHWARTZ: Thank you.
THE COURT REPORTER: Before we pull this up, can I take a quick two-minute bathroom break?
MR. SCHWARTZ: Why limit it to two minutes. Why don't you take, um -- does five minutes work for everybody?
THE COURT REPORTER: That's fine. I'm sorry.
MR. JOHNSON: Yes, that's fine.
MR. SCHWARTZ: Okay. So, we'll reconvene in five minutes.
(Whereupon a short break was taken.)
THE COURT REPORTER: We're back on the record.
BY MR. SCHWARTZ:

Q Mr. Sax, before we move onto the document that I'd like to show you, um, you testified earlier with regard to your responsibilities in investigations. Do you remember that testimony?
A Yes.
Q Okay. Um, what would your activities be with regard to assisting the detectives in an investigation of a homicide?
A It would be more along the lines of a request. If I --
MS. SMITH: I'm -- I'm sorry. I just want to object to the form of the question. But you can answer.
THE WITNESS: Yes. Yes, ma'am. Um, it would be more along the lines of a request. Um, and I say a request, um, because they weren't -- they're a different agency. So, you know, they don't have to do what we tell them. They're not, um -- but invariably they would.
So, after reading a file and reading everything that they gave me, if I thought additional investigation, um, was warranted, um, to interview -- you know, someone mentioned that this witness was out there. Someone mentioned

that, um, something happened a block away. Um, there were -- a witness who said, you know, he heard three shots and not one. Maybe we should go out there and look for additional fire cartridge casings, or something like that.

If -- if I thought that additional investigation would be helpful, required, um, in -- in someway, shape, or form, I would ask them to do it.

BY MR. SCHWARTZ:

Q Did you --

MR. JOHNSON: I'm just going to -- I'm going to object to --

MR. SCHWARTZ: I'm sorry?

MR. JOHNSON: I'm going to object -- and it's a continuing objection -- to any questions relating to investigation of this matter, or any matter.

There's a very narrow issue in this case, and the issue is solely, solely what he did post-trial related to the appeal, your assertion that he had dominion and control over the file on appeal. That's the narrow issue in this case.

It doesn't have anything to do with the

investigation, or what happened at the trial level. So, I have a continuing objection.

MR. SCHWARTZ: So, that speaking objection was relevance?

MR. JOHNSON: Correct.

BY MR. SCHWARTZ:

Q Mr. Sax, did you ever, um, ask, or conduct any interview, um, as part of your, um -- as part of these investigations yourself?

A No.

Q If a detective did not follow your suggestion that he, or she interview, um, someone who may have relevant information with regard to a, um, prosecution, um, did you ever take it upon yourself to, um, conduct that part of the investigation?

A No. What I would do is ask one of the, um -- they were referred to as DAD, District Attorney Detectives, not Homicide Division Police Department, who were assigned to the case Detectives. I would ask them to do it. And they never would refuse. They worked for us.

Q Um, with regard to --

A Taking -- taking my own interview, um, would be really foolish and inappropriate and improper because then I would be a witness in my own case.

Q Um, turning back to the files in the Appeals Unit. Um, you testified with regard to where files were kept in the Homicide Unit, and I'd just like to ask you a couple of similar questions with regard to the Appeals Unit.

Um, during your time with the Homicide Division, how often would you go to the Appeals Unit?

A Almost never.

Q Okay. Where was the Appeals Unit between 2005 and 2017?

A Bear with me. I'm doing this by process of elimination. I don't know where they stored all their files, um, because they might have had some parts of additional floors, but their offices -- my best recollection is -- were on five.

Q And to your recollection, um, not all of the Appeals Unit's files were also located on five?

A I -- I -- you know, it's not fair for me to -- it's more of a guess than speculation. I don't -- I don't know. They had --

Q Well --

A -- so many files. I don't know where they kept their files except I know that most of the time, um, they probably had them in their own offices because I -- you know, the few times I was down there I would see someone's

office chockful of files that obviously they were working on and filing cabinets outside their office.

So, it's just an assumption on my part that they kept them in, or near their own office just like I did mine.

Q Right. So, I'm not -- I don't want any assumptions. I think you -- you understood that. Um, I'm just going to ask you with regard to things that you actually observed. So --

A Okay.

Q -- first, how many times -- I understand from your testimony you didn't go down to the Appeals Unit often.

But how often during 2005 to 2017 did you have occasion to go to the Appeals Unit?

A Hardly ever. Just to --

Q Could you estimate --

A -- to bring my case to them, period. There would be no reason for me to come down there.

Q So, over the course of a given year, you told me that you would handle approximately fifty to one-hundred cases, correct?

A More, or less.

Q And of those fifty to one-hundred cases, how many of them would reach resolution either, you know, through post-trial motions, or via some type of negotiated

settlement with the defendant?
A Twenty, twenty-five.
Q Okay. So, for each of those twenty-five files, you would have personally brought those files to the Appeals Unit, correct?
A Yes.
Q Okay. And that would have been the case through the entire period 2005 to 2017 except for the two years when you were with the Training Unit, correct?
A Yes.
Q So, if we just multiply that out, that would have been twenty-five times -- it would have been twenty-five times a year for those -- that entire period other than those two years, correct?
A Once, or twice a month probably, yes.
Q Okay. And other than bringing files down to the Appeals Unit, did you ever have occasion to go to the Appeals Unit?
A No.
Q So, in the times that you went down to the Appeals Unit, where would you observe files being located?
A Both in and outside of the appellate lawyers' offices.
Q Um, in file cabinets?

A Sometimes on desks. Sometimes besides desks. Sometimes stacked up against walls. And sometimes in filing cabinets. All of the above. Yes, sir.

Q So, there's a -- would you agree that there's a contrast between the way that the Homicide Unit stored files and the way the Appeals Unit stored files in terms of organization and file cabinets?

A I would not -- yeah. I would not agree to that. Um -- I mean, some of the DA's had them on their desks, beside their desks. Um, if there weren't enough file cabinets to go around, lined up against the wall of their office, lined up against the wall outside their office.

Q So, in the Appeals Unit, there were files that were lined up outside the office outside of filing cabinets?

A Yes. I'm sure --

Q Stacked up?

A Yes, yes.

Q I'm sorry. I didn't mean to interrupt.

A No, it's quite all right. I'm -- I'm finished.

Q Files stacked on tables?

A Of course.

Q I would like to share with you a document. Again, I'm going to give this a try and see how this goes.

A Okay.

Q With my apologies, I -- it looks like I have to leave the meeting and come back in the meeting to share this screen. I can't explain why.

MR. SCHWARTZ: Is that something that's going to be possible for us just to do immediately?

I'm asking that to the text support, not you Mr. Sax. If you know, then you've got another career --

THE WITNESS: I'm done careers.

MR. SCHWARTZ: That would be directed towards Ms. Hines, or text support.

THE COURT REPORTER: You want to log off and come back in?

MR. SCHWARTZ: That's what I'm going to do.

THE COURT REPORTER: Yes. Go ahead. That's fine.

MR. SCHWARTZ: Okay. Thank you.

(Whereupon a short break was taken.)

THE COURT REPORTER: We're back on the record.

BY MR. SCHWARTZ:

Q All right. I am directing your attention to a

document. Um, it says -- begins at P3536, and it ends at P3540.

MS. SMITH: Well, I can't see any document --

MR. SCHWARTZ: Okay.

MS. SMITH: -- just so we're clear. I see I think -- what I think is your Zoom -- your web browser with the Zoom launch screen on it.

MR. SCHWARTZ: Okay. So, I should have -- let me try again then. I'm seeing --

THE COURT REPORTER: There you go.

MS. SMITH: There you go.

MR. JACKAL: There you go.

MR. JOHNSON: There you go.

MR. SCHWARTZ: Thank you again for your patience, everyone.

BY MR. SCHWARTZ:

Q All right. So, again --

MS. SMITH: We've all been there.

MR. SCHWARTZ: I'm sorry?

MS. SMITH: We've all been there.

MR. SCHWARTZ: Again, you -- you were probably there four years ago. Um --

MS. SMITH: True.

BY MR. SCHWARTZ:
Q So, this is 3536 again through imp 3540. I'm just going to show you the top of this document.
MR. SCHWARTZ: And this I'll have marked as Exhibit A, or I guess however we're going to do this today. Sax 1.
THE COURT REPORTER: So, Sax 1?
MR. SCHWARTZ: That's fine, yes.
THE COURT REPORTER: Okay.
(Whereupon the court reporter marked Exhibit Sax 1 for identification.)
BY MR. SCHWARTZ:
Q Mr. Sax, is, um -- you know, based on what you see on your screen, is this a document that you recognize?
A The actual document, or, um, a paper called Investigation Interview Record? But, um -- I mean, the actual Cynthia Smith interview?
Q Yes.
A I'd have to read the whole thing. Um -- but I -- I'm not able to scroll. Maybe only you are. Wait. You're going too fast.
Q No, that was unintentional what I just did.
A No -- no worries.
Q I wanted to see if I can make it smaller, so that

it's --
A Yeah.
Q -- all on your screen.
A It's kind of --
Q You see it?
A Yeah, but it needs to be bigger.
Q So, now you can't see it?
A Well, I can. I can see it, but I can't --
Q Not big enough to read it.
A If you can make it bigger.
Q So, why don't we handle this a half a screen at a time and you just tell me when to proceed. Okay? I'd like you to read this, and then I'm going to ask you if you're familiar with this document.
A I -- I have another idea. Can you read it to me?
Q It is four pages long. Um --
A I -- I got the time.
MR. SCHWARTZ: Counsel, do you have any input on that?
THE WITNESS: How many -- stop there. Stop there.
MR. SCHWARTZ: Okay.
THE WITNESS: How many people reside at 925 Wynnewood.

MR. SCHWARTZ: I'm not asking you to read it out loud, Mr. Sax. So --

THE WITNESS: I know.

MR. SCHWARTZ: You can read it to yourself if that's okay.

THE WITNESS: Yes.

THE COURT REPORTER: I'm going to plug in real quick as he's reading.

THE WITNESS: Yeah. Right now there are -- right now there are four -- what? Four regulars? Is that what it says? Michael -- who -- just came back from -- he's my boyfriend.

THE COURT REPORTER: Do you want me to go off the record until he reads it, and then we'll get back on?

MR. SCHWARTZ: That's fine.

THE COURT REPORTER: Okay.

(Whereupon a short discussion was held off the record.)

THE COURT REPORTER: We're back on the record.

BY MR. SCHWARTZ:

Q All right. So, again, Mr. Sax. I presented you with a document. It's called Investigation Interview

Record. Name, Cynthia Smith. Um, this is dated, um, 11/14/96. Um, this is -- the place of interview is Room 104 PAB. Brought in by Detective Dougherty and Mee. And we are questioning you concerning the shooting death of Robert Campbell.

So, I'm going to read beginning at the middle of the first page of this exhibit and continue through till the end --

A Thank you.

Q -- for the purpose of, um, complying with the witness's request that I do so, so that he can familiarize himself with the document. And I'm going to do the best that I can obviously. Question. And I'll state that the Q stands for question, and A stands for answer to the best of my understanding.

Question. How many people reside at 929 Wynnewood. Answer. Right now there are four regulars, but sometimes other people will stay. There are two other regulars that are in jail now. Michael will let anyone stay if they need a place. Question. Who is Michael. Michael Cupaiolo. He just came back from here. He is my boyfriend.

Question. Who are the others that live here. Answer. Suzanne DeLuca and Mary Verrichio are both in jail. Phil and Mona are a couple. They stay there. Her last name

is, um, illegible.

MS. SMITH: McKenna.

MR. SCHWARTZ: McKenna. Thank you, counsel.

BY MR. SCHWARTZ:

Q I don't know his last name. Kenny Hart has been staying here and there, a guy name Billy Kerns but he's not there now. He was --

A The name Billy.

Q -- illegible. The name illegible.

A I think that says he uses the name Billy Mann too.

Q I think you're right. He was bad. He didn't pay his rent, so he can't come back for two weeks. Question. Did you know the decedent, Robert Campbell. Answer. I didn't know him, but I knew of him. I knew he was in the Town Watch. Rob always referred to him as the little town snitch.

Question. Who is Rob. Answer. Rob Reiston, or Ricardo. I'm not sure. His real first name might be Ricardo. When did you first hear about the victim's death. The night it happened -- answer. The night it happened I was at home and Rob walked in. He walked right in and changed the channel and sat down in front of, um, it -- illegible -- that no one else can see.

MS. SMITH: So that no one else could see.

BY MR. SCHWARTZ:

Q Could see. He was blocking the set. I asked him what he was doing, and he was like well, yo, this is important. Didn't you hear about the guy getting shot down at the gas station. You know, the guy. The fucking snitch. That Town Watch guy, Bobby Campbell, end quote. He kept on talking about it after the story went off.

He left the house. About an hour later he came back in. He said that he had been there. He talked about the guy having a gun and the handcuffs. He said the guy was bleeding. He said he stood over top of the guy saying, quote, yo, dumb fuck, end quote.

Now, I don't know if he was talking to the guy, or to the -- or to somebody else. Question. Who else was present about -- who was present --

MS. SMITH: When you heard this.

BY MR. SCHWARTZ:

Q -- when you heard this. Answer. It was me, Kenny, and Michael I believe when he came in and turned the -- turned the TV. I think the three of us were there. The second time too with Phil. He's been staying there too.

Question. Did you ever see Rob with a gun.

Answer. Yeah, a big one. Question. Can you describe it. Answer. It was dark. A revolver. It had the round thing. Question. Did Rob even -- excuse me one second. Did Rob even say that he was involved in Campbell's death. Answer. Yeah. He had been watching the news over and over again. He started to get real --

MR. JOHNSON: Casual.

BY MR. SCHWARTZ:

Q -- casual about the whole thing. Kenny was teasing him. And -- and so --

MR. JOHNSON: And finally --

BY MR. SCHWARTZ:

Q And finally I said, quote, are you the one their looking for. Are you the one that shot him, end quote. And he said, quote, yeah, I did it, end quote. He kept on talking about the guy being a snitch. When he said that he did it everything just stopped. I got real nervous. I really didn't want to talk about it anymore.

Then, Rob said that he had to go and he left. But like fifteen, or twenty minutes later he was back offering to lend me money for my dope. It was like he was trying to buy me off because before he said it, I had tried to borrow some money from him and he wouldn't lend it to me.

Question. Did Rob say anything else about the

decedent. Answer. Yeah. He said that this was -- this is what happens to snitches. That he had to teach somebody a lesson. Question. When did Rob say that. Answer. Since it happened, he's just kept on talking about it. The longer it went, the more comfortable it seemed he felt. Yesterday afternoon --

MR. JOHNSON: Is when he said he did it.

BY MR. SCHWARTZ:

Q -- is when he said he did it. Question. Since this incident took place, have you spoken to anyone who may have witnessed this incident. Answer. I was down at the -- illegible -- 64th --

MR. JOHNSON: I was down at the bar at 64th --

BY MR. SCHWARTZ:

Q -- at the bar at 64th Street and Carlton. They were talking about it. Um, one of the bartenders said he had to give, um, Eleine --

MS. SMITH: A free white.

BY MR. SCHWARTZ:

Q -- a free weight --

MS. SMITH: White.

BY MR. SCHWARTZ:

Q -- because --

MR. SCHWARTZ: A free white?

MS. SMITH: I assume that's wine, but go on.

BY MR. SCHWARTZ:

Q Okay -- because she was so upset about what happened. Question. Who was the bartender. Answer. Mike. Question. What is Eleine's last name. Answer. I don't know -- I don't for sure. It might -- Squares, or something like that. She has a brother Tony. She lives at the house I showed you earlier across from the bar. And there's something that was redacted before across from the bar.

Question. Do you know of anyone else that might have witnessed the incident. Answer. I heard that four, or five people from the bar saw it. Signed, Cynthia Smith.

All right. Mr. Sax, I read that to the best of my ability.

A Um-hum. Yes.

Q You're familiar with this document?

A Um, doesn't ring a -- doesn't look familiar to me. Did she testify would be my question because I would wonder why she didn't. Um, Rob is Ricardo. Ricardo admitted to doing it.

Q This is you would agree, um, exculpatory evidence?

A Oh, no. No. I would --

Q Or exculpatory of Mr. Natividad. Inculpatory of, um -- of, um --
A Well, wait.
Q -- of Rob, correct?
A Didn't -- didn't she say Rob was Ricardo --
MR. JOHNSON: Yes.
THE WITNESS: -- earlier in the statement?
MR. JOHNSON: Yes.
THE WITNESS: I would say it's pretty inculpatory. And I would have asked -- had I had it, I would have asked Detective Mee to see if she can testify if we can find her.
If we can subpoena her, we can bring her to court because she seems to be saying that Ricardo Natividad came into money, had a gun that was capable of killing this man, admitted to killing him, and was watching TV, watching it over and over again.
This is something that I would definitely turn over whether it was exculpatory, or inculpatory. But it looks like it's really inculpatory.
BY MR. SCHWARTZ:

Q So, you think Rob is Mr. Natividad?
A I don't think anything. She said that Rob is Ricardo. And Ricardo is the first name of Natividad, isn't it?
Q The question is this is, um -- this would be something that you have an ethical obligation to hand over to defense, correct?
A If I had it, it would be something I would hand over to the defense, yes.
Q So, you testified earlier that you would have had your file, and then you would have made sure to receive everything from the investigation from the, um, investigating detectives, correct?
A I would -- I would make sure to ask the detective to give me everything in his file whether or not --
Q So, the detective --
A -- whether --
Q I'm sorry.
A Whether or -- sir, whether or not a detective gave me everything in their file, you would have to ask the detective.
Q All right. So, if this was not in your file, um, after you having asked the detective for this document, then it would have been the detectives fault that it's not in

your file, correct?

A Oh, I don't know. I'm not going to say it was anybody's fault. Um -- um, I'm just going to say that I don't remember this.

I would, um -- um -- you asked me about additional investigation. I probably would have had, um, requested Mr. Natividad be put in a line up with criminal defense attorney present and have Cynthia Smith come to a lineup to see if she could identify, um, Ricardo Natividad, um, as the person who she was referring to as Ricardo.

So, to me, this is incredibly inculpatory that I would have turned over whether it was -- whether someone wanted to suggest that Ricardo wasn't Ricardo or not and therefore exculpatory, it's something I would have turned over, yes.

Q So, to your knowledge one way or another though you don't know this Rob, or Rolston Ricardo do you? Rolston Ricardo Robinson, is that a name that's familiar to you?

A Not at all.

Q Okay. So, you're assuming that this is Mr. Natividad, but you don't know one way or anther whether if this is him, or Rolston Ricardo Robinson, or someone else, correct?

A I'm not assuming anything. I am just seeing what

it says. It says Rob is Ricardo. And -- and, um, had I had it, I'm sure I would have turned it over without any question in my mind.
Q Because this would be evidence that you have an ethical obligation to hand over to defense, correct?
A Yes.
Q All right. Just a few more questions.
A I mean, I remember the case. I certainly don't remember anybody saying that he confessed to Cynthia Smith, but that's what this seems to say. And you're saying -- and I say this most respectfully you're saying that this Ricardo is a different Ricardo. I mean -- right. Okay.
Q Okay. Just give me, um, one moment while I look at my notes.
A Of course, sir.
Q Thank you. Okay. Mr. Sax?
A Yes, sir.
MR. SCHWARTZ: And, counsel, are you, um -- are you there as well?
MS. SMITH: Yeah, I'm here. We're here.
MR. JACKAL: I'm here.
MR. SCHWARTZ: Very good. I just wanted to make sure.
BY MR. SCHWARTZ:

Q Mr. Sax, are you aware of an order from a Judge Rufe with regard to Discovery in the Natividad matter?
A Judge who?
Q Rufe, R-U-F-E. I maybe pronounced it incorrectly.
MS. SMITH: Her name is Rufe. Rufe. Like what's on the top of your house. Her name is Rufe, R-U-F-E.
MR. SCHWARTZ: Thank you, counsel.
THE WITNESS: Honestly never heard of that name, that judge before in my life.
BY MR. SCHWARTZ:
Q Are you aware of Judge Rufe's July 9, 2014 Discovery Order --
A No.
Q -- with regards to the Natividad appeal?
A No.
Q Did you have any discussions with --
MR. JOHNSON: I'm -- I'm sorry. I'm sorry, Noah. Did you say what year?
MR. SCHWARTZ: 2014.
MR. JOHNSON: Thank you.
MR. SCHWARTZ: Certainly.
BY MR. SCHWARTZ:
Q Um, Mr. Sax, did you have any conversations with

ADA Mahler with regard to, um, Mr. Sax's final appeal?
A Mr. Natividad's final appeal? None that I --
Q Mr. Natividad. Thank you.
A No worries, sir. No worries, sir. Um --
Q So, it maybe the case that -- I'm sorry?
A None -- none that I recall.
Q So, it's possible that you did have a discussion with Ms. Mahler with regard to the Natividad final appeal?
A It's possible.
Q Have you had any conversations with, um, Ms. Mahler with regard to any Natividad appeal?
A I mean, I haven't talked to Cari Mahler in, um, seven years since I left. What year is this, 2025. Eight years since I left the office.
So, before 2017, I have no recollection of, um, any conver -- any specific conversation with Cari Mahler, um, which is in no way, shape, or form to suggest it didn't happen. I just -- it -- it was nothing that strikes me as something that I remember.
Q Do you have any recollection of having any conversation with ADA Mahler with regard to Mr. Natividad?
A No.
Q That is everything I have, and I thank you for your time, Mr. Sax.

A Mr. Schwartz, I thank you, sir. Thank you very kindly.

MR. SCHWARTZ: Anyone --

MR. JACKAL: Good afternoon, Mr. Sax. I don't have any questions for you. Thank you.

MS. SMITH: Okay.

THE WITNESS: And -- and wait. You're law trained? I -- sir, you have no questions? I'm sorry. I'm just keeping it light.

MS. SMITH: No questions. He'll turn it to -- that's the way that works. I'm kidding.

Um -- so, Mr. Schwartz, I have some questions for Mr. Sax, but Mr. Johnson has just one. And because he's handled the previous case to which that question is relevant to something that you raised, it's probably cleaner for him to ask that question, and then me to do the rest if you're amenable to that.

MR. SCHWARTZ: I certainly am.

MS. SMITH: Okay. Thank you.

MR. JOHNSON: Okay. Thank you so much for your courtesy, counsel.

What I want to clear up is I had mentioned -- but I believe the whole conversation

might have been off the record -- a previous case where Mr. Sax testified, Pedro Alicea, A-L-I-C-E-A. And I gave, um, the Civil Action Number 22-CV-3437-JS.

And I just want to read, um, from -- Jonathan Fineberg took the deposition in that case. And I want to clarify so that there's no confusion about Mr. Sax's role, um, and to clear up, um, any misunderstanding about what his testimony was.

Um -- so, in his preparatory remarks, Mr. Sax -- I'm sorry -- Mr. Fineberg in order to orient Mr. Sax to what his testimony while he was there as a witness said the following. And let me know with just a bit -- a little bit more specificity the nature of our plans and why you are an important witness.

One of our allegations is that the investigating detectives and police officers obtained exculpatory information about this murder, which pointed to other suspects besides Mr. Alicea and that they suppressed that information from you -- meaning, Mr. Sax -- which in turn lead to the suppression of information

from the defense.

So, I wanted to make that clear. I believe you had asked him a question about was there any cases that he was involved in with subsequently it was learned that information had been suppressed, and Alicea was, in fact, one of those cases.

But the claim was not that the prosecutor suppressed the evidence, but that the detectives and police officers suppressed the evidence from the prosecutor, so it never made it into the prosecutor's file.

MR. SCHWARTZ: Understood. I -- thank you. And I -- if you wouldn't mind, would you please send over to me that deposition transcript you just read from.

MR. JOHNSON: Sure.

MR. SCHWARTZ: Thank you. Ms. Smith, you have some questions?

MS. SMITH: Yes, just a couple. Thank you.

CROSS-EXAMINATION

BY MS. SMITH:

Q Good morning, Mr. Sax. Um, there's been some

questions about, um, the post-trial proceedings in this matter. And I just want to clarify, or I would like you to clarify if you could, um, the sequence of events and the overarching timeframe that would apply to them.

So, when did this -- when did the trial of Mr. Natividad conclude if you recall?

A I don't. I don't. I don't.

Q Okay.

A I don't, um, know. Um, it was, um -- Paul left the office. It was in the late '90's.

Q Okay. Right. He was arrested in 1997 -- correct -- or does that sound familiar?

A That -- that sounds familiar. Yes, ma'am.

Q Okay. And so, um, if I told you that the -- if I told you that West Law -- just a second -- reflects that Mr. Natividad's trial concluded -- I'm sorry. Give me one second -- in 1997, does that sound -- the end of 1997, does that sound about right?

A That, um, absolutely sounds about right.

Q Okay. Now, what is the very next, um, step that Mr. Natividad would have to pursue in order to challenge that conviction?

A So, since the case was a capital one, I think it's an automatic right of appeal directly to the Supreme Court.

Q All right. So --
A And that --
Q Okay. And that appeal would be handled by the Appeals Unit -- right -- as you described?
A No question.
Q Okay. So, when that appeal was filed from the trial that concluded in 1997, is that when you would have transmitted the file that you had, the trial file that you had to the Appeals Unit?
A Absolutely.
Q Okay. And when you transmitted it, you described earlier that you would physically take it to Appeals on the fifth floor of the building, right?
A Yes, ma'am.
Q Okay. What did you do -- did you stay? Did you hang around when you took it up there, or have a conversation, or --
A Um, none that -- none that I -- none that I can recall. If I said anything about the case, it was this is one of the strongest, um, most, um, vicious cases with great evidence, um, is what I would have said.
Q Okay. Um, and then, um, do you -- did you -- do you know, um, when the Supreme Court decided Mr. Natividad's appeal?

A I do not.
Q Okay. After, um -- I'm going to represent to you what I think is not in dispute, which is that his appeal was denied and the conviction was upheld, um, and that West Law reflects that that occurred in -- on June 25th of 2001.
Now, after that appeal was denied, what would be the next step in the process for Mr. Natividad?
MR. SCHWARTZ: Objection to form. You can answer.
THE WITNESS: Not -- thank you, sir.
MS. SMITH: I'll rephrase it.
THE WITNESS: Um, not --
MS. SMITH: Before you answer -- hold on. Before you answer, I'll rephrase it.
BY MS. SMITH:
Q If Mr. Natividad wished to challenge further his conviction, what would the next step in that process for him be?
A So, um, not being, um, great at appellate processes, I think it would have been a federal habeas, or a PCRA, a Post-Conviction Relief Act --
Q Okay.
A -- either in the state, or in federal, or in both.
Q Okay. And who would handle that in the District

Attorney's Office?

A Um -- um, the unit that was called PCRA.

Q Okay. Would --

A Tom Dolgenos -- Tom Dolgenos was the Chief of that unit.

Q Okay. Would the file have been transmitted back to you between the Appeals Unit handling the direct appeal and a PCRA -- the PCRA Unit handling a PCRA petition?

A Presumably not.

Q Would you have had any contact with that file in between from the time you took it to Appeals when the direct appeal was filed and the time it was transmitted, or -- or the time that a PCRA petition was filed?

A No, ma'am.

Q Okay. And, um, I'm -- I'm going to represent to you also, um, that the PCRA -- I'm sorry -- the habeas proceeding in this matter has a Civil Action Number of 2008.

So, we can assume -- we can -- all lawyers on this -- on this deposition can all assume that that means that the habeas petition was filed in 2008 because the docket number assigned to it would reflect the year that it was filed. Um, that is obviously seven years after the direct appeal was filed.

At any point from the time that you transmitted

the file to Appeals for the direct appeal until 2008 when a habeas petition was filed, did that file come back to you?

A No, ma'am. And I can make this clear. Until and unless some court -- federal, or state -- returned the case back for retrial, I would not see the file.

Q Okay. Great.

A In this one, or any other.

Q Okay. Did you ever have any communication between 1997 when you concluded the trial and 2017 when you retired from the District Attorney's Office to direct anyone in the District Attorney's Office not to disclose documents --

A No, ma'am.

Q -- in the appeal of this case?

A Absolutely, no.

Q Okay. That includes Tom Dolgenos?

A That includes tom Dolgenos.

Q Does that include Molly Lorber? Molly Lorber. Did you know Molly Lorber?

A Um, Molly rings a bell, that first name. But the last name does not ring a bell. Um --

Q Okay.

A An Appeals DA?

Q Yes.

A No.

Q Okay. That includes Cari Mahler?
A No.
Q Okay. Um, what was your understanding -- you -- you eluded to this earlier.
But what was your understanding of the obligation of an appellate lawyer in the District Attorney's Office with respect to a case that they were handling in terms of their ethical obligation?
A One-hundred percent the same as mine.
Q Okay. And -- strike that. Um, that is all the questions I have.
MR. SCHWARTZ: I just have one follow-up, or a line of follow-up I should say. It'll be brief.

REDIRECT EXAMINATION

BY MR. SCHWARTZ:
Q Mr. Sax, you testified with regard to going down to the Appeals Unit approximately, um, twenty-five times a year, correct?
A Solely and exclusively to give them a file that I just disposed of. Yes, sir.
Q And you said that the -- just like in the Homicide Unit, the office doors were unlocked, correct?
A No. I said I don't know, um, what they did what

their offices. They maybe --
Q The filing cabinets?
A I never tried anybody's door without knocking. And if they --
Q So, they weren't --
A -- weren't there --
Q I'm sorry. I didn't mean to interrupt.
THE COURT REPORTER: I'm sorry. I didn't get that.
MR. SCHWARTZ: I'm sorry?
THE COURT REPORTER: I didn't get his full answer.
THE WITNESS: I'm sorry. So, I would never enter an office if the door was closed without knocking. And if nobody answered, I would not go in.
BY MR. SCHWARTZ:
Q So, you don't know one way or another whether the, um -- the, um, Appeals Unit attorneys locked their office doors?
A No, I wouldn't.
Q How about with regard to the file cabinets inside their offices? Do you know one way or another whether they kept their file cabinets locked?

A I would not.
Q Do you have any knowledge one way or another whether the file cabinets in the hallways of the Appeals Unit were locked or not?
A I would not know that.
Q When you went down to the Appeals Unit, were you ever stopped to check -- to have your ID checked?
A Um, no. Everyone --
Q They permitted --
A Everyone pretty much knew me there.
Q So, you're permitted to pass without anyone stopping you, is that correct?
A That is correct, sir.
Q That's everything I have. Thank you, Mr. Sax.
A Thank you, sir.

MS. SMITH: I'm sorry. I have one more question.

RECROSS-EXAMINATION

BY MS. SMITH:

Q At any point while you were in the Homicide Unit, did you go to the Appeals Unit and pull things out of their files?
A No, I wouldn't do that --
Q Okay.

A -- ever. I wouldn't know where to look for it. I wouldn't start searching for something. I went to the DA himself and say, hey -- but I didn't do that. Once the file was gone, I never did that.

Q Thank you. I have nothing further.

MR. SCHWARTZ: Thank you.

MR. JOHNSON: Thank you, all.

MR. JACKAL: Thank you.

THE COURT REPORTER: Ms. Smith, would you like a copy of the deposition transcript?

MS. SMITH: Absolutely. Electronic, please.

THE COURT REPORTER: Okay. And, Mr. Jackal, would you like a copy of the deposition transcript?

MR. JACKAL: Yes, please. An electronic and regular is good for me. Thank you.

THE COURT REPORTER: Okay. And, Mr. Schwartz, of course, right?

MR. SCHWARTZ: Yes, please.

THE COURT REPORTER: Okay. Thank you.

(Whereupon the witness was excused and the deposition was concluded at 12:15 p.m.)

C E R T I F I C A T I O N

I, Heather K. Hines, Notary Public and Court Reporter, certify that the foregoing is a true and accurate transcript of the foregoing deposition, that the witness was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Heather Hines
___________________________

Heather K. Hines
Court Reporter
and Notary Public.
My commission expires
August 22, 2027.

# Magna Litigation Screen Grab Preview




*The video of this deposition may be available to order through our Magna VOD program. If this deposition was* ***not noticed*** *for video, all parties must approve of the production for it to be released to any party. Admissibility will ultimately be determined by a judge. Please visit magnals.com/vod to order.*



# Magna Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**A-L-I-C-E-A**
89:3
**a.m**
1:14
**ability**
7:11 81:16
**able**
7:24 11:4 73:20
**absent**
19:11
**absolutely**
6:24 12:19 14:11 38:15 55:3 91:19 92:10 95:14 99:11
**absurd**
27:17
**accept**
8:21
**access**
29:20,23 30:4,19 31:1 62:8
**accordion**
55:16 56:1
**accumulate**
18:3
**accurate**
34:2 100:7
**accused**
9:3,6,10
**accustomed**
6:16
**Act**
93:21
**acting**
10:24
**action**
1:2 89:3 94:17 100:12,15
**activities**
64:6
**actual**
73:15,17
**ADA**
10:11,13 11:7 14:7 15:8,13 16:12 17:1 17:3 21:9 28:11 29:1,20 34:5 37:19 39:1,12 42:3 57:19 87:1,21
**ADA's**
29:4 33:4,23 38:24 48:9,13 50:5,11,17 50:21
**adding**
56:2
**additional**
19:15 25:1 35:20 64:22 65:4,6 67:13 84:5
**adjacent**
42:14
**administrative**
44:13
**admissibility**
15:7
**admissible**
14:24 15:3
**admitted**
81:21 82:17
**Affidavit**
17:14
**affiliated**
20:22
**affirmatively**
60:14
**afternoon**
53:8 80:6 88:4
**agency**
64:17
**ago**
72:23
**agree**
19:18 25:5,13 36:12 36:20 39:9 56:3 70:4,8 81:23
**agreed**
5:1
**agreement**
24:9
**ahead**
26:23,24 71:17
**Aid**
5:16
**AL**
1:8
**alcohol**
7:11
**alibi**
18:24
**Alicea**
89:2,22 90:6
**allegation**
8:24 9:8,8 36:18
**allegations**
89:18
**alleged**
30:20
**altercation**
25:15
**amenable**
88:18
**Ann**
41:3
**answer**
6:22 7:11 13:4 16:4 30:24,24 37:14,15 37:15 42:7 47:10 64:13 76:14,17,23 77:14,18,21 78:20 79:1,2,4 80:1,3,11 81:6,7,13 93:9,13 93:14 97:12
**answered**
34:8 60:18 61:10 97:15
**anther**
84:21
**anticipate**
17:10
**anybody**
85:9
**anybody's**
84:3 97:3
**anymore**
24:12 36:1 79:18
**anytime**
60:4
**anyway**
14:24 49:20 56:19
**apologies**
71:1
**appeal**
24:14 25:12 28:8 29:1,12,20,21 31:6 31:6 33:23 36:5,13 52:14,16 54:14,21 56:6,8,12,22 58:14 58:18,19 59:7,13,14 59:21,22 60:7,8 62:7,11 65:21,23 86:15 87:1,2,8,11 91:24 92:3,6,24 93:3,6 94:7,12,23 95:1,13
**appeals**
22:9 23:10,11,21 24:15,23,23 25:5 28:10 29:4,5 32:9 32:15,17 33:4,7,10 34:3,4,4,6,9 35:3,6 35:7 36:23 38:18,20 38:21,24 39:1,14,24 40:8 46:24 51:14 52:21,22,24 53:3 54:3,6,14,17,18,21 54:24 55:2,6,13 58:10 59:9 60:4,13 60:16,20 61:8,21 67:1,4,6,8,16 68:11 68:13 69:4,17,18,20 70:6,13 92:4,9,12 94:7,11 95:1,22 96:18 97:19 98:3,6 98:21
**appear**
26:8,8,9
**appearing**
5:17
**appellate**

24:14,16 25:3 52:12 54:11 56:12 57:8,11 57:12 69:22 93:19 96:6
**application** 51:11 58:22
**apply** 91:4
**appreciate** 14:2 34:17 59:16
**appropriately** 39:21
**approximately** 11:11 42:2 44:10 50:18 68:19 96:18
**April** 10:15 12:13 27:21 28:2,2 36:20 44:22 45:13
**Arch** 2:11,17 40:21 41:12 41:12
**ARCHER** 2:15
**arguably** 15:5 21:4
**argue** 15:1
**arguments** 32:19
**arm** 26:18
**arrest** 17:14 22:23 47:15
**arrested** 91:11
**article** 35:10
**aside** 28:23
**asked** 26:14 29:13,24 30:5 30:12,23 33:14 34:15 51:11 60:17 61:10 78:4 82:11,12 83:23 84:5 90:3
**asking** 5:20 31:12 33:10 43:20 71:7 75:1
**asks** 46:9
**aspect** 59:14
**aspects** 56:22
**assertion** 65:21
**assigned** 8:18 11:8 16:20 17:16 19:11,12 23:11 43:23 47:5,9 48:14 57:22 66:18 94:21
**assignment** 40:17
**assist** 34:14 38:24 56:20 57:7,10
**assistance** 51:14
**Assistant** 10:9 23:11,12 27:12 27:13 30:21 39:18 39:19 41:1,2 44:10 44:12
**assistants** 44:13
**assisted** 28:10,24 29:4
**assisting** 31:5 33:4,7 34:6,9,11 34:12,16 37:19 64:7
**assume** 81:2 94:18,19
**assuming** 84:20,24
**assumption** 68:3
**assumptions** 68:6
**attack** 28:1 45:6
**attempt** 40:10
**attention** 46:9,14 71:24
**attorney** 6:4 9:23 10:19 13:14 14:18,19,20 18:17 18:22 19:1 21:7 25:18 35:11 54:22 66:17 84:7 100:11 100:14
**Attorney's** 94:1 95:10,11 96:6
**attorneys** 10:22 19:8 97:19
**August** 45:4 100:21
**automatic** 91:24
**autopsy** 17:24
**average** 45:24
**aware** 21:6,14 49:17 58:24 59:18,22 86:1,12

**B**

**B** 21:5
**back** 9:19,22 11:15 19:2 19:19 28:17 30:17 35:9 36:17 45:11 49:21,22 55:8 57:12 63:22 67:1 71:2,14 71:21 75:12,15,20 76:21 77:13 78:11 79:20 94:6 95:2,5
**backward** 46:15
**bad** 77:12
**bar** 10:8,8 80:13,16 81:10,11,14
**barrel** 22:6
**bartender** 81:6
**bartenders** 80:17
**based** 73:13
**basis** 51:3,5,6
**bathroom** 63:12
**baton** 45:12
**bazaar** 36:16
**bear** 63:4 67:10
**beginning** 45:20 53:23 55:20 76:6
**begins** 72:1
**behalf** 31:20
**believe** 6:14 7:21 12:24 42:22 43:14 52:13 78:21 88:24 90:3
**believed** 54:2
**bell** 95:19,20
**Ben** 2:10 37:8
**best** 67:13 76:12,14 81:15
**better** 54:1,3
**big** 47:23 55:15 74:9 79:1

**bigger**
55:24 74:6,10
**Billy**
77:7,9,11
**bit**
16:6 17:11 89:15,15
**bleeding**
78:13
**Blessington**
26:1 27:3,6 30:22 37:20
**block**
65:1
**blocking**
78:4
**blunt**
19:7
**Bobby**
78:8
**borrow**
79:22
**Boulevard**
2:5
**box**
55:9,10,13,15 56:1 60:16,19 61:8
**boxes**
30:3,8,12 55:11
**boyfriend**
75:12 76:21
**break**
63:12,21 71:20
**breath**
53:12
**brief**
24:18 32:16 96:14
**briefly**
6:11
**briefs**
24:9,19 31:15,16,17 31:18,19
**bring**
68:16 82:14
**bringing**
69:16
**brings**
27:1
**broadcasts**
6:18
**broadly**
50:16
**brother**
81:9
**brought**
27:3 69:4 76:3
**browser**
72:8
**building**
42:16,17 92:13
**bunch**
27:5 38:1
**Burns**
23:13 39:18 61:21
**bursting**
27:4
**buy**
79:22

**C**

**C**
2:1 100:2,2
**cabinet**
46:8 47:14,24 48:24 49:22 50:16 55:13 62:13,14,15,17,18
**cabinets**
47:24 48:3,21 50:7,7 50:9,19,20 68:2 69:24 70:3,7,11,14 97:2,22,24 98:3
**call**
25:19,23 28:7 30:6 35:21 54:14
**called**
11:23 12:9 17:22 51:17 73:15 75:24 94:2
**Cameron**
41:4
**Campbell**
35:19 76:5 77:14 78:8
**Campbell's**
79:4
**candid**
63:3
**capable**
82:17
**capacity**
8:17 15:13 39:1
**capital**
91:23
**captioned**
8:10
**car**
26:19,19
**cards**
45:21
**care**
32:22 36:2,2
**cared**
57:3
**career**
10:14,15 42:3 71:9
**careers**
71:10
**careful**
6:21
**Cari**
56:21 87:12,16 96:1
**Carlton**
2:16 37:7 80:16
**carried**
52:22
**cartridge**
65:4
**case**
8:16,17,18 9:4,7 16:21 17:6 18:23 22:4,13,20 23:4,11 24:15,20,22 25:4 26:10,12 27:13 28:20 29:11,21 31:21 32:8 33:14 35:13,14,15,22,23 36:3,4,9,15,19 37:20 39:21 46:10 46:14,15,21 47:15 52:6,7,7,10 54:10 54:15 55:20 56:9 57:4,4,4,12,20 65:20,23 66:19,24 68:16 69:7 85:8 87:5 88:14 89:1,7 91:23 92:19 95:4,13 96:7 100:14
**caseload**
40:2,8
**caseloads**
48:10
**cases**
17:4 18:4 19:6 26:15 33:8 38:10 52:16 62:1,13 68:20,22 90:4,7 92:20
**casings**
65:5
**casual**
79:7,9
**cause**
17:14,23
**causing**
28:21
**Center**
2:5 43:11
**certainly**
8:21 14:9 16:20 21:2 28:16 29:14,16,22 41:18 85:8 86:22 88:19
**certification**
5:3
**certify**
100:6,10
**challenge**
91:21 93:16
**change**
42:21
**changed**
19:21,22 42:20 77:23

**channel**
77:23
**charge**
39:4
**Charlie**
41:3
**check**
98:7
**checked**
98:7
**Chestnut**
41:11
**chief**
14:14 23:12,12 94:4
**Chief's**
41:1,2,5
**Chiefs**
39:18
**chockful**
68:1
**chose**
52:16
**circumstance**
28:19
**circumstances**
27:10
**city**
2:9 37:8 42:14
**civil**
1:2 2:10 10:7 13:14 89:3 94:17
**civilian**
21:3
**claim**
90:8
**clarify**
89:7 91:2,3
**class**
13:23,24
**cleaner**
88:16
**clear**
9:9 34:21 44:4 53:10 62:21 72:6 88:23 89:8 90:2 95:3
**clinically**
45:7
**close**
45:5 48:1 50:8
**closed**
57:13 97:14
**cloths**
14:17
**colleague**
25:24
**combination**
11:23
**come**
19:1,10 20:13 26:3 26:14 27:7 28:12,13 29:5,17 30:22 36:21 37:24 55:21 56:24 68:17 71:2,14 77:13 84:8 95:2
**comfortable**
80:5
**coming**
24:6 26:22 27:10 28:14,17,19 33:1 38:9 39:24 46:17 49:23 54:24
**commencing**
1:14
**commission**
100:21
**communication**
95:8
**complete**
29:23 35:4 57:11,14 58:8 60:15 61:7,11 61:15
**completed**
40:4
**completely**
24:1 30:3,14
**compliant**
17:13
**complicated**
6:17 55:7
**complying**
76:10
**con**
36:21
**conceivable**
51:16
**concern**
26:7
**concerning**
76:4
**conclude**
91:6
**concluded**
91:16 92:7 95:9 99:23
**conclusion**
58:6,7
**condition**
11:13
**conducive**
5:22
**conduct**
66:7,14
**conference**
1:13 49:4,8,19 50:1,2 50:12,21
**confessed**
85:9
**conflict**
38:10
**confused**
34:17
**confusion**
89:8
**consisted**
11:22
**consulting**
10:21,22
**contact**
56:11 57:5 94:10
**contacted**
21:2 33:10,19
**content**
13:1
**contents**
60:19
**context**
7:20 25:12
**continually**
37:17
**continue**
76:7
**continued**
36:13
**continuing**
39:15 65:16 66:2
**contrast**
70:5
**control**
22:11 36:15,18 65:22
**controlled**
23:2,2,23
**conver**
87:16
**conversation**
87:16,21 88:24 92:17
**conversations**
57:6 86:24 87:10
**convicted**
54:19
**conviction**
13:20 91:22 93:4,17
**cooperate**
26:10 27:12 29:14
**copy**
99:10,14
**corner**
35:1 42:12,14
**correct**
5:15 6:2,3,6 9:23 10:14,17 11:1,19 15:22 19:20 20:2,7 21:23 23:24 33:6,24 38:22 39:8 40:9,13 42:5 45:18 50:8 57:19 58:6,18 59:6 61:15 62:5 66:5 68:20 69:5,9,14 82:4 83:7,13 84:1 84:23 85:5 91:11 96:19,23 98:12,13

**correctly**
31:8 39:21 58:21
**counsel**
2:7,12,19 5:2 20:2 21:1 59:11 74:18 77:4 85:18 86:8 88:22 100:11,14
**couple**
6:3,5,10 12:8 17:15 17:21 18:4 23:19 26:15 29:8 32:4 47:23 49:11 59:13 67:3 76:24 90:20
**course**
5:24 7:9 11:20 12:21 12:23 13:3 26:8,13 26:16 30:16 31:1 32:10 46:4 52:16 68:18 70:21 85:15 99:19
**court**
1:1 6:15 8:2,6 9:19 11:23,24 12:18 13:2 14:15 15:1,4,6,6 22:17 24:17,20 26:1 26:3,6,8,9 27:14 30:17 32:17,18 37:5 37:9 52:14,15 54:23 57:1 63:11,16,22 71:13,17,21 72:11 73:7,9,10 75:7,13 75:17,20 82:15 91:24 92:23 95:4 97:8,11 99:9,13,18 99:21 100:6,20
**courtesy**
6:22 88:22
**crime**
54:19
**criminal**
14:18,19,20 17:13 84:7
**CROSS-EXAMIN...**
90:22
**cuff**
26:17
**Cummings**
28:18 30:2 31:3,4,5
**Cupaiolo**
76:21
**Cynthia**
4:17 73:17 76:1 81:14 84:8 85:9

**D**

**DA**
10:10 12:15 23:11,17 24:16 27:12,13 28:11 29:5 32:15 40:8 54:14 95:22 99:2
**DA's**
11:4 14:1 24:2 33:7 36:1 39:19 41:20 44:10,12 54:9 70:9
**DAD**
66:17
**dark**
79:2
**date**
41:19 100:9
**dated**
76:1
**Dave**
41:3
**day**
30:13 35:15 45:4 48:24 49:18 53:17 53:18
**days**
26:14 46:18,18 49:11 52:4,13,14
**dead**
45:7
**death**
17:23 59:8 76:4 77:20 79:4
**decade**
59:5
**decades**
58:15,16,19
**decedent**
77:14 80:1
**deceitfully**
37:18
**December**
10:10
**decided**
52:18 53:7 92:23
**defend**
13:22
**defendant**
7:23 16:16 18:11 20:22 24:13 25:11 28:7 31:20 52:4,12 69:1
**defendant's**
20:23
**Defendants**
1:9 2:12,19
**defense**
14:18,19,20 15:15 16:11,19 18:17,22 19:1,7,20,20,22 20:5 21:1,7,12,22 31:14,16 36:23 54:22 55:23 83:7,9 84:7 85:5 90:1
**deferential**
18:24
**define**
51:12
**definitely**
18:4 54:20 82:21
**delivered**
57:12
**DeLuca**
76:23
**demanded**
23:9
**denied**
93:4,6
**Department**
2:9 66:18
**dependent**
14:6
**depending**
55:15
**deposed**
7:14,15,18 8:23
**deposition**
1:4,11 6:12,13 7:15 7:20 8:12 89:6 90:15 94:19 99:10 99:14,23 100:7,12
**depositions**
6:2,5,7
**deputy**
23:13
**describe**
12:20 18:19 42:10 79:1
**described**
13:3 15:9 33:6 50:2 50:13 52:1 58:9 92:4,11
**DESCRIPTION**
4:15
**desk**
26:21 47:9 49:2
**desks**
70:1,1,9,10
**details**
26:3
**detective**
1:7 16:20 17:16 19:16 21:3 66:11 76:3 82:12 83:14,16 83:19,21,23
**detectives**
16:21 19:12,16 26:22 27:5,7 38:1 44:14 64:7 66:17,19 83:13 83:24 89:19 90:10
**determine**
15:23 16:2
**determining**
16:15
**dictated**
23:9

**die**
35:15 36:10
**difference**
13:18
**different**
13:14 47:2 64:17 85:12
**difficult**
55:7
**direct**
5:9 94:7,11,22 95:1 95:10
**directed**
71:11
**directing**
71:24
**directly**
11:20 20:21 42:13 91:24
**Director**
11:11,14 12:14 40:15 43:4,13,17
**disclose**
9:6 95:11
**discovery**
30:10 59:21 86:2,13
**discussion**
9:17 75:18 87:7
**discussions**
60:3 86:17
**dispense**
6:9
**disposed**
23:4,6 47:15 54:10 96:21
**disproven**
30:20
**dispute**
93:3
**distinction**
38:23
**District**
1:1,1 25:18 35:10 66:17 93:24 95:10 95:11 96:6
**disturbed**
49:12,20
**Division**
11:12,22 38:21 61:22 66:18 67:5
**docket**
94:20
**document**
15:17 17:22 20:13 23:16 62:3,5,6 63:2 63:6 64:1 70:22 72:1,4 73:3,14,15 74:14 75:24 76:12 81:18 83:23
**documents**
5:21 18:7,8 20:3,4 55:5 95:11
**doing**
34:5 38:6 46:16 49:14 51:23 67:10 78:5 81:22
**Dolgenos**
94:4,4 95:15,16
**dominion**
65:22
**door**
48:7 50:3 97:3,14
**doors**
96:23 97:20
**dope**
79:21
**Dougherty**
76:3
**dozens**
35:20
**drove**
26:18
**drugs**
7:10
**due**
11:13 26:1 39:22
**duly**
5:8
**dumb**
78:14
**Duquesne**
10:2
**duty**
25:5

**E**

**E**
2:1,1 100:2
**earlier**
26:14 52:1 58:9 64:2 81:10 82:7 83:10 92:12 96:4
**early**
14:14 17:5
**EASTERN**
1:1
**Ed**
41:4
**education**
14:3
**eight**
28:15 43:14 55:18 87:13
**Eisenberg**
23:13 39:18 61:21
**either**
22:5 29:16 41:3 45:1 50:15 68:23 93:23
**electronic**
45:15,20 99:11,16
**Eleine**
80:18
**Eleine's**
81:7
**elimination**
67:11
**Elk**
5:16
**eluded**
96:4
**employed**
27:2 39:2,6,12,13 42:20 100:11,14
**employee**
100:13
**employees**
44:8
**employment**
10:6,19
**EMT**
10:24 11:2,6
**EMT's**
5:15
**encapsulated**
13:9
**encapsulation**
13:12
**ended**
24:12
**ends**
72:1
**ensure**
16:10 56:5 60:14 61:4,6
**enter**
97:14
**entire**
10:14,15 11:10 18:10 24:16 30:13 32:2 40:21 43:3 44:17 69:8,13
**entirely**
61:4
**equal**
44:12
**especially**
13:7 15:13
**ESQUIRE**
2:4,4,10,15,16,16
**estimate**
44:16 68:15
**ET**
1:8
**ethical**
12:17 13:2,22 16:17 19:7,18 20:4 21:11 21:21 25:5 33:5,23 36:12 37:1 39:7,20 56:4 83:6 85:5 96:8
**Ethics**

12:21
**event**
16:8
**events**
91:3
**eventually**
55:24
**everybody**
53:16 63:3,15
**everyday**
48:24
**everyway**
22:13
**evidence**
9:1,3 14:11,23 19:15 24:11 25:2 36:22 53:22 81:23 85:4 90:9,11 92:21
**exactly**
31:19 41:23
**examination**
1:5 5:9 17:24 96:15
**examined**
5:8
**example**
18:20 51:15
**excellent**
46:23
**exception**
12:14 40:14 43:8
**excised**
32:6
**exclusively**
29:9 96:20
**exculpatory**
9:1,3,11 14:11,12,13 15:5,10,14 16:9,10 16:15 18:10,14 19:19 20:5,11,16,16 21:4,10,19 24:7,11 25:1,11 31:7 36:22 53:21 81:23 82:1,21 84:14 89:20
**excuse**
79:3
**excused**
99:22
**exhibit**
73:5,11 76:7
**EXHIBITS**
4:14
**exist**
16:13
**exoneration**
35:24
**experience**
18:13 25:2 32:16 54:20
**expires**
100:21
**explain**
13:17 20:12 22:16,19 26:12 29:7,14 33:15 33:16 34:24 71:3
**explained**
27:11
**extend**
6:22
**extent**
48:19
**extremely**
11:13 27:15 51:19

**F**

**F**
100:2
**face**
38:4
**fact**
17:13 21:16 90:6
**factually**
33:15
**failure**
8:24 9:6
**fair**
14:8 63:1 67:17
**fairly**
35:23 36:7 39:21
**Fall**
8:13
**familiar**
42:9 59:1 74:14 81:18,19 84:18 91:12,13
**familiarize**
76:11
**family**
20:23 44:11
**far**
26:7
**fast**
73:21
**fault**
83:24 84:3
**federal**
22:10 24:15 28:20 34:18 93:20,23 95:4
**feet**
49:5
**fellow**
48:13
**felonies**
12:2,4,5
**Felony**
12:1,6
**felt**
80:5
**field**
13:15
**fifteen**
11:2 79:20
**fifth**
92:13
**fifty**
44:16 47:7,10,17 68:19,22
**fifty-five**
46:2 47:13
**fight**
15:4
**fighting**
15:6
**file**
15:18,24 16:9 17:2,3 17:6,7,12 18:2,15 20:6,12 21:5,6,21 22:5,12,23 23:8,14 23:16,18,20,21 24:5 24:17 29:9,10,21 30:1,4,7,14,19,23 31:2,6,6,14,24 32:2 32:2,5,20,21,22 33:16,17 46:10 47:19 48:3,24 49:19 49:21,24 50:7,7,15 50:19,20 52:1,2,5 52:13,14,19,19 53:3 53:20,22 54:6 55:1 55:5,8,13,15 56:1,2 56:5 57:11,14,18,24 58:4,5,9,13,18 59:6 60:15,19 61:7,12,15 61:23 62:4,8,10 64:20 65:22 69:24 70:7,10 83:11,15,20 83:22 84:1 90:12 92:8,8 94:6,10 95:1 95:2,5 96:20 97:22 97:24 98:3 99:3
**filed**
24:9 31:20 54:15 55:23 92:6 94:12,13 94:20,22,23 95:2
**files**
34:13 39:14 40:3 45:15,15,21,24 46:4 46:17 47:4,9,18 48:13 50:6,15,22 51:2 67:1,2,12,16 67:21,22 68:1 69:3 69:4,16,21 70:5,6 70:13,20 98:22
**filing**
5:4 46:8 47:13,24,24 48:21 50:9 62:13,14 62:14,17,18 68:2 70:2,14 97:2
**final**
87:1,2,8
**finally**

79:11,13
**financially** 100:15
**find** 21:16 82:13
**fine** 5:20,23 63:16,18 71:18 73:8 75:16
**Fineberg** 89:6,12
**finish** 6:21
**finished** 48:23 51:24 58:13,17 59:6 70:19
**fire** 65:4
**firm** 10:7
**first** 5:7,16 7:17 11:22 16:13 28:3 53:1 57:18,22 68:10 76:7 77:19,20 83:3 95:19 100:8
**five** 23:7 27:23 34:10 43:7 52:23,23 63:14 63:20 67:14,16 81:14
**five-hundred** 24:2,3
**flee** 28:21
**floor** 2:11 42:23 43:12,14 43:16 44:6,9,18 52:23 92:13
**floors** 23:19 42:23 67:13
**focus** 46:13
**folders** 55:16
**follow** 53:10 66:11
**follow-up** 96:13,13
**followed** 40:15
**following** 43:21 89:14
**follows** 5:8
**foolish** 66:23
**foregoing** 100:6,7
**forget** 52:23
**form** 5:5 14:24 22:13 56:20 64:12 65:8 87:17 93:8
**former** 25:17,23
**forth** 100:9
**forty** 47:17
**forward** 46:15
**found** 21:19
**four** 23:7 27:23 72:23 74:16 75:10,10 76:17 81:13
**free** 80:19,21 81:1
**Friday** 26:4,13 44:24
**front** 5:18,19 15:1 26:21 30:6 46:7,22 77:23
**fuck** 78:14
**fucking** 78:7
**fuel** 23:1
**fulfill** 16:16
**full** 62:24 97:12
**further** 20:19 93:16 99:5 100:10,13

**G**

**gain** 46:8
**Gallagher** 41:3
**gas** 78:7
**gather** 46:8
**generally** 11:9
**genesis** 25:22
**geography** 42:9
**getting** 35:22 78:6
**give** 10:18 18:18 31:13,24 32:5 44:16 52:11 54:1 59:2 70:23 80:18 83:15 85:13 91:16 96:20
**given** 16:21 18:15 26:12 45:24 46:2 47:4 68:18
**giving** 35:15 38:3 52:12
**globally** 11:9
**go** 6:10 10:1 11:20 16:14 23:21 26:23 26:24 30:1,9 37:18 47:3 55:2,23 57:21 65:3 67:6 68:11,13 69:17 70:11 71:17 72:11,12,13,14 75:14 79:19 81:2 97:16 98:21
**goal** 15:1
**goes** 70:23
**going** 6:20 26:22,23,24 30:5 32:10 35:9 43:21 50:16 54:21 54:22,22 55:17 60:10 63:3 65:12,13 65:15 68:7 70:23 71:5,15 73:3,5,21 74:13 75:7 76:6,12 84:2,3 93:2 94:15 96:17
**Goldberg** 30:6
**Goldberg's** 28:20 30:17
**gong** 22:7
**good** 5:12,13 6:9 63:9 85:22 88:4 90:24 99:17
**Gooding** 35:20
**gotten** 9:6
**graduate** 10:3
**graduated** 10:5
**great** 92:20 93:19 95:6
**GREINER** 2:15
**guess** 67:18 73:5
**guided**

14:21
**guidelines**
53:2
**guilty**
22:5 23:5
**gun**
78:12,24 82:16
**guy**
77:7 78:6,7,8,12,12
78:13,15 79:16

**H**

**H**
17:22
**habeas**
93:20 94:16,20 95:2
**habit**
50:11
**half**
6:7 12:1,3 38:2 43:14
43:15,16 74:11
**hall**
42:14 62:17
**hallways**
98:3
**hand**
15:9 16:17 19:8 20:4
21:3,9,11,21 23:8
24:7,24 32:15 34:23
83:6,8 85:5
**handcuffs**
38:1 78:12
**handed**
15:14 16:11 19:9
**handful**
33:9
**handle**
23:14,19,21 32:13
38:17 39:14,20 52:8
68:19 74:11 93:24
**handled**
23:22 26:16 29:11
31:21 32:9 36:5,6
38:10 56:21 57:23
58:23 88:14 92:3
**handling**
24:17 32:17 36:11
62:7,10 94:7,8 96:7
**handsful**
33:9
**hang**
92:16
**happen**
19:5 21:17 28:13
51:20 52:2,10 87:18
**happened**
18:23 22:8 23:24
28:4,19 29:6,8,15
30:2 33:13 35:2
51:18,19,23 54:23
56:24 57:1 65:1
66:1 77:21,21 80:4
81:6
**happening**
33:12 35:21
**happens**
36:3 80:2
**happy**
24:4 54:1
**harass**
37:24
**Hart**
77:6
**He'll**
88:10
**health**
11:15
**hear**
9:9 42:7 77:20 78:6
**heard**
41:8 65:3 78:18,20
81:13 86:9
**hearing**
17:15,18,20 18:1,2,6
22:23 57:23
**hearings**
11:24
**hearsay**
14:23,23,23
**heart**
27:24 36:3,10 45:6
**Heather**
1:12 100:5,19
**heavenly**
46:23
**held**
9:17 75:18
**help**
7:24 33:11 34:3 35:3
35:6 36:1 37:20
39:1 53:11 59:14
**helpful**
59:12 65:7
**helping**
29:20 33:22 34:3
**hey**
29:6 56:24 99:3
**high**
26:11
**Hines**
1:12 48:18 71:12
100:5,19
**hired**
11:21 38:8
**history**
56:22
**hold**
27:24 41:19 54:9,9
55:17 56:1 93:13
**Hom**
40:17
**home**
77:22
**homicide**
11:12,15,18,21 12:11
12:15 15:13 17:4,22
27:12 38:16 40:12
40:18 41:11,12,15
42:3,21 43:22 44:5
44:10,17 45:14,23
48:9,11,16 57:19
58:5 64:8 66:18
67:3,5 70:5 96:22
98:20
**honestly**
31:22 36:6 39:21
86:9
**hope**
62:22
**horizon**
46:11,11,12
**hour**
78:10
**hours**
30:9
**house**
78:10 81:9 86:6
**Hugh**
23:13 39:18 61:21
**humanly**
58:10
**hundreds**
33:1 61:24

**I**

**ID**
98:7
**idea**
74:15
**identification**
73:11
**identify**
84:9
**illegible**
77:1,10,10,24 80:12
**imagine**
6:1
**immediately**
46:10 48:20 71:6
**imp**
73:2
**impact**
7:11
**importance**
49:13
**important**
35:14 78:6 89:17
**impossible**
40:1,2,7,10
**improper**

66:23
**inaccurate**
24:1
**inappropriate**
66:23
**inaugurated**
28:5
**inches**
55:19
**incident**
25:19,22 27:18 80:10 80:11 81:13
**include**
18:3 25:10 95:17
**included**
44:13
**includes**
95:15,16 96:1
**including**
22:2 61:21
**incomplete**
30:14
**incorrect**
61:4
**incorrectly**
86:4
**incredibly**
84:11
**inculpatory**
14:9 15:9 25:1,1 82:1 82:11,22,23 84:11
**INDEX**
4:1
**indicated**
62:24
**individual**
9:2 50:20
**individuals**
9:2,5
**infamous**
49:8
**influence**
7:10
**information**
9:11 14:22 15:10,14 16:9,11,15 18:10,14 19:9,19 20:5,11,17 21:10,19 22:9 24:8 25:11 31:7 32:10 55:23 66:13 89:20 89:23,24 90:5
**inherited**
17:4,5 57:20
**initially**
57:13
**Innocence**
31:19 38:8,11,12
**innumerable**
54:23
**input**
74:19
**inquire**
24:16
**Inquirer**
35:10
**inside**
32:22 97:22
**instances**
28:24,24 58:20
**intend**
17:17
**intending**
18:5
**interaction**
25:17 30:13 35:10
**interest**
38:10
**interested**
100:15
**interrupt**
70:18 97:7
**interview**
4:16 23:15 64:23 66:8,12,22 73:16,17 75:24 76:2
**interviews**
17:15,21 30:10
**intimidate**
37:24
**introductory**
6:10
**invariably**
29:9 64:19
**invested**
46:14
**investigating**
83:13 89:19
**investigation**
4:16 64:7,22 65:7,17 66:1,15 73:16 75:24 83:12 84:6
**investigations**
64:3 66:9
**investigative**
19:12
**investigator**
18:16 19:11,13 20:6 20:12,18 21:9
**investigators**
18:9
**involved**
6:1,4,6 7:19 8:16,17 21:8 56:8 57:8,17 57:18 59:10 79:4 90:4
**involving**
12:4 56:8
**iPad**
5:19,23
**issue**
43:24 46:20 65:19,20 65:23
**issued**
59:20
**issues**
24:17
**It'll**
96:14

**J**

**Jackal**
2:10 4:7 37:4,8,8 39:10 40:6 60:22 61:18 72:13 85:21 88:4 99:8,14,16
**jail**
76:19,23
**January**
28:5
**JFK**
2:5
**job**
10:9 32:23
**jobs**
39:23
**Johnson**
2:16 4:10 7:24 8:1,3 8:4,20 9:14 31:9 34:8 37:3,7,7 40:5 59:11 60:17 61:10 61:17 63:5,8,18 65:12,15 66:5 72:14 79:7,11 80:7,13 82:6,9 86:18,21 88:13,21 90:17 99:7
**join**
60:22
**Jonathan**
89:6
**judge**
15:2 22:3 28:20 30:6 30:17 32:15 52:5,9 59:19,20 86:1,3,10 86:12
**judges**
52:11
**July**
86:12
**June**
93:5
**Juniper**
42:12
**jury**
12:5,8 45:6
**justice**
13:19 25:8 33:24 36:7,13 37:2,21 39:7,16,22 40:3,10 53:22 56:4

**K**

**K**
1:12 100:5,19
**keep**
23:20,20 34:10 48:1 50:6 52:17
**keeping**
88:9
**Kenny**
77:6 78:21 79:9
**kept**
23:18 55:12 67:2,21 68:4 78:8 79:15 80:4 97:24
**Kerns**
77:7
**kidding**
88:11
**killing**
82:17,18
**kind**
49:7 74:4
**kindly**
88:2
**knew**
23:17 26:22 29:10 53:14 77:15,15 98:10
**knocking**
97:3,15
**know**
6:12,15 8:9 9:5 16:13 17:19 19:6,14 21:14 24:10,15,21 26:10 27:4,6,7,9 28:14 29:5,6,11,13,23,24 30:5 31:18 32:5,6,7 33:8,14,15 34:24 35:1 39:17 41:14 46:14 47:16 49:12 51:21 52:15 53:12 53:17 54:7,20 55:17 55:20 57:1,3,16 58:14 59:2 60:7 61:14,16,19 64:17 64:23 65:2 67:11,17 67:19,21,22,24 68:23 71:8 73:13 75:3 77:6,14,15 78:7,15 81:8,12 84:2,17,21 89:15 91:9 92:23 95:18 96:24 97:18,23 98:5 99:1
**knowledge**
84:16 98:2
**Krasner**
25:18 27:4 28:3 35:11 36:16 37:23 38:7

**L**

**lack**
15:7
**Larry**
38:7
**late**
12:10 41:17 91:10
**launch**
72:8
**law**
2:9 10:1 12:16 13:23 61:22 88:8 91:15 93:4
**Laws**
13:5
**lawyer**
6:8 19:17 54:11 96:6
**lawyers**
19:22 24:2 37:12 94:18
**lawyers'**
69:22
**lead**
89:24
**learn**
13:1,21
**learned**
14:7 90:5
**leave**
39:22 49:11 71:2
**leaving**
49:23
**left**
11:12 26:18 27:23 28:2 57:21,23 78:10 79:19 87:13,14 91:9
**legal**
12:21 39:20
**lend**
79:21,23
**lengthy**
51:6
**lesson**
80:3
**let's**
25:19
**letters**
30:10
**level**
24:5,14,14 40:4 47:16 52:1 54:10 66:2
**life**
38:3 86:10
**light**
13:7 88:9
**limit**
55:24 63:13
**line**
15:16 84:7 96:13
**lined**
70:11,12,14
**lines**
64:9,15
**lineup**
84:8
**listen**
37:11
**literally**
44:15
**litigation**
7:20,22 8:9,15,15,20 8:22,23 57:8,8
**little**
16:6 17:11 43:15 77:16 89:15
**live**
76:22
**lived**
23:1 57:4
**lives**
81:9
**living**
23:6
**located**
50:7 51:2,5 67:16 69:21
**location**
42:11
**lock**
22:6 48:7 50:3
**locked**
48:3 97:19,24 98:4
**log**
71:13
**Logan**
2:17
**long**
9:13 13:4 25:24 30:24 74:16
**longer**
22:21 27:2 37:1 80:4
**look**
30:1,7 46:9,11 65:4 81:19 85:13 99:1
**looked**
29:24
**looking**
46:24 49:17 53:12 61:14 79:14
**looks**
71:1 82:22
**Lorber**
95:17,17,18
**lost**
20:14
**lot**
33:19
**loud**

75:2
**Loughlin**
57:22
**luck**
63:9

**M**

**ma'am**
64:14 91:13 92:14 94:14 95:3,12
**Mahler**
56:21 58:23 59:10 60:3,15 61:7 62:4,7 62:10 87:1,8,11,12 87:16,21 96:1
**Mahler's**
62:14,18
**main**
30:14
**maintain**
61:23
**Major**
12:4,7
**majority**
40:24
**making**
25:10 32:18 57:10
**man**
38:7,8 82:17
**Mann**
77:11
**manner**
17:23
**March**
1:14
**marginally**
14:12
**marked**
4:15 73:4,10
**marks**
6:10
**Mary**
76:23
**massive**
45:6
**materials**
19:12
**matter**
26:2,2 65:17,18 86:2 91:2 94:17
**matters**
51:18
**McKenna**
77:2,3
**mean**
14:3 15:23 18:21 19:21 32:12 35:18 36:11 46:6 51:12 53:17 58:19 70:9,18 73:16 85:8,12 87:12 97:7
**meaning**
89:23
**meaningless**
30:3
**means**
7:2 94:19
**meant**
35:19 36:9
**media**
25:18
**medical**
11:13 40:14 43:23
**Mee**
76:3 82:12
**meeting**
71:2,2
**member**
56:11
**mental**
46:16
**mentioned**
5:14 12:13 14:15 36:14 38:16 64:23 64:24 88:24
**met**
41:20
**mezzanine**
43:9,10
**Michael**
56:23 75:11 76:19,20 76:20 78:21
**middle**
76:6
**Mike**
81:6
**Miller**
28:7,7,8,9 37:20
**mind**
28:12,13 29:18 33:8 36:3,7 39:17 85:3 90:14
**mine**
23:1 25:24 32:24 68:4 96:9
**MINOTT**
2:16 4:9
**minutes**
45:7 63:14,15,20 79:20
**mirrored**
31:16
**mischaracterization**
35:6
**missing**
32:3 62:3,5,6
**misunderstanding**
89:9
**Molly**
95:17,17,18,19
**moment**
5:18 46:2 85:13
**moms**
35:21
**Mona**
76:24
**Monday**
46:13,13
**money**
79:21,23 82:16
**month**
69:15
**months**
10:18 28:4 45:12
**moral**
39:20
**morning**
5:12,13 49:24 90:24
**motion**
24:19 52:13
**motions**
22:3 32:14 52:5,8,17 52:18,19 53:7 55:22 68:24
**mountain**
5:16 11:1,6
**mouth**
17:8
**move**
17:8 41:8,10 64:1
**moved**
40:20,21 41:7,11,15 41:22 61:8
**multiple**
58:20 59:9
**multiply**
69:11
**municipal**
11:23,24 14:15
**murder**
35:13,21 47:14 89:21
**murders**
33:1
**mutual**
62:22

**N**

**N**
2:1 100:2
**name**
5:11 12:6 31:3 38:7 76:1,24 77:6,7,9,10 77:11,19 81:7 83:3 84:18 86:5,6,10 95:19,20
**named**
7:23
**narrow**
65:19,23
**narrowed**

13:6
**nasty**
27:15
**Natividad**
1:4 56:9,13 57:18 58:5,9,17 82:1,16 83:1,3 84:7,9,21 86:2,15 87:3,8,11 87:21 91:6,21 93:7 93:16
**Natividad's**
59:21 60:4,13 87:2 91:16 92:23
**nature**
7:8 8:14 28:18 89:16
**near**
68:4
**necessarily**
14:24 46:19 56:19
**necessary**
32:18
**necessity**
52:20
**need**
23:15 26:3,6 49:22 52:21 76:20
**needs**
74:6
**negotiated**
68:24
**neither**
20:17 63:8 100:10
**nervous**
79:17
**never**
21:19,19 24:12,18,18 24:19 35:2 36:5 40:9 49:12,15,16,17 63:4,5 66:20 67:7 86:9 90:11 97:3,14 99:4
**new**
19:23 31:15,18 39:24
**news**
79:5
**night**
49:23 77:21,21
**nine**
28:15 43:15
**ninety-nine**
19:14 43:18
**Noah**
2:4 5:11 9:14 86:19
**nominated**
28:4
**normally**
46:6,21
**Notary**
1:13 100:5,20
**notes**
85:14
**notice**
5:21 26:5 54:14
**number**
4:15 42:21 44:13 89:4 94:17,21

**O**

**O**
100:2
**O'HANLON**
2:3,4 4:6
**oath**
7:2
**object**
64:12 65:13,15
**objected**
37:6
**objection**
31:9 37:3,4 39:10 40:5,6 60:17,22 61:17,18 65:16 66:2 66:4 93:8
**objections**
5:4 34:18
**obligation**
15:9 16:17 19:19 20:4 21:11,21 24:7 24:11 33:5,23 36:12 37:1 39:7 53:21 56:4 83:6 85:5 96:5 96:8
**obligations**
13:2,22 39:20
**obliged**
29:16
**observe**
69:21
**observed**
68:8
**obtained**
89:20
**obviously**
6:12 14:12 68:1 76:13 94:22
**occasion**
68:13 69:17
**occasions**
29:8 33:13 34:22,23 37:16
**occurred**
47:14 93:5
**offered**
10:9
**offering**
79:20
**offhand**
20:21
**office**
5:15 14:1 24:3 25:24 26:20 27:5,12,13 28:17 35:13 36:1,17 37:17,23 38:2 40:18 40:21,23,24 41:1,2 41:5,20 42:24 43:10 43:12,16 45:8,11 46:8 47:20,22,23 48:1,2,4,4,7,7,20,20 48:22 49:3,6,15,16 50:8 53:19 55:12 57:21,23 62:12 68:1 68:2,4 70:12,12,14 87:14 91:10 94:1 95:10,11 96:6,23 97:14,19
**officer**
21:3
**officers**
89:19 90:10
**offices**
11:11 40:15 50:7,10 50:20,20 67:13,23 69:23 97:1,23
**oh**
28:16 30:15,15 37:11 81:24 84:2
**okay**
5:17,20 6:1,9,15,23 7:1,10,14,19 8:12 8:14 9:13 10:11,13 11:7,16 13:21 14:5 18:7 19:24 20:3 23:14 25:8 28:6,23 31:11 33:20 34:4 35:9 37:9 40:17 41:6,14 42:2,23 43:20,24 44:2,17,23 45:14 47:8 51:24 53:1,13 55:1 56:3 58:8 59:2,5 60:1 63:19 64:6 67:8 68:9 69:3,7,16 70:24 71:19 72:5,9 73:9 74:12,22 75:5 75:17 81:5 84:20 85:12,13,16 88:6,20 88:21 91:8,11,14,20 92:3,6,11,15,22 93:2,22,24 94:3,6 94:15 95:6,8,15,21 96:1,3,10 98:24 99:13,18,21
**old**
31:16
**once**
22:4,20 24:8 29:9 32:8 40:20,21 42:10 51:24 52:18 53:1 58:8 69:15 99:3
**one-hundred**

22:10 24:1 25:7 31:17 33:17 35:17 38:15 44:15,15 47:7 47:11 49:5 50:14 53:20 68:19,22 96:9
**one-semester** 12:23
**ones** 24:5 47:13
**open** 15:6
**opinion** 28:21 30:18
**opposed** 27:10
**oral** 1:5 7:5
**order** 26:7,9 59:19,21,23 86:1,13 89:12 91:21
**ordered** 32:4
**ordinary** 13:14
**organization** 70:7
**organized** 49:9,19
**orient** 89:13
**original** 23:18 30:10
**outside** 47:24 48:4,20 50:20 68:2 69:22 70:12,14 70:14
**overarching** 91:4
**overnight** 49:11

**P**

**P** 2:1,1
**P.C** 2:3,15
**p.m** 99:23
**P3536** 72:1
**P3540** 72:2
**PA** 2:6,11,18
**PAB** 76:3
**packed** 58:9
**packing** 55:1
**page** 4:3 76:7
**pages** 74:16
**paper** 15:17 23:15 45:15,16 45:17,22 55:8 73:15
**paperwork** 16:22 18:3 30:4,10 32:21 55:21
**paralegals** 44:14
**part** 15:24 17:4 19:13 30:14 31:14 56:3 62:5,6 66:8,8,14 68:3
**participate** 51:11,12
**particular** 16:16 26:4
**parties** 5:2 26:11 100:12
**parts** 67:12
**party** 7:22 8:19,20
**pass** 24:4 45:12 46:23 98:11
**Pat** 25:24 27:3,6 30:22
**patience** 72:16
**Patricia** 31:4 35:20
**Patrol** 5:16
**Patroller** 11:3,5
**Paul** 1:7 57:22 91:9
**pay** 77:12
**PCRA** 22:10 24:14 26:1 29:12 51:11,18 93:21 94:2,8,8,8,13 94:16
**Pedro** 89:2
**pendency** 21:20 22:1,4
**Penn** 2:5 40:22,23 41:9,13 41:15,22 42:5,10,12 42:18,24 43:1
**PENNSYLVANIA** 1:1
**people** 24:13 36:2 39:17 74:23 76:16,18 81:14
**percent** 19:14 22:11 24:1 25:7 31:17 33:17 35:17 38:15 43:18 50:14 53:20 96:9
**percentage** 52:11
**period** 40:19 41:8 43:19 48:10,23 50:6 52:3 52:18 53:7 68:16 69:8,13
**permanent** 11:5
**permitted** 98:9,11
**person** 24:13 84:9
**person's** 6:18
**personal** 27:15 53:13
**personally** 69:4
**perspective** 22:4,21 26:5 32:11 32:13 33:18
**pertaining** 56:12
**petition** 94:8,13,20 95:2
**Phil** 76:24 78:23
**Philadelphia** 2:6,9,11,18 7:17 10:11,13 42:9
**phone** 2:6,12,18 5:18,22 25:23
**photocopied** 23:18
**phrase** 59:12
**phrased** 58:21
**physical** 22:11 23:14 26:6 32:21 47:19 48:20 52:2,19
**physically** 52:22 92:12
**pickup** 32:24
**piece** 15:17 16:8 23:15 24:24 55:8 56:5
**Pittsburgh**

10:2
**place**
8:12 24:8 50:22 58:14 76:2,20 80:10 100:8
**plaintiff**
1:5 2:7 56:9
**plans**
89:16
**plate**
47:1 58:23
**Plaza**
2:5
**plea**
22:5 23:5
**pleading**
27:22
**pleadings**
23:23
**please**
12:20 14:6 41:19 63:4 90:15 99:12,16 99:20
**pleased**
24:4
**plug**
75:7
**point**
9:7,12 27:19 28:14 29:18 41:21 45:21 54:12 62:23 94:24 98:20
**pointed**
89:21
**pol**
53:9
**police**
15:17 21:3 55:22 66:18 89:19 90:10
**policy**
23:9 53:10 54:5,8
**politely**
30:12
**Ponterio**
41:3
**position**
11:5
**possession**
15:19,21 16:1,1,10 18:8,15 20:17,18 22:11 36:21 55:8
**possible**
18:10 20:22 53:6 54:4 58:11 71:5 87:7,9
**possibly**
21:14
**post-conviction**
26:2 93:21
**post-mortem**
17:24
**post-trial**
22:3 24:8,19 32:14 52:5,8,13,17,18 53:7 65:21 68:24 91:1
**potential**
18:24
**potentially**
9:1 14:10
**practice**
57:21
**pre-preliminary**
17:20 18:2 22:23
**precise**
16:7
**preference**
53:15
**preliminary**
11:24 17:15,18 18:1 18:6 57:23
**preparatory**
89:11
**present**
14:10 78:17,17 84:8
**presented**
75:23
**presenting**
5:21
**presumably**
18:4 94:9
**presume**
20:1 62:12
**pretty**
13:4 45:1 51:23 58:12 82:10 98:10
**prevent**
38:6
**previous**
20:1 88:14 89:1
**primarily**
58:22
**primary**
27:24
**private**
57:21
**Probable**
17:14
**probably**
6:6 17:9 29:8 33:13 33:18 42:15 44:16 45:5 48:4 51:21,22 56:14,15 57:6 60:5 67:23 69:15 72:23 84:6 88:16
**procedure**
23:9 27:1
**procedures**
53:2
**proceed**
39:15 74:12
**proceeding**
94:17
**proceedings**
91:1
**process**
67:10 93:7,17
**processes**
93:20
**production**
59:19
**professional**
1:12 12:21,22 13:3,5 13:5,10,22
**Project**
31:19 38:8,11,12
**promoted**
12:11
**pronounced**
86:4
**proper**
26:24 34:18
**prosecuted**
35:13
**prosecuting**
57:19
**prosecution**
12:10 31:15,16,18 66:13
**prosecutor**
8:18 13:8,13 38:13 90:9,11
**prosecutor's**
90:12
**Prosecutors**
13:10
**provide**
16:21
**province**
38:20
**Public**
1:13 100:5,20
**published**
30:18
**pull**
63:11 98:21
**purely**
38:20
**purpose**
76:10
**purposely**
37:17
**pursue**
91:21
**put**
14:17 17:17 18:5 49:21,22 60:15,18 61:7 84:7

**Q**

**qualified**
15:20
**question**
6:21 16:5,14 17:11 20:14 31:1,12,23 33:22 34:1,2 51:2,5 54:5 60:24 61:3,6 64:12 76:13,14,16 76:20,22 77:13,18 78:16,24 79:1,3,24 80:3,9 81:6,7,12,20 83:5 85:3 88:15,17 90:3 92:5 98:17
**questioning**
76:4
**questions**
5:5 7:12 34:16 43:21 65:16 67:4 85:7 88:5,8,10,13 90:19 91:1 96:11
**quick**
63:12 75:8
**quickly**
54:12 58:10
**quite**
16:4 19:6 36:17 70:19
**quote**
32:3,3 35:16 78:8,14 78:14 79:13,14,15 79:15
**quoted**
35:12

**R**

**R**
2:1,15 100:2
**R-U-F-E**
86:4,7
**raised**
88:16
**RALEY**
1:7
**ran**
47:22
**Rape**
12:10
**rarely**
29:5 51:19,20
**reach**
68:23
**reached**
24:10
**read**
15:16 31:19 73:19 74:9,13,15 75:2,4 76:6 81:15 89:5 90:16
**reading**
5:3 64:20,20 75:8
**reads**
75:14
**ready**
49:10
**real**
75:8 77:19 79:6,17
**realized**
30:8
**really**
5:22 9:12 13:6 20:3 66:23 79:18 82:22
**reason**
19:2 49:18 54:8 68:17
**reassigned**
43:23 57:24
**recall**
7:23 8:11 9:12 26:2 28:16,17 29:2 32:12 87:6 91:6 92:19
**receipt**
24:12
**receive**
12:17 83:11
**received**
17:5,16 19:20 21:20 22:9 23:7 25:23 32:9
**receiving**
32:12
**recognize**
73:14
**recollection**
9:7 26:15 30:24 33:11 51:17,22 56:14,16 60:6,11 67:13,15 87:15,20
**reconvene**
63:20
**record**
4:17 9:14,18,20,22 15:6 17:22,22 44:21 63:23 71:22 73:16 75:14,19,21 76:1 89:1
**recover**
45:9
**RECROSS-EXAM...**
98:18
**recuperate**
45:10
**red-faced**
27:16
**redacted**
81:11
**REDIRECT**
96:15
**refer**
59:22
**referred**
42:15 66:17 77:16
**referring**
43:21 84:10
**reflect**
94:21
**reflects**
91:15 93:5
**refresh**
26:14 30:23
**refuse**
66:20
**regard**
13:2,10,21 14:6 18:11 24:10 27:18 28:6 39:1,22 40:17 54:6 56:12 57:10 59:21 60:4 64:2,7 66:13,21 67:2,4 68:7 86:2 87:1,8,11 87:21 96:17 97:22
**regarding**
7:1 30:11
**regards**
86:15
**regular**
99:17
**regulars**
75:11 76:17,19
**Reiston**
77:18
**related**
65:21 100:11
**relates**
16:16
**relating**
65:17
**relative**
46:10 60:12 100:13
**relatively**
7:16
**relevance**
66:4
**relevant**
66:12 88:15
**Relief**
93:21
**relieved**
23:8
**remainder**
48:2
**remarks**
89:11
**remember**
7:17 8:14 14:14 17:21 25:19 34:21 35:15 41:22 43:12 64:3 84:4 85:8,9 87:19
**removed**
49:16

**rent**
77:13
**repeatedly**
60:18
**rephrase**
93:11,14
**rephrasing**
34:10
**report**
15:17 17:24
**reported**
25:18
**reporter**
1:12 6:15 8:2,6 9:19 22:17 37:5,9 63:11 63:16,22 71:13,17 71:21 72:11 73:7,9 73:10 75:7,13,17,20 97:8,11 99:9,13,18 99:21 100:6,20
**represent**
13:20 93:2 94:15
**representation**
8:21
**represented**
24:13
**request**
28:18 64:9,15,16 76:11
**requested**
84:6
**required**
13:6 65:7
**reserved**
5:5
**reside**
74:23 76:16
**resolution**
68:23
**respect**
14:16 46:20 62:22,23 62:24 96:7
**respectfully**
35:5 46:20 61:2 62:20 85:11
**respective**
5:2
**responses**
7:4
**responsibilities**
12:18 13:7,13 14:4,6 64:3
**responsibility**
12:22 13:3,6,10,23 22:13 23:3 32:24 52:8
**responsible**
55:1
**rest**
88:17
**result**
38:11
**resulting**
35:24
**results**
10:9
**retired**
10:21 11:4 12:12 27:19,21 28:11 29:1 29:3,19,19 36:16 37:1,16 38:17 44:20 44:21 50:19 95:9
**retrial**
95:5
**return**
48:24
**returned**
11:15 32:4 95:4
**revolver**
79:2
**Ricardo**
1:4 77:19,20 81:21 81:21 82:5,16 83:3 83:3 84:9,10,13,13 84:17,18,22 85:1,11 85:12
**RICHARD**
1:7 4:4 5:7
**right**
5:11 13:8,11 14:3,8 25:6 26:23,24 33:5 33:24 34:20 37:2,16 38:3,7,14 39:7,15 41:1,4,5 46:7,22 47:9 52:5,15 54:23 56:4 59:7 63:2,8 68:5 70:19 71:24 72:18 75:9,10,23 76:17 77:12,22 81:15 83:22 85:7,12 91:11,18,19,24 92:1 92:4,13 99:19
**right-hand**
38:8
**rights**
2:10 52:12
**ring**
81:19 95:20
**rings**
95:19
**Rob**
77:16,18,18,22 78:24 79:3,3,19,24 80:3 81:21 82:4,5 83:1,2 84:17 85:1
**Robert**
76:4 77:14
**Robinson**
84:18,22
**role**
13:19 19:16,17 32:13 32:23 89:8
**Rolston**
84:17,17,22
**Ron**
23:13 39:18 61:21
**room**
43:8 47:23 48:19 49:4,8,20 50:1,2 53:18 76:2
**rooms**
50:12,21
**rotator**
26:17
**round**
79:2
**Rufe**
59:20 86:2,4,5,5,7
**Rufe's**
86:12
**rules**
13:12 34:19
**running**
30:16

**S**

**S**
2:1
**safe**
23:20
**sat**
77:23
**saw**
17:8 37:22,22 81:14
**Sax**
1:7 4:4,16 5:7,11,14 6:1 8:9 9:22 35:14 59:18 64:1 66:7 71:8 73:6,7,11,13 75:2,23 81:15 85:16 86:1,24 87:24 88:4 88:13 89:2,12,13,23 90:24 96:17 98:14
**Sax's**
87:1 89:8
**saying**
34:11 35:12 78:13 82:15 85:9,10,11
**says**
23:23 34:2 72:1 75:11 77:11 85:1,1
**school**
10:1 12:16 13:23
**Schwartz**
2:3,4 4:5 5:10,11 8:7 8:8 9:16,21 22:18 31:11 33:3 34:15 35:8 37:13 39:11 40:11 59:16,17 60:24 61:3,5,13

62:2 63:10,13,19,24 65:10,14 66:3,6 71:4,11,15,19,23 72:5,9,15,17,20,22 73:1,4,8,12 74:18 74:22 75:1,4,16,22 77:3,5 78:3,19 79:8 79:12 80:8,15,20,23 81:1,4 82:24 85:18 85:22,24 86:8,11,20 86:22,23 88:1,3,12 88:19 90:13,18 93:8 96:12,16 97:10,17 99:6,19,20
**screen** 71:3 72:8 73:14 74:3 74:11
**scribble** 33:16 35:2
**scroll** 73:20
**sealing** 5:3
**searching** 99:2
**second** 9:15 14:2 78:23 79:3 91:15,17
**secure** 11:4 13:20 36:13 37:2,21
**secured** 39:16 40:3
**see** 30:23 32:20,21,21 47:2 67:24 70:23 72:3,7 73:13,24 74:5,7,8 77:24 78:2 78:4,24 82:12 84:8 95:5
**seeing** 5:22 72:10 84:24
**seeking** 19:14,15
**self-defense** 18:24
**semantics** 27:23
**send** 90:15
**sent** 58:10
**sentence** 15:16
**sentenced** 59:8
**sequence** 91:3
**serious** 11:13 12:2,5 54:19
**Services** 44:14
**set** 30:3 78:4 100:9
**settlement** 24:10 69:1
**seven** 30:9 43:2,3,19 87:13 94:22
**seventh** 44:6,8,18
**Sexual** 44:11
**shape** 14:24 22:13 56:19 65:8 87:17
**share** 52:11 70:22 71:2
**shared** 63:5
**sheet** 17:13 23:16
**SHELLEY** 2:15
**shooting** 76:4
**short** 9:17 62:3 63:21 71:20 75:18
**shot** 78:6 79:14
**shots** 65:3
**show** 63:2 64:2 73:3
**showed** 81:10
**side** 13:20 29:16
**sign** 27:6 38:5
**signed** 27:17 81:14
**signing** 5:3
**similar** 48:10 62:12 67:4
**similarly** 48:19 50:9
**simple** 46:16
**sir** 7:3,13 10:12,18,23 15:11 17:10 22:22 25:9 27:17 28:12 29:2,17 34:1 35:5 38:9,22 40:10,16 42:22 44:7,19 51:9 57:8 58:7 60:2 62:19 70:3 83:19 85:15,17 87:4,4 88:1,8 93:10 96:21 98:13,15
**sit** 47:9
**situation** 20:19 21:8 28:6 40:14
**six** 30:9 45:12 52:4
**sixty** 46:3
**sketch** 17:20
**ski** 5:16 11:1,3,5
**small** 5:19 56:1
**smaller** 73:24
**Smith** 2:15 4:8,17 64:11 72:3,6,12,19,21,24 73:17 76:1 77:2 78:1,18 80:19,22 81:2,14 84:8 85:9 85:20 86:5 88:6,10 88:20 90:18,20,23 93:11,13,15 98:16 98:19 99:9,11
**snitch** 77:17 78:7 79:16
**snitches** 80:2
**solely** 65:20,20 96:20
**somebody** 27:1 78:16 80:2
**someone's** 67:24
**someway** 65:8
**soon** 53:4,6,6,6 54:3
**sooner** 53:24 54:1
**sorry** 8:2,4 17:7,9 22:17,19 30:24 37:5,11 42:7 42:8 48:18 51:8 56:18 58:3,16 59:11 59:19 63:17 64:11 65:14 70:18 72:20 83:18 86:18,19 87:5 88:9 89:12 91:16 94:16 97:7,8,10,13 98:16
**soul** 36:4
**sound**

91:12,17,18
**sounds**
59:1 91:13,19
**source**
20:19,20 55:22
**South**
40:22,23 41:9,13,15 41:22 42:5,10,12,17 42:24 43:1
**Southeast**
42:13
**space**
46:16
**speak**
12:2 17:5 45:13
**speaking**
11:9 66:3
**special**
13:7
**specific**
9:7 33:11 56:14 60:11 87:16
**specifically**
29:17 59:14
**specificity**
89:16
**specifics**
26:3
**speculation**
67:18
**spoke**
33:17
**spoken**
80:10
**spread**
49:2,3,9,19 50:12,22
**Square**
2:17 40:22,23 41:9 41:13,16,22 42:5,10 42:13,18,24 43:1
**Squares**
81:8
**stack**
22:6
**stacked**
70:2,16,20
**staff**
44:12
**stage**
60:9
**stakes**
26:11
**stand**
39:19
**stands**
76:14,14
**start**
6:22 17:6 46:24 53:12 54:11 56:2 99:2
**started**
10:10 11:18 17:13 41:21 55:21 79:6
**starting**
18:3 22:23
**state**
22:10 24:15 30:16 59:13 60:9 76:13 93:23 95:4
**stated**
60:18
**statement**
82:8
**statements**
18:5
**states**
1:1 34:1
**station**
78:7
**stationed**
5:15
**status**
60:12
**stay**
76:18,19,24 92:15
**stayed**
45:8,11
**staying**
77:7 78:23
**step**
91:20 93:7,17
**Stephen**
2:4 28:9
**stint**
12:9
**stipulated**
5:1
**stolen**
49:15
**stood**
78:13
**stop**
74:20,21
**stopped**
79:17 98:7
**stopping**
98:12
**store**
48:13
**stored**
50:23 51:1 67:11 70:5,6
**stories**
42:17,21
**story**
78:9
**street**
2:11,17 19:13 40:21 41:12,12 42:13 80:16
**strike**
20:14 96:10
**strikes**
87:18
**strong**
25:15
**strongest**
92:20
**strongly**
35:23
**studying**
10:8
**subject**
28:20 30:18 58:23
**subpoena**
26:7 27:9,16 82:14
**subsequently**
90:5
**successful**
60:8,8
**suggest**
12:6 18:24 84:13 87:17
**suggested**
18:23 27:22
**suggestion**
66:11
**Suite**
2:5,17
**Summer**
10:8 45:4
**superior**
32:17 52:14,15 54:23 56:24
**supervisors**
39:19
**support**
44:12 71:7,12
**supposed**
45:5,9
**suppressed**
89:22 90:6,9,10
**suppression**
89:24
**Supreme**
32:18 91:24 92:23
**sure**
9:16 15:12,14 16:4 19:22 22:7 25:10 31:7 36:18 39:13 40:3 45:1 51:23 55:4 57:10 70:15 77:19 81:8 83:11,14 85:2,23 90:17
**surgery**
26:18
**surprise**
14:10
**suspects**
89:21

**Suzanne**
76:23
**swinging**
38:1
**sworn**
5:8 100:8

**T**

**T**
2:4 100:2,2
**tables**
70:20
**take**
10:18 44:16 45:9 46:20 53:11 59:3 63:12,14 66:14 92:12
**taken**
1:11 6:13 8:12 24:8 63:21 71:20 100:13
**talk**
17:8,23 22:7,8 60:10 79:18
**talked**
17:9 27:19 78:11 87:12
**talking**
6:16 11:18 48:18 59:10 78:9,15 79:16 80:4,17
**TANNEIKA**
2:16
**task**
48:23
**teach**
80:2
**teasing**
79:10
**tell**
14:5 24:3,3 30:2 56:21 64:18 74:12
**Telling**
38:4
**temporary**
51:2,5
**ten**
42:19 43:7 46:18 52:13 55:18
**tens**
61:24
**tenure**
45:19
**terminated**
27:22
**terms**
12:17 13:1,17 14:4 20:5 42:11 53:2,16 57:16 70:6 96:7
**testified**
5:8 31:10,12 34:12 64:2 67:2 83:10 89:2 96:17
**testify**
30:6 51:17 81:20 82:13
**testifying**
51:18
**testimony**
13:9 36:24 64:4 68:11 89:10,13
**Texas**
28:21
**text**
71:7,12
**thank**
5:23 8:6,7 37:9 63:10 71:19 72:15 76:9 77:3 85:16 86:8,21 87:3,23 88:1,1,5,20 88:21 90:13,18,20 93:10 98:14,15 99:5 99:6,7,8,17,21
**thankfully**
46:23
**thin**
17:20
**thing**
13:8,11 24:4 25:6 27:4 30:14 33:5,24 36:15 37:2,16,18 38:4,7,14 39:7,15 56:4 73:19 79:2,9
**things**
7:7 49:9 68:7 98:21
**think**
9:9 14:16,17 15:3 20:21,24 24:1 35:4 36:6 40:20 41:6,8 43:10,11,13,13,14 52:23 55:17 57:22 68:6 72:7,7 77:11 77:12 78:22 83:1,2 91:23 93:3,20
**thinking**
18:20
**third**
20:19
**thirty**
11:3 26:22 44:10,11 46:2 47:12,16 52:4 52:13
**thirty-six**
6:7 10:17 11:7,17 21:18 35:12 38:2
**thought**
6:9 64:21 65:6
**thousand**
15:4 26:15
**thousands**
33:8 61:24,24
**three**
2:17 22:24 23:5,7 34:22 40:22,23 41:9 41:13,15,22 42:5,10 42:17 43:1,7 45:7 46:17 49:5 65:3 78:22
**three-hundredth**
45:5
**Throw**
37:23
**thrown**
38:4
**thumbnail**
17:20
**tickets**
26:19
**till**
76:7
**time**
5:6 6:19 7:17 8:11 11:10 19:14 21:9 25:3 28:22 33:18 40:19,24 41:7 43:3 43:18,19,21,22 44:4 44:5,18 45:9,12,14 45:23 46:14 48:10 48:16,22 50:5 51:8 51:10 52:3,18 53:7 57:17,17 58:13,14 58:17,18 67:5,22 74:12,17 78:23 87:24 94:11,12,13 94:24 100:8
**timeframe**
91:4
**times**
15:4 34:10 54:23 59:13 67:24 68:10 69:12,13,20 96:18
**timing**
54:6
**today**
7:5,12 36:11 73:6
**told**
27:7,13 54:22 68:18 91:14,15
**tom**
94:4,4 95:15,16
**Tony**
81:9
**top**
73:3 78:13 86:6
**total**
10:17
**tough**
47:6
**town**
26:18 77:16,16 78:8
**track**

20:14
**trained**
9:23 88:8
**training**
11:11,15,19 12:15,17 12:20 14:1 40:16 43:4,8,11,13,17,24 44:5 69:9
**transcript**
1:11 90:15 99:10,15 100:7
**transfer**
45:20 54:6 55:18
**transferred**
55:5 56:5 60:16
**transferring**
53:3
**transmitted**
92:8,11 94:6,12,24
**transpired**
57:17 58:15
**trial**
5:6 11:10,12,17,22 14:10 19:6,9,10 22:2,3,12,20 23:5 24:8 29:15 32:14,14 33:2 39:15 40:4,8 45:3,6 46:13 47:16 49:10 51:24 52:9 53:12 54:9,10 55:14 58:7 66:1 91:5,16 92:7,8 95:9
**trials**
11:24 12:4,5,7,7,8,8 39:24
**tried**
17:24 33:8 35:23 37:11,16 52:6 57:4 79:22 97:3
**true**
72:24 100:6
**trust**
57:15
**trusted**
23:19,20 61:20
**truthfully**
7:12
**try**
6:20 16:6 17:5 24:20 27:11,11 38:14 70:23 72:10
**trying**
8:18 38:6 79:21
**turn**
8:24 14:8,20 15:2 19:2,3,4,19 20:23 20:24 21:6,15 24:11 32:10 53:21 82:21 88:10 89:24
**turned**
15:2 20:24 22:6 25:2 30:11,11 34:13 36:22 78:21,22 84:12,14 85:2
**turning**
9:3 15:5 19:5 67:1
**TV**
78:22 82:18
**twenty**
44:11 69:2 79:20
**twenty-five**
69:2,3,12,12 96:18
**twice**
40:20 41:7 69:15
**two**
11:10,19 12:14 20:14 22:24 23:5,7 26:19 28:23 30:3,8 33:9 34:22 40:15 43:7 46:11,21 49:5 55:11 63:13 69:8,14 76:18 77:13
**two-minute**
63:12
**two-year**
12:9
**type**
68:24

**U**

**uh-huh's**
7:7
**ultimate**
38:9,10
**um**
5:17 6:3,16 7:1,1,14 7:16,16,19 8:16,22 8:24,24 9:1,5,5,13 9:22 10:5,6,7,17,24 11:4,4,5,7,12,13,16 11:20,22 12:3,3,4,8 12:13,13,13,16 13:4 13:19,20,22,24 14:3 14:9,11,14,17,17,22 15:17,18,19,20 16:5 16:8 17:10,13,14,14 17:16,17,20,20,21 17:23 18:4,7,17,22 18:23,23,24 19:5,6 19:7,7,7,8,9,11,14 19:15,21 20:18 21:4 21:5,20,20,24 22:1 22:2,2,4,5,5,5,8,10 22:11,11,11,12,13 23:5,12,17 24:2,9,9 24:10,16,17,18,18 24:20 25:14,15,17 26:2,5,17,17,19,21 27:3,4,10,11,11,11 27:13,15,16,16,21 27:22 28:2,3,7,12 28:17,18 29:3,5,8 29:13,16,16,17,17 29:22,22,23 30:1,4 30:6,8,9,10,12,13 30:17,19,19,21,22 30:22 31:5,6,15,15 31:19,20,21 32:1,2 32:13 33:15 34:21 34:22,24 35:10,19 35:19,20,23,24 36:5 36:5,5,9,9,15,15,20 36:20,21 37:17 38:1 38:1,4,6,6,12,12,16 38:17,23,24 39:1,13 39:13,18,20 40:17 40:18,20,21,22,24 41:2,3,14,17,19,20 41:20,24 42:1,12,23 42:23 43:4,15,16,22 44:6,12,13,14,14,20 45:3,5,6,6,6,7,8,8,8 45:8,11,15 46:2,9 46:15,16,22,24 47:4 47:7,14,21 48:1,3,9 48:13,18,22,23 49:4 49:4,5,7,7,9,9,10,12 49:17,21 50:11,18 50:19 51:12,12,16 51:16,18 52:1,1,3,6 52:7,15,17,19 53:11 54:7,8,13,13,14,15 54:19 55:5,7,14,16 55:16,22,22,23,24 56:8,8,9,21,22,23 57:4,7,12,14,16,19 57:20,22,23 58:22 59:12,18,20 60:6,11 60:16 61:8 62:13,17 63:2,14 64:2,6,14 64:15,16,19,22,22 65:1,1,7 66:7,8,8,12 66:13,13,14,16,21 66:22 67:1,2,5,12 67:15,22 68:6 69:24 70:9,10 72:1,23 73:13,15,16,19 74:16 76:1,1,2,10 77:1,23 80:17,18 81:19,21,23 82:2,2 83:5,12,22 84:3,3,5 84:5,6,9,9 85:1,13 85:18 86:24 87:1,4 87:10,12,15,17 88:12 89:3,5,8,9,11 90:24 91:1,3,9,9,9 91:14,19,20 92:18 92:20,20,21,22,22 92:23 93:2,4,12,19 93:19 94:2,2,15,16

94:22 95:19,20 96:3 96:10,18,24 97:19 97:19 98:8
**Um-hum**
81:17
**um-hum's**
7:7
**underlined**
8:22 9:4
**understand**
7:2,4 22:22 31:8,23 32:2 41:6 54:2 68:10
**understanding**
38:23 76:15 96:3,5
**understood**
49:13 68:6 90:13
**unfounded**
9:8
**unintentional**
73:22
**unit**
2:10 11:10,17,18,19 11:23 12:1,6,7,10 14:15 15:13 22:9,10 23:10 24:23 25:3 33:10 36:23 38:16 40:12,18 41:15 42:21 43:22,24 44:5 44:5,11,17,18 45:14 45:24 46:24 48:9,17 50:17 51:14 52:21 52:24 53:3 54:17,18 56:6,12 57:11,12 61:8 67:1,3,4,6,8 68:11,13 69:5,9,17 69:18,21 70:5,6,13 92:4,9 94:2,5,7,8 96:18,23 97:19 98:4 98:6,20,21
**Unit's**
67:16
**UNITED**
1:1
**units**
11:8
**universe**
16:15 18:10
**unlocked**
50:9,10 62:15,18 96:23
**untrue**
9:8
**update**
56:20 57:3,5
**updated**
60:7
**upheld**
93:4
**upset**
81:5
**upstairs**
43:11 55:9
**Urlick**
56:23
**use**
25:14 26:18 45:15 47:2 49:7
**uses**
77:11

**V**

**verdict**
22:5
**Verrichio**
76:23
**versus**
19:16
**vicious**
92:20
**Victim**
44:14
**victim's**
77:20
**victims'**
35:21
**Violence**
44:11
**virtually**
17:12 38:3
**voice**
6:18
**voluntarily**
12:13
**volunteer**
11:2,3
**vs**
1:6

**W**

**wad**
58:15
**wait**
6:21 26:24 27:1 54:13 58:16 59:7 73:20 82:3 88:7
**waiting**
57:1,2
**waived**
5:4
**waiver**
12:1,6,7,8
**walk**
24:23
**walked**
77:22,22
**wall**
70:11,12
**walls**
70:2
**Wanamaker**
42:16
**Wanamaker's**
42:15
**want**
14:18,19 25:14 32:23 53:24 64:12 68:5 71:13 75:13 79:18 88:23 89:5,7 91:2
**wanted**
26:10 27:9 37:23 38:12 62:9 73:24 84:13 85:22 90:2
**wants**
27:5
**warrant**
55:15
**warranted**
64:22
**wasn't**
6:6 18:14,15 19:12 19:13 23:17 25:24 27:21 30:11 33:21 34:7,8,12 36:7 55:7 58:21 60:24 84:13
**Watch**
77:16 78:8
**watched**
37:17
**watching**
79:5 82:18,18
**way**
15:18 18:23 21:5,6 23:4,22 45:2 54:24 70:5,6 84:16,21 87:17 88:11 97:18 97:23 98:2
**we'll**
6:10 28:7 63:19 75:15
**we're**
5:17,21 9:19,22 22:7 28:14 30:5 35:9 54:22 57:1,2 59:9 60:8,9 63:22 71:21 72:6 73:5 75:20 85:20
**we've**
6:15 72:19,21
**web**
72:8
**Webb**
41:3
**Wednesday**
1:14
**week**
26:4 28:3 46:13
**weeks**
27:23 32:4 52:4 77:13

**weight**
80:21
**went**
11:15 12:3 22:12 23:2,3 26:19,21 29:9 30:16 31:6 32:8 52:15 55:8,10 55:13 69:20 78:9 80:5 98:6 99:2
**weren't**
39:4 48:6 50:2 64:16 70:10 97:5,6
**West**
91:15 93:4
**white**
80:19,22 81:1
**wide**
55:19
**wife**
41:20
**win**
38:12
**wine**
81:2
**Winter**
8:13
**wished**
93:16
**withholding**
9:10
**witness**
4:3 8:5 18:22 19:1 31:13 34:14,20 37:10 40:7 59:15 60:21,23 61:2,11,19 63:7 64:14,24 65:2 66:24 71:10 74:20 74:23 75:3,6,9 82:7 82:10 86:9 88:7 89:14,17 93:10,12 97:13 99:22 100:8
**witness's**
76:11
**witnessed**
80:11 81:13
**witnesses**
17:17 18:5 35:24
**wonder**
81:20
**word**
15:16 25:15,16 47:2 49:8 51:1
**words**
25:6
**work**
10:22 39:15 41:21 49:24 53:20,22,23 58:8 59:6 63:15
**worked**
10:7 29:10 66:20
**working**
15:8 39:12 42:24 46:5,6,20,21 47:18 48:22,23 49:1 50:5 50:18 51:24 54:11 68:1
**works**
88:11
**worries**
73:23 87:4,4
**worry**
27:8 49:18
**wouldn't**
24:12 32:5,11 34:3 36:17 46:19 55:15 79:23 90:14 97:21 98:23 99:1,2
**wound**
40:22
**writing**
32:16 57:7
**written**
24:18 26:6 54:8
**wrong**
37:18
**wrote**
36:19
**Wynnewood**
74:24 76:17

**X**

**Y**

**yeah**
10:7 11:2 13:19 19:21 24:20 27:21 27:24 31:4 37:10,22 41:10,20 49:21 50:9 54:13 59:1,11 60:21 60:23 70:8 74:2,6 75:9 79:1,5,15 80:1 85:20
**year**
10:15 11:14 12:1,1,3 12:3,12 22:24 41:14 41:18 46:1,4 47:4,6 59:2 68:18 69:13 86:19 87:13 94:21 96:19
**years**
6:7 10:17 11:2,7,10 11:14,17,19 12:9,10 12:14 21:18 22:24 22:24 23:6 26:16,23 28:15 35:12 38:3 40:15 69:8,14 72:23 87:13,14 94:22
**yep**
25:23 28:9 43:2 44:1
**Yesterday**
80:5
**yo**
78:5,14

**Z**

**Zoom**
1:13 5:17 6:13,16,18 63:3,7 72:7,8

**0**

**1**

**1**
4:16 73:6,7,11
**10:01**
1:14
**104**
76:2
**11/14/96**
76:2
**12**
1:14
**12:15**
99:23
**13**
45:13
**1300**
41:11
**13th**
10:15 27:21 28:3 36:20 44:22
**1400**
2:5
**1421**
40:21 41:8,11,12,15
**14th**
2:11
**1500**
2:5
**1515**
2:11
**16**
45:1
**17**
27:24
**1717**
2:17
**19102**
2:6
**19102-1595**
2:11
**19103-2739**
2:18
**1980**
10:4,5,10
**1988**
12:11,12 40:13
**1997**
91:11,17,17 92:7 95:9

**2**

**2**
2:5
**2:22-CV-05061-GJP**
1:2
**20**
42:2 50:18
**2000**
41:18
**2001**
93:5
**2004**
8:13
**2005**
11:14 41:24 42:2 44:20 50:18 51:10 67:8 68:12 69:8
**2006**
11:14
**2008**
94:17,20 95:1
**2012**
59:18 61:14
**2014**
59:20 86:12,20
**2015**
47:8
**2016**
10:16 12:12 27:24 28:1 40:13 44:20 45:4
**2017**
28:2 36:16,20 44:22 44:22 45:13 50:18 51:10 67:9 68:12 69:8 87:15 95:9
**2018**
28:5
**2021**
36:15,19
**2025**
1:14 87:13
**2027**
100:21
**215**
2:12,18
**22**
100:21
**22-CV-3437-JS**
89:4
**25th**
93:5
**267**
2:6

**3**

**3**
41:8
**3500**
2:17
**3536**
73:2
**3540**
73:2

**4**

**4**
4:5

**5**

**546-9066**
2:6

**6**

**64th**
80:12,14,16
**683-5434**
2:12

**7**

**7:00**
49:24
**72**
4:16

**8**

**80**
12:10
**86**
12:10
**87**
12:10
**89**
4:8
**8th**
10:10

**9**

**9**
86:12
**9:00**
49:23
**90's**
41:17 91:10
**925**
74:24
**929**
76:16
**95**
4:5 41:20
**963-3300**
2:18
**97**
4:8 41:21

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION
NO.: 2:22-CV-05061-GJP

| | | |
|---|---|---|
| RICARDO NATIVIDAD | ) | DEPOSITION UPON |
| | ) | |
| Plaintiff | ) | ORAL EXAMINATION |
| | ) | |
| - vs - | ) | OF |
| | ) | |
| DETECTIVE PAUL RALEY, | ) | ARTHUR MEE |
| ET AL., | ) | |
| | ) | |
| Defendants | ) | |

- - - - - - - - - - - - - -

TRANSCRIPT OF DEPOSITION, taken by and before HEATHER K. HINES, Professional Reporter and Notary Public, via Zoom Conference, on Wednesday, March 5, 2025, commencing at 10:08 a.m.

A P P E A R A N C E S:

O'HANLON SCHWARTZ, P.C.
BY: STEPHEN T. O'HANLON, ESQUIRE
2 Penn Center Plaza, Suite 1400
1500 JFK Boulevard
Philadelphia, PA 19102
Phone No. (267) 546-9066
Counsel for the Plaintiff

CITY OF PHILADELPHIA LAW DEPARTMENT
CIVIL RIGHTS UNIT
BY: BEN JACKAL, ESQUIRE
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
Phone No. (215) 683-5434
Counsel for the Defendants

ARCHER & GREINER, P.C.
BY: SHELLEY R. SMITH, ESQUIRE
BY: TANNEIKA MINOTT, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-2739
Phone No. (215) 963-3300
Counsel for the Defendants

INDEX


| WITNESS: | | PAGE |
|---|---|---|
| ARTHUR MEE | | |
| | BY: MR. O'HANLON | 4 |
| | BY: MS. SMITH | |
| | BY: MR. JACKAL | |


EXHIBITS


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| P-1 MEE | Investigation Interview Record | 11 |
| P-2 MEE | Investigation Interview Record | 20 |

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing sealing, certification, and filing are waived and that all objections, except as to the form of the questions, are reserved until the time of trial.)

ARTHUR MEE, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. O'HANLON:

Q Mr. Mee, good morning. My name is Stephen O'Hanlon. I'm an Attorney. I represent a plaintiff by the name of Ricardo Natividad, who has sued both yourself and a few other individuals as well as the City of Philadelphia.

Have you ever had your deposition taken before?

A Not that I can recall, no.

Q Okay. Have you ever been sued before?

A Years ago, yes, but l don't -- really had to do anything.

Q Okay. Do you remember what kind of case that was?

A That was a robbery case, an armed robbery.

Q Okay. Have you retired from the Philadelphia Police Department?

A Have I? Yeah, I've been retired since 2001.

Q Okay. Let me give you, um, some instructions for the deposition and hopefully they will make sense.

First of all, this will be a relatively short deposition. I would estimate two hours at the very maximum. However, if you want to take a break at any time, you can. Is that okay?

A Certainly.

Q Okay. If there's any question that you do not understand in all likelihood it will be because it will be too long, um, you can just ask me to break it down and I will do that to make it, um, easier to understand. Okay?

A Yep.

Q There is a Court Reporter here, and she has -- she's taking down everything that we say. So, I would just ask as best as possible that, um, you have verbal responses. So, shakes and nods of the head and shrugs and so forth cannot be taken down. Does that make sense?

A Yes, it does.

Q Okay. There's quite a few people on here. Um, and this is a Zoom deposition, obviously. Um, what happens when one person speaks over another person on Zoom is that the second speaker cuts out the first speaker -- right -- and you've experienced that.

A Okay.

Q Okay. So, in order for there to be a clear record, even if you can anticipate where my question is going, I would ask as best you can that you just wait until I finish before you answer.

And, likewise, even if I can anticipate where your answer is going, I will try and wait until you're fully finished so that there's a clear record. Okay?

A Yes, sir.

Q Okay. Is there any reason why you cannot testify truthfully today?

A No.

Q Okay. All right. Good morning, um -- should I call you Detective Mee, or Mr. Mee, or --

A Art is fine with me.

Q Oh. Let's -- let's go with something a little bit more formal. So, I'll try to call you Mr. Mee, or Detective Mee.

Um, how long did you work for the Philadelphia Police Department, Mr. Mee?

A Um, thirty-two and a half years.

Q And how long were you in the Homicide Division?

A Ten.

Q And before that, were you a Detective in some other division?

A Yes.
Q What -- where was that?
A Northwest Detectives.
Q Okay. So, where did that cover, the Germantown area?
A That was, um -- yeah. Parts of North Philadelphia, Germantown, Olney, Chestnut Hill, West Oak Lane.
Q Okay. And how did you become a Homicide Detective? Did you have to take a test?
A No. Well, the test -- a test for Detective.
Q Yes.
A But you just get transferred.
Q Okay. While you were a Philadelphia Police Officer, were you ever -- did you ever have any Internal Affairs investigations?
A I'm sure I did, yes.
Q Okay. Do you know how many approximately?
A No.
Q Okay. Do you remember the outcomes of those Internal Affairs investigations?
A There was no outcome. Nothing happened.
Q So, none of them were sustained, is that correct?
A Correct.

Q Okay. Um, when you were in the Homicide Division, did you ever have any Internal Affairs investigations?
A No.
Q When -- when did they occur if you remember?
A Both as a -- as a uniformed Officer as a Detective in Northwest.
Q Okay. Did they ever involve any -- anything to do with manipulating of statements from witnesses?
A No.
Q What did they involve if you remember?
A Um, the only thing I -- I don't really remember all of that stuff. Um -- or I try not to remember. I -- I just don't recall what they were. It was a lifetime ago.
Q I understand. All right. Um, do you remember this case that we're here for today, the underlined criminal case involving an individual by the name of Ricardo Natividad?
A No, I don't.
Q Do you remember -- well, let me see if I can give you anything that would, um, jog your memory.
Do you remember a report by an individual on November 9th of 1996 where an individual by the name of Michael Havens allegedly had -- was robbed at gun point in a black Lincoln vehicle?

A No.
Q Do you remember -- well, let me ask you this. Did you review any documents for your testimony here today?
A No.
Q Okay. Did you speak with anyone besides Mr. Jackal, or --
A No.
Q -- any other attorneys at City of Philadelphia?
A No.
Q Okay. In 1996, do you remember if you worked with a particular, um, group of detectives within the Homicide Unit?
A In '96, I was in Two Squad. So, yeah, you have -- you have -- there was probably fourteen of us, fifteen of us.
Q And in Two Squad, do you remember if you worked with a Detective Paul Raley? That's, R-A-L-E-Y.
A Yes.
Q How long did you work with Detective Paul Raley in Homicide for?
A Um -- hmm. Maybe eight, or nine years. Most of the time I was there, he was there.
Q And did you work in the same squad?
A Yeah. Different group, but the same squad.

Q Okay. How about Detective James Dougherty?
A It will be the same.
Q So, you worked with him for approximately eight to nine years in the same squad, is that correct?
A Again, same squad. Different group.
Q Okay. Do you remember testifying in a -- in a death penalty case involving the plaintiff in this case before Judge Savitt? That's, S-A-V-I-T-T.
A No, I don't.
Q Okay. Do you ever remember testifying in any PCRA Hearings in Mr. Natividad's case?
A No.
Q Okay. Do you remember -- going back to the date of November 9th of 1996, I talked to you about the robbery of a vehicle around about 2:00 a.m.
Later the same day, there was an individual by the name of Robert Campbell shot to death at an Exxon Gas Station in the area of 63rd and Vine. Do you remember that incident?
A No, sir.
Q Do you remember interviewing any of the witnesses involved in this case?
A No.
Q Okay. I'm going to share my screen and see if

this refreshes your recollection in anyway. Just one second. And let me know if you can see this.

MR. O'HANLON: And I'll mark this as P-1 Mee. Let me see if I can --

THE COURT REPORTER: P-1 Mee.

MR. O'HANLON: And I'll send it over to you later. Just one second.

(Whereupon the court reporter marked Exhibit P-1 Mee for identification.)

BY MR. O'HANLON:

Q Mr. Mee, can you see the document that I'm sharing right now?

A I see that it says P-1 Mee. I don't --

Q Okay.

A -- see anything else.

Q Okay. So, I'm going to --

A It's coming in down here below, okay.

Q Okay. I'm going to scroll through it. Um, do you see at the top of page one where it says Mee Number 981, is that you? Is that your badge number?

A That was my badge number.

Q Okay. Do you remember interviewing a woman by the name of Cynthia Smith --

A Not at all.

Q -- on November 14th of 1996?

A No.

Q Would you have any reason to doubt that this interview took place?

A Oh, no. That's my handwriting.

Q Okay. And this is Detective Dougherty that we talked about, um, that brought in this witness?

A Yes.

Q Okay. And it's the shooting death of Robert Campbell. Do you see that?

A Yes.

Q Okay. Okay. And you see on the first page there's an individual by the name of Michael -- and you can read out your writing better than me -- Capiolo?

A Um, I guess. I don't -- I don't know. I can't even read my own writing.

Q Okay.

A Sorry.

Q That's okay. Do you know why in 1996 you were still taking, um, written -- handwritten statements?

A Why?

Q Yes.

A That's what we did.

Q Okay. Why didn't you take typed statements in

1996?

A Oh, I -- we -- we did typed statements as well. But if there's -- there's only so many typewriters.

Q I see. So, the only reason that you would have taken -- well, first of all, let me ask you this.

If there was a typewriter available, would you have used the typewriter instead of a handwritten statement?

A Yes.

Q Okay. Do you remember an individual by the name of Rolston -- that's, R-O-L-S-T-O-N -- Ricardo Robinson, also known as Rob that was associated with this case?

A No.

Q Okay. And I'm just going down to, um, page two of the statement.

Do you see, um, on page two where you ask Ms. Smith who is Rob --

A Yes.

Q -- and she gives you a response to that? Yes?

A Yes.

MR. JACKAL: Stephen, I hate to interrupt.

Could you give the Detective the opportunity to read the whole document if you're going to ask him questions about specific parts of

it, specific questions if he wants to?
BY MR. O'HANLON:
Q Do you want to read the whole document, Detective?
A No, I don't think so.
Q Okay. Um, do you see on the next, um -- um -- well, the last question on this second page. It says when did you first hear about the victim death. Did I read that correctly?
A Yes.
Q And Ms. Smith gives the answer the night it happened I was at home and Rob walked in. He walked right in and changed the channel and sat down in front of it so that no one else could see. He was blocking the set.
I asked him what he was doing and he said like, yo, this is important. Didn't you hear about the guy getting shot down at the gas station. You know the guy, the fucking snitch, that town watch guy, Bobby Campbell. He kept on talking about it. Did I read that correctly?
A I believe you did, yes.
Q Do you remember -- does that help reflect your recollection as to whether you took this statement from Cynthia Smith?
A Oh, I'm sure I took it, but I don't remember any of it.

Q Okay. Going onto the next page, it says who else was present when you heard this. And it says it was me, Kenny, and Michael I believe.
Do you know who those individuals are, Kenny and Michael?
A No idea.
Q Okay. And you see on the following page at the top, um, which is page four of P-1, um -- what does this say? Can you please read these -- these first few words if possible?
A So, finally I said are you the one their -- no -- that their -- that their looking for. Are you the one that shot him.
Q And he said, yeah, I did it correct?
A Correct.
Q And then further on down the page you ask did Rob say anything else about the decedent. And her answer was, yeah, he said this is what happens to snitches, that he had to teach somebody a lesson. Do you see that?
A Yes.
Q Did I read that correctly?
A You did.
Q And do you have any reason to doubt that that's what Ms. Smith told you about this case?

A No.
Q Okay. I'm going to stop sharing for a minute. Mr. Mee, let me ask you some -- some general questions.
Um, when there's an admission relayed to you about a doer in a homicide, do you pass that information to the District Attorney's Office?
A At some point, we would, yeah.
Q Okay. Do you know if this statement was ever passed to the District Attorney's Office?
A I'm -- I'm sure it was.
Q Okay. Who -- who brings, um, documents associated with a homicide investigation from the Philadelphia Police Department to the Philadelphia District Attorney's Office?
A The -- the assigned Detective.
Q And in this case, do you remember who that was?
A No.
Q Okay. Let me see something very quickly. And which documents do -- does the assigned Detective -- when you were working at homicide, which documents would the assigned Detective bring to the District Attorney's Office?
A All of them.
Q Do you know why in this case there was a discrep -- there is a difference between the Philadelphia Police Department's homicide file and what was in the District

Attorney's Discovery?

MR. JACKAL: Objection to the form of the question.

MS. SMITH: Same objection.

BY MR. O'HANLON:

Q Okay. Mr. Mee, if -- if possible, um, and if you know, you can answer.

MR. JACKAL: You can answer the question.

THE WITNESS: About the -- the forms?

BY MR. O'HANLON:

Q The question was do you know why the Discovery that was in the possession of the Philadelphia District Attorney's Office is not exactly the same as the Philadelphia Police Department's homicide file documents?

A I have no --

MR. JACKAL: Objection --

THE WITNESS: -- idea.

MR. JACKAL: -- to the form of the question. You can answer.

THE WITNESS: I have no idea.

MR. O'HANLON: Okay.

MS. SMITH: I have the same objection.

BY MR. O'HANLON:

Q In this case, there was a cooperating witness by the name of Byron Price. Do you remember that individual?
A No, sir.
Q Okay. If there's a cooperating witness, do you know in general why, um, Homicide Detectives would have to take multiple statements from the same witness?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: The only -- the -- something -- somebody may have -- another witness may have said something that the original witness didn't say, so you go back and say do you know about this.
BY MR. O'HANLON:
Q Do you ever remember in this case, um, a 357 Revolver being handed into an attorney's office, an Attorney by the name of Frank Spina, and then him calling Homicide Detectives?
A No.
Q Okay. Do you ever remember an -- the cooperating witness by the name of Byron Price saying that the plaintiff in this case carried a 38 Special Revolver?
A No.
Q Okay. Do you remember a case from 1997 where

there was a defendant by the name of -- a criminal defendant by the name of Rober Hall, and he was arrested and charged for the murder of a decedent by the name of Edward Williams? Do you remember that case?

A No, sir.

Q Do you ever remember an alleged witness by the name of Elwood -- that's, E-L-W-O-O-D -- Quillen -- that's, Q-U-I-L-L-E-N -- being involved in that case?

A No, sir.

Q Let me see if you remember the following allegation.

Do you ever remember that Mr. Quillen admitted that he had murdered, um, Edward Williams and it was not Robert Hall?

A No, sir.

Q Do you ever remember, um, an allegation by Elwood Quillen saying that you, um, essentially forced him to recant his statement and handed him a statement that was preprepared by yourself?

A No, sir.

Q Do you ever remember threatening this individual, Elwood Quillen?

A No, sir.

MR. JACKAL: Objection to form. You can

answer the question.

BY MR. O'HANLON:

Q Do you ever remember anyone -- any supervisors at the Philadelphia Homicide Unit questioning you about this incident?

A No.

Q Okay. Let me show you something that I will mark as P-2 Mee. Just give me one second.

(Whereupon the court reporter marked Exhibit P-2 Mee for identification.)

BY MR. O'HANLON:

Q Can you see that document, Mr. Mee?

A I to.

Q And, again, is that your name and badge number and handwriting on this document?

A Yes.

Q And this is marked at the top as C29. It was used as a Commonwealth Exhibit in PCRA proceedings that I'll represent to you.

Do you remember, um, taking this statement? And it looks like 12/28/1996.

A No, sir, I don't.

Q Okay. Just one second. I want to just scroll down to page five of this statement. And, again, you can

look at the whole statement if you want. These markings are not mine. They're the Assistant District Attorney's I believe because they were entered as DA -- as Commonwealth Exhibits.

Um, do you see at the top of page five -- where we are right now?

A Yes, I see it.

Q And I will go to the, um -- it says, um -- and I'll go to the previous page.

It says what can you tell me about a gun that Keith Smith purchased. And it says that was about maybe a week, or two before Thanksgiving. I was -- what does that say -- waxing my car. Keith was with me. I heard a whistle, and then a, yo, Keith. I saw Rick. He was across the street in front of the church. I didn't know what it was about. I kept on washing my car, and Keith went --

A Went across, yeah.

Q -- across to see Ricky. He was there with him for a few minutes, then he came back. He asked my opinion. He said Rick had a 357 that he wanted to sell. He wanted to know what I thought.

Since -- so, we talked about it a little. I told him that you always take a chance with something like that. Then, he decided to buy it. He went back around the corner

to see Rick and pay him. I -- what does that say?
A Guess.
Q I guess. Okay. Then, he came back. He showed me the gun. It was a chrome 357 with black grips. It looked nice. Then, he took it home. That was the only time I even saw the gun. Do you remember taking that statement?
A No, sir.
Q Do you know in general how you would have brought in an, um, individual -- like how -- how -- well, let me -- strike that. Let me just, um, see if I can, um, have -- have a different question given that you don't remember.
Let's go to the final page of this, um -- of this document. And it says have you ever seen Rick driving a dark blue Lincoln. And it says I've seen him drive a lot of different cars. I saw him a Lincoln LSE. It was the only time I even saw him in a Lincoln. It was a two-door, real dark. I thought it was black. Do you remember taking that part of the statement?
A No, sir.
Q Okay. Is there anything else that you remember, um, about this -- about this case involving the plaintiff, Ricardo Natividad?
MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: No, sir.

BY MR. O'HANLON:

Q Okay. I want to ask you some general questions about things that were going on in the Philadelphia Police Department around about the time of this investigation.

Do you remember in the early 1980's and early -- I'm sorry -- during the 1980's and the 19 -- early 1990's several cases were -- there were, um, Federal Orders entered enjoining, or stopping the Philadelphia Police Department from engaging in unconstitutional practices?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: No.

BY MR. O'HANLON:

Q Do you ever remember receiving a training on a Consent Decree arising out of a thing called Operation Cold Turkey?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: No.

BY MR. O'HANLON:

Q Do you ever remember, um, something enjoining -- stopping the Philadelphia Police Department from engaging in sweeps of Latinos in the Spring Garden area, um, relating to

a homicide investigation in 1985?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: No.

BY MR. O'HANLON:

Q Do you ever remember a Consent Decree from 1985 -- sorry 1988 enjoining the Philadelphia Police Department from engaging in stops and searches of African American males during the investigation of the Center City Stalker?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: No.

BY MR. O'HANLON:

Q Okay. You don't remember those incidents?

A I do not.

MR. JACKAL: Objection.

BY MR. O'HANLON:

Q Do you remember any training, or new policies that the Philadelphia Police Department implemented stemming from those Consent Decrees?

MR. JACKAL: Objection. You can answer.

THE WITNESS: No.

BY MR. O'HANLON:

Q Okay. Do you remember the, um -- in the late

1980's and early 1990's, um, a narcotic squad operating out of the 39th Police District engaging in alleged unconstitutional practices including fabrication of evidence?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: I vaguely remember that, yeah.

BY MR. O'HANLON:

Q Okay. What do you remember about that, Mr. Mee?

A I think it was the -- the Five Squad guys. And I think they -- they were -- they were all fired I believe.

Q Okay. And was there any broader training, or, um, policies that were implemented as -- by the Philadelphia Police Department stemming from that -- that -- that Five Squad?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Not to my knowledge.

BY MR. O'HANLON:

Q Do you ever remember receiving specific training stemming --

MR. JACKAL: Objection -- I'm sorry. I didn't mean to interrupt.

BY MR. O'HANLON:
Q Do you remember receiving specific training stemming from those incidents?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: No, sir.
BY MR. O'HANLON:
Q Okay. Just one second. I'm just reading something.
Do you ever remember receiving specific training about, um, taking statements of witnesses in homicide investigations?
A Training?
Q Yes.
A Not really.
Q Do you ever remember any, um, kind of discipline being implemented against any of the other Homicide Detectives when you worked in Homicide?
A No.
MR. JACKAL: Objection to the form of the question. You can answer.
BY MR. O'HANLON:
Q Did you ever report any other Homicide Detectives for engaging in misconduct?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: No.

BY MR. O'HANLON:

Q Were there any specific, um, policies, or procedures for reporting other Homicide Detectives when they engaged in what you perceived to be misconduct?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Could -- could you say that again?

MR. O'HANLON: Yes.

THE WITNESS: Could you repeat that, please?

BY MR. O'HANLON:

Q Were there any specific policies, or procedures, um, in place for reporting misconduct of other Homicide Detectives when you worked in the Homicide Unit of the Philadelphia Police Department?

A Not --

MR. JACKAL: Same objection. You can answer.

THE WITNESS: Not to my knowledge.

BY MR. O'HANLON:

Q Just one second. I'm just reading through some notes, Mr. Mee.
Do you ever remember an individual in this case by the name of John McCullough -- that's, M-C-C-U-L-L-O-U-G-H -- who reported to police that the plaintiff was not involved in the underlined homicide?
A No, sir.
Q Do you ever remember interviewing this individual with the nickname of Rob, also known as Rolston Ricardo Robinson?
A No, sir.
Q Do you ever remember besides Cynthia Smith's statement that we went through another individual by the name of Joseph Rutherford who said that Rob admitted to the murder of the decedent in the underlined case, Robert Campbell?
A No.
Q Do you ever remember a Police Officer by the name of, um -- Police Officer Wilson who reported that Rob admitted to the murder?
A No, sir.
Q Okay. Did you -- do you ever remember going to the -- to the murder scene?
A No, sir.

Q Okay. Do you ever remember a witness by the name of Beth Johnson who said that a four-door Lincoln left the murder scene and not a two-door Lincoln?
A No, sir.
Q When Detectives are accused of engaging in misconduct in -- in PCRA proceedings, is there any policy, or procedure in place to limit the -- the same detectives involvement in investigating witnesses that are involved in the collateral, or PCRA proceedings?
MR. JACKAL: Objection to the form of the question. It's vague and confusing. You can answer.
THE WITNESS: I don't -- with PCRA hearings, we didn't -- we didn't get involved in them at all, but generally speaking.
BY MR. O'HANLON:
Q Okay. Would you go and, um -- and interview potential witnesses that were involved in PCRA hearings?
A I -- I don't --
MR. JACKAL: Objection.
THE WITNESS: -- believe I --
MR. JACKAL: Just for the record, objection to the form of the question. You can answer.

THE WITNESS: I don't believe I ever did that.

BY MR. O'HANLON:

Q Okay. Let me just see if I can -- this is not what I wanted. Give me one second, Detective. I just want to check something very quickly.

Could you just give me -- could we just take a five-minute break, and then I think I'm almost done. Is that okay?

A That's fine.

Q All right. Thank you. I'll be right back.

(Whereupon a short break was taken.)

THE COURT REPORTER: We're back on the record.

BY MR. O'HANLON:

Q Okay. Mr. Mee, you said that for most of your time at Homicide you worked in Two Squad. And for most of the time there, you also worked with Detective Dougherty and Detective Raley, is that correct?

A Yes.

Q Okay. And all homicide investigations involve, um, a team of Detectives, correct?

A Correct.

MR. JACKAL: Objection to the form of

the question. You can answer.

THE WITNESS: Yes.

BY MR. O'HANLON:

Q Okay. And do all hom -- do -- when you're working on that team on an investigation, are you as a team responsible for documents that are produced -- that are transferred to the District Attorney's Office?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Normally, it would be the assigned Detective who does that.

BY MR. O'HANLON:

Q Okay. And who decides in general, um, which Detectives in the team take which statements?

A Who -- whoever is available.

Q Okay. And the statement that we went through, um -- that would be P-1 -- it just has your name as the only interviewer and it doesn't have anyone else present. Um, and that's the same for P-2, which I showed you.

Um, was there ever a time where the policy within the Philadelphia Police Department changed to have two Detectives present for the taking of statements?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Um, I don't think there was a set policy. Um, when there's only one, normally it just means we're busy.

BY MR. O'HANLON:

Q I see. And do you know why -- going back to -- all the way back to 1996, which I guess is like twenty-nine years ago, right? Do you know why statements weren't videoed at that time?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: We didn't -- we didn't do that.

BY MR. O'HANLON:

Q Why not?

A I have no idea. I'm just a -- I'm an Indian. I'm not the Chief.

Q Okay. Do you remember when -- were you still there with the Homicide Unit when they started having that technology available to start taking videos?

A No, I was gone.

Q Okay. Do you know if the FOP ever objected to taking of videoed statements?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: I have no idea.
BY MR. O'HANLON:
Q Do you know if the taking of videoed statements was delayed because of, um, labor negotiations between the FOP and the City of Philadelphia?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: I don't know that.
BY MR. O'HANLON:
Q I believe that that's all the questions that I have right now for you, Mr. Mee. Thank you so much for your time. And if -- if I don't speak to you again, enjoy the rest of your retirement.
A Thank you, sir.
MR. JACKAL: I don't have any questions for you, Detective. I don't know whether Ms. Smith, or one of her colleagues does.
MS. SMITH: I do not have any questions for you, Detective Mee. Thank you so much.
THE WITNESS: You're welcome.
MR. JACKAL: Thank you, Detective.
THE WITNESS: You're welcome.
MR. O'HANLON: All right. So, the next one is at 1:00, is that correct?

MR. JACKAL: Yes.
MR. O'HANLON: All right. Bye-bye.
MS. SMITH: All right. See you then.
MR. JACKAL: Thanks, everyone. Take care.
THE WITNESS: Okay. I'm out of here then.
THE COURT REPORTER: Mr. Jackal, would you like a copy of the deposition transcript?
MR. JACKAL: Yes, I would.
THE COURT REPORTER: Okay. And --
MR. JACKAL: Electronic only is fine and regular timeline.
THE COURT REPORTER: Okay.
MR. JACKAL: Thank you.
THE COURT REPORTER: You're welcome. And, Ms. Smith, would you like a copy of the deposition transcript?
MS. SMITH: Yes, we'd like a copy as well.
THE COURT REPORTER: Okay.
MS. SMITH: Um, the same format, electronic and regular time.
THE COURT REPORTER: Okay. Thank you.

(Whereupon the witness was excused and the deposition was concluded at 10:54 a.m.)

C E R T I F I C A T I O N

I, Heather K. Hines, Notary Public and Court Reporter, certify that the foregoing is a true and accurate transcript of the foregoing deposition, that the witness was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Heather K. Hines ______________________

Heather K. Hines
Court Reporter
and Notary Public.
My commission expires
August 22, 2027.



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**about** 11:1,14,15 13:7 14:24 15:7,15,18 16:17,24 17:4 18:10 19:13 21:4 22:10,11 22:16,22 23:21,21 24:4,5 26:10 27:11
**accurate** 37:7
**accused** 30:5
**across** 22:14,17,18
**action** 1:2 37:12,15
**admission** 17:4
**admitted** 20:12 29:14,20
**Affairs** 8:16,21 9:2
**African** 25:8
**after** 5:7
**again** 11:5 21:14,24 28:11 34:12
**against** 27:17
**ago** 5:18 9:13 33:7
**agreed** 5:1
**AL** 1:8
**all** 5:4 6:3,9 7:12 9:12 9:14 12:24 14:5 17:21 26:12 30:15 31:11,21 32:4 33:6 34:10,23 35:2,3
**allegation** 20:11,16
**alleged** 20:6 26:2
**allegedly** 9:23
**almost** 31:8
**also** 14:11 29:9 31:18
**always** 22:23
**am** 37:10,13,14
**American** 25:8
**an** 5:12,21 9:16,21,22 11:16,17 13:13 14:9 17:4 19:16,16,20 20:6,16 23:9 29:3 32:5 33:15
**another** 6:21 19:10 29:13
**answer** 7:4,6 15:10 16:17 18:7,8,20 19:8 21:1 23:24 24:12,19 25:3 25:11,21 26:6,18 27:5,21 28:2,9,22 30:12,24 32:1,9,24 33:10,24 34:7
**anticipate** 7:2,5
**any** 6:5,8 7:9 8:15 9:2,7 10:3,8 11:10,21 13:3 15:23 16:23 21:3 25:18 26:13 27:16,17,23 28:5,16 30:6 34:15,18 37:11 37:13
**anyone** 10:5 21:3 32:18
**anything** 5:19 9:7,20 12:15 16:17 23:20
**anyway** 12:1
**approximately** 8:18 11:3
**Arch** 2:10,16
**ARCHER** 2:14
**are** 5:4,5 16:4,11,12 22:1 22:6 30:5,8 32:5,6,6
**area** 8:5 11:18 24:24
**arising** 24:16
**armed** 5:21
**around** 11:15 22:24 24:5
**arrested** 20:2
**Art** 7:14
**ARTHUR** 1:7 4:4 5:7
**as** 5:5,8,14,14 6:15,15 7:3 9:5,5,5 12:3 14:2,11 15:21 18:14 21:8,17,18 22:3,3 26:14 29:9 32:5,17 35:19
**ask** 6:10,15 7:3 10:2 14:5 14:15,24 16:16 17:3 24:3
**asked** 15:14 22:19
**assigned** 17:14,18,20 32:11
**Assistant** 22:2
**associated** 14:11 17:11
**at** 1:14 6:4,5 9:23 10:8 11:17 12:19,24 15:11,16 16:7 17:7 17:19 21:3,17 22:1 22:5 30:15 31:17 33:8 34:24 36:2 37:8
**attorney** 5:12 19:16 37:11,14
**attorneys** 10:8
**attorney's** 17:6,9,13,20 18:1,14 19:16 22:2 32:7
**August** 37:21
**available** 14:6 32:15 33:19
**a.m** 1:14 11:15 36:2

**B**

**back** 11:13 19:12 22:19,24 23:3 31:11,13 33:5 33:6
**badge** 12:20,21 21:14
**be** 6:3,9,9,17 7:1 11:2 28:7 31:11 32:10,17
**because** 6:9 22:3 34:4
**become** 8:9
**been** 5:7,17,24
**before** 1:12 5:15,17 7:4,23 11:8 22:12 37:9
**being** 19:16 20:8 27:17
**believe** 15:19 16:3 22:3 26:12 30:21 31:1 34:10
**below** 12:17

**BEN**
2:10
**besides**
10:5 29:12
**best**
6:15 7:3
**Beth**
30:2
**better**
13:14
**between**
5:2 17:23 34:4
**bit**
7:15
**black**
9:24 23:4,17
**blocking**
15:13
**blue**
23:14
**Bobby**
15:17
**both**
5:13 9:5
**Boulevard**
2:5
**break**
6:5,10 31:8,12
**bring**
17:20
**brings**
17:11
**broader**
26:13
**brought**
13:7 23:8
**busy**
33:3
**but**
5:18 8:13 10:24 14:3 15:23 30:15
**buy**
22:24
**by**
1:11 2:4,10,15,15 4:5 4:6,7 5:1,10,12 9:16 9:21,22 11:16 12:10 12:22 13:13 14:9 15:2 18:5,11,24 19:1,14,17,21 20:1 20:2,3,6,16,19 21:2 21:11 24:2,14,21 25:5,13,17,23 26:9 26:14,20 27:1,7,22 28:4,15,24 29:3,13 29:18 30:1,16 31:3 31:15 32:3,12 33:4 33:13 34:2,9 37:8 37:11
**Bye-bye**
35:2
**Byron**
19:2,21

**C**

**C**
2:1 37:2,2
**call**
7:13,16
**called**
24:16
**calling**
19:17
**came**
22:19 23:3
**Campbell**
11:17 13:10 15:17 29:16
**can**
5:16 6:5,10 7:2,3,5 9:19 12:2,4,11 13:13 16:9 18:7,8 18:20 19:8 20:24 21:12,24 22:10 23:10,24 24:12,19 25:3,11,21 26:6,18 27:5,21 28:2,9,21 30:11,23 31:4 32:1 32:9,24 33:10,24 34:7
**cannot**
6:17 7:9
**can't**
13:15
**Capiolo**
13:14
**car**
22:13,16
**care**
35:5
**carried**
19:22
**cars**
23:15
**case**
5:20,21 9:15,16 11:7 11:7,11,22 14:11 16:24 17:15,22 19:1 19:15,22,24 20:4,8 23:21 29:3,15 37:14
**cases**
24:8
**Center**
2:4 25:9
**Certainly**
6:7
**certification**
5:3
**certify**
37:6,10
**chance**
22:23
**changed**
15:12 32:21
**channel**
15:12
**charged**
20:2
**check**
31:6
**Chestnut**
8:7
**Chief**
33:16
**chrome**
23:4
**church**
22:15
**City**
2:9 5:14 10:8 25:9 34:5
**CIVIL**
1:2 2:9
**clear**
7:1,7
**Cold**
24:16
**collateral**
30:9
**colleagues**
34:17
**coming**
12:17
**commencing**
1:14
**commission**
37:21
**Commonwealth**
21:18 22:3
**concluded**
36:2
**Conference**
1:13
**confusing**
30:11
**Consent**
24:16 25:6,20
**cooperating**
19:1,4,20
**copy**
35:9,17,19
**corner**
22:24
**correct**
8:23,24 11:4 16:14 16:15 31:19,22,23 34:24
**correctly**
15:8,18 16:21
**could**
14:22 15:13 28:10,10 28:13 31:7,7
**counsel**
2:6,12,18 5:2 37:11

37:14
**court**
1:1 6:13 12:5,8 21:9 31:13 35:8,11,14,16 35:21,24 37:6,20
**cover**
8:4
**criminal**
9:15 20:1
**cuts**
6:22
**Cynthia**
12:23 15:22 29:12
**C29**
21:17

**D**

**DA**
22:3
**dark**
23:14,17
**date**
11:13 37:9
**day**
11:16
**death**
11:7,17 13:9 15:7
**decedent**
16:17 20:3 29:15
**decided**
22:24
**decides**
32:13
**Decree**
24:16 25:6
**Decrees**
25:20
**defendant**
20:1,1
**Defendants**
1:9 2:12,18
**delayed**
34:4
**Department**
2:9 5:23 7:19 17:13 24:5,9,23 25:7,19 26:15 28:19 32:21
**Department's**
17:24 18:15
**deposition**
1:4,11 5:15 6:2,4,20 35:9,18 36:2 37:7 37:12
**DESCRIPTION**
4:12
**Detective**
1:7 7:13,16,23 8:10 8:11 9:5 10:17,19 11:1 13:6 14:22 15:3 17:14,18,20 31:5,18,19 32:11 34:16,19,21
**detectives**
8:3 10:11 19:5,18 27:18,23 28:6,18 30:5,7 31:22 32:14 32:22
**did**
7:18 8:4,9,10,15,17 9:2,4,7,10 10:2,5,19 10:23 13:23 14:2 15:7,7,18,19 16:14 16:16,21,22 27:23 29:22 31:1
**didn't**
13:24 15:15 19:12 22:15 26:24 30:14 30:14 33:11,11
**difference**
17:23
**different**
10:24 11:5 23:11,15
**DIRECT**
5:9
**discipline**
27:16
**Discovery**
18:1,12
**discrep**
17:22
**District**
1:1,1 17:6,9,13,20,24 18:13 22:2 26:2 32:7
**division**
7:21,24 9:1
**do**
5:18,20 6:8,11 8:18 8:20 9:7,14,19,21 10:2,10,16 11:6,10 11:13,18,21 12:18 12:22 13:10,19 14:9 14:15 15:3,5,20 16:4,19,23 17:5,8 17:15,18,22 18:12 19:2,4,12,15,20,24 20:4,6,12,16,21 21:3,20 22:5 23:6,8 23:17 24:6,15,22 25:6,15,18,24 26:10 26:21 27:2,10,16 29:3,8,12,18,22 30:1 32:4,4 33:5,7 33:11,17,21 34:3,18
**document**
12:11 14:23 15:3 21:12,15 23:13
**documents**
10:3 17:11,18,19 18:15 32:6
**doer**
17:5
**does**
6:17,18 15:20 16:8 17:18 22:12 23:1 32:11 34:17
**doesn't**
32:18
**doing**
15:14
**done**
31:8
**don't**
5:18 9:11,13,18 11:9 12:13 13:15,15 15:4 15:23 21:22 23:11 25:14 30:13,19 31:1 33:1 34:8,12,15,16
**doubt**
13:3 16:23
**Dougherty**
11:1 13:6 31:18
**down**
6:10,14,17 12:17 14:13 15:12,16 16:16 21:24
**drive**
23:14
**driving**
23:13
**duly**
5:7
**during**
24:7 25:9

**E**

**E**
2:1,1 37:2
**early**
24:6,6,7 26:1
**easier**
6:11
**EASTERN**
1:1
**Edward**
20:3,13
**eight**
10:21 11:3
**electronic**
35:12,23
**else**
12:15 15:13 16:1,17 23:20 32:18
**Elwood**
20:7,16,22
**employed**
37:11,14
**employee**
37:13
**engaged**
28:7
**engaging**
24:10,23 25:8 26:2 27:24 30:5

**enjoining**
24:9,22 25:7
**enjoy**
34:12
**entered**
22:3 24:8
**ESQUIRE**
2:4,10,15,15
**essentially**
20:17
**estimate**
6:4
**ET**
1:8
**even**
7:2,5 13:16 23:5,16
**ever**
5:15,17 8:15,15 9:2,7 11:10 17:8 19:15,20 20:6,12,16,21 21:3 23:13 24:15,22 25:6 26:21 27:10,16,23 29:3,8,12,18,22 30:1 31:1 32:20 33:21
**everyone**
35:4
**everything**
6:14
**evidence**
26:4
**exactly**
18:14
**EXAMINATION**
1:5 5:9
**examined**
5:8
**except**
5:4
**excused**
36:1
**Exhibit**
12:9 21:10,18
**Exhibits**
4:11 22:4
**experienced**
6:23
**expires**
37:21
**Exxon**
11:17
**E-L-W-O-O-D**
20:7

**F**

**F**
37:2
**fabrication**
26:3
**Federal**
24:8
**few**
5:14 6:19 16:9 22:19
**fifteen**
10:14
**file**
17:24 18:15
**filing**
5:4
**final**
23:12
**finally**
16:11
**financially**
37:15
**fine**
7:14 31:10 35:12
**finish**
7:4
**finished**
7:7
**fired**
26:12
**first**
5:7 6:3,22 13:12 14:5 15:7 16:9 37:8
**five**
21:24 22:5 26:11,15
**five-minute**
31:8
**Floor**
2:10
**following**
16:7 20:10
**follows**
5:8
**FOP**
33:21 34:5
**for**
1:1 2:6,12,18 5:2 6:1 7:1,18 8:11 9:15 10:3,20 11:3 12:9 16:12 17:2 20:3 21:10 22:18 27:24 28:6,17 30:22 31:16 31:17 32:6,19,22 34:11,11,16,19 37:11
**forced**
20:17
**foregoing**
37:6,7
**form**
5:5 18:2,19 19:7 20:24 23:23 24:11 24:18 25:2,10 26:5 26:17 27:4,20 28:1 28:8 30:10,23 31:24 32:8,23 33:9,23 34:6
**formal**
7:16
**format**
35:22
**forms**
18:10
**forth**
6:16 37:9
**four**
16:8
**fourteen**
10:14
**four-door**
30:2
**Frank**
19:17
**from**
5:22 9:8 15:21 17:12 19:6,24 24:10,23 25:6,7,19 26:15 27:3
**front**
15:12 22:15
**fucking**
15:17
**fully**
7:6
**further**
16:16 37:10,13

**G**

**Garden**
24:24
**gas**
11:17 15:16
**general**
17:3 19:5 23:8 24:3 32:13
**generally**
30:15
**Germantown**
8:4,7
**get**
8:13 30:14
**getting**
15:16
**give**
6:1 9:19 14:22 21:8 31:5,7
**given**
23:11
**gives**
14:18 15:10
**go**
7:15 19:12 22:8,9 23:12 30:17
**going**
7:3,6 11:13,24 12:16 12:18 14:13,24 16:1 17:2 24:4 29:22 33:5
**gone**
33:20
**good**

5:11 7:12
**GREINER**
2:14
**grips**
23:4
**group**
10:11,24 11:5
**guess**
13:15 23:2,3 33:6
**gun**
9:23 22:10 23:4,6
**guy**
15:15,16,17
**guys**
26:11

**H**

**had**
5:15,18 9:23 16:18 20:13 22:20
**half**
7:20
**Hall**
20:2,14
**handed**
19:16 20:18
**handwriting**
13:5 21:15
**handwritten**
13:20 14:7
**happened**
8:22 15:11
**happens**
6:20 16:18
**has**
5:13 6:13 32:17
**hate**
14:20
**have**
5:15,17,22,24 6:15 8:10,15 9:2 10:13 10:14 13:3 14:4,7 16:23 18:16,21,23 19:5,10,11 23:8,10 23:11,13 32:18,21 33:15 34:1,11,15,18
**Havens**
9:23
**having**
5:7 33:18
**he**
10:22 15:1,11,13,14 15:14,17 16:14,18 16:18 20:2,13 22:14 22:18,19,19,19,20 22:20,24,24 23:3,3 23:5
**head**
6:16
**hear**
15:7,15
**heard**
16:2 22:13
**hearings**
11:11 30:14,18
**Heather**
1:12 37:5,19
**help**
15:20
**her**
16:17 34:17
**here**
6:13,19 9:15 10:3 12:17 35:6
**hereby**
5:1
**herein**
37:9
**Hill**
8:7
**him**
11:3 14:24 15:14 16:13 19:17 20:17 20:18 22:18,23 23:1 23:14,15,16
**Hines**
1:12 37:5,19
**his**
20:18
**hmm**
10:21
**hom**
32:4
**home**
15:11 23:5
**homicide**
7:21 8:9 9:1 10:11,20 17:5,12,19,24 18:15 19:5,17 21:4 25:1 27:11,17,18,23 28:6 28:17,18 29:6 31:17 31:21 33:18
**hopefully**
6:2
**hours**
6:4
**how**
7:18,21 8:9,18 10:19 11:1 23:8,9,9
**However**
6:5

**I**

**idea**
16:6 18:18,21 33:15 34:1
**identification**
12:9 21:10
**if**
6:5,8 7:2,5 9:4,10,19 10:10,16 11:24 12:2 12:4 14:3,6,23 15:1 16:9 17:8 18:6,6,6 19:4 20:10 22:1 23:10 31:4 33:21 34:3,12,12
**implemented**
25:19 26:14 27:17
**important**
15:15
**in**
1:1 6:9 7:1,21,23 9:1 9:6,23 10:10,13,13 10:16,19,23 11:4,6 11:6,7,10,11,18,22 12:1,17 13:7,19,24 15:11,12,12 17:5,15 17:22,24 18:13 19:1 19:5,15,22 20:8 21:18 22:15 23:8,9 23:16 24:4,6,10,23 24:24 25:1,8,24 26:2 27:11,18,24 28:7,17,18 29:3,6 29:15 30:5,6,6,7,8,8 30:14,18 31:17 32:13,14 37:12,14 37:15
**incident**
11:19 21:5
**incidents**
25:14 27:3
**including**
26:3
**INDEX**
4:1
**Indian**
33:15
**individual**
9:16,21,22 11:16 13:13 14:9 19:2 20:21 23:9 29:3,8 29:13
**individuals**
5:14 16:4
**information**
17:5
**instead**
14:7
**instructions**
6:1
**interested**
37:15
**Internal**
8:15,21 9:2
**interrupt**
14:21 26:24
**interview**
4:13,15 13:4 30:17
**interviewer**
32:18
**interviewing**
11:21 12:22 29:8
**into**

19:16
**investigating**
30:8
**investigation**
4:13,15 17:12 24:5 25:1,9 32:5
**investigations**
8:16,21 9:2 27:12 31:21
**involve**
9:7,10 31:21
**involved**
11:22 20:8 29:6 30:8 30:14,18
**involvement**
30:8
**involving**
9:16 11:7 23:21
**is**
5:1,11 6:6,13,20,21 7:2,6,9,14 8:23 11:4 12:19,20 13:6 14:16 15:15 16:8,18 17:23 18:14 21:14,17 23:20 30:6 31:4,8 31:19 32:15 33:6 34:24,24 35:12 37:6
**it**
5:1 6:9,9,10,11,18 9:13 11:2 12:6,13 12:18,19 15:1,6,10 15:12,18,23,24 16:1 16:2,2,14 17:10 20:13 21:17,21 22:7 22:8,10,11,15,22,24 23:4,4,5,13,14,15 23:16,17 26:11 32:10,17,18 33:3
**it's**
12:17 13:9 30:11
**I'll**
7:16 12:3,6 21:18 22:9 31:11
**I'm**
5:12 8:17 11:24 12:11,16,18 14:13 15:23 17:2,10,10 24:7 26:23 27:8 29:1 31:8 33:15,15 33:15 35:6
**I've**
5:24 23:14

**J**

**Jackal**
2:10 4:7 10:6 14:20 18:2,8,17,19 19:7 20:24 23:23 24:11 24:18 25:2,10,16,21 26:5,17,23 27:4,20 28:1,8,21 30:10,20 30:22 31:24 32:8,23 33:9,23 34:6,15,21 35:1,4,8,10,12,15
**James**
11:1
**JFK**
2:5
**jog**
9:20
**John**
29:4
**Johnson**
30:2
**Joseph**
29:14
**Judge**
11:8
**just**
6:10,14 7:3 8:13 9:13 12:1,7 14:13 21:8 21:23,23 23:10 27:8 27:8 29:1,1 30:22 31:4,5,7,7 32:17 33:3,15

**K**

**K**
1:12 37:5,19
**Keith**
22:11,13,14,16
**Kenny**
16:3,4
**kept**
15:18 22:16
**kind**
5:20 27:16
**know**
8:18 12:2 13:15,19 15:16 16:4 17:8,22 18:7,12 19:5,12 22:15,21 23:8 33:5 33:7,21 34:3,8,16
**knowledge**
26:19 28:23
**known**
14:11 29:9

**L**

**l**
5:18
**labor**
34:4
**Lane**
8:8
**last**
15:6
**late**
25:24
**later**
11:16 12:7
**Latinos**
24:24
**LAW**
2:9
**left**
30:2
**lesson**
16:19
**let**
6:1 9:19 10:2 12:2,4 14:5 17:3,17 20:10 21:7 23:9,10 31:4
**let's**
7:15,15 23:12
**lifetime**
9:13
**like**
15:14 21:21 22:23 23:9 33:6 35:9,17 35:19
**likelihood**
6:9
**likewise**
7:5
**limit**
30:7
**Lincoln**
9:24 23:14,15,16 30:2,3
**little**
7:15 22:22
**Logan**
2:16
**long**
6:10 7:18,21 10:19
**look**
22:1
**looked**
23:4
**looking**
16:12
**looks**
21:21
**lot**
23:14
**LSE**
23:15

**M**

**make**
6:2,11,17
**males**
25:8
**manipulating**
9:8
**many**
8:18 14:3
**March**
1:14
**mark**
12:3 21:7
**marked**
4:12 12:8 21:9,17

**markings**
22:1
**maximum**
6:4
**may**
19:10,11
**maybe**
10:21 22:11
**McCullough**
29:4
**me**
6:1,10 7:14 9:19 10:2 12:2,4 13:14 14:5 16:2 17:3,17 20:10 21:7,8 22:10,13 23:3,9,10 31:4,5,7 37:8
**mean**
26:24
**means**
33:3
**Mee**
1:7 4:4,13,15 5:7,11 7:13,13,16,17,19 12:4,5,9,11,13,19 17:3 18:6 21:8,10 21:12 26:10 29:2 31:16 34:11,19
**memory**
9:20
**Michael**
9:23 13:13 16:3,5
**mine**
22:2
**MINOTT**
2:15
**minute**
17:2
**minutes**
22:19
**misconduct**
27:24 28:7,17 30:6
**more**
7:16
**morning**
5:11 7:12
**most**
10:21 31:16,17
**Mr**
4:5,7 5:10,11 7:13,16 7:19 10:5 11:11 12:3,6,10,11 14:20 15:2 17:3 18:2,5,6,8 18:11,17,19,22,24 19:7,14 20:12,24 21:2,11,12 23:23 24:2,11,14,18,21 25:2,5,10,13,16,17 25:21,23 26:5,9,10 26:17,20,23 27:1,4 27:7,20,22 28:1,4,8 28:12,15,21,24 29:2 30:10,16,20,22 31:3 31:15,16,24 32:3,8 32:12,23 33:4,9,13 33:23 34:2,6,9,11 34:15,21,23 35:1,2 35:4,8,10,12,15
**Ms**
4:6 14:15 15:10 16:24 18:4,23 34:16 34:18 35:3,17,19,22
**much**
34:11,19
**multiple**
19:6
**murder**
20:3 29:15,20,23 30:3
**murdered**
20:13
**my**
5:11 7:2 11:24 12:21 13:5,16 22:13,16,19 26:19 28:23 37:21
**M-C-C-U-L-L-O-...**
29:4

**N**

**N**
2:1 37:2
**name**
5:11,13 9:16,22 11:17 12:23 13:13 14:9 19:2,17,21 20:1,2,3,7 21:14 29:4,14,18 30:1 32:17
**narcotic**
26:1
**Natividad**
1:4 5:13 9:17 23:22
**Natividad's**
11:11
**negotiations**
34:4
**neither**
37:10
**new**
25:18
**next**
15:5 16:1 34:23
**nice**
23:5
**nickname**
29:9
**night**
15:10
**nine**
10:21 11:4
**no**
1:2 2:6,11,17 5:16 7:11 8:11,19,22 9:3 9:9,18 10:1,4,7,9 11:9,12,20,23 13:2 13:5 14:12 15:4,13 16:6,11 17:1,16 18:16,21 19:3,19,23 20:5,9,15,20,23 21:6,22 23:7,19 24:1,13,20 25:4,12 25:22 27:6,19 28:3 29:7,11,17,21,24 30:4 33:15,20 34:1
**nods**
6:16
**none**
8:23
**nor**
37:11,11,14
**normally**
32:10 33:3
**North**
8:6
**Northwest**
8:3 9:6
**not**
5:16 6:8 9:12 12:24 18:14 20:13 22:2 25:15 26:19 27:15 28:20,23 29:5 30:3 31:4 33:14,16 34:18 37:11,13
**Notary**
1:13 37:5,20
**notes**
29:2
**Nothing**
8:22
**November**
9:22 11:14 13:1
**now**
12:12 22:6 34:11
**number**
4:12 12:19,20,21 21:14

**O**

**O**
37:2
**Oak**
8:7
**objected**
33:21
**objection**
18:2,4,17,23 19:7 20:24 23:23 24:11 24:18 25:2,10,16,21 26:5,17,23 27:4,20 28:1,8,21 30:10,20 30:23 31:24 32:8,23 33:9,23 34:6
**objections**
5:4

**obviously**
6:20
**occur**
9:4
**office**
17:6,9,13,20 18:14 19:16 32:7
**Officer**
8:15 9:5 29:18,19
**Oh**
7:15 13:5 14:2 15:23
**okay**
5:17,20,22 6:1,6,8,11 6:19,24 7:1,7,9,12 8:4,9,14,18,20 9:1,7 10:5,10 11:1,6,10 11:13,24 12:14,16 12:17,18,22 13:6,9 13:12,12,17,19,24 14:9,13 15:5 16:1,7 17:2,8,11,17 18:6 18:22 19:4,20,24 21:7,23 23:3,20 24:3 25:14,24 26:10 26:13 27:8 29:22 30:1,17 31:4,9,16 31:21 32:4,13,16 33:17,21 35:6,11,14 35:21,24
**Olney**
8:7
**on**
1:13 6:19,21 9:21 13:1,12 14:15 15:5 15:6,18 16:7,16 21:15 22:16 24:4,15 31:13 32:5,5 37:8
**one**
6:21 12:1,7,19 15:13 16:11,12 21:8,23 27:8 29:1 31:5 33:2 34:17,24
**only**
9:11 14:3,4 19:9 23:5 23:15 32:17 33:2 35:12
**onto**
16:1
**operating**
26:1
**Operation**
24:16
**opinion**
22:19
**opportunity**
14:23
**or**
7:13,13,16 9:12 10:6 10:21 22:12 24:9 25:18 26:13 28:5,16 30:7,9 34:17 37:13 37:14
**ORAL**
1:5
**order**
7:1
**Orders**
24:8
**original**
19:11
**other**
5:14 7:24 10:8 27:17 27:23 28:6,17
**out**
6:22 13:14 24:16 26:1 35:6
**outcome**
8:22
**outcomes**
8:20
**over**
6:21 12:6
**own**
13:16
**O'Hanlon**
2:3,4 4:5 5:10,12 12:3,6,10 15:2 18:5 18:11,22,24 19:14 21:2,11 24:2,14,21 25:5,13,17,23 26:9 26:20 27:1,7,22 28:4,12,15,24 30:16 31:3,15 32:3,12 33:4,13 34:2,9,23 35:2

**P**

**P**
2:1,1
**PA**
2:5,11,17
**page**
4:3 12:19 13:12 14:13,15 15:6 16:1 16:7,8,16 21:24 22:5,9 23:12
**part**
23:18
**particular**
10:11
**parties**
5:2 37:12
**parts**
8:6 14:24
**pass**
17:5
**passed**
17:9
**Paul**
1:7 10:17,19
**pay**
23:1
**PCRA**
11:10 21:18 30:6,9 30:13,18
**penalty**
11:7
**Penn**
2:4
**PENNSYLVANIA**
1:1
**people**
6:19
**perceived**
28:7
**person**
6:21,21
**Philadelphia**
2:5,9,11,17 5:14,22 7:18 8:7,14 10:8 17:12,13,23 18:13 18:15 21:4 24:4,9 24:23 25:7,19 26:14 28:19 32:21 34:5
**Phone**
2:6,11,17
**place**
13:4 28:17 30:7 37:8
**plaintiff**
1:5 2:6 5:12 11:7 19:21 23:21 29:5
**Plaza**
2:4
**please**
16:9 28:14
**point**
9:23 17:7
**police**
5:23 7:19 8:14 17:12 17:23 18:15 24:4,9 24:23 25:7,19 26:2 26:15 28:19 29:5,18 29:19 32:21
**policies**
25:18 26:14 28:5,16
**policy**
30:6 32:20 33:2
**possession**
18:13
**possible**
6:15 16:10 18:6
**potential**
30:18
**practices**
24:10 26:3
**preprepared**
20:19
**present**
16:2 32:18,22
**previous**
22:9
**Price**
19:2,21
**probably**

10:14
**procedure**
30:7
**procedures**
28:6,16
**proceedings**
21:18 30:6,9
**produced**
32:6
**Professional**
1:12
**Public**
1:13 37:5,20
**purchased**
22:11
**P-1**
4:13 12:3,5,9,13 16:8 32:17
**P-2**
4:15 21:8,10 32:19
**P.C**
2:3,14

**Q**

**question**
6:8 7:2 15:6 18:3,9 18:12,20 19:8 21:1 23:11,24 24:12,19 25:3,11 26:6,18 27:5,21 28:2,9 30:11,23 32:1,9,24 33:10,24 34:7
**questioning**
21:4
**questions**
5:5 14:24 15:1 17:3 24:3 34:10,15,18
**quickly**
17:17 31:6
**Quillen**
20:7,12,17,22
**quite**
6:19
**Q-U-I-L-L-E-N**
20:8

**R**

**R**
2:1,15 37:2
**Raley**
1:7 10:17,19 31:19
**read**
13:14,16 14:23 15:3 15:7,18 16:9,21
**reading**
5:3 27:8 29:1
**real**
23:16
**really**
5:18 9:11 27:15
**reason**
7:9 13:3 14:4 16:23
**recall**
5:16 9:13
**recant**
20:18
**receiving**
24:15 26:21 27:2,10
**recollection**
12:1 15:21
**record**
4:14,16 7:2,7 30:22 31:14
**reflect**
15:20
**refreshes**
12:1
**regular**
35:13,23
**related**
37:11
**relating**
24:24
**relative**
37:13
**relatively**
6:3
**relayed**
17:4
**remember**
5:20 8:20 9:4,10,11 9:12,14,19,21 10:2 10:10,16 11:6,10,13 11:18,21 12:22 14:9 15:20,23 17:15 19:2 19:15,20,24 20:4,6 20:10,12,16,21 21:3 21:20 23:6,11,17,20 24:6,15,22 25:6,14 25:18,24 26:7,10,21 27:2,10,16 29:3,8 29:12,18,22 30:1 33:17
**repeat**
28:13
**report**
9:21 27:23
**reported**
29:5,19
**reporter**
1:12 6:13 12:5,8 21:9 31:13 35:8,11,14,16 35:21,24 37:6,20
**reporting**
28:6,17
**represent**
5:12 21:19
**reserved**
5:5
**respective**
5:2
**response**
14:18
**responses**
6:15
**responsible**
32:6
**rest**
34:13
**retired**
5:22,24
**retirement**
34:13
**review**
10:3
**Revolver**
19:16,22
**Ricardo**
1:4 5:13 9:16 14:10 23:22 29:9
**Rick**
22:14,20 23:1,13
**Ricky**
22:18
**right**
6:22 7:12 9:14 12:12 15:11 22:6 31:11,11 33:7 34:11,23 35:2 35:3
**RIGHTS**
2:9
**Rob**
14:11,16 15:11 16:16 29:9,14,19
**robbed**
9:23
**robbery**
5:21,21 11:14
**Rober**
20:2
**Robert**
11:17 13:9 20:14 29:15
**Robinson**
14:10 29:10
**Rolston**
14:10 29:9
**Rutherford**
29:14
**R-A-L-E-Y**
10:17
**R-O-L-S-T-O-N**
14:10

**S**

**S**
2:1
**said**
15:14 16:11,14,18 19:11 22:20 29:14 30:2 31:16
**same**
10:23,24 11:2,4,5,16

18:4,14,23 19:6 28:21 30:7 32:19 35:22
**sat**
15:12
**Savitt**
11:8
**saw**
22:14 23:6,15,16
**say**
6:14 16:9,17 19:12 19:12 22:13 23:1 28:10
**saying**
19:21 20:17
**says**
12:13,19 15:6 16:1,2 22:8,10,11 23:13,14
**scene**
29:23 30:3
**SCHWARTZ**
2:3
**screen**
11:24
**scroll**
12:18 21:23
**sealing**
5:3
**searches**
25:8
**second**
6:22 12:2,7 15:6 21:8 21:23 27:8 29:1 31:5
**see**
9:19 11:24 12:2,4,11 12:13,15,19 13:10 13:12 14:4,15 15:5 15:13 16:7,19 17:17 20:10 21:12 22:5,7 22:18 23:1,10 31:4 33:5 35:3
**seen**
23:13,14
**sell**
22:20
**send**
12:6
**sense**
6:2,17
**set**
15:13 33:2 37:9
**several**
24:8
**shakes**
6:16
**share**
11:24
**sharing**
12:11 17:2
**she**
6:13 14:18
**SHELLEY**
2:15
**she's**
6:14
**shooting**
13:9
**short**
6:3 31:12
**shot**
11:17 15:16 16:13
**should**
7:12
**show**
21:7
**showed**
23:3 32:19
**shrugs**
6:16
**signing**
5:3
**since**
5:24 22:22
**sir**
7:8 11:20 19:3 20:5,9 20:15,20,23 21:22 23:7,19 24:1 27:6 29:7,11,21,24 30:4 34:14
**Smith**
2:15 4:6 12:23 14:16 15:10,22 16:24 18:4 18:23 22:11 34:17 34:18 35:3,17,19,22
**Smith's**
29:12
**snitch**
15:17
**snitches**
16:18
**so**
6:14,16,16 7:1,7,16 8:4,23 10:13 11:3 12:16 14:3,4 15:4 15:12 16:11 19:12 22:22 34:11,19,23
**some**
6:1 7:23 17:3,3,7 24:3 29:1
**somebody**
16:19 19:10
**something**
7:15 17:17 19:10,11 21:7 22:23 24:22 27:9 31:6
**sorry**
13:18 24:7 25:7 26:23
**speak**
10:5 34:12
**speaker**
6:22,22
**speaking**
30:15
**speaks**
6:21
**Special**
19:22
**specific**
14:24 15:1 26:21 27:2,10 28:5,16
**Spina**
19:17
**Spring**
24:24
**squad**
10:13,16,23,24 11:4 11:5 26:1,11,16 31:17
**Square**
2:16
**Stalker**
25:9
**start**
33:19
**started**
33:18
**statement**
14:7,14 15:21 17:8 20:18,18 21:20,24 22:1 23:6,18 29:13 32:16
**statements**
9:8 13:20,24 14:2 19:6 27:11 32:14,22 33:7,22 34:3
**STATES**
1:1
**station**
11:18 15:16
**stemming**
25:19 26:15,22 27:3
**Stephen**
2:4 5:11 14:20
**still**
13:20 33:17
**stipulated**
5:1
**stop**
17:2
**stopping**
24:9,23
**stops**
25:8
**street**
2:10,16 22:15
**strike**
23:10
**stuff**
9:12
**sued**
5:13,17
**Suite**

2:4,16
**supervisors**
21:3
**sure**
8:17 15:23 17:10
**sustained**
8:23
**sweeps**
24:24
**sworn**
5:8 37:8
**S-A-V-I-T-T**
11:8

**T**

**T**
2:4 37:2,2
**take**
6:5 8:10 13:24 19:6 22:23 31:7 32:14 35:4
**taken**
1:11 5:15 6:17 14:5 31:12 37:13
**taking**
6:14 13:20 21:20 23:6,17 27:11 32:22 33:19,22 34:3
**talked**
11:14 13:7 22:22
**talking**
15:18
**TANNEIKA**
2:15
**teach**
16:19
**team**
31:22 32:5,5,14
**technology**
33:19
**tell**
22:10
**Ten**
7:22
**test**
8:10,11,11
**testified**
5:8
**testify**
7:9
**testifying**
11:6,10
**testimony**
10:3
**than**
13:14
**Thank**
31:11 34:11,14,19,21 35:15,24
**Thanks**
35:4
**Thanksgiving**
22:12
**that's**
10:17 11:8 13:5,19 13:23 14:10 16:23 20:7,7 29:4 31:10 32:19 34:10
**their**
16:11,12,12
**them**
8:23 17:21 30:15
**then**
16:16 19:17 22:14,19 22:24 23:3,5 31:8 35:3,7
**there**
6:13 7:1,9 8:22 10:14 10:22,22 11:16 14:6 17:22,23 19:1 20:1 22:18 23:20 24:8 26:13 28:5,16 30:6 31:18 32:20 33:1,18
**there's**
6:8,19 7:7 13:13 14:3 14:3 17:4 19:4 33:2
**these**
16:9,9 22:1
**they**
6:2 9:4,7,10,13 22:3 26:12,12,12 28:6 33:18
**They're**
22:2
**thing**
9:11 24:16
**things**
24:4
**think**
15:4 26:11,12 31:8 33:1
**thirty-two**
7:20
**this**
6:3,20 9:15 10:2 11:7 11:22 12:1,2,3 13:3 13:6,7 14:5,11 15:6 15:15,21 16:2,8,18 16:24 17:8,15,22 19:1,13,15,22 20:21 21:4,15,17,20,24 23:12,12,21,21 24:5 29:3,8 31:4 37:12 37:14,15
**those**
8:20 16:4 25:14,20 27:3
**thought**
22:21 23:17
**threatening**
20:21
**Three**
2:16
**through**
12:18 29:1,13 32:16
**time**
5:6 6:5 10:22 23:5,16 24:5 31:17,18 32:20 33:8 34:12 35:23 37:8
**timeline**
35:13
**to**
5:5,18 6:5,10,11,11 7:1,16 8:10 9:7,12 11:3,13,14,17,24 12:6,16,18 13:3 14:13,18,20,23,24 15:1,3,21 16:18,19 16:23 17:2,4,5,9,13 17:20 18:2,19 19:5 19:7 20:17,24 21:13 21:19,23,24 22:8,9 22:18,20,20,24 23:1 23:12,23 24:3,11,18 24:24 25:2,10 26:5 26:17,19,24 27:4,20 28:1,7,8,23 29:5,14 29:20,22,23 30:7,10 30:23 31:6,24 32:7 32:8,21,23 33:5,6,9 33:19,21,23 34:6,12 37:11,12
**today**
7:10 9:15 10:3
**told**
16:24 22:22
**too**
6:10
**took**
13:4 15:21,23 23:5
**top**
12:19 16:8 21:17 22:5
**town**
15:17
**training**
24:15 25:18 26:13,21 27:2,10,13
**transcript**
1:11 35:9,18 37:7
**transferred**
8:13 32:7
**trial**
5:6
**true**
37:6
**truthfully**
7:10
**try**
7:6,16 9:12
**Turkey**
24:17
**twenty-nine**

33:6
**two**
6:4 10:13,16 14:13 14:15 22:12 31:17 32:21
**two-door**
23:16 30:3
**typed**
13:24 14:2
**typewriter**
14:6,7
**typewriters**
14:3

**U**

**um**
6:1,10,11,15,19,20 7:12,18,20 8:6 9:1 9:11,12,14,20 10:11 10:21 12:18 13:7,15 13:20 14:13,15 15:5 15:5,5 16:8,8 17:4 17:11 18:6 19:5,15 20:13,16,17 21:20 22:5,8,8 23:9,10,10 23:12,21 24:8,22,24 25:24 26:1,13 27:11 27:16 28:5,17 29:19 30:17 31:22 32:13 32:16,18,20 33:1,2 34:4 35:22
**unconstitutional**
24:10 26:3
**underlined**
9:15 29:6,15
**understand**
6:9,11 9:14
**uniformed**
9:5
**Unit**
2:9 10:12 21:4 28:18 33:18
**UNITED**
1:1
**until**
5:6 7:3,6
**UPON**
1:4
**us**
10:14,15
**used**
14:7 21:17

**V**

**vague**
30:11
**vaguely**
26:7
**vehicle**
9:24 11:15
**verbal**
6:15
**very**
6:4 17:17 31:6
**via**
1:13
**victim**
15:7
**videoed**
33:8,22 34:3
**videos**
33:19
**Vine**
11:18
**vs**
1:6

**W**

**wait**
7:3,6
**waived**
5:4
**walked**
15:11,11
**want**
6:5 15:3 21:23 22:1 24:3 31:5
**wanted**
22:20,20 31:5
**wants**
15:1
**was**
5:8,20,21 8:2,6,22 9:13,23 10:13,14,22 10:22 11:16 12:21 14:6,11 15:11,13,14 16:2,2,17 17:8,10 17:15,22,24 18:12 18:13 19:1 20:1,2 20:13,18 21:17 22:11,12,13,14,16 22:18 23:4,5,15,16 23:17 26:11,13 29:5 31:12 32:20 33:2,20 34:4 36:1,2 37:8,12
**washing**
22:16
**watch**
15:17
**waxing**
22:13
**way**
33:6
**we**
6:14 13:6,23 14:2,2 17:7 22:5,22 29:13 30:14,14 31:7 32:16 33:11,11
**Wednesday**
1:14
**week**
22:12
**welcome**
34:20,22 35:16
**well**
5:14 8:11 9:19 10:2 14:2,5 15:6 23:9 35:20
**went**
22:16,17,24 29:13 32:16
**were**
7:21,23 8:14,15,23 9:1,13 13:19 17:19 22:3 24:4,8,8 26:12 26:12,14 28:5,16 30:18 33:17
**weren't**
33:7
**West**
8:7
**we'd**
35:19
**we're**
9:15 31:13 33:3
**what**
5:20 6:20 8:2 9:10,13 13:23 15:14 16:8,18 16:24 17:24 22:10 22:12,15,21 23:1 26:10 28:7 31:5
**when**
6:21 9:1,4,4 15:6 16:2 17:4,18 27:18 28:6,18 30:5 32:4 33:2,17,18
**where**
7:2,5 8:2,4 9:22 12:19 14:15 19:24 22:5 32:20
**Whereupon**
12:8 21:9 31:12 36:1
**whether**
15:21 34:16
**which**
16:8 17:18,19 32:13 32:14,19 33:6 37:12
**While**
8:14
**whistle**
22:14
**who**
5:13 14:16 16:1,4 17:11,11,15 29:5,14 29:19 30:2 32:11,13 32:15
**whoever**
32:15
**whole**
14:23 15:3 22:1
**why**
7:9 13:19,21,24 17:22 18:12 19:5 33:5,7,14

**will**
6:2,3,9,9,11 7:6 11:2 21:7 22:8
**Williams**
20:3,13
**Wilson**
29:19
**with**
7:14,15 9:8 10:5,10 10:17,19 11:3 14:11 17:12 22:13,18,23 23:4 29:9 30:13 31:18 33:18
**within**
10:11 32:20
**witness**
4:3 13:7 18:10,18,21 19:1,4,6,9,10,11,21 20:6 24:1,13,20 25:4,12,22 26:7,19 27:6 28:3,10,13,23 30:1,13,21 31:1 32:2,10 33:1,11 34:1,8,20,22 35:6 36:1 37:8
**witnesses**
9:8 11:21 27:11 30:8 30:18
**woman**
12:22
**words**
16:9
**work**
7:18 10:19,23
**worked**
10:10,16 11:3 27:18 28:18 31:17,18
**working**
17:19 32:4
**would**
6:4,14 7:3 9:20 13:3 14:4,6 17:7,19 19:5 23:8 30:17 32:10,17 35:8,10,17
**writing**
13:14,16
**written**
13:20

**Y**

**yeah**
5:24 8:6 10:13,24 16:14,18 17:7 22:17 26:8
**years**
5:18 7:20 10:21 11:4 33:7
**Yep**
6:12
**yes**
5:18 6:18 7:8 8:1,12 8:17 10:18 13:8,11 13:22 14:8,17,18,19 15:9,19 16:20 21:16 22:7 27:14 28:12 31:20 32:2 35:1,10 35:19
**yo**
15:15 22:14
**your**
5:15 7:5 9:20 10:3 12:1,20 13:14 15:20 21:14 31:16 32:17 34:11,13
**yourself**
5:13 20:19
**you're**
7:6 14:23 32:4 34:20 34:22 35:16
**you've**
6:23

**Z**

**Zoom**
1:13 6:20,21

**1**

**1:00**
34:24
**10:08**
1:14
**10:54**
36:2
**11**
4:13
**12/28/1996**
21:21
**14th**
2:10 13:1
**1400**
2:4
**1500**
2:5
**1515**
2:10
**1717**
2:16
**19**
24:7
**19102**
2:5
**19102-1595**
2:11
**19103-2739**
2:17
**1980's**
24:6,7 26:1
**1985**
25:1,6
**1988**
25:7
**1990's**
24:7 26:1
**1996**
9:22 10:10 11:14 13:1,19 14:1 33:6
**1997**
19:24

**2**

**2**
2:4
**2:00**
11:15
**2:22-CV-05061-GJP**
1:2
**20**
4:15
**2001**
5:24
**2025**
1:14
**2027**
37:21
**215**
2:11,17
**22**
37:21
**267**
2:6

**3**

**3500**
2:16
**357**
19:15 22:20 23:4
**38**
19:22
**39th**
26:2

**4**

**4**
4:5

**5**

**5**
1:14
**546-9066**
2:6

**6**

**63rd**
11:18
**683-5434**
2:11

**9**

**9th**
9:22 11:14
**96**
10:13
**963-3300**
2:17

**981**
12:19

# P1: MEE

# INVESTIGATION INTERVIEW RECORD

PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION

CASE NO. H 96-373

INTERVIEWER MEE #981

| NAME | AGE | RACE | DOB |
|---|---|---|---|
| Cynthia Smith | 31 | W/F | 1-8-65 |

| ADDRESS | APARTMENT NO. | PHONE NO. |
|---|---|---|
| [redacted] | | N/P |

| NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO. |
|---|---|
| Unemployed | 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 |

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |
|---|---|---|
| | | |

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

ADDRESS | PHONE NO.

| PLACE OF INTERVIEW | DATE | TIME | AM/PM |
|---|---|---|---|
| Room 104 PAB | 11-14-96 | 2:05 | PM |

| BROUGHT IN BY | DATE | TIME | AM/PM |
|---|---|---|---|
| Det's Dougherty & Mee | 11-14-96 | 1:45 | PM |

WE ARE QUESTIONING YOU CONCERNING: The shooting death of Robert Campbell.

| WARNINGS GIVEN BY | DATE | TIME | AM/PM |
|---|---|---|---|
| | | | |

ANSWERS (1) (2) (3) (4) (5) (6) (7)

Q. How many people reside at 525 Wynnewood?

A. Right now there are 4 regular – but sometimes other people will stay. There are 2 other regular that are in jail now. Michael will let anyone stay, if they need a place.

Q. Who is Michael?

A. Michael Giraldo: he just came back from here: he's my boyfriend.

Q. Who are the others that live there?

A. Frannie DeLuca & Mary Verrichio are both in jail. Phil & Mona are a couple – they stay there. Her last name is McKenna. I don't

RECORD ☐ Yes ☐ No | CHECKED BY X Cynthia L. Smith

REVIEWED BY

75-483 (Rev. 7/82)

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Cynthia Smith | PAGE: 2 | CASE NO.: M 96-373

- know his last name. Kenny Hart has been staying there. & there's a guy named Billy Kerns, but he's not there now. He uses the name Billy Mann too. He was bad, he didn't pay his rent, so he can't come back for 2 weeks.

Q. Did you know the decedent, Robert Campbell?
A. I didn't know him, but I knew of him. I knew he was in the Town Watch. Rob always referred to him as the little town snitch.

Q. Who is Rob?
A. Rob Relston, or Ricardo. I'm not sure. His real first name might be Ricardo.

Q. When did you first hear about the victim's death?
A. The night it happened. I was at home & Rob walked in. He walked right in & changed the channel, & sat down in front of it so that no one else could see. He was blocking the set. I asked him what he was doing & he said like "Yo - this is important. Didn't you hear about the guy getting shot - down at the gas station. You know the guy - the fucking snitch - that town watch guy Bobby Campbell." He kept on talking about it. After

75-483A

X Cynthia L Smith

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME Cynthia Smith
PAGE 3
CASE NO. H 96-373

- The story went off he left the house. About an hour later, he came back in. He said that he had been there. He talked about the guy having a gun & the handcuffs. He said the guy was bleeding. He said he stood over top of the guy saying "You dumb fuck." Now, I don't know if he was talking to the guy - or to somebody else.

Q. Who else was present when you heard this?
A. It was me, Kenny & Michael I believe, when he came in & turned the TV. I think the 3 of us were there the 2nd time too - with Phil. He's been staying there too.

Q. Did you ever see Rob with a gun?
A. Yeah - a big one.

Q. Can you describe it?
A. It was dark - a revolver; it had the round thing

Q. Did Rob ever say that he was involved in Campbell's death?
A. Yeah - he had been watching the news over & over again. He started to get real casual about the whole thing. Kenny was teasing him &

75-483A

x Cynthia L Smith

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Cynthia Smith
PAGE: 4
CASE NO. H 96-373

- So finally I said "Are you the one they're looking for - are you the one that shot him?" & he said "Yeah - I did it." He kept on talking about the guy being a snitch. When he said that he did it - everything just stopped. I got real nervous. I really didn't want to talk about it anymore. Then Rob said he had to go & he left. But like 15 or 20 minutes later, he was back, offering to lend me money for my dope. It was like he was trying to buy me off because before he did it, I had tried to borrow some money from him & he wouldn't lend it to me.

Q. Did Rob say anything else about the decedent?
A. Yeah - he said that that's what happens to snitches - that he had to teach somebody a lesson.

Q. When did Rob say that?
A. Since it happened, he's just kept on talking about it - the longer it went, the more comfortable it seemed he felt. Yesterday afternoon is when he said he did it.

x Cynthia L Smith

75-483A

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME Cynthia Smith | PAGE 5 | CASE NO. M96-373

Q. Since this incident took place, have you spoken to anyone who may have witnessed this incident?

A. I was down at the bar at 64th St & Carlton. They were talking about it. One of the bartenders said he had to give Elaine a free shot because she was so upset about what had happened.

Q. Who was the bartender?
A. Mike

Q. What is Elaine's last name?
A. I don't for sure - it might Squares or something like that. She has a brother Tony. She lives at the house I showed you earlier ([redacted] across from the bar.

Q. Do you know of anyone else that might have witnessed this incident?
A. I heard that 4 or 5 people from the bar saw it.

x Cynthia L. Smith

75-483A

# P2: MEE

C-29

# INVESTIGATION INTERVIEW RECORD

PHILADELPHIA POLICE DEPARTMENT
HOMICIDE DIVISION

CASE NO. H96-373
INTERVIEWER MEE #981

| NAME | AGE | RACE | DOB |
| --- | --- | --- | --- |
| CARL ANTHONY HARRIS | 20 | B/M | 1-21-76 |

| ADDRESS | APARTMENT NO. | PHONE NO. |
| --- | --- | --- |
| 601 COBBS CREEK PKWY | B# 566.453 | 747-0519 |

NAME OF EMPLOYMENT/SCHOOL: UNEMPLOYED
SOC. SEC. NO.:
ADDRESS OF EMPLOYMENT/SCHOOL:
DEPARTMENT:
PHONE NO.:
DATES OF PLANNED VACATIONS:
DATES OF PLANNED BUSINESS TRIPS:
NAME OF CLOSE RELATIVE:
ADDRESS:
PHONE NO.:

PLACE OF INTERVIEW: ROOM 104 PAB
DATE: 12-23-96 TIME: 4 40 PM

BROUGHT IN BY: POLICE
DATE: TIME: AM PM

WE ARE QUESTIONING YOU CONCERNING: THE SHOOTING DEATH OF ROBERT CAMPBELL

WARNINGS GIVEN BY:
DATE: TIME: AM PM

ANSWERS
(1) (2) (3) (4) (5) (6) (7)

Q. DID YOU KNOW OR HAVE ANY CONTACT W/ THE DECEDENT?
A. NO - I NEVER HEARD OF HIM BEFORE THAT NIGHT.

Q. WHAT NIGHT WAS THAT?
A. THE NIGHT THIS HAPPENED — I SAW IT ON THE NEWS. I ALWAYS WATCH THE NEWS - I HEARD THE 63RD + VINE, & I PAY ATTENTION TO THINGS THAT HAPPEN IN MY NEIGHBORHOOD. A COUPLE DAYS LATER I SAW IT ON TV AGAIN. THEY HAD A MEMORIAL SERVICE AT THE GAS STATION.

Q. HAS ANYONE GIVEN YOU ANY INFORMATION ABOUT THIS SHOOTING?
A. WELL - I HAD HEARD ABOUT THIS WHEN IT FIRST

RECORD ☐ Yes ☐ No
CHECKED BY X Carl HARRIS
REVIEWED BY

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: CARL ANTHONY HARRIS | PAGE: 2 | CASE NO.: H96-323

– happened. but I didn't know anything about it. I didn't really know anything about it until today – That's when it was put together for me.

Q. Explain that for me.
A. Well I had heard some rumor going around the neighborhood – about some guys I know having a body, but I didn't know it was this thing until today.

Q. Who was it that you spoke to today?
A. Kevin Smith – his brother Keith was down here today. When Keith was down here, Kevin came over to my house. When Keith left here, I saw him. He told me you had my name & wanted to speak with me.

Q. What did Kevin tell you?
A. He just said that the detective had been at his house about a homicide – about a gun he had & that they brought him down for questioning. Then, when he got let go, he came to Kevin's job: that's when I spoke to him.

Q. Did Kevin tell you which murder they were talking about?

75-483A

X Carl Harris

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Carl Anthony Harris | PAGE: 3 | CASE NO.: H96-373

A. No - but I figured it out, that maybe the Rumor were true. I just put 2 + 2 together.

Q. You said earlier that you had heard a Rumor in the neighborhood about some guy "having a body." Tell me about that.

A. I heard that Rick + Byron had a body. I just thought it was talk - until today.

Q. When did you first hear that Rumor?

A. Back around Thanksgiving time.

Q. Who told you?

A. I think his name is Tyrone - he's a short dark skinned guy, maybe my size, + a little darker. He's on 63rd st. all the time. He asked me if I had heard what had happened to Rick - I told him no. He said that Rick had tried to rob somebody - then he left it alone.

Q. Who is Rick?

A. He lives on Catherine st. - around 62nd st.

Q. I'm showing you a photo display. Do you recognize anyone?

A. Yeah that's Rick. (indicating the 2nd male from the



X Carl Harris

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|---|---|---|
| Carl Anthony Harris | 4 | H 96-373 |

- left, on the 2nd line.)

Q. How long have you known Rick?
A. About a year.

Q. Is this the Rick we have been talking about?
A. Yes.

Q. About how long have you known Byron?
A. Maybe a year & a couple months. We call him "B"

Q. What can you tell me about him?
A. His last name is Price. He lives on Webster St. The house with the picket fence

*

Q. What can you tell me about a gun that Keith Smith purchased.
A. That was about maybe a week or two before Thanksgiving. I was washing my car & Keith was with me. I heard a whistle & then a "Yo, Keith." I saw Rick - he was across the street in front of the church. I didn't know what it was about - I kept on washing my car & Keith went across to see Rick. He was there with him for a few minutes, then he came back. He asked my opinion - he said Rick had a .357 that he wanted to sell. He wanted to know what I thought.

75-483A

X C. A. Harris

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|---|---|---|
| CARL ANTHONY HARRIS | 5 | H 96.373 |

– So, we talked about it a little – I told him that you always take a chance with something like that. Then he decided to buy it. He went back around the corner to see Rick & pay him I guess. Then he came back. He showed me the gun – it was a chrome .357 with the black grips. It looked nice. Then he took it home. That was the only time I ever saw the gun.

Q. Do you know how much Keith payed for the gun?

A. No.

Q. Did you see how Rick arrived on your block?

A. No.

Q. Did there come a time when you & Keith discussed the .357 again?

A. Yes – it was a couple of weeks before X-mas. I kept on hearing the rumors: I told him to get rid of it. I didn't want him to get caught with the gun if the rumors were true.

Q. Did you hear the rumor from anyone else?

A. Yeah – a guy named "Chaos" his real name is Keith. He's always on 60th & Catherine.

75-483A

X Carl Harris

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| NAME Carl Anthony Harris | PAGE 6 | CASE NO. H 96.373 |

Q. Describe him?
A. Maybe 18 - 6' - maybe 160 lb. Brown skinned, maybe light complexion.

Q. What did he tell you?
A. He asked me if Rick shot somebody - I told him I didn't know.

Q. Do you know a person named Eugene Wilson?
A. Yeah - They call him "Chick" he lives on Webster St.

Q. Were you present when either Rick or Byron talked about this incident?
A. No - I never heard him say anything.

Q. Have you spoken to either Rick or Byron since this incident?
A. Yes I have.

Q. Have you discussed this incident with either one or both of them?
A. No - it wasn't my business. I wanted to avoid all of this.

X Carl Harris

75-483A

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Carl Anthony Harris | PAGE: 7 | CASE NO.: H96-373

Q. Have you ever seen Rick with a gun?

A. Yeah- during the summer. He had a .380 Beretta. It was black.

*

Q. Have you ever seen Rick driving a dark blue Lincoln?

A. I've seen him drive a lot of different cars. I saw him in a Lincoln "LSE" - it was the only time I ever saw him in a Lincoln. It was a 2 door - real dark. I thought it was black.

*

Q. When was that?

A. I'm not sure - it was before Thanksgiving. *

Q. Was he alone?

A. I couldn't tell - the windows were tinted. I figured it was stolen because I saw him get into it on 62nd + Walton - that block - it's like an unknown block. I figured it was stolen but that's where people park stolen cars.

X Carl Harris

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION
NO.: 2:22-CV-05061-GJP

| | | |
|---|---|---|
| RICARDO NATIVIDAD | ) | DEPOSITION UPON |
| | ) | |
| Plaintiff | ) | ORAL EXAMINATION |
| | ) | |
| - vs - | ) | OF |
| | ) | |
| DETECTIVE PAUL RALEY, | ) | PAUL RALEY |
| ET AL., | ) | |
| | ) | |
| Defendants | ) | |

- - - - - - - - - - - - - - -

TRANSCRIPT OF DEPOSITION, taken by and before HEATHER K. HINES, Professional Reporter and Notary Public, via Zoom Conference, on Wednesday, March 5, 2025, commencing at 1:05 p.m.

A P P E A R A N C E S:

O'HANLON SCHWARTZ, P.C.
BY: STEPHEN T. O'HANLON, ESQUIRE
2 Penn Center Plaza, Suite 1400
1500 JFK Boulevard
Philadelphia, PA 19102
Phone No. (267) 546-9066
Counsel for the Plaintiff

CITY OF PHILADELPHIA LAW DEPARTMENT
CIVIL RIGHTS UNIT
BY: BEN JACKAL, ESQUIRE
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
Phone No. (215) 683-5434
Counsel for the Defendants

ARCHER & GREINER, P.C.
BY: SHELLEY R. SMITH, ESQUIRE
BY: TANNEIKA MINOTT, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-2739
Phone No. (215) 963-3300
Counsel for the Defendants

INDEX


| WITNESS: | | PAGE |
|---|---|---|
| PAUL RALEY | | |
| | BY: MR. O'HANLON | 4 |
| | BY: MS. SMITH | |
| | BY: MR. JACKAL | |


EXHIBITS


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| P-1 RALEY | Activity Sheet | 10 |
| P-2 RALEY | Investigation Interview Record | 14 |
| P-3 RALEY | Investigation Interview Report | 18 |

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing sealing, certification, and filing are waived and that all objections, except as to the form of the questions, are reserved until the time of trial.)

PAUL RALEY, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. O'HANLON:

Q Hello, Mr. Raley. Good afternoon. Thank you for doing this.

Um, are you still employed by the Philadelphia Police Department, or --

A No.

Q Okay. Well, thank you for sparing us your time. Um, have you ever had your deposition taken before?

A No.

Q Okay. Have you ever been sued before?

A No.

Q Well -- okay. Let me give you some brief instructions and, um -- and if there's anything that you don't understand, just let me know.

This will be a relatively short deposition. I

would estimate an hour depending on what you remember. Um, but if you want to take a break at any time, um, just let me know and we'll take as long as you want. Okay?

A Understood.

Q If there's any question that you do not understand in all likelihood because it's, um, what lawyers call a compound question, or made up of multiple parts, just let me know and I will break it down to make it more easy to understand. Okay?

A Okay.

Q And then finally, um -- and this is -- this relates to depositions in the pre-COVID world. But, um, the Court Reporter, Heather, is taking down everything that you say, so -- and nods and shakes of the head, shrugs, and various kinds of uh-huhs, um, are difficult to take down.

So, I would just ask as best as possible that your answers be verbal. Okay?

A Okay.

Q And then the final thing, which is a post-COVID thing is that when one speaker is speaking on Zoom and another speaker begins to speak, the second speaker cuts out the first speaker.

So, I would ask that even though you might be able to anticipate where a question is going, that you do your

best to wait until I finish the question before answering. And, likewise, even if I can anticipate where your answer is going, I will and wait before I ask another question so there's a clear record. Does that make sense?

A It does.

Q All right. Thank you. Um, and I'll -- I'll try and call you, um, Mr. Raley, or Detective Raley if that's okay rather than using any kind of, um, first name.

A Okay.

Q Mr. Raley, how long were you employed by the Philadelphia Police Department?

A Um, twenty-five years, four months, and two days.

Q And how long were you in the Homicide Unit?

A Um, approximately ten years.

Q Okay. And before that --

A Ten and a half years actually.

Q Okay. I'm sorry. And before that, were you a Detective in a -- in a -- in a Detective division?

A Yes.

Q Whereabouts were you a Detective before that?

A In, um, '82 when I got promoted, I was first assigned to Central Detectives, which was at 20th and Hamilton. Um, in -- let me check.

In '85, I went to East Detectives, Front and

Westmorland. In '86, I went to Major Crimes. And then in June of '86, I went to Homicide.

Q Okay. And when you were in the Homicide Unit, were you in a particular squad?

A Yes.

Q Um, do you remember what number squad that was?

A Two.

Q And how long were you in this Two Squad for?

A Um, when -- from when I first went there, which would have been, like I said, around June of '86 until the mid '90's, I did a brief stint in the Homicide um -- Homicide Fugitive Squad. And then I came back from the Fugitive Squad and went right back into Two Squad again.

Q When you were -- when you were in Two Squad -- well, first of all, do you remember, um, in November of 1996 -- and this might be difficult for you to remember -- were you in the Fugitive Squad, or Two Squad?

A Um, I would say Two Squad.

Q Okay. And while you were in Two Squad, um, for most of your time, or all of your time in Two Squad, did you work with Detective Arthur Mee and Detective James Dougherty?

A Um, I worked with Art, Arthur Mee for -- when he first got there, but I never worked in the same squad as

Jimmy Dougherty.
Q Okay. Did you ever work on particular jobs with Jimmy Dougherty?
A Not that I recall.
Q Okay. So, I want to talk to you and see if you remember anything about the underlined criminal case that relates to this civil case that involves a criminal defendant by the name of Ricardo Natividad.
Do you know -- do you remember anything about that case?
A I haven't -- I never heard that name until I spoke to Mr. Jackal.
Q Okay. And I don't want you to -- I don't want you to tell me anything that you spoke to Mr. Jackal about. But, um, other than that, um, let me see if I can refresh your memory a little bit.
Do you remember anything about on November 9th of 1996 a criminal complainant by the name of Michael Havens alleging that he was robbed in a black, or dark colored Lincoln in the area of Island and Elmwood Avenues in Philadelphia?
A I have no recollection of that.
Q Okay. How about later on that evening at approximately 9:35 p.m., do you remember anything about an

individual by the name of Robert Campbell being shot dead at a gas station in the area of 63rd and Vine?
A No, I don't.
Q Okay. Do you remember anything about this investigation?
A None at all.
Q Okay. Do you ever remember a gun turning up at an attorney by the name of Frank Spina's office?
A No.
Q Do you know Frank Spina?
A I heard the name.
Q Okay. Um, let me just switch over to another folder very quickly.
I want to go through three different statements and see if they help, um, job your memory. Okay?
A Sure.
Q So, I'm going to share my screen, and let me know if you can see them. Just one second.
So, the first one is an Activity Report. So, I'm going to share my screen and show you this Activity Report. And the quality is not great.
Um, do you recognize that as -- do you recognize that as a format of an Activity Sheet?
A Pretty involved for an Activity Sheet, but I -- I

recognize it.
Q Okay. If -- and do you see at the top where it says assigned Detective, J. Dougherty?
A Um-hum. Yes, I do.
Q Is that -- is that Jim -- Jimmy Dougherty, or James Dougherty that we were talking about a few moments ago?
A Yes.
MR. JACKAL: Objection to the form of the question. You can answer.
BY MR. O'HANLON:
Q Okay. And this is an Activity Sheet. And I'll mark it as Exhibit P-1 Raley.
(Whereupon the court reporter marked Exhibit P-1 Raley for identification.)
BY MR. O'HANLON:
Q And it says it's related to the death of decedent, Robert Campbell. I want to go down to the bottom paragraph of this first page.
It says Detectives Raley and Reinhold interviewed persons who called 9-1-1 about a shooting incident at Horton and Callowhill on the same night as this killing, but it is -- but it does not appear as if the two incidents were related. The complainant and eyewitness to the Horton and

Callowhill shooting were unavailable and will be subsequently contacted to verify that there is no connection.

Do you ever remember interviewing, um, complainants about a shooting on November 9th of 1996 with Detective Reinhold?

A Do not recall that.

Q Okay. Do you remember, um -- do you ever remember encountering a woman by the name of Beth Johnson in relation to the killing of Robert Campbell at the Exxon Gas Station at 63rd and Vine?

A No, I don't.

Q Did you ever hear either directly from Ms. Johnson, or from anyone else that it was a four-door Lincoln that was leaving the scene of the murder?

A I have no recollection of that.

Q Okay. Going onto the second page of this, um -- of this document. First of all, did Detective DiBlasi -- was he in the same squad as you?

A It's a female. Maria DiBlasi.

Q Okay. Was she in the same squad as you?

A Um, I'm -- I don't think so, no. I think she was in Four Squad.

Q Okay. Would -- on some jobs, some murders, would

various squads work together?
A It's -- it's possible. It depends how -- if maybe they were short somebody and needed somebody to do an interview or something, it could overlap a little.
Q Okay. It says here that Detective DiBlasi and the assigned tried to locate a Joan Jones, who was the matron in charge of the Exxon Laundromat at the time of the shooting, but she was out and arrangements were made to meet her on 11/4/96.
Also, attempts to locate Norman Robinson, a maintenance man at Exxon Station were unsuccessful. John McCullough, a member of Town Watch interviewed on 11/12/96 had stated that he was -- that he warned Robinson of an impending robbery at the Exxon Station. Do you ever remember that?
A None --
MR. JACKAL: Mr. O'Hanlon --
THE WITNESS: -- of it.
MR. JACKAL: -- I apologize for interrupting. Could you please try to make this bigger if possible? It's hard for me to read.
MR. O'HANLON: I could try and make it bigger. I don't think -- I don't think it's the size that's the issue. It's the quality of the

paper. Um, but I think I'm -- I think I'm done with it anyway.

Do you want to -- I can try and make it bigger. Let me see. And you can tell me if it works.

MR. JACKAL: If the Detective is able to read it, it's fine with me. I just --

MR. O'HANLON: Okay. I'll stop sharing.

THE COURT REPORTER: I'm sorry. The audio overlapped on the answer there. Was the answer to the previous question none of that?

THE WITNESS: None of it.

THE COURT REPORTER: Okay. Thank you.

BY MR. O'HANLON:

Q Did you ever hear -- do you ever remember receiving any kind of information either from fellow officers, or directly from this individual called John McCullough that Ricardo Natividad was not involved in the shooting of this decedent, Robert Campbell at 63rd and Vine on November 9th of 1996?

A No, I don't.

Q Okay. Do you ever remember receiving information from either a Joseph Rutherford, or a Cynthia Smith who stated that an individual called Rolston Ricardo Robinson

admitted to the killing of this decedent, Mr. Campbell?
A No, I don't.
Q Okay. Let me show you, um, a second statement. I'll close out of this. And what I will do is I will, um, mark this as P-1. I'll try and go full screen on my Zoom and see if this makes the statement bigger. Okay? Just one second.
THE COURT REPORTER: Was the Activity Sheet P-1 Raley?
MR. O'HANLON: Yes. I'm sorry.
THE COURT REPORTER: Okay. So, this is P-2 Raley?
MR. O'HANLON: Yes.
THE COURT REPORTER: Okay.
MR. O'HANLON: And I'll send them over to you as well.
THE COURT REPORTER: Thank you.
(Whereupon the court reporter marked Exhibit P-2 Raley for identification.)
BY MR. O'HANLON:
Q Okay. Can you see this that says Exhibit P-2 Raley?
A Yes.
Q Okay. Um, Detective Paul Raley, Badge Number

9077. Is that you?
A That's me.
Q Okay. Um, and do you remember taking a statement from this individual on December 28th of 1996, an individual by the name of Robert Golatt? That's, G-O-L-A-T-T.
A I don't recall taking it, no.
Q Do you have any reason to question the authenticity of this statement, whether it's like real or not?
A At this time, no.
Q Okay. So, I want to -- I want to direct your attention to page -- you can read the whole statement if you want to. Do you want me to scroll through the whole statement, Detective?
A Just down to the body for right now.
Q Just the -- the what?
A The body of it where the -- the question and answer part.
Q Okay. That's what -- I'll go through this as slowly as you want. You tell me when you're done.
A Okay. I'm finished with that.
Q Okay. And these markings are not mine. Um, these are -- these are Assistant District Attorney Exhibits from PCR -- from a PCRA Hearing. So, just in case there's any,

um, lack of clarification about that, or clarity rather.
A Okay. I'm done reading that.
Q Okay. Well, let me just ask you. Does this, um, question that I'm going to highlight here, um -- about halfway down, it says what kind of car did Rick pull up in at 61st and Catherine. It says a Lincoln LSC, navy blue, two-door. Do you remember asking that question?
A I don't remember asking it, but I can read it.
Q Okay. And would you have any reason to doubt that that's the question and answer that occurred?
A I have no reason to doubt that.
Q Okay. Let's go onto the second to last -- well, it's the final whole page to the second to last page.
A I can only see down to where it's underlined.
Q Yep. And then I'll scroll down.
A Okay. Okay. I'm finished reading. No. Maybe not.
Q Okay. And then the final -- final page.
A Okay. I'm done.
Q Okay. Detective Raley, do you remember testifying in the criminal trial before a judge called Judge Savitt -- S-A-V-I-T-T, if I'm not mistaken -- in this case?
A I do not recall that.
Q Do you remember having to testify, um, because Mr.

Golatt was impeached with this statement because he recanted his alleged statement to you?

A I have no recollection of testifying regarding this case.

Q Okay. Do you ever recall, um, hearing either in court, or based upon your testimony, or discussions with the Assistant District Attorney that Robert Golatt testified at the criminal trial that you and the other defendants in this case told him about a 357 revolver in order to place the blame, or inculpate, um, Ricardo Natividad?

A No.

Q Do you remember a cooperating witness by the name of Byron Price in this case?

A No.

Q Do you remember that Mr. Price initially, um, told police that Mr. Natividad had a 38 special revolver?

A No.

Q Do you remember Byron Price, um, initially telling police that there was no description of any black grips on a 357 revolver that was attributed to Mr. Natividad at trial?

A No.

Q Okay. I'm going to show you one final document, and then we can move on from this. Just one second. I just want to close out of a few things.

(Whereupon the court reporter marked Exhibit P-3 Raley for identification.)

BY MR. O'HANLON:

Q Can you see Exhibit P-3 Raley?

A Yes. I can see it, yes.

Q Um, do you remember taking a statement of Byron Price, this individual with Detective Dougherty?

A I don't remember that, no.

Q Um, is this your handwriting in this statement in P -- which I will mark as P-3?

A It is not.

Q Do you recognize it as Detective Dougherty's handwriting?

A Um, no. I wouldn't be able to identify Detective Dougherty's handwriting.

Q I understand. Okay. Do you -- do you have any recollection of, um -- of Mr. Price being a cooperating witness in this case?

A I have no recollection of that.

Q Do you know why there would be multiple, um, statements taken from a cooperating witness?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: I don't know. Maybe

something came up in the investigation that he needed to be reinterviewed. Not unusual.

BY MR. O'HANLON:

Q Okay. How about reinterviewed four times?

A I don't find it unusual.

Q Okay. Do you know why this statement, which was taking in 19 -- in December of 1996, do you know why it would have been handwritten at that time?

MR. JACKAL: Objection to the form of the question. You can answer.

THE WITNESS: Where was this -- where was this statement taken?

BY MR. O'HANLON:

Q At -- it was taken at the Land Title Building, 100 South Broad Street, Room 2214. And I'll show you where it says that. It says this at the place of interview here, Room 2214. Is that the Philadelphia Sheriff's Office?

A I have no idea what that office is. 100 South Broad. Is that the DA's Office?

Q No, that's -- that's 3 South Penn Square I believe.

A Okay. Well, it was at 1400 Arch when I was there. So --

MS. SMITH: Just to be clear, that's

now, Mr. O'Hanlon. That's not in 1996 --

MR. O'HANLON: Okay.

MS. SMITH: -- the location of the DA's Office.

BY MR. O'HANLON:

Q Okay. Well, was the DA's Office ever at the Land Title Building at 100 South Broad?

A Who are you asking that to?

Q You.

A You're asking me that?

Q Yes. You're the only --

A I have no idea. It was at 1400 Arch when I was still on the job.

Q Okay. Um, I represent to you that the Sheriff's Office at least part of it is currently at -- at the Land Title Building at 100 South Broad, do you know why you would have been questioning, or why possibly you would have been questioning an individual at the Sheriff's Office?

MS. SMITH: Objection --

MR. JACKAL: Objection.

MS. SMITH: -- to the form of the question.

MR. JACKAL: Same objection. You can answer, Detective.

THE WITNESS: I have no idea.
BY MR. O'HANLON:
Q Okay. And going back to the question that I originally asked before we got, um, sidetracked about where it occurred, do you know why Homicide Detectives, yourself, and Detective Raley would have, um, taken a handwritten statement from a potential witness?
A Well, it --
MR. JACKAL: Objection to the form of the question. You can answer, Detective.
THE WITNESS: Well, it was myself and Detective Dougherty. And Detective Dougherty did write it. And why it was done that way I would -- my best guess would be there was no typewriters.
There were no computers then that I remember. It was all done either with a typewriter, or by hand.
BY MR. O'HANLON:
Q Okay. And I want to go onto page four of this statement and just see if you remember this.
The question -- and I can't really highlight -- oh. Maybe it's -- I'm having a little bit of difficulty highlighting the question. But it only highlights just above and just below.

But the question is -- it says, um -- from either yourself, or Detective Dougherty, the question is describe the gun that Ricardo Natividad used to shoot and kill Robert Campbell. And the answer was it was a chrome revolver, and it looked like a 38. Do you remember that?
A I do not.
Q Okay. Do you have any idea where in subsequent testimony and subsequent statements, um, Mr. Price changed the description of the gun from a 38 revolver to a 357 revolver?
MR. JACKAL: Objection to the form of the question. You can answer, Detective.
THE WITNESS: I would have no idea why he would change it.
BY MR. O'HANLON:
Q Okay. I'm going to stop sharing this statement. And, um, I believe that, um -- I just want to go through some other -- but I believe that's all the questions that I will have on any kind of documents.
Do you ever remember hearing of the alleged doer, or an alleged shooter on this case by the name of Rolston -- that's, R-O-L-S-T-O-N -- Ricardo Robinson?
A No.
Q Do you ever remember, um, Detective DiBlasi taking

a -- or hearing of a statement that Detective DiBlasi, um, took where Mr. Robinson placed himself at the scene of the murder?

A No.

Q Do you ever remember hearing of any statements from other people including Joseph Rutherford and Cynthia Smith who stated that Mr. Robinson admitted to the killing of Mr. Campbell?

MR. JACKAL: Objection to the form of the question. You can answer.

MS. SMITH: Same objection.

THE WITNESS: No.

BY MR. O'HANLON:

Q Detective Raley, did you ever have any Internal Affairs complaints against you?

A Um, I had an EEOC complaint.

Q And what was that?

A Um, another police officer said that I called her a bitch.

Q Okay. So, some kind of gender discrimination case?

A I guess.

MR. JACKAL: Objection. You can answer.

THE WITNESS: Yeah. I assume that's

what it is, yeah. I don't --
BY MR. O'HANLON:
Q What --
A -- know.
Q What was the outcome of that?
A Um, I was exonerated and nothing happened.
Q Okay. How about any kind of, um, issues directly related to police work rather than, you know, not getting -- not allegedly getting along with employees? Did you have any complaints about that?
MS. SMITH: Objection to the form of the question.
MR. JACKAL: Same objection. You can answer.
THE WITNESS: Um, the only one I saw in my record was that there was a complaint about something happened to a house during a search and seisure warrant.
BY MR. O'HANLON:
Q Okay. And what happened there?
A I have no idea.
Q Okay. Were you, um -- were you adjudicated guilty, or exonerated, or --
A Exonerated.

Q I'm sorry. What was your answer?
A Exonerated.
Q Okay. Good. I want to ask you if you remember this case.
Um, there was a case, um, with Philadelphia Court of Common Pleas, Docket CP-51-CR-0411991 involving an individual called Barry Mallory. That's, M-A-L-L-O-R-Y. Do you remember that case?
A Um, I don't have recollection of it, no.
Q The allegations in that case was Mr. Mallory alleged that Detective Raley and other Detectives coached and supplied a witness, William Rodney with a pre-written statement that was used against Barry Mallory. Do you remember that?
A Not at all.
Q The statement did not belong to William Rodney, but was taking from another individual and simply ascribed to the witness by defendant Raley. That's you. Defendant Raley and the other Detectives coached the witness to provide false testimony against Mallory. Do you ever remember that?
A Not at all.
Q Do you ever remember receiving allegations about that?

A Not at all.
Q Okay. And there was no internal investigation into that I take it because you don't remember it and -- and according to you it didn't happen, correct?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: No, I don't have any recollection.
BY MR. O'HANLON:
Q Okay. I want to talk to you, um, briefly about, um, some issues that were going on with the Philadelphia Police Department around about the time of the plaintiff in this case -- about the time of his arrest and prosecution.
Do you remember, um, any training associated with Consent Decrees relating to Operation Cold Turkey?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: No. I never heard that before.
BY MR. O'HANLON:
Q How about, um, a Federal Consent Decree -- I'm sorry -- a Federal Injunction stopping police from sweeps -- engaging in police sweeps of Latinos in the Spring Garden area in a homicide investigation? Do you ever remember

being trained on issues associated with that?

MR. JACKAL: Same objection. You can answer.

THE WITNESS: No.

BY MR. O'HANLON:

Q And the case is Spring Garden Neighbors versus the City of Philadelphia, and it's 614 F. Supp 1350 Eastern District, 1985.

How about, um, a third case Arrington -- that's, A-R-R-I-N-G-T-O-N -- versus City of Philadelphia, CA Number 882264 Eastern District, 1988? Do you ever remember receiving training in relation to this Order enjoining stops, detentions, and searches of African American males during an investigation of the Center City Stalker?

MR. JACKAL: Same objection. You can answer.

THE WITNESS: I don't have any recollection of that.

BY MR. O'HANLON:

Q Okay. So, you don't recollect any kind of, um, training?

MR. JACKAL: Same objection.

THE WITNESS: At this time, I don't have any recollection.

BY MR. O'HANLON:

Q How about, um, a narcotics squad working out of the 39th District? Do you ever remember that in the late '80's and 1990's?

MR. JACKAL: Objection. Same objection. You can answer.

THE WITNESS: No, I have no knowledge of it.

BY MR. O'HANLON:

Q Okay. So, you don't remember receiving any training about unconstitutional practices, fabrication of evidence, unlawful searches and arrest warrants, concealment of allegation, and so on as a result of that incident, is that correct?

MR. JACKAL: Same objection. You can answer.

THE WITNESS: At this time, I have no recollection of that.

BY MR. O'HANLON:

Q Okay. How about, um, within the Philadelphia Homicide Detective Unit? Was there any, um, method whereby you could report misconducts of other Detectives?

MR. JACKAL: Same objection. You can answer.

THE WITNESS: Um, I don't know what you mean by -- you might have to explain that one to me.
BY MR. O'HANLON:
Q Sure. If there was, um, say a Detective -- for example -- coercing a false confession, um, is there some way that you could report that internally?
MR. JACKAL: Same objection. You can answer.
THE WITNESS: Um, I assume there's a procedure out there for it. I -- I don't know what the procedure is, but I'm sure there's something.
BY MR. O'HANLON:
Q Okay. But, um, going back to around about the time of, um, 1996, is there any, um, policy, or procedure, or chain of command that you can remember that you would use at that time?
MR. JACKAL: Same objection. You can answer.
THE WITNESS: No, I don't.
BY MR. O'HANLON:
Q Did you ever report another Detective for engaging in misconduct?

A No.
Q Did -- were you ever reported by another Detective for engaging in misconduct?
A Not that I'm aware.
Q Okay. In all your time at Homicide -- which was how long again? How many years?
A Ten years. Ten and a half years.
Q Okay. Ten and a half years. Had you ever heard of any other Detective reporting another Detective for engaging in misconduct?
A No. No, I wasn't -- I haven't -- I was not aware of any.
Q Okay. And during the ten and a half years that you worked in Homicide, did you ever see another Detective engage in misconduct?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: No.
BY MR. O'HANLON:
Q And whereabouts was the Homicide Unit when you worked there? Was it at like Franklin Square -- across from Franklin Square?
A PAB, Room 104.
Q Okay. And were there any cameras in interview

rooms when you worked at the Homicide Unit?
A No.
Q Why not?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: Um, it was in the days before cameras in interview rooms.
BY MR. O'HANLON:
Q Okay. And do you know why cameras were subsequently introduced at video rooms?
MR. JACKAL: Same objection.
BY MR. O'HANLON:
Q At interview rooms. I'm sorry.
MR. JACKAL: Same objection. You can answer, Detective.
THE WITNESS: I don't know why they were. I was gone by then.
BY MR. O'HANLON:
Q Okay. Do you know if the FOP -- if the FOP opposed cameras being installed at Homicide interview rooms?
MR. JACKAL: Same objection. You can answer, Detective.
THE WITNESS: I do not, no.
BY MR. O'HANLON:

Q One second. Just one second. Do you ever remember interacting with any of the following witnesses? I think we talked about, um -- we talked about Beth Johnson already. Do you remember that name?
A I believe you mentioned it.
Q But you don't remember it?
A No.
Q John McCullough. We talked about him, right? You don't remember him?
A I do not.
Q Joseph Rutherford, do you remember that individual?
A No, I don't.
Q Cynthia Smith?
A No.
Q Michael Capaiulo. That's, C-A-P-A-I-U-L-O.
A No.
Q How about Tish Ann Ambrosine, A-M-B-R-O-S-I-N-E?
A No.
Q Robert Golatt we -- we discussed. Byron Price we discussed.
How about a Police Officer, um, with the last name Wilson? Do you ever remember her, um, relaying that Mr. Robinson had, um, admitted to the murder of the decedent in

this case, Mr. Campbell?
A No.
Q How about a woman by the name of Tracie -- that's, T-R-A-C-I-E -- Dunham -- D-U-N-H-A-M -- who said that, um -- who said that Rob, or Rolston Ricardo Robinson was at the scene of the murder with a gun? Do you ever remember speaking to that woman?
A No.
Q How about, um, Richard Anderson? Do you ever remember receiving information from Richard Anderson who said the person who killed the decedent in this case resided at Rob's address? Do you ever remember that?
A No.
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: No.
BY MR. O'HANLON:
Q How about if there's alleged police misconduct in a Post-Conviction Relief Petition, have you ever come across that in your time in the Homicide Unit?
A No. I never heard that term before either.
Q Okay. How about if -- if, um, in a PCRA -- which term, PCRA?
A Well, that one too. But the one you said before,

post conviction something.

Q Okay. Um, it might have been called the PCHA, or something like that.

Have you ever testified at an Evidentiary Hearing for a Post-Conviction Relief Petition?

A No.

Q Okay. You are aware -- let me see if you are aware of this. But, um, you're aware of trials, correct?

A Yes.

Q And then you're aware of direct appeals -- right -- where, um -- where things go up on appeal and things like where you hear lawyers say objection in court. Those things go up on direct appeal, correct?

MR. JACKAL: Objection to the form of the question. You can answer, Detective.

THE WITNESS: If you say so.

BY MR. O'HANLON:

Q Okay. And then, um, there's things called collateral proceedings where, um, people can allege that they have new evidence, or ineffectiveness, or trial counsel, or direct appeal counsel. You never testified at one of those PCR Hearings?

A Not that I recall.

Q Okay. If there was new -- newly discovered

evidence, or alleged newly discovered evidence like police corruption, or police criminality, um, in a Post-Conviction Relief Petition, would the same police who are alleged to have engaged in the police misconduct, or police corruption, would they be the same people that would go out and interview potential witnesses for the Post-Conviction Relief Petition?

MS. SMITH: Objection --

MR. JACKAL: Objection --

MS. SMITH: -- to the form of the question.

MR. JACKAL: Same objection. You can answer, Detective.

THE WITNESS: I have no idea what you're talking about.

BY MR. O'HANLON:

Q Okay. Well, let me see if -- if you, um -- if it makes sense in this case then.

In this case -- all right -- in the underlined PCRA proceedings for Ricardo Natividad, there were allegations that several of the Detectives engaged in misconduct and covered up evidence, right?

A If --

MR. JACKAL: Objection.

THE WITNESS: -- you say so.
BY MR. O'HANLON:
Q Okay. Now, one of those Detectives was Detective Dougherty, okay? Does that -- does that make -- okay. I'm -- I'm telling you that.
So, based upon that, would it be normal for Detective Dougherty to then go out and interview witnesses where Detective Dougherty is alleged to have engaged in misconduct?
MS. SMITH: Objection to --
MR. JACKAL: Same objection.
MS. SMITH: -- the form of the question.
MR. JACKAL: You can answer, Detective.
THE WITNESS: I -- I don't know.
BY MR. O'HANLON:
Q Okay. Is Detective Dougherty also retired now?
MR. JACKAL: Objection to the form of the question. You can answer.
THE WITNESS: Um, I believe he is.
BY MR. O'HANLON:
Q Okay. Do you -- in around about -- I'm sorry. What year did you retire again?
A November of '97.
Q So, it was a year -- about a year after this

incident?
A About that.
MR. JACKAL: Objection to the form of the question. You can answer, Detective.
BY MR. O'HANLON:
Q Okay. Have you discussed, um, this civil case with either Arthur Mee, or Jimmy Dougherty?
A No.
Q Have you discussed this case with anyone apart from Mr. Jackal?
A No.
Q Okay. All right. I think I'm -- I think I'm pretty much done.
Could we just take like a three-minute break, and then I'll be right back. I just want to review some notes. Is that okay, Mr. Raley?
A That's fine with me.
Q All right. Thank you. Just one second.
(Whereupon a short break was taken.)
THE COURT REPORTER: We're back on the record.
BY MR. O'HANLON:
Q Mr. Raley, um, how about in general if there are allegations of police misconduct, um, made by attorneys, is

there any kind of policy, or procedure in place to take those Detectives out of the continued investigatory function in a criminal case?

MS. SMITH: Objection --

MR. JACKAL: Objection to the form of --

MS. SMITH: -- to the form of the question.

MR. JACKAL: Same objection.

MS. SMITH: I'm sorry.

MR. JACKAL: You can answer, Detective.

THE WITNESS: I -- I never been -- I never seen anything like that. I have no idea what a procedure would be for that.

BY MR. O'HANLON:

Q Okay. Um, how frequently would you have training on -- for example -- taking statements from witnesses?

MR. JACKAL: Same objection. You can answer.

MS. SMITH: Same objection.

THE WITNESS: I don't know that there was a set, um, schedule to receive any training like that.

BY MR. O'HANLON:

Q How often when you were in the Homicide Unit would

you be retrained?
A Well, they had mandatory training that was done once a year.
Q And what was that about?
A That included everything, laws, and arrest, first aid, shooting.
Q Okay. Did you have specific -- do you ever remember any specific training about taking statements from witnesses?
A Not specifically.
Q Okay. I think that's all the questions I have. Um, thank you for your time. I don't know if I'll speak to you again, but enjoy your retirement. Some of the other attorneys may have questions. Take care.
A Okay. Thank you.

THE COURT REPORTER: Mr. Jackal, I didn't hear any audio for you if you were speaking.

MR. JACKAL: I'm sorry. I don't have any questions for you, Detective. Thank you.

THE WITNESS: Okay.

MS. SMITH: I don't have any questions either, Detective Raley. Thank you.

THE WITNESS: Thank you.

THE COURT REPORTER: Okay. Mr. Jackal, would you like a copy of the deposition transcript?

MR. JACKAL: Yes, I would. And electronic and regular schedule is fine for me.

THE COURT REPORTER: Okay. Thank you. And, Ms. Smith, would you like a copy of the deposition transcript?

MS. SMITH: Same here, please. Thank you.

THE COURT REPORTER: You're welcome. Thank you.

(Whereupon the witness was excused and the deposition was concluded at 1:53 p.m.)

C E R T I F I C A T I O N

I, Heather K. Hines, Notary Public and Court Reporter, certify that the foregoing is a true and accurate transcript of the foregoing deposition, that the witness was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Heather K. Hines
__________________________

Heather K. Hines
Court Reporter
and Notary Public.
My commission expires
August 22, 2027.



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**able**
6:23 14:6 19:14
**about**
9:6,9,14,17,23,24 10:4 11:6,21 12:5 17:1,4 18:9 20:4 22:4 25:7,10,16 26:23 27:10,12,13 27:21 28:9 29:2,11 29:20 30:15 33:3,3 33:8,18,22 34:3,9 34:18,22 36:15 37:21,24 38:2,23 40:4,8
**above**
22:24
**according**
27:4
**accurate**
42:7
**across**
31:21 34:19
**action**
1:2 42:12,15
**Activity**
4:13 10:19,20,23,24 11:12 15:8
**actually**
7:16
**address**
34:12
**adjudicated**
25:22
**admitted**
15:1 24:7 33:24
**Affairs**
24:15
**African**
28:13
**after**
5:7 37:24
**afternoon**
5:11
**again**
8:13 31:6 37:22 40:13
**against**
24:15 26:13,20
**ago**
11:7
**agreed**
5:1
**aid**
40:6
**AL**
1:8
**all**
5:4 6:6 7:6 8:15,20 10:6 12:18 22:16 23:18 26:15,22 27:1 31:5 36:19 38:12,18 40:11
**allegation**
29:13
**allegations**
26:10,23 36:21 38:24
**allege**
35:19
**alleged**
18:2 23:20,21 26:11 34:18 36:1,3 37:8
**allegedly**
25:9
**alleging**
9:19
**along**
25:9
**already**
33:4
**also**
13:10 37:16
**am**
42:10,13,14
**Ambrosine**
33:18
**American**
28:13
**an**
6:1 9:24 10:7,19,23 10:24 11:12 13:3,13 14:24 16:4 21:18 23:21 24:16 26:6 28:14 35:4
**Anderson**
34:9,10
**Ann**
33:18
**another**
6:21 7:3 10:12 24:18 26:17 30:23 31:2,9 31:14
**answer**
7:2 11:10 14:10,11 16:18 17:10 19:23 20:10 21:24 22:10 23:4,12 24:10,23 25:14 26:1 27:6,17 28:3,16 29:6,16,24 30:9,20 31:17 32:5 32:15,22 34:15 35:15 36:13 37:13 37:18 38:4 39:10,18
**answering**
7:1
**answers**
6:17
**anticipate**
6:24 7:2
**any**
6:2,5 7:8 14:16 16:7 16:24 17:9 18:19 19:16 23:7,19 24:5 24:14 25:7,10 27:7 27:14 28:17,20,24 29:10,21 30:16 31:9 31:12,24 33:2 39:1 39:21 40:8,17,20,22 42:11,13
**anyone**
12:14 38:9
**anything**
5:22 9:6,9,14,17,24 10:4 39:12
**anyway**
14:2
**apart**
38:9
**apologize**
13:19
**appeal**
35:11,13,21
**appeals**
35:10
**appear**
11:23
**approximately**
7:14 9:24
**Arch**
2:10,16 20:22 21:12
**ARCHER**
2:14
**are**
5:4,5,13 6:15 16:22 16:23,23 21:8 35:7 35:7 36:3 38:23
**area**
9:20 10:2 27:24
**around**
8:10 27:12 30:15 37:21
**arrangements**
13:8
**arrest**
27:13 29:12 40:5
**Arrington**
28:9
**Art**
8:23
**Arthur**
8:21,23 38:7
**as**
5:5,8 6:3,3,16,16 8:24 10:22,23 11:13 11:22,23 12:19,21 15:5,16 16:19,20 19:10,12 29:13
**ascribed**
26:17
**ask**
6:16,23 7:3 17:3 26:3
**asked**
22:4

**asking**
17:7,8 21:8,10
**assigned**
7:22 11:3 13:6
**Assistant**
16:23 18:7
**associated**
27:14 28:1
**assume**
24:24 30:10
**at**
1:14 6:2 7:22 9:23 10:1,6,7 11:2,21 12:10,11 13:7,11,14 14:19 16:10 17:6 18:7,20 20:8,14,14 20:16,22 21:6,7,12 21:15,15,15,16,18 24:2 26:15,22 27:1 28:23 29:17 30:18 31:5,21 32:1,10,13 32:20 34:5,12 35:4 35:21 41:14 42:8
**attempts**
13:10
**attention**
16:12
**attorney**
10:8 16:23 18:7 42:11,14
**attorneys**
38:24 40:14
**attributed**
18:20
**audio**
14:10 40:17
**August**
42:21
**authenticity**
16:8
**Avenues**
9:20
**aware**
31:4,11 35:7,8,8,10
**A-M-B-R-O-S-I-N-E**
33:18
**A-R-R-I-N-G-T-O-N**
28:10

**B**

**back**
8:12,13 22:3 30:15 38:15,20
**Badge**
15:24
**Barry**
26:7,13
**based**
18:6 37:6
**be**
5:24 6:17,23 8:16 12:1 19:14,20 20:2 20:24 22:14 36:5 37:6 38:15 39:13 40:1
**because**
6:6 17:24 18:1 27:3
**been**
5:7,19 8:10 20:8 21:17,17 35:2 39:11
**before**
1:12 5:17,19 7:1,3,15 7:17,20 17:21 22:4 27:19 32:7 34:21,24 42:9
**begins**
6:21
**being**
10:1 19:17 28:1 32:20
**believe**
20:21 23:17,18 33:5 37:19
**belong**
26:16
**below**
22:24
**BEN**
2:10
**best**
6:16 7:1 22:14
**Beth**
12:9 33:3
**between**
5:2
**bigger**
13:21,23 14:4 15:6
**bit**
9:16 22:22
**bitch**
24:19
**black**
9:19 18:19
**blame**
18:10
**blue**
17:6
**body**
16:15,17
**bottom**
11:18
**Boulevard**
2:5
**break**
6:2,8 38:14,19
**brief**
5:21 8:11
**briefly**
27:10
**Broad**
20:15,19 21:7,16
**Building**
20:14 21:7,16
**but**
6:2,12 8:24 9:15 10:24 11:22,23 13:8 14:1 17:8 22:23 23:1,18 26:17 30:12 30:15 33:6 34:24 35:8 40:13
**by**
1:11 2:4,10,15,15 4:5 4:6,7 5:1,10,13 7:10 9:8,18 10:1,8 11:11 11:16 12:9 14:14 15:20 16:5 18:12 19:3 20:3,13 21:5 22:2,17,18 23:15,21 24:13 25:2,19 26:18 27:9,20 28:5,19 29:1,9,19 30:2,4,14 30:22 31:2,19 32:8 32:12,17,18,24 34:3 34:17 35:17 36:16 37:2,15,20 38:5,22 38:24 39:14,23 42:8 42:11
**Byron**
18:13,18 19:6 33:20

**C**

**C**
2:1 42:2,2
**CA**
28:10
**call**
6:6 7:7
**called**
11:21 14:17,24 17:21 24:18 26:7 35:2,18
**Callowhill**
11:22 12:1
**came**
8:12 20:1
**cameras**
31:24 32:7,9,20
**Campbell**
10:1 11:18 12:10 14:19 15:1 23:4 24:8 34:1
**can**
7:2 9:15 10:18 11:10 14:3,4 15:21 16:12 17:8,14 18:23 19:4 19:5,23 20:10 21:23 22:10 23:12 24:10 24:23 25:13 27:6,17 28:2,15 29:6,15,23 30:8,17,19 31:17 32:5,14,21 34:15 35:15,19 36:12 37:13,18 38:4 39:10 39:17
**can't**

22:21
**Capaiulo**
33:16
**car**
17:5
**care**
40:14
**case**
9:6,7,10 16:24 17:22 18:4,9,13 19:18 23:21 24:21 26:4,5 26:8,10 27:13 28:6 28:9 34:1,11 36:18 36:19 38:6,9 39:3 42:14
**Catherine**
17:6
**Center**
2:4 28:14
**Central**
7:22
**certification**
5:3
**certify**
42:6,10
**chain**
30:17
**change**
23:14
**changed**
23:8
**charge**
13:7
**check**
7:23
**chrome**
23:4
**City**
2:9 28:7,10,14
**civil**
1:2 2:9 9:7 38:6
**clarification**
17:1
**clarity**
17:1
**clear**
7:4 20:24
**close**
15:4 18:24
**coached**
26:11,19
**coercing**
30:6
**Cold**
27:15
**collateral**
35:19
**colored**
9:19
**come**
34:19
**command**
30:17
**commencing**
1:14
**commission**
42:21
**Common**
26:6
**complainant**
9:18 11:24
**complainants**
12:5
**complaint**
24:16 25:16
**complaints**
24:15 25:10
**compound**
6:7
**computers**
22:15
**concealment**
29:12
**concluded**
41:14
**Conference**
1:13
**confession**
30:6
**connection**
12:3
**Consent**
27:15,21
**contacted**
12:2
**continued**
39:2
**conviction**
35:1
**cooperating**
18:12 19:17,21
**copy**
41:2,7
**correct**
27:4 29:14 35:8,13
**corruption**
36:2,4
**could**
13:4,20,22 29:22 30:7 38:14
**counsel**
2:6,12,18 5:2 35:21 35:21 42:11,14
**court**
1:1 6:13 11:14 14:9 14:13 15:8,11,14,17 15:18 18:6 19:1 26:5 35:12 38:20 40:16 41:1,6,11 42:6,20
**covered**
36:22
**CP-51-CR-0411991**
26:6
**Crimes**
8:1
**criminal**
9:6,7,18 17:21 18:8 39:3
**criminality**
36:2
**currently**
21:15
**cuts**
6:21
**Cynthia**
14:23 24:6 33:14
**C-A-P-A-I-U-L-O**
33:16

**D**

**dark**
9:19
**date**
42:9
**days**
7:12 32:6
**DA's**
20:19 21:3,6
**dead**
10:1
**death**
11:17
**decedent**
11:17 14:19 15:1 33:24 34:11
**December**
16:4 20:7
**Decree**
27:21
**Decrees**
27:15
**defendant**
9:8 26:18,18
**defendants**
1:9 2:12,18 18:8
**Department**
2:9 5:14 7:11 27:12
**depending**
6:1
**depends**
13:2
**deposition**
1:4,11 5:17,24 41:2,8 41:14 42:7,12
**depositions**
6:12
**describe**
23:2
**description**
4:12 18:19 23:9
**Detective**
1:7 7:7,18,18,20 8:21 8:21 11:3 12:6,18

13:5 14:6 15:24 16:14 17:20 19:7,12 19:14,23 21:24 22:6 22:10,12,12 23:2,12 23:24 24:1,14 26:11 29:21 30:5,23 31:2 31:9,9,14 32:15,22 35:15 36:13 37:3,7 37:8,13,16 38:4 39:10 40:20,23

**Detectives**
7:22,24 11:20 22:5 26:11,19 29:22 36:21 37:3 39:2

**detentions**
28:13

**DiBlasi**
12:18,20 13:5 23:24 24:1

**did**
8:11,20 9:2 12:13,18 14:15 17:5 22:12 24:14 25:9 26:16 30:23 31:2,14 37:22 40:7

**didn't**
27:4 40:17

**different**
10:14

**difficult**
6:15 8:16

**difficulty**
22:22

**direct**
5:9 16:11 35:10,13 35:21

**directly**
12:13 14:17 25:7

**discovered**
35:24 36:1

**discrimination**
24:20

**discussed**
33:20,21 38:6,9

**discussions**
18:6

**District**
1:1,1 16:23 18:7 28:8 28:11 29:3

**division**
7:18

**do**
6:5,24 8:6,15 9:9,9 9:17,24 10:4,7,10 10:22,22 11:2,4 12:4,7,8,8 13:3,14 14:3,15,22 15:4 16:3,7,13 17:7,20 17:23,24 18:5,12,15 18:18 19:6,12,16,16 19:20 20:6,7 21:16 22:5 23:5,6,7,20,24 24:5 26:7,13,20,23 27:14,24 28:11 29:3 32:9,19,23 33:1,4 33:10,11,23 34:6,9 34:12 37:21 40:7

**Docket**
26:6

**document**
12:18 18:22

**documents**
23:19

**doer**
23:20

**does**
7:4,5 11:23 17:3 37:4 37:4

**doing**
5:12

**done**
14:1 16:20 17:2,19 22:13,16 38:13 40:2

**don't**
5:23 9:13,13 10:3 12:12,22 13:23,23 14:21 15:2 16:6 17:8 19:8,24 20:5 25:1 26:9 27:3,7 28:17,20,23 29:10 30:1,11,21 32:16 33:6,9,13 37:14

39:20 40:12,19,22

**doubt**
17:9,11

**Dougherty**
8:22 9:1,3 11:3,5,6 19:7 22:12,12 23:2 37:4,7,8,16 38:7

**Dougherty's**
19:12,15

**down**
6:8,13,15 11:18 16:15 17:5,14,15

**duly**
5:7

**Dunham**
34:4

**during**
25:17 28:14 31:13

**D-U-N-H-A-M**
34:4

**E**

**E**
2:1,1 42:2

**East**
7:24

**Eastern**
1:1 28:7,11

**easy**
6:8

**EEOC**
24:16

**either**
12:13 14:16,23 18:5 22:16 23:1 34:21 38:7 40:23

**electronic**
41:5

**Elmwood**
9:20

**else**
12:14

**employed**
5:13 7:10 42:11,14

**employee**
42:13

**employees**
25:9

**encountering**
12:9

**engage**
31:15

**engaged**
36:4,21 37:8

**engaging**
27:23 30:23 31:3,10

**enjoining**
28:12

**enjoy**
40:13

**ESQUIRE**
2:4,10,15,15

**estimate**
6:1

**ET**
1:8

**even**
6:23 7:2

**evening**
9:23

**ever**
5:17,19 9:2 10:7 12:4 12:8,13 13:14 14:15 14:15,22 18:5 21:6 23:20,24 24:5,14 26:20,23 27:24 28:11 29:3 30:23 31:2,8,14 33:1,23 34:6,9,12,19 35:4 40:7

**everything**
6:13 40:5

**evidence**
29:12 35:20 36:1,1 36:22

**Evidentiary**
35:4

**EXAMINATION**
1:5 5:9

**examined**
5:8

**example**

30:6 39:16
**except**
5:4
**excused**
41:13
**Exhibit**
11:13,15 15:19,21 19:2,4
**Exhibits**
4:11 16:23
**exonerated**
25:6,23,24 26:2
**expires**
42:21
**explain**
30:2
**Exxon**
12:10 13:7,11,14
**eyewitness**
11:24

**F**

**F**
28:7 42:2
**fabrication**
29:11
**false**
26:20 30:6
**Federal**
27:21,22
**fellow**
14:16
**female**
12:20
**few**
11:6 18:24
**filing**
5:4
**final**
6:19 17:13,18,18 18:22
**finally**
6:11
**financially**
42:15
**find**
20:5
**fine**
14:7 38:17 41:5
**finish**
7:1
**finished**
16:21 17:16
**first**
5:7 6:22 7:8,21 8:9 8:15,24 10:19 11:19 12:18 40:5 42:8
**Floor**
2:10
**folder**
10:13
**following**
33:2
**follows**
5:8
**FOP**
32:19,19
**for**
1:1 2:6,12,18 5:2,11 5:16 8:8,16,19,23 10:24 11:15 13:19 13:21 15:19 16:15 19:2 30:5,11,23 31:3,9 35:5 36:6,20 37:6 39:13,16 40:12 40:17,20 41:5 42:11
**foregoing**
42:6,7
**form**
5:5 11:9 19:22 20:9 21:21 22:9 23:11 24:9 25:11 27:5,16 31:16 32:4 34:14 35:14 36:10 37:12 37:17 38:3 39:5,6
**format**
10:23
**forth**
42:9
**four**
7:12 12:23 20:4 22:19
**four-door**
12:14
**Frank**
10:8,10
**Franklin**
31:21,22
**frequently**
39:15
**from**
8:9,12 12:13,14 14:16,17,23 16:4,23 16:24 18:23 19:21 22:7 23:1,9 24:6 26:17 27:22 31:21 34:10 38:10 39:16 40:8
**Front**
7:24
**Fugitive**
8:12,13,17
**full**
15:5
**function**
39:2
**further**
42:10,13

**G**

**Garden**
27:23 28:6
**gas**
10:2 12:10
**gender**
24:20
**general**
38:23
**getting**
25:8,9
**give**
5:21
**go**
10:14 11:18 15:5 16:19 17:12 22:19 23:17 35:11,13 36:5 37:7
**going**
6:24 7:3 10:17,20 12:17 17:4 18:22 22:3 23:16 27:11 30:15
**Golatt**
16:5 18:1,7 33:20
**gone**
32:17
**Good**
5:11 26:3
**got**
7:21 8:24 22:4
**great**
10:21
**GREINER**
2:14
**grips**
18:19
**guess**
22:14 24:22
**guilty**
25:23
**gun**
10:7 23:3,9 34:6
**G-O-L-A-T-T**
16:5

**H**

**had**
5:17 13:13 18:16 24:16 31:8 33:24 40:2
**half**
7:16 31:7,8,13
**halfway**
17:5
**Hamilton**
7:23
**hand**
22:17
**handwriting**
19:9,13,15
**handwritten**
20:8 22:6
**happen**
27:4

**happened**
25:6,17,20
**hard**
13:21
**have**
5:17,19 8:10 9:22 12:16 16:7 17:9,11 18:3 19:16,19 20:8 20:18 21:12,17,17 22:1,6 23:7,13,19 24:14 25:9,21 26:9 27:7 28:17,23 29:7 29:17 30:2 34:19 35:2,4,20 36:4,14 37:8 38:6,9 39:12 39:15 40:7,11,14,19 40:22
**Havens**
9:18
**haven't**
9:11 31:11
**having**
5:7 17:24 22:22
**he**
8:23 9:19 12:19 13:13,13 18:1 20:1 23:14 37:19
**head**
6:14
**hear**
12:13 14:15 35:12 40:17
**heard**
9:11 10:11 27:18 31:8 34:21
**hearing**
16:24 18:5 23:20 24:1,5 35:4
**Hearings**
35:22
**Heather**
1:12 6:13 42:5,19
**Hello**
5:11
**help**
10:15
**her**
13:8 24:18 33:23
**here**
13:5 17:4 20:16 41:9
**hereby**
5:1
**herein**
42:9
**highlight**
17:4 22:21
**highlighting**
22:23
**highlights**
22:23
**him**
18:9 33:8,9
**himself**
24:2
**Hines**
1:12 42:5,19
**his**
18:2 27:13
**homicide**
7:13 8:2,3,11,12 22:5 27:24 29:21 31:5,14 31:20 32:1,20 34:20 39:24
**Horton**
11:21,24
**hour**
6:1
**house**
25:17
**how**
7:10,13 8:8 9:23 13:2 20:4 25:7 27:21 28:9 29:2,20 31:6,6 33:18,22 34:3,9,18 34:22 38:23 39:15 39:24

**I**

**idea**
20:18 21:12 22:1 23:7,13 25:21 36:14 39:12
**identification**
11:15 15:19 19:2
**identify**
19:14
**if**
5:22 6:2,5 7:2,7 9:5 9:15 10:15,18 11:2 11:23 13:2,21 14:4 14:6 15:6 16:12 17:22 22:20 26:3 30:5 32:19,19 34:18 34:22,22 35:7,16,24 36:17,17,17,23 38:23 40:12,17
**impeached**
18:1
**impending**
13:14
**in**
1:1 6:6,12 7:13,18,18 7:18,21,23,24 8:1,1 8:3,4,8,11,14,15,17 8:19,20,24 9:19,20 9:20 10:2 12:9,19 12:21,23 13:6 14:18 16:24 17:5,21,22 18:5,8,9,13 19:9,9 19:18 20:1,7,7 21:1 23:7 25:15 26:10 27:12,23,23,24 28:12 29:3 30:24 31:3,5,10,14,15,24 32:6,7 33:24 34:11 34:18,20,20,22 35:12 36:2,4,18,19 36:19,21 37:8,21 38:23 39:1,3,24 42:12,14,15
**incident**
11:21 29:13 38:1
**incidents**
11:23
**included**
40:5
**including**
24:6
**inculpate**
18:10
**INDEX**
4:1
**individual**
10:1 14:17,24 16:4,4 19:7 21:18 26:7,17 33:12
**ineffectiveness**
35:20
**information**
14:16,22 34:10
**initially**
18:15,18
**Injunction**
27:22
**installed**
32:20
**instructions**
5:22
**interacting**
33:2
**interested**
42:15
**internal**
24:14 27:2
**internally**
30:7
**interrupting**
13:20
**interview**
4:14,16 13:4 20:16 31:24 32:7,13,20 36:6 37:7
**interviewed**
11:20 13:12
**interviewing**
12:4
**into**
8:13 27:3
**introduced**
32:10
**investigation**
4:14,16 10:5 20:1 27:2,24 28:14
**investigatory**

39:2
**involved**
10:24 14:18
**involves**
9:7
**involving**
26:6
**is**
5:1 6:11,13,19,20,20 6:24 7:2 10:19,21 11:5,5,12,22 12:2 14:6 15:4,11 16:1 19:9,11 20:17,18,19 21:15 23:1,2 25:1 28:6 29:13 30:6,12 30:16 37:8,16,19 38:16,24 41:5 42:6
**Island**
9:20
**issue**
13:24
**issues**
25:7 27:11 28:1
**it**
5:1 6:8,8 7:5 11:1,2 11:13,17,20,22,23 12:14 13:2,4,5,18 13:22 14:2,3,4,7,12 16:6,17 17:5,6,8,8 19:5,11,12 20:5,7 20:14,15,16,22 21:12,15 22:5,8,11 22:13,13,16,23 23:1 23:4,5,14 25:1 26:9 27:3,3,4 29:8 30:11 31:21 32:6 33:5,6 35:2 36:17 37:6,24
**it's**
6:6 11:17 12:20 13:2 13:2,21,23,24 14:7 16:8 17:13,14 22:22 28:7
**I'll**
7:6,6 11:12 14:8 15:4 15:5,15 16:19 17:15 20:15 38:15 40:12
**I'm**
7:17 10:17,19 12:22 14:1,1,9 15:10 16:21 17:2,4,16,19 17:22 18:22 22:22 23:16 26:1 27:21 30:12 31:4 32:13 37:4,5,21 38:12,12 39:9 40:19

**J**

**J**
11:3
**Jackal**
2:10 4:7 9:12,14 11:9 13:17,19 14:6 19:22 20:9 21:20,23 22:9 23:11 24:9,23 25:13 27:5,16 28:2,15,22 29:5,15,23 30:8,19 31:16 32:4,11,14,21 34:14 35:14 36:9,12 36:24 37:11,13,17 38:3,10 39:5,8,10 39:17 40:16,19 41:1 41:4
**James**
8:21 11:6
**JFK**
2:5
**Jim**
11:5
**Jimmy**
9:1,3 11:5 38:7
**Joan**
13:6
**job**
10:15 21:13
**jobs**
9:2 12:24
**John**
13:11 14:17 33:8
**Johnson**
12:9,14 33:3
**Jones**
13:6
**Joseph**
14:23 24:6 33:11
**judge**
17:21,21
**June**
8:2,10
**just**
5:23 6:2,7,16 10:12 10:18 14:7 15:6 16:15,16,24 17:3 18:23,23 20:24 22:20,23,24 23:17 33:1 38:14,15,18

**K**

**K**
1:12 42:5,19
**kill**
23:3
**killed**
34:11
**killing**
11:22 12:10 15:1 24:7
**kind**
7:8 14:16 17:5 23:19 24:20 25:7 28:20 39:1
**kinds**
6:15
**know**
5:23 6:3,8 9:9 10:10 10:17 19:20,24 20:6 20:7 21:16 22:5 25:4,8 30:1,11 32:9 32:16,19 37:14 39:20 40:12
**knowledge**
29:7

**L**

**lack**
17:1
**Land**
20:14 21:6,15
**last**
17:12,13 33:22
**late**
29:3
**later**
9:23
**Latinos**
27:23
**Laundromat**
13:7
**LAW**
2:9
**laws**
40:5
**lawyers**
6:6 35:12
**least**
21:15
**leaving**
12:15
**let**
5:21,23 6:2,7 7:23 9:15 10:12,17 14:4 15:3 17:3 35:7 36:17
**Let's**
17:12
**like**
8:10 16:8 23:5 31:21 35:3,11 36:1 38:14 39:12,22 41:2,7
**likelihood**
6:6
**likewise**
7:2
**Lincoln**
9:20 12:14 17:6
**little**
9:16 13:4 22:22
**locate**
13:6,10
**location**
21:3
**Logan**
2:16
**long**
6:3 7:10,13 8:8 31:6

**looked**
23:5
**LSC**
17:6

**M**

**made**
6:7 13:8 38:24
**maintenance**
13:11
**Major**
8:1
**make**
6:8 7:4 13:20,22 14:3 37:4
**makes**
15:6 36:18
**males**
28:13
**Mallory**
26:7,10,13,20
**man**
13:11
**mandatory**
40:2
**many**
31:6
**March**
1:14
**Maria**
12:20
**mark**
11:13 15:5 19:10
**marked**
4:12 11:14 15:18 19:1
**markings**
16:22
**matron**
13:6
**may**
40:14
**maybe**
13:2 17:16 19:24 22:22
**McCullough**
13:12 14:18 33:8
**me**
5:21,23 6:2,7 7:23 9:14,15 10:12,17 13:21 14:4,4,7 15:3 16:2,13,20 17:3 21:10 30:3 35:7 36:17 38:17 41:5 42:8
**mean**
30:2
**Mee**
8:21,23 38:7
**meet**
13:8
**member**
13:12
**memory**
9:16 10:15
**mentioned**
33:5
**method**
29:21
**Michael**
9:18 33:16
**mid**
8:11
**might**
6:23 8:16 30:2 35:2
**mine**
16:22
**MINOTT**
2:15
**misconduct**
30:24 31:3,10,15 34:18 36:4,22 37:9 38:24
**misconducts**
29:22
**mistaken**
17:22
**moments**
11:6
**months**
7:12
**more**
6:8
**most**
8:20
**move**
18:23
**Ms**
4:6 12:13 20:24 21:3 21:19,21 24:11 25:11 36:8,10 37:10 37:12 39:4,6,9,19 40:22 41:7,9
**much**
38:13
**multiple**
6:7 19:20
**murder**
12:15 24:3 33:24 34:6
**murders**
12:24
**my**
10:17,20 15:5 22:14 25:16 42:21
**myself**
22:11
**M-A-L-L-O-R-Y**
26:7

**N**

**N**
2:1 42:2
**name**
7:8 9:8,11,18 10:1,8 10:11 12:9 16:5 18:12 23:21 33:4,22 34:3
**narcotics**
29:2
**Natividad**
1:4 9:8 14:18 18:10 18:16,20 23:3 36:20
**navy**
17:6
**needed**
13:3 20:2
**Neighbors**
28:6
**neither**
42:10
**never**
8:24 9:11 27:18 34:21 35:21 39:11 39:12
**new**
35:20,24
**newly**
35:24 36:1
**night**
11:22
**no**
1:2 2:6,11,17 5:15,18 5:20 9:22 10:3,9 12:2,12,16,22 14:21 15:2 16:6,10 17:11 17:16 18:3,11,14,17 18:19,21 19:8,14,19 20:18,20 21:12 22:1 22:14,15 23:13,23 24:4,12 25:21 26:9 27:2,7,18 28:4 29:7 29:7,17 30:21 31:1 31:11,11,18 32:2,23 33:7,13,15,17,19 34:2,8,13,16,21 35:6 36:14 38:8,11 39:12
**nods**
6:14
**none**
10:6 13:16 14:11,12
**nor**
42:11,11,14
**normal**
37:6
**Norman**
13:10
**not**
6:5 9:4 10:21 11:23 12:7 14:18 16:9,22 17:17,22,23 19:11 20:2 21:1 23:6 25:8 25:9 26:15,16,22

27:1 31:4,11 32:3 32:23 33:10 35:23 40:10 42:11,13
**Notary**
1:13 42:5,20
**notes**
38:15
**nothing**
25:6
**November**
8:15 9:17 12:5 14:20 37:23
**now**
16:15 21:1 37:3,16
**number**
4:12 8:6 15:24 28:10

**O**

**O**
42:2
**objection**
11:9 19:22 20:9 21:19,20,23 22:9 23:11 24:9,11,23 25:11,13 27:5,16 28:2,15,22 29:5,5 29:15,23 30:8,19 31:16 32:4,11,14,21 34:14 35:12,14 36:8 36:9,12,24 37:10,11 37:17 38:3 39:4,5,8 39:17,19
**objections**
5:4
**occurred**
17:10 22:5
**office**
10:8 20:17,18,19 21:4,6,15,18
**officer**
24:18 33:22
**officers**
14:17
**often**
39:24
**oh**
22:22
**on**
1:13 6:1,20 9:2,17,23 11:22 12:5,24 13:8 13:12 14:10,20 15:5 16:4 18:19,23 21:13 23:19,21 27:11 28:1 29:13 35:11,13 38:20 39:16 42:8
**once**
40:3
**one**
6:20 10:18,19 15:6 18:22,23 25:15 30:2 33:1,1 34:24,24 35:22 37:3 38:18
**only**
17:14 21:11 22:23 25:15
**onto**
12:17 17:12 22:19
**Operation**
27:15
**opposed**
32:20
**or**
5:14 6:7 7:7 8:17,20 9:19 11:5 12:14 13:4 14:17,23 16:8 17:1 18:6,6,10 21:17 22:17 23:2,21 24:1 25:23,23 30:16 30:17 34:5 35:2,20 35:20,21 36:1,2,4 38:7 39:1 42:13,14
**ORAL**
1:5
**order**
18:9 28:12
**originally**
22:4
**other**
9:15 18:8 23:18 24:6 26:11,19 29:22 31:9 40:13
**out**
6:21 13:8 15:4 18:24 29:2 30:11 36:5 37:7 39:2
**outcome**
25:5
**over**
10:12 15:15
**overlap**
13:4
**overlapped**
14:10
**O'Hanlon**
2:3,4 4:5 5:10 11:11 11:16 13:17,22 14:8 14:14 15:10,13,15 15:20 19:3 20:3,13 21:1,2,5 22:2,18 23:15 24:13 25:2,19 27:9,20 28:5,19 29:1,9,19 30:4,14 30:22 31:19 32:8,12 32:18,24 34:17 35:17 36:16 37:2,15 37:20 38:5,22 39:14 39:23

**P**

**P**
2:1,1 19:10
**PA**
2:5,11,17
**PAB**
31:23
**page**
4:3 11:19 12:17 16:12 17:13,13,18 22:19
**paper**
14:1
**paragraph**
11:18
**part**
16:18 21:15
**particular**
8:4 9:2
**parties**
5:2 42:12
**parts**
6:7
**Paul**
1:7,7 4:4 5:7 15:24
**PCHA**
35:2
**PCR**
16:24 35:22
**PCRA**
16:24 34:22,23 36:20
**Penn**
2:4 20:20
**PENNSYLVANIA**
1:1
**people**
24:6 35:19 36:5
**person**
34:11
**persons**
11:21
**Petition**
34:19 35:5 36:3,7
**Philadelphia**
2:5,9,11,17 5:13 7:11 9:21 20:17 26:5 27:11 28:7,10 29:20
**Phone**
2:6,11,17
**place**
18:9 20:16 39:1 42:8
**placed**
24:2
**plaintiff**
1:5 2:6 27:12
**Plaza**
2:4
**Pleas**
26:6
**please**
13:20 41:9
**police**
5:14 7:11 18:16,19 24:18 25:8 27:12,22 27:23 33:22 34:18 36:1,2,3,4,4 38:24

**policy** 30:16 39:1
**possible** 6:16 13:2,21
**possibly** 21:17
**post** 35:1
**Post-Conviction** 34:19 35:5 36:2,6
**post-COVID** 6:19
**potential** 22:7 36:6
**practices** 29:11
**pretty** 10:24 38:13
**previous** 14:11
**pre-COVID** 6:12
**pre-written** 26:12
**Price** 18:13,15,18 19:7,17 23:8 33:20
**procedure** 30:11,12,16 39:1,13
**proceedings** 35:19 36:20
**Professional** 1:12
**promoted** 7:21
**prosecution** 27:13
**provide** 26:20
**Public** 1:13 42:5,20
**pull** 17:5
**P-1** 4:13 11:13,15 15:5,9
**P-2** 4:14 15:12,19,21
**P-3** 4:16 19:2,4,10
**P.C** 2:3,14
**p.m** 1:14 9:24 41:14

**Q**

**quality** 10:21 13:24
**question** 6:5,7,24 7:1,3 11:10 14:11 16:7,17 17:4 17:7,10 19:23 20:10 21:22 22:3,10,21,23 23:1,2,12 24:10 25:12 27:6,17 31:17 32:5 34:15 35:15 36:11 37:12,18 38:4 39:7
**questioning** 21:17,18
**questions** 5:5 23:18 40:11,14 40:20,22
**quickly** 10:13

**R**

**R** 2:1,15 42:2
**Raley** 1:7,7 4:4,13,14,16 5:7,11 7:7,7,10 11:13,15,20 15:9,12 15:19,22,24 17:20 19:2,4 22:6 24:14 26:11,18,19 38:16 38:23 40:23
**rather** 7:8 17:1 25:8
**read** 13:21 14:7 16:12 17:8
**reading** 5:3 17:2,16
**real** 16:8
**really** 22:21
**reason** 16:7 17:9,11
**recall** 9:4 12:7 16:6 17:23 18:5 35:23
**recanted** 18:1
**receive** 39:21
**receiving** 14:16,22 26:23 28:12 29:10 34:10
**recognize** 10:22,22 11:1 19:12
**recollect** 28:20
**recollection** 9:22 12:16 18:3 19:17,19 26:9 27:8 28:18,24 29:18
**record** 4:15 7:4 25:16 38:21
**refresh** 9:15
**regarding** 18:3
**regular** 41:5
**Reinhold** 11:20 12:6
**reinterviewed** 20:2,4
**related** 11:17,24 25:8 42:11
**relates** 6:12 9:7
**relating** 27:15
**relation** 12:9 28:12
**relative** 42:13
**relatively** 5:24
**relaying** 33:23
**Relief** 34:19 35:5 36:3,6
**remember** 6:1 8:6,15,16 9:6,9 9:17,24 10:4,7 12:4 12:8,8 13:15 14:15 14:22 16:3 17:7,8 17:20,24 18:12,15 18:18 19:6,8 22:16 22:20 23:5,20,24 24:5 26:3,8,14,21 26:23 27:3,14,24 28:11 29:3,10 30:17 33:2,4,6,9,11,23 34:6,10,12 40:8
**report** 4:17 10:19,20 29:22 30:7,23
**reported** 31:2
**reporter** 1:12 6:13 11:14 14:9 14:13 15:8,11,14,17 15:18 19:1 38:20 40:16 41:1,6,11 42:6,20
**reporting** 31:9
**represent** 21:14
**reserved** 5:5
**resided** 34:11
**respective** 5:2
**result** 29:13
**retire** 37:22
**retired**

37:16
**retirement** 40:13
**retrained** 40:1
**review** 38:15
**revolver** 18:9,16,20 23:4,9,10
**Ricardo** 1:4 9:8 14:18,24 18:10 23:3,22 34:5 36:20
**Richard** 34:9,10
**Rick** 17:5
**right** 7:6 8:13 16:15 33:8 35:10 36:19,22 38:12,15,18
**RIGHTS** 2:9
**Rob** 34:5
**robbed** 9:19
**robbery** 13:14
**Robert** 10:1 11:18 12:10 14:19 16:5 18:7 23:3 33:20
**Robinson** 13:10,13 14:24 23:22 24:2,7 33:24 34:5
**Rob's** 34:12
**Rodney** 26:12,16
**Rolston** 14:24 23:21 34:5
**Room** 20:15,17 31:23
**rooms** 32:1,7,10,13,20
**Rutherford** 14:23 24:6 33:11
**R-O-L-S-T-O-N** 23:22

**S**

**S** 2:1
**said** 8:10 24:18 34:4,5,11 34:24
**same** 8:24 11:22 12:19,21 21:23 24:11 25:13 28:2,15,22 29:5,15 29:23 30:8,19 32:11 32:14,21 36:3,5,12 37:11 39:8,17,19 41:9
**Savitt** 17:21
**saw** 25:15
**say** 6:14 8:18 30:5 35:12 35:16 37:1
**says** 11:3,17,20 13:5 15:21 17:5,6 20:16 20:16 23:1
**scene** 12:15 24:2 34:6
**schedule** 39:21 41:5
**SCHWARTZ** 2:3
**screen** 10:17,20 15:5
**scroll** 16:13 17:15
**sealing** 5:3
**search** 25:17
**searches** 28:13 29:12
**second** 6:21 10:18 12:17 15:3,7 17:12,13 18:23 33:1,1 38:18
**see** 9:5,15 10:15,18 11:2 14:4 15:6,21 17:14 19:4,5 22:20 31:14 35:7 36:17
**seen** 39:12
**seisure** 25:18
**send** 15:15
**sense** 7:4 36:18
**set** 39:21 42:9
**several** 36:21
**shakes** 6:14
**share** 10:17,20
**sharing** 14:8 23:16
**she** 12:21,22 13:8
**Sheet** 4:13 10:23,24 11:12 15:9
**SHELLEY** 2:15
**Sheriff's** 20:17 21:14,18
**shoot** 23:3
**shooter** 23:21
**shooting** 11:21 12:1,5 13:7 14:19 40:6
**short** 5:24 13:3 38:19
**shot** 10:1
**show** 10:20 15:3 18:22 20:15
**shrugs** 6:14
**sidetracked** 22:4
**signing** 5:3
**simply** 26:17
**size** 13:24
**slowly** 16:20
**Smith** 2:15 4:6 14:23 20:24 21:3,19,21 24:7,11 25:11 33:14 36:8,10 37:10,12 39:4,6,9 39:19 40:22 41:7,9
**so** 6:14,16,23 7:3 9:5 10:17,19,19 12:22 15:11 16:11,24 20:23 24:20 28:20 29:10,13 35:16 37:1 37:6,24
**some** 5:21 12:24,24 23:18 24:20 27:11 30:6 38:15 40:13
**somebody** 13:3,3
**something** 13:4 20:1 25:17 30:13 35:1,3
**sorry** 7:17 14:9 15:10 26:1 27:22 32:13 37:21 39:9 40:19
**South** 20:15,18,20 21:7,16
**sparing** 5:16

**speak**
6:21 40:12
**speaker**
6:20,21,21,22
**speaking**
6:20 34:7 40:18
**special**
18:16
**specific**
40:7,8
**specifically**
40:10
**Spina**
10:10
**Spina's**
10:8
**spoke**
9:11,14
**Spring**
27:23 28:6
**squad**
8:4,6,8,12,13,13,14 8:17,17,18,19,20,24 12:19,21,23 29:2
**squads**
13:1
**Square**
2:16 20:20 31:21,22
**Stalker**
28:14
**stated**
13:13 14:24 24:7
**statement**
15:3,6 16:3,8,12,14 18:1,2 19:6,9 20:6 20:12 22:7,20 23:16 24:1 26:13,16
**statements**
10:14 19:21 23:8 24:5 39:16 40:8
**STATES**
1:1
**station**
10:2 12:10 13:11,14
**STEPHEN**
2:4
**still**
5:13 21:13
**stint**
8:11
**stipulated**
5:1
**stop**
14:8 23:16
**stopping**
27:22
**stops**
28:13
**Street**
2:10,16 20:15
**subsequent**
23:7,8
**subsequently**
12:2 32:10
**sued**
5:19
**Suite**
2:4,16
**Supp**
28:7
**supplied**
26:12
**sure**
10:16 30:5,12
**sweeps**
27:22,23
**switch**
10:12
**sworn**
5:8 42:8
**S-A-V-I-T-T**
17:22

**T**

**T**
2:4 42:2,2
**take**
6:2,3,15 27:3 38:14 39:1 40:14
**taken**
1:11 5:17 19:21 20:12,14 22:6 38:19 42:13
**taking**
6:13 16:3,6 19:6 20:7 23:24 26:17 39:16 40:8
**talk**
9:5 27:10
**talked**
33:3,3,8
**talking**
11:6 36:15
**TANNEIKA**
2:15
**tell**
9:14 14:4 16:20
**telling**
18:18 37:5
**ten**
7:14,16 31:7,7,8,13
**term**
34:21,23
**testified**
5:8 18:7 35:4,21
**testify**
17:24
**testifying**
17:20 18:3
**testimony**
18:6 23:8 26:20
**than**
7:8 9:15 25:8
**thank**
5:11,16 7:6 14:13 15:17 38:18 40:12 40:15,20,23,24 41:6 41:9,12
**that's**
7:7 13:24 16:2,5,19 17:10 20:20,20,24 21:1 23:18,22 24:24 26:7,18 28:9 33:16 34:3 38:17 40:11
**them**
10:18 15:15
**then**
6:11,19 8:1,12 17:15 17:18 18:23 22:15 32:17 35:10,18 36:18 37:7 38:15
**there**
8:9,24 12:2 14:10 18:19 19:20 20:22 22:14,15 25:16,20 26:5 27:2 29:21 30:5,6,11,16 31:21 31:24 35:24 36:20 38:23 39:1,20
**there's**
5:22 6:5 7:4 16:24 30:10,12 34:18 35:18
**these**
16:22,22,23
**they**
10:15 13:3 32:16 35:20 36:5 40:2
**thing**
6:19,20
**things**
18:24 35:11,11,12,18
**think**
12:22,22 13:23,23 14:1,1 33:3 38:12 38:12 40:11
**third**
28:9
**this**
5:12,24 6:11,11 8:8 8:16 9:7 10:4,20 11:12,19,22 12:17 12:18 13:20 14:17 14:19 15:1,4,5,6,11 15:21 16:4,8,10,19 17:3,22 18:1,4,8,13 18:23 19:7,9,9,18 20:6,11,12,16 22:19 22:20 23:16,21 26:4 27:13 28:12,23 29:17 34:1,11 35:8 36:18,19 37:24 38:6 38:9 42:12,14,15
**those**

35:12,22 37:3 39:2
**though**
6:23
**three**
2:16 10:14
**three-minute**
38:14
**through**
10:14 16:13,19 23:17
**time**
5:6,16 6:2 8:20,20 13:7 16:10 20:8 27:12,13 28:23 29:17 30:16,18 31:5 34:20 40:12 42:8
**times**
20:4
**Tish**
33:18
**Title**
20:14 21:7,16
**together**
13:1
**told**
18:9,15
**too**
34:24
**took**
24:2
**top**
11:2
**Town**
13:12
**Tracie**
34:3
**trained**
28:1
**training**
27:14 28:12,21 29:11 39:15,21 40:2,8
**transcript**
1:11 41:3,8 42:7
**trial**
5:6 17:21 18:8,20 35:20
**trials**
35:8
**tried**
13:6
**true**
42:6
**try**
7:6 13:20,22 14:3 15:5
**Turkey**
27:15
**turning**
10:7
**twenty-five**
7:12
**two**
7:12 8:7,8,13,14,17 8:18,19,20 11:23
**two-door**
17:7
**typewriter**
22:17
**typewriters**
22:14
**T-R-A-C-I-E**
34:4

**U**

**uh-huhs**
6:15
**Um-hum**
11:4
**unavailable**
12:1
**unconstitutional**
29:11
**underlined**
9:6 17:14 36:19
**understand**
5:23 6:5,9 19:16
**Understood**
6:4
**Unit**
2:9 7:13 8:3 29:21 31:20 32:1 34:20 39:24
**UNITED**
1:1
**unlawful**
29:12
**unsuccessful**
13:11
**until**
5:6 7:1 8:10 9:11
**unusual**
20:2,5
**up**
6:7 10:7 17:5 20:1 35:11,13 36:22
**upon**
1:4 18:6 37:6
**us**
5:16
**use**
30:17
**used**
23:3 26:13
**using**
7:8

**V**

**various**
6:15 13:1
**verbal**
6:17
**verify**
12:2
**versus**
28:6,10
**very**
10:13
**via**
1:13
**video**
32:10
**Vine**
10:2 12:11 14:19
**vs**
1:6

**W**

**wait**
7:1,3
**waived**
5:4
**want**
6:2,3 9:5,13,13 10:14 11:18 14:3 16:11,11 16:13,13,20 18:24 22:19 23:17 26:3 27:10 38:15
**warned**
13:13
**warrant**
25:18
**warrants**
29:12
**was**
5:8 7:21,22 8:6 9:19 12:14,15,19,21,22 13:6,8,13 14:10,18 15:8 18:1,19,20 20:6,11,12,14,22,22 21:6,12,12 22:11,13 22:14,16 23:4,4 24:17 25:5,6,16,16 26:1,5,10,13,17 27:2 29:21 30:5 31:5,11,20,21 32:6 32:17 34:5 35:24 37:3,24 38:19 39:21 40:2,4 41:13,14 42:8,12
**wasn't**
31:11
**Watch**
13:12
**way**
22:13 30:7
**we**
11:6 18:23 22:4 33:3 33:3,8,20,20,20 38:14
**Wednesday**
1:14
**welcome**
41:11
**well**
5:16,21 8:15 15:16

17:3,12 20:22 21:6 22:8,11 34:24 36:17 40:2
**went**
7:24 8:1,2,9,13
**were**
7:10,13,17,20 8:3,4,8 8:14,14,16,19 11:6 11:23 12:1 13:3,8 13:11 22:15 25:22 25:22 27:11 31:2,24 32:9,17 36:20 39:24 40:17
**Westmorland**
8:1
**we'll**
6:3
**We're**
38:20
**what**
6:1,6 8:6 15:4 16:16 16:19 17:5 20:18 24:17 25:1,3,5,20 26:1 30:1,12 36:14 37:22 39:13 40:4
**when**
6:20 7:21 8:3,9,9,14 8:14,23 16:20 20:22 21:12 31:20 32:1 39:24
**where**
6:24 7:2 11:2 16:17 17:14 20:11,11,15 22:4 23:7 24:2 35:11,11,12,19 37:8
**whereabouts**
7:20 31:20
**whereby**
29:21
**Whereupon**
11:14 15:18 19:1 38:19 41:13
**whether**
16:8
**which**
6:19 7:22 8:9 19:10 20:6 31:5 34:22 42:12
**while**
8:19
**who**
11:21 13:6 14:23 21:8 24:7 34:4,5,10 34:11 36:3
**whole**
16:12,13 17:13
**why**
19:20 20:6,7 21:16 21:17 22:5,13 23:13 32:3,9,16
**will**
5:24 6:8 7:3 12:1 15:4,4 19:10 23:19
**William**
26:12,16
**Wilson**
33:23
**with**
8:21,23 9:2 12:5 14:2 14:7 16:21 18:1,6 19:7 22:16 25:9 26:5,12 27:11,14 28:1 33:2,22 34:6 38:7,9,17
**within**
29:20
**witness**
4:3 13:18 14:12 18:12 19:18,21,24 20:11 22:1,7,11 23:13 24:12,24 25:15 26:12,18,19 27:7,18 28:4,17,23 29:7,17 30:1,10,21 31:18 32:6,16,23 34:16 35:16 36:14 37:1,14,19 39:11,20 40:21,24 41:13 42:8
**witnesses**
33:2 36:6 37:7 39:16 40:9
**woman**
12:9 34:3,7
**work**
8:21 9:2 13:1 25:8
**worked**
8:23,24 31:14,21 32:1
**working**
29:2
**works**
14:5
**world**
6:12
**would**
6:1,16,23 8:10,18 12:24,24 17:9 19:20 20:8 21:16,17 22:6 22:13,14 23:13,14 30:17 36:3,5,5 37:6 39:13,15,24 41:2,4 41:7
**wouldn't**
19:14
**write**
22:13

**Y**

**yeah**
24:24 25:1
**year**
37:22,24,24 40:3
**years**
7:12,14,16 31:6,7,7,8 31:13
**Yep**
17:15
**yes**
7:19 8:5 11:4,8 15:10 15:13,23 19:5,5 21:11 35:9 41:4
**your**
5:16,17 6:16,24 7:2 8:20,20 9:16 10:15 16:11 18:6 19:9 26:1 31:5 34:20 40:12,13
**yourself**
22:5 23:2
**you're**
16:20 21:10,11 35:8 35:10 36:14 41:11

**Z**

**Zoom**
1:13 6:20 15:5

**1**

**1:05**
1:14
**1:53**
41:14
**10**
4:13
**100**
20:14,18 21:7,16
**104**
31:23
**11/12/96**
13:12
**11/4/96**
13:9
**1350**
28:7
**14**
4:14
**14th**
2:10
**1400**
2:4 20:22 21:12
**1500**
2:5
**1515**
2:10
**1717**
2:16
**18**
4:16
**19**
20:7
**19102**
2:5
**19102-1595**
2:11

**19103-2739**
2:17
**1985**
28:8
**1988**
28:11
**1990's**
29:4
**1996**
8:15 9:18 12:5 14:20 16:4 20:7 21:1 30:16

**2**

**2**
2:4
**2:22-CV-05061-GJP**
1:2
**20th**
7:22
**2025**
1:14
**2027**
42:21
**215**
2:11,17
**22**
42:21
**2214**
20:15,17
**267**
2:6
**28th**
16:4

**3**

**3**
20:20
**3500**
2:16
**357**
18:9,20 23:9
**38**
18:16 23:5,9
**39th**
29:3

**4**

**4**
4:5

**5**

**5**
1:14
**546-9066**
2:6

**6**

**61st**
17:6
**614**
28:7
**63rd**
10:2 12:11 14:19
**683-5434**
2:11

**8**

**80's**
29:4
**82**
7:21
**85**
7:24
**86**
8:1,2,10
**882264**
28:11

**9**

**9th**
9:17 12:5 14:20
**9-1-1**
11:21
**9:35**
9:24
**90's**
8:11
**9077**
16:1
**963-3300**
2:17
**97**
37:23

# EXHIBIT P1: RALEY

CMF

ACTIVITY SHEET

2 Platoon Wednesday 11-13-96

H96-373 8 X 4 Capt. MOONEY

Decedent: Robert CAMPBELL ASSGN: J. DOUGHERTY

On Saturday, 11-9-96, at 9:44PM, 19th District Police responded to a Radio Call and found Robert CAMPBELL 49/W/M lying at the Exon station at 63rd & Vine Sts., fatally shot in the head.

The assigned was contacted by a retired Detective who related that he had been contacted by an old informant who related that persons in 929 Wynnewood Rd., may have information as to the identity of the perpetrator and that he may be named ROB and was a Jamaican male. Det. DiBlasi & the assigned set up a surveillance of this location and noted that a B/M left the location and drove away in a 1989 Acura painted gray. The license tag was checked thru BMV and it was registered to a RUPERT ROBINSON at [redacted]t. This male fit the general description of the male called ROB. It was also noted that adults aged 20 to 40 both white and black were coming and going from this location. The Detectives stopped one of these persons and learned that ROB does operate the gray Acura and several persons in the location were upset with him over drug matters.

Previously it had been learned that, Jonnell CULLADHY, a female friend of the decedent's son had been told by an Asian male known to her as FERRITY that he had been in the car when a Black male shot and killed the decedent during a robbery attempt. The Black male's name was given as CAPUCHINO, DERRICK and SNOOP. This female was interviewed on 11-11-96 and in summary she had related the Asian male was a friend of her girlfriend's boyfriend, NICK FISHER. Attempts were made to locate NICK FISHER and his girlfriend, a TRACEY BRODEUR, who both live in Delaware County. BRODEUR was located but FISHER has not yet been located.

Dets. WALLS & JONES began visiting persons listed on the frequent visitors log kept at the Exon laundromat but found no one who was a witness to the shooting as of this time. The list contains the names of 22 persons who frequented the laundromat on the day of the incident.

Dets. RALEY & REINHOLD intervewed persons who called 911 about a shooting incident at Horton and Callowhill on the same night as this killing but it does not appear as if the 2 incidents were related. The complainant and eyewitness to the Horton and Callowhill shooting were unavailable and will be subsequently contacted to verify that there is no connection.

ACTIVITY SHEET

2 Platoon Wednesday 11-13-96

H96-373 8 X 4 Capt. MOONEY

Decedent: Robert CAMPBELL ASSGN: J. DOUGHERTY

Det. DiBLASI and the assigned tried to locate a Joan JONES who was the matron in charge of the Exon laundromat at the time of the shooting but she was out and arrangements were made to meet her on 11-14-96. Also, attempts to locate a Norman ROBINSON, a maintenance man at the Exon station were unsuccessful. John McCULLOUGH, a member of TownWatch, interviewed on 11-12-96, had stated he warned ROBINSON of an impending robbery at the Exon station.

The Detectives met with P/O JOSEY, 16th District, regarding a C/S that he made on 11-11-96. Additional investigation will be conducted regarding this C/S. It was learned from P/O JOSEY that there was some type of possible car jacking in the area of 52nd & Market during the week before the killing and the vehicle stolen was supposed to be a black Lincoln. P/O JOSEY believed that a P/O FRIEL in the 19th District may be able to provide more information about this incident.

The assigned spoke with members of the FBI & DEA who may have possible information regarding this incident from their informants. The information will be investigated by the assigned.

The assigned contacted the C.O. of the 19th District and requested that the sector RPC and EPW check the decedent's residence during the hours of the upcoming viewing and funeral services, and to update him on the ongoing investigation.

The investigation continues.

# EXHIBIT P2: RALEY

C 30

# INVESTIGATION INTERVIEW RECORD

PHILADELPHIA POLICE DEPARTMENT
HOMICIDE DIVISION

CASE NO. H96-373
INTERVIEWER Det. Paul Raley #9077

| | | | |
|---|---|---|---|
| NAME Robert Golatt | AGE 23 | RACE B/M | DOB 11-28-73 |
| ADDRESS 6028 Catherine St. | APARTMENT NO. 2nd. fl. | | PHONE NO. 748-0888 |
| NAME OF EMPLOYMENT/SCHOOL | | | SOC. SEC. NO. 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 |
| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | | PHONE NO. |
| DATES OF PLANNED VACATIONS | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | |
| NAME OF CLOSE RELATIVE Mother - Flora Golatt | | | |
| ADDRESS same | | | PHONE NO. same |
| PLACE OF INTERVIEW Room "D" 104 PAB | | DATE 12-28-96 | TIME 4:48PM AM PM |
| BROUGHT IN BY Raley/Mangoni | | DATE 12-28-96 | TIME AM PM |
| WE ARE QUESTIONING YOU CONCERNING The shooting death of Robert Campbell on 11-9-96 at 63rd. & Vine St. | | | |
| WARNINGS GIVEN BY N/A | | DATE | TIME AM PM |

ANSWERS (1) (2) (3) (4) (5) (6) (7)

Q. Robert, are you known by any other names?

A. My nick name is MONT.

Q. Did you ever know a person by the name of Robert Campbell?

A. No.

Q. Did you hear about the murder of a man at the Exxon Gas Station at 63rd. & Vine on November 9th. 1996 at about 9:45PM?

A. Yes.

Q. When was it that you heard about this murder? (2)

A. About 2 or 3 days later on the street.

Q. Didn't you hear or see it on the news? (1)

A. No.

CP-51-CR-0400131-1997 Comm. v. Natividad, Ricardo
Hearing Exhibits
4469133

Q. Where were you the first time that you heard about the murder at 63rd. & Vine?

A. I was walking to therapy. I walked past 60th. & Catherine. Some guys that I know were

RECORD ☐ Yes ☐ No | CHECKED BY

REVIEWED BY Robert Golatt

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Robert Golatt | PAGE: 2 | CASE NO. H96-373

A.....standing there talking. They were talking about the murder. They were saying that Byron and Rick were the ones that had done it. At first I didn't believe it. I said to myself that I was going to find out from Byron and Rick if it was true. I continued on to my therapy. It was either the next day or the day after that, I was walking past 61st. and Catherine. Rick pulled up and Byron was with him.

Q. Who is Byron?

A. Byron Price, he a friend of mine for about 6 or 7 years. He lives in the 6000 block of Webster St.

Q. Who is Rick?

A.Ricardo Natividad. I know him from the neighborhood. I've known him for about 4 years. He lives at 6135 Catherine.

Q. I am showing you eight photographs. Do you recognize anyone?

A. Yes, number 6. (event #200008563) That's Rick.

Q. What kind of car did Rick pull up in at 61st. & Catherine?

A. a Lincoln LSC, navy blue, 2 door.

3

Q. Had you ever seen Rick or Byron in that car before?

A. No.

Q. What happened after they pulled over at 61st. & Catherine?

4

A. I walked over to the car. I said, "what's up". I told them that I had heard on the corner that they were the ones that had did the murder the other night at 63rd. & Vine. They asked me who told me that. I told them that it was just talk on the corner. They asked me where I was going and if I wanted to get in. I got in the back seat. I asked them again what was up with what I heard happened. Rick said that they were in the gas station at 63rd. & Vine and that the dude reached on him so he popped him first. Byron said that he was in the car and that he heard the gunshot and turned around and saw Rick running back towards the car. That was the end of the conversation. I got out of the car.

75-483A

√ Robert Golatt

**INVESTIGATION INTERVIEW RECORD**
*CONTINUATION SHEET*

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Robert Golatt | PAGE: 3 | CASE NO. H96-373

Q. Did Rick or Byron say why they were in the gas station at 63rd. & Vine?

A. No, I didn't even ask.

Q. Did Rick or Byron say why the dude was "reaching" on him?

A. No. I should of asked, but I just wanted to know if it was the truth. After they told me that, I didn't have anymore questions.

Q. Have you ever seen Rick or Byron with a gun?

A. I've seen Rick with a gun before.

Q. What kind of gun have you seen him with?

A. A black 25 automatic.

Q. When was the last time that you saw Rick with a gun?

A. In the summer time.

Q. Since the day in the Lincoln, how many times have you seen and spoken to Rick?

A. About 10 times.

Q. During those 10 times, did you and Rick discuss the shooting?

A. Yes, about 2 or 3 times.

Q. What did Rick say about the shooting during those 2 or 3 times?

A. Nothing different. He would say things like, "I wish we wasn't there. Why did Dude have to reach".

Q. Since the day in the Lincoln, how many times have you seen and spoken to Byron?

A. More times than I seen Rick.

Q. How many times did you discuss the shooting with Byron?

A. I don't know how many times it was, but it was a few times.

Q. What did Byron say during those few times?

A. He would say he didn't know why Rick shot the man. (5)

Q. When was the last time that you spoke to Rick and Byron?

A. Rick about a week ago and Byron about three days ago.

75-483A

✓ Robert Golatt

**INVESTIGATION INTERVIEW RECORD**
***CONTINUATION SHEET***

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**

| NAME | PAGE | CASE NO. |
|---|---|---|
| Robert Golatt | 4 | H96-373 |

Q. did you ever see Rick or Byron with the navy blue Lincoln after that day at 61st. & Catherine?

A. I might have seen Rick in it the next day, but I never saw it after that.

Q. Did Rick or Byron ever tell you what happened to the Lincoln?

A. No.

Q. Did Rick or Byron tell you what kind of gun he had the night of the shooting?

A. Yeah, when Rick told me that he shot the guy I asked him if he shot the guy with the 25 automatic. He said NO. He said that he had a chrome .357. (6)

Q. Did Rick or Byron tell you what happened to that gun?

A. No.

75-483A

Y R 1. 4 Q1 1. H

# EXHIBIT P3: RALEY

(1) D-2

# INVESTIGATION INTERVIEW RECORD

PHILADELPHIA
POLICE DEPARTMENT
HOMICIDE DIVISION

CASE NO. H96-373

INTERVIEWER KACER / J. DOUGHERTY

NAME: BYRON EDWARD PRICE

AGE: 24 RACE: B/M DOB: 7-17-72

PHONE NO. [redacted]

APARTMENT NO.

ADDRESS: 6038 WEBSTER ST.

SOC. SEC. NO. 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

NAME OF EMPLOYMENT/SCHOOL: SCHOOL DISTRICT PHILA

PHONE NO.

DEPARTMENT

ADDRESS OF EMPLOYMENT/SCHOOL: 734 SCHUYLKILL AVE.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE: CAROLYN PRICE (MOTHER)

PHONE NO.

ADDRESS: 6038 WEBSTER

PLACE OF INTERVIEW: 100 S. BROAD - LAND TITLE BUILDING ROOM 2214

DATE: 12-30-96 TIME: 2:28 AM/PM (PM circled)

BROUGHT IN BY

DATE TIME AM PM

WE ARE QUESTIONING YOU CONCERNING: SHOOTING DEATH OF ROBERT CAMPBELL ON 11-9-96

WARNINGS GIVEN BY

DATE TIME AM PM

ANSWERS (1) (2) (3) (4) (5) (6) (7)

Q. Byron, are you known by any other name?

A. My friends call me 'B'.

Q. We have explained to you in the presence of your lawyer, Mr William Cannon, that we would like to ask you questions about the shooting death of Robert Campbell which occurred on 11-9-96 at the Exxon gas station at 63rd & Vine Sts & you have indicated you are willing to answer our questions. Is that correct?

A. Yes.

RECORD ☐ Yes ☐ No

CHECKED BY: BYRON PRICE

REVIEWED BY

75-483 (Rev. 7/82)

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

PAGE 2 CASE NO.

NAME BYRON PRICE

Q. Were you present when Robert Campbell 49/w/m was shot & killed on 11-9-96 about 9:40 PM at the Exxon gas station at 63rd & Vine?
A. Yes.

Q. Did you see who shot & killed Robert Campbell?
A. Yes.

Q. Who shot & killed Robert Campbell?
A. Ricardo Natividad.

Q. How long have you known Ricardo Natividad?
A. About 22 years.

Q. Would you go on in your own words & tell us *again what happened on the night of 11-9-96 when Robert Campbell was shot & killed?
A. I remember that it was between 6:30 & 7 o'clock that night & I had gone to 40-40's store at 60th & Catherine to buy some beer. As I was walking out of the store Rick – that's Ricardo Natividad pulled up in the Lincoln & he told me to jump in & take a ride

BYRON PRICE

75-483A

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|---|---|---|
| BYRON PRICE | 3 | |

with him. He was alone in the car & I got in the front passenger seat. I had got a 40 of Budweiser & we shared it while Rich drove. We were just cruising around from around Baltimore Ave to Girard. We were riding around for about 2 hours & then we were going up 63rd Street & Rich pulled into the Exxon station at 63rd & Vine. I thought he was just going to get some gas & he pulled up to the pump just across from where the white guy was at. Rich told me to just stay where I was, so I was just sitting in the car listening to the radio. I seen Rich walk towards where the white guy was at & I went back to just listening to the radio. It seemed like maybe 2-3 minutes went by & then all of a sudden I heard the really loud gunshot & I seen Rich running back to the car & I seen the white guy laying on the ground - I could see his head on the ground. Rich jumped in the car & then drove really fast out of the station. He drove out the ramp onto 63rd & then down 63rd towards

BYRON PRICE

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

PAGE 4 | CASE NO.

NAME BYRON PRICE

Market. While he was driving I asked him why did he shoot the man & he told me, "the guy drew on me". About 2 blocks down from the gas station we stopped for a red light & I told him to let me out & I got out & walked home to 6038 Webster. That night I watched the news & found out the man was killed.

Q. Describe the gun that Ricardo Natividad used to shoot & kill Robert Campbell?
A. It was a chrome revolver & it looked like a .38.

Q. How many shots were fired that night?
A. One.

Q Did you see any kind of gun or weapon on the man who was shot & killed?
A. No.

Q. What happened to the gun that Ricardo Navidad? used to shoot & kill Robert Campbell?
A. My friend Dwayne Davis told me he had heard that Rick sold it to 1 of the twins, Keith.



BYRON PRICE

CITY OF PHILADELPHIA
POLICE DEPARTMENT

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

PAGE 5 | CASE NO.

NAME
BYRON PRICE

Q. What is Keith's last name & where does he live?
A. I don't know his last name but his brother's named Kevin & they live in the 6100 block of Walton St.

Q. Do you know what would cause this shooting?
A. I guess that Rick was trying to rob the man.

Q. How often would you see & speak with Ricardo Navidad?
A. Usually about 3 times a week.

Q. What is Ricardo Navidad's address?
A. 6135 Catherine - he lives with his brothers, 1 is Taro.

Q. Det. Raley is showing you a photograph - (PPN 683161 - Ricardo Matavidad) - do you know this person?
A. Yes, that's Rick.

Q. Is that the same person - Rick - that you have been referring to in this interview - & who you saw shoot & kill Robert Campbell at the Exxon station on 11-8-96 at 63rd & Vine Sts?

75-483A

BYRON PRICE

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|---|---|---|
| Byron Price | 6 | |

A. Yes.

Q. What happened to the Lincoln car that Ricardo Moviedo was driving on the night of the killing?
A. I heard that it was burned or torched up in Germantown. I heard that about a week or 2 ago. It was just what people were saying in the street.

Q. What color was the Lincoln?
A. It looked black to me.

Q. Were you ever in the Lincoln after the killing?
A. No.

Q. Have you seen or spoken with Ricardo Moviedo since the killing?
A. Yes

Q. Did either you or Ricardo say anything to each other about the killing?
A. No. I was afraid to say anything to him & he just acted like it was nothing to him. That's the way Rick is.

75-483A

BYRON PRICE

**INVESTIGATION INTERVIEW RECORD**
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

PAGE 7 | CASE NO.

NAME Byron Price

Q. Were you supposed to watch the Tyson fight on the night of the killing?
A. Yeah, I was supposed to go over my friend, Dwayne Davis's apartment on Wynnewood Road, but I never went. I didn't want to be around anybody - I was so upset about what Rick had done - I just stayed in to try & calm my nerves down.

Q. Who did you tell about this killing before today?
A. My girlfriend, Natasha Catlett, my Mom & Grandmom. My friend, Dwayne Davis, Robert Goulart & Eugene Miller talked about it.

Q. Why didn't you come forward before today & tell the Police about this killing?
A. I was just scared that I would get blamed too - just because I was there.

Q. Were you ever threatened about this killing?
A. Not me but my girlfriend, Natasha Catlett was threatened by Rick.

75-483A

BYRON PRICE

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: BYRON PRICE
PAGE: 8
CASE NO.:

Q. Did Rick have keys for the Lincoln?
A. Yes.

Q. Did you ever drive the Lincoln?
A. No.

Q. Did you ever learn where Rick got the Lincoln?
A. No.

Q. When was the last time you were in Germantown?
A. About 2 years ago.

Q. Is there anything else you can tell us that would help this investigation?
A. No, except Rick is heavier now than in his picture & his hair is cut closer now.

Q. Did you see the man who was killed Robert Campbell, say or do anything that would make Ricardo Navidad shoot him?
A. No.

Q. Did you hear any arguing before the shooting?
A. No.

75-483A

BYRON PRICE 12/20/96 3:54 PM