# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICARDO NATIVIDAD,

*Plaintiff,*

v.

DETECTIVE PAUL RALEY, et al.,

*Defendants.*

CIVIL ACTION
NO. 22-5061

**Pappert, J.**                                                                                    **May 30, 2025**

## MEMORANDUM

In November of 1997, Ricardo Natividad was convicted and sentenced to death for the murder of Robert Campbell.  Twenty-four years later, a federal judge vacated Natividad's conviction after finding that the Commonwealth failed to fulfill its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).  Natividad subsequently pleaded guilty to third-degree murder and received a sentence of twenty-five to fifty years' imprisonment.

Natividad then sued three police detectives, two assistant district attorneys and the City of Philadelphia, alleging that the defendants violated his Fourteenth Amendment due process rights.  The claims against the ADAs were dismissed, and the remaining defendants now move for summary judgment.  For the reasons discussed below, Natividad's claim against Detective James Dougherty for deliberate deception may proceed to trial, but summary judgment is entered for Defendants on all other claims.

I

A

1

On November 9, 1996, Robert Campbell was murdered at the Exxon gas station at the corner of 63rd and Vine Streets in Philadelphia. (Nov. 5, 1997 Trial Tr. at 203:17–24, 204:18–206:16, 230:1–231:18, ECF No. 62-2.) Detective James Dougherty of the Philadelphia Police Department was the lead detective investigating Campbell's murder. (Dougherty Dep. at 16:23, ECF No. 70-1; Nov. 7, 1997 Trial Tr. at 125:14–25, ECF No. 62-4.) Shortly after the shooting, Dougherty wrote a note listing "John Maculla" as a potential witness to the shooting. (Dougherty Dep. at 21:3–22; May 20, 2016 PCRA H'rg Tr. at 44:6–15, ECF No. 62-21); *see also* (Maculla Note, ECF No. 62-10).

Within a week of the shooting, several individuals gave statements to the police implicating in Campbell's murder Rolston Ricardo Robinson and/or individuals connected with 929 Wynnewood Road. *Natividad v. Beard*, No. 08-449, 2021 WL 3737201, at *6–8 (E.D. Pa. Aug. 24, 2021) (describing the statements).[1] Various detectives took these statements, including Dougherty, (Ambrosine Statement at 2,[2] ECF No. 62-19), and Detective Arthur Mee, (C. Smith Statement at 2, ECF No. 62-13). Dougherty set up surveillance of 929 Wynnewood Road and identified Robinson. (Police Activity Sheets Nov. 12 & 13, 1997, ECF Nos. 24 & 16.) On November 14, Robinson

---

[1]     Most of these statements were attached to the Defendants' Motion for Summary Judgment. *See* (ECF Nos. 62-12, -13, -15, -17, -18, & -19.)

[2]     Except when citing transcripts, all page numbers within record cites indicate ECF, not internal, pagination.

gave a statement admitting he drove past the station after Campbell was killed but denying any involvement in the crime.  (Robinson Statement, ECF No. 62-14.)

On December 28, Robert Golatt gave a statement to Detective Paul Raley, telling him that Natividad admitted to shooting Campbell with a .357.  (Golatt Statement at 457–60, ECF No. 70-1.)  On December 30, Dougherty and Raley questioned Byron Price, a longtime acquaintance of Natividad's.  (Price Statement at 462–63, ECF No. 70-1.)  Price told them that he was with Natividad the night of the murder.  (*Id.* at 463–65.)  According to Price, they had been driving around that evening for about two hours before pulling into the Exxon at 63rd and Vine.  (*Id.* at 464.)  Price told the detectives that another man was also at the station and that Price stayed in the car while Natividad walked toward the other man.  (*Id.*)  A few minutes later, Price said, he heard a gunshot and Natividad got back in the car and drove them away.  (*Id.*)  Price identified the gun Natividad allegedly used as "a chrome revolver" that "looked like .38."  (*Id.* at 465.)

Dougherty obtained an arrest warrant for Natividad on December 31, and he was arrested the following March.  (Nov. 7, 1997 Trial Tr. at 58:25–59:2, 88:7–19.)  In June of 1997, Michael Havens, the victim of a carjacking in the early morning of November 9, 1996, identified Natividad in a photo array.  (Nov. 5, 1997 Trial Tr. at 58:16–59:9, 146:19–22.)  Natividad was indicted separately for this crime, but the Havens and Campbell cases were consolidated for trial after the court found that evidence related to the Havens carjacking was relevant to determining the identity of Campbell's killer.  *Natividad*, 2021 WL 3737201, at *2.

2

At trial, Price was the sole witness to place Natividad at the scene of Campbell's murder.[3]  Three other witnesses — Golatt, Natasha Catlett, and Eugene Wilson — testified that Natividad told them he killed Campbell.  (Nov. 6, 1997 Trial Tr. at 154:18–155:7, 164:2–165:17, 182:22–183:16, ECF No. 62-3.)

Price and Golatt both testified about the gun Natividad allegedly used to kill Campbell.  (*Id.* at 13:4–13, 66:20–67:15, 74:25–75:7; 165:19–23, 171:18–19, 173:13–177:19.)  Carl Harris and Frank Spina also testified for the Commonwealth.  Harris told the jury that he saw an acquaintance of his, Keith Smith, meet Natividad a few weeks before Thanksgiving and return from that meeting with a .357.  (*Id.* at 110:8–116:3.)  And Spina, Smith's attorney, testified that Smith gave Spina a .357 in early January of 1997.  (Nov. 7, 1997 Trial Tr. at 14:7–17:5.)

Two of the defendants here testified at trial.  Mee testified about retrieving the .357 from Spina.  (*Id.* at 19:23–23:12.)  Dougherty testified briefly about several matters, including his responsibilities as lead detective, obtaining the arrest warrants for Natividad, and Havens's identification of Natividad.  (*Id.* at 125:14–140:11.)  On cross-examination, he was asked again about Havens's identification but primarily testified about taking Price's statement and his knowledge of Price's prior interactions with detectives in the case, testimony that conflicted with Price's recollection.  (*Id.* at 141:5–155:1.)

---

[3]    Martin and Beth Johnson, who witnessed Campbell's murder from across the street, testified about the killer's clothing and car.  (Nov. 6, 1997 Trial Tr. at 77:16–78:12, 81:9–83:8, 84:20–85:13, 89:22–90:24; 93:18–96:12, 98:10–99:6, 101:4–103:7.)

The jury convicted Natividad of first-degree murder, (Nov. 10, 1997 Trial Tr. at 163:17–164:3, ECF No. 62-5), and sentenced him to death, *see Natividad*, 2021 WL 3737201, at *4.

B

Natividad's conviction was upheld on direct appeal and his first PCRA petition was denied. *Commonwealth v. Natividad*, 773 A.2d 167 (Pa. 2001); *Commonwealth v. Natividad*, 938 A.2d 310 (Pa. 2007). In 2008, Natividad filed a petition in this court under 28 U.S.C. § 2254. *Commonwealth v. Natividad*, 200 A.3d 11, 17 (Pa. 2019); Petition for Writ of Habeas, *Natividad v. Beard*, No. 08-449 (E.D. Pa. June 27, 2008).

During the federal proceedings, Judge Rufe twice ordered the Commonwealth to produce documents to Natividad. The first order, which concerned only specified categories of information, resulted in production of the Maculla Note. *See* Pet'rs Supp. Mot. for Discovery at 2–3, *Natividad v. Beard*, No. 08-449 (E.D. Pa. Feb. 4, 2013). After receiving the Maculla Note, Natividad's counsel obtained a declaration from a John McCullough who said that he saw the murder, gave a statement to police the same night, and that Natividad was not one of the men he saw with Campbell. *Id.* at 3. Judge Rufe then granted Natividad access to the police and district attorney's complete files for both the carjacking and murder, which resulted in production of the Robinson Material. Second Supp. to Pet. for Writ at 2, *Natividad v. Beard*, No. 08-449 (E.D. Pa. Feb. 22, 2019). Natividad's third PCRA petition, filed while his federal petition was pending, raised *Brady* claims based on this discovery, but the state courts denied relief. *Natividad*, 200 A.3d at 14.

Natividad then amended his pending federal *habeas* petition.  Second Supp. to Pet. for Writ of Habeas Corpus, *Natividad v. Beard*, No. 08-449 (E.D. Pa. Feb. 22, 2019).  The Commonwealth conceded that Natividad was entitled to relief.  Answer to Pet., *Natividad v. Beard*, No. 08-449 (E.D. Pa. June 15, 2021).

Judge Rufe conducted an independent *de novo* review of Natividad's petition and vacated his conviction after concluding that the Commonwealth's failure to disclose the Maculla Note and Robinson Material denied Natividad due process.  *Natividad v. Beard*, No. 08-449, 2021 WL 3737201, at *9–14 (E.D. Pa. Aug. 24, 2021).  She conditionally granted a writ of *habeas corpus* and ordered the Commonwealth to retry him within 180 days.  *Id.* at *14.

Natividad subsequently pleaded guilty to robbery, kidnapping and related offenses in relation to Havens's carjacking and to third-degree murder, robbery and related crimes in relation to Campbell's murder.  (Guilty Plea Transcript at 24:13–29:15, ECF No. 62-26.)  He did not dispute the Commonwealth's summary of facts, according to which (1) Natividad forced Havens into the backseat of his own car at gunpoint before ordering him out of the car and fleeing with it and (2) Natividad and Price drove to a gas station where Natividad attempted to rob Campbell and then shot and killed him.  (*Id.* at  24:13–26:1, 27:12–28:21.)  Natividad was sentenced to twenty-five to fifty years' imprisonment.  (*Id.* at 44:7–46:1.)  He is still serving that sentence.

In December of 2022, Natividad filed this suit under 42 U.S.C. § 1983.  He alleged in Count I of his complaint that three of the detectives who investigated Campbell's murder — Dougherty, Mee and Raley — along with two ADAs violated his Fourteenth Amendment rights by fabricating evidence and deliberately deceiving the

court.  In Count II he claimed that these individuals conspired to deprive him of his rights.  Finally, he contended in Count III that the City of Philadelphia had a policy or custom of, or was deliberately indifferent toward, conduct that violated his rights.  The claims against the ADAs were dismissed, (ECF Nos. 42 & 65), and the remaining defendants moved for summary judgment on all claims against them, (Def. Mot. for Summary Judgment, ECF No. 62), now in Natividad's Second Amended Complaint, (ECF No. 33).  The Court held oral argument on May 9, (ECF No. 74), and now grants the motion as to Counts II and III in full and in part as to Count I.[4]

## II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of [his] case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their

---

[4]    Counts IV and V, standalone counts for "Damages" and "Punitive Damages," respectively, are dismissed.

initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). But "conjecture and speculation" cannot create a genuine issue of material fact. *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016). And the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III

Defendants argue initially, and incorrectly, that this suit is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, a plaintiff may not recover damages for an allegedly unconstitutional conviction unless that conviction was previously invalidated. 512 U.S. at 486–87 . So where a plaintiff's claim, if successful, "would necessarily imply the invalidity" of an existing conviction, that claim is barred. *Id.* at 487. The Third Circuit has yet to address *Heck*'s application to "two-conviction" cases — those in which a plaintiff whose original conviction was overturned was then re-

convicted. *See Thomas v. City of Philadelphia*, No. 24-4914, 2025 WL 607544, at *5 (E.D. Pa. Feb. 25, 2025).[5] But courts in this District often rely on the Second Circuit's decision in *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) (en banc). *See id.* (collecting cases).

In *Poventud*, the Second Circuit held that *Heck* did not bar the plaintiff's suit for damages arising out of a *Brady* violation even though he pled guilty to a lesser offense following vacatur of his original conviction. 750 F.3d at 134–35. Success on Poventud's claim, the court reasoned, concerned only the *fairness* of the first trial, not his innocence. *Id.* at 134. And because he was now aware of the *Brady* material, the earlier *Brady* violation could not have affected his second conviction — so success on his civil claim could not undermine the validity of the second conviction. *Id.* at 138. In other words, even in two-conviction cases, so long as success does not "*necessarily imply*" the invalidity of a subsequent conviction, *Heck* does not bar a plaintiff's claims. *Thomas*, 2024 WL 607544 at *5 (quoting *Nelson v. Campbell*, 541 U.S. 637, 647 (2004)).

The same analysis applies to fabrication-of-evidence and deliberate-deception claims. The misconduct at issue in these claims impugns only the first conviction and says nothing about the second: because the misconduct affecting the first conviction has since been recognized and accounted for in the second conviction, the claims "are not necessarily inconsistent with [the plaintiff's] guilt." *Id.*; *see also Jackson v. Barnes*, 749 F.3d 755, 760–61 (9th Cir. 2014) (agreeing with *Poventud*'s reasoning and holding plaintiff who was reconvicted at trial of first-degree murder after his earlier conviction

---

[5]     The Third Circuit will have an opportunity to do so in *Dennis v. City of Philadelphia*, No. 24-2596 (3d Cir. filed Aug. 26, 2024).

was vacated could bring a § 1983 claim based on use of an un-Mirandized confession in his first trial).

Defendants attempt to distinguish *Poventud* on several grounds, but without success. First, the fact that Natividad is incarcerated and could file a *habeas* petition, whereas Poventud could not, (Oral Arg. Tr. at 4:12–17, 14:23–15:11, ECF No. 75), is irrelevant. Natividad is not challenging his present detention or the conviction pursuant to which he is in jail. Rather, he is suing for damages from violations of his constitutional rights related to his vacated conviction, and nothing in *Poventud* — or *Heck* — suggests that prisoners cannot bring a § 1983 suit for such claims.

Defendants also point out Poventud pleaded guilty to attempted robbery, an offense with different elements and proofs than his vacated conviction for attempted murder, whereas Natividad pleaded guilty to third-degree murder, an offense with essentially the same elements and supported by the same facts offered at his first-degree murder trial. (Oral Arg. Tr. at 8:8–23, 6:17–20, 15:13–20.) But the relevant question is not whether there is any overlap in the elements or facts required for both convictions. What matters is whether a claim concerning the fairness of the first trial necessarily implies the invalidity of the second conviction — and the fact that an error undermines confidence in the jury's verdict does not mean that a jury *could not* have found guilt beyond a reasonable doubt after the error was corrected.[6]

---

[6]    In other words, even if (1) the detectives fabricated testimony or (2) deliberately deceived the court and jury, such that there is a reasonable likelihood that the outcome would have been different absent those errors, these conclusions do not necessarily imply the invalidity of Natividad's second conviction because they do not mean the second conviction *must have* turned out differently than the first. *See Thomas*, 2024 WL 607544 at *5 n.5; *cf. Dennis v. Secretary, Pennsylvania Dep't of Corrections*, 834 F.3d 263, 295, 303 (3d Cir. 2013) ("*Kyles* explained that *Brady* materiality does not turn on a determination of the sufficiency of the evidence[.]"). A jury could still have convicted Natividad beyond a reasonable doubt based on the Commonwealth's evidence.

Insofar as courts "look to the underlying facts pled to assess whether a claim is barred by *Heck*," Natividad's success here does not depend on facts or theories that would negate the elements or undermine the factual basis of his second conviction. *See Ramos-Ramirez v. Berwick Borough*, 819 Fed. App'x 103, 106 (3d Cir. 2020); *Maldonado v. City of Philadelphia*, No. 22-3474, 2023 WL 4685967, at *7 (E.D. Pa. July 21, 2023) (noting plaintiff's claim may be barred if his conviction was based only on allegedly fabricated evidence because his success "could invalidate the *factual* basis" of the conviction). For example, the facts recited during Natividad's guilty plea colloquy include that Price was there when Natividad killed Campbell, but do not discuss the kind of gun he used. *See* (Guilty Plea Tr. at 23–28.) Natividad's fabrication-of-evidence claim does not contradict the facts underlying his guilty plea because he alleges only that Price's trial testimony concerning the caliber of the gun, not his entire testimony, was fabricated. (Oral Arg. Tr. at 67:2–14, 79:2–80:5.) *Cf. Ramos-Ramirez*, 819 Fed. App'x at 106–07 (finding plaintiff could not pursue his claim on a theory that conflicted with a fact agreed upon at the guilty plea hearing but could proceed on a theory that did not); *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006) (holding *Heck* did not apply where the plaintiff did not "collaterally attack his conviction, . . . or challenge the factual basis presented at his change of plea hearing"); *Poventud*, 750 F.3d at 137–38.[7]

IV

To succeed on a fabrication-of-evidence claim, the plaintiff must show that the defendant willfully, knowingly or recklessly formulated or submitted false evidence that

---

[7]    Defendants point to Natividad's post-guilty-plea protestation of innocence. (Compl. ¶¶ 1, 42–43.) But because his claims do not rely upon this allegation, his success would not necessarily imply the invalidity of his conviction. *Thomas v. City of Philadelphia*, No. 24-4914, 2025 WL 607544, at *5 n.6 (E.D. Pa. Feb. 25, 2025).

was introduced at trial.  *Mervilus v. Union County*, 73 F.4th 185, 194–95 (3d Cir. 2023).

"Evidence is not fabricated if it 'is incorrect or simply disputed.'"  *Id.* at 194 (citation

omitted).  Moreover, liability under § 1983 "must be predicated on [a defendant's] direct

and personal involvement in the alleged violation[.]"  *Jutrowski v. Twp. of Riverdale*,

904 F.3d 280, 289 (3d Cir. 2018).  An official is not liable simply because he was "in the

immediate vicinity" of another official who violated the plaintiff's rights.  *Id.* at 290.  So

in opposing summary judgment, "a § 1983 plaintiff must produce evidence supporting

each individual defendant's personal involvement in the alleged violation to bring that

defendant to trial."  *Id.* at 291.

In addition to showing that a defendant fabricated evidence in bad faith, the

plaintiff must show that there is a "reasonable likelihood" that, without the use of the

falsified evidence, he would not have been convicted.  *Halsey v. Pfeiffer*, 750 F.3d 273,

294 (3d Cir. 2014).  This "reasonable likelihood" causation standard requires only a

"meaningful connection" between the conviction and the use of fabricated evidence.  *Id.*

at 294 n.19.[8]

A

Natividad claims that Raley, Mee and Dougherty fabricated evidence against

him by coaching, coercing or otherwise manipulating Price's trial testimony concerning

the caliber of the gun he said Natividad used.  (Oral Arg. Tr. at 65:10–66:3, 66:23–67:6,

77:21–23, 81:17–19.)  But there is no evidence in the record from which the jury could

reasonably find that Mee or Raley participated in any such conduct.

---

[8]    Defendants do not raise qualified immunity as a defense against this claim.  *See* (Oral Arg. Tr. at 32:6–13, 34:12–15).

At trial, Price testified that two detectives were present when Dougherty told him that a .357 was used in the murder.  (Nov. 6, 1997 Trial Tr. at 55:18–24, 66:24–67:8.)  Price could only identify Dougherty, (*id.* at 55:18–24), but his December 30, 1996 statement indicated that Raley and Dougherty conducted the interview together, *see* (Price Statement at 462, 466, ECF No. 70-1).  Nonetheless, Raley's mere presence at the interview provides insufficient basis for concluding he personally engaged in fabrication of evidence.  *See Handy v. City of Philadelphia*, No. 24-1905, 2024 WL 4309973, at *4 (E.D. Pa. Sept. 26, 2024) (dismissing fabrication claim against a detective who was allegedly present when another detective coerced the plaintiff's confession because presence alone "does not permit the inference that [he] participated in that coercion or later submitted that confession to the prosecution").

When asked at oral argument to identify record evidence of Mee's and Raley's conduct with respect to Price, Natividad's counsel offered only that they worked closely with Dougherty, were "present or nearby" when Price's statement was taken, and remained silent about the fact that Price changed his story at trial.  (Oral Arg. Tr. at 70:2–71:19, 72:20–23, 74:2–6.)  But Natividad must prove that Mee and Raley personally and in bad faith formulated or submitted false evidence offered at trial.  *See Mervilus*, 73 F.4th at 194–95.  And counsel could offer only unsupported assertions, not record evidence from which a reasonable jury could find that Mee or Raley violated Natividad's rights by fabricating Price's testimony.  Mee and Raley are thus entitled to summary judgment on this claim.

B

Dougherty is as well, but for a different reason.  The record shows that Dougherty told Price that Natividad owned a .357.[9]  But no reasonable jury could find that Dougherty *fabricated* evidence — that is, "willfully, knowingly or recklessly formulated or submitted false evidence that was introduced at trial," *Mervilus*, 73 F.4th at 194–95.

Price testified that he saw Natividad with a gun and described it as a "chrome revolver," but initially said nothing about the caliber of the weapon.  (Nov. 6, 1997 Trial Tr. at 9:22–24, 11:4–6.)  When cross-examined by defense counsel, Price said that he told the police the gun was a chrome revolver that looked like a .38, at which point Dougherty told him it was actually a .357.  (*Id.* at 66:20–67:8.)  On redirect, when presented with his written statement to the police, which described the gun as a .38, Price confirmed that is what he told the detectives.  (*Id.* at 74:25–75:7.)  Price also testified that no one promised him anything in connection with his testimony.  (*Id.* at 75:14–16.)[10]  So Price's written statement and trial testimony provide no evidence that Dougherty falsified a document or coerced, via promises or threats, that testimony.

Moreover, even if Dougherty influenced Price's trial testimony, a jury could not reasonably find that Dougherty fabricated or submitted false evidence.  There is no indication that Price's testimony was *false*.  *See Halsey*, 750 F.3d at 295 ("[T]estimony

---

[9]      This evidence comes exclusively from Price's trial testimony.  No party objected under Federal Rule of Civil Procedure 56(c)(2) to the use of the testimony based on potential inadmissibility at trial in this case, so the Court need not yet decide that issue.

[10]      Price also testified that the police told him that they had been told Price would not be charged in connection with the murder, but he did not know who told the police that.  (Nov. 6, 1997 Trial Tr. at 37:7–38:20.)

that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."). And Price's testimony about the caliber of the gun was elicited by the defense, not the prosecution. *See id.* ("[A] witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the *proponents* of the evidence were aware that the identification was incorrect, and thus, in effect, *offered* the evidence in bad faith.") (emphasis added). With no material facts from which a reasonable jury could find that Dougherty coerced, coached or manipulated the presentation of false trial testimony, he is entitled to summary judgment.[11]

## V

Before it can evaluate whether there is a genuine dispute of material fact concerning Natividad's deliberate-deception claim, the Court must first figure out what Natividad is actually alleging. The parties agree that if Natividad's claim is a *Brady* claim, the Defendants are entitled to qualified immunity.[12] *See* (Oral Arg. Tr. at 32:6–

---

[11] Moreover, there is no evidence in the record from which a reasonable jury could find that the outcome at trial would have been different absent Price's mention of a .357. At most, defense counsel could have elicited Price's recollection of a .38. That testimony would have conflicted with testimony from Golatt, Harris and Spina about a .357 connected to Natividad. But the jury also heard a firearms identification and ballistics expert testify that a .357 and a .38 can look alike. (Nov. 7, 1997 Trial Tr. at 30:1–6, 42:11–43:2.) On these facts, no reasonable jury could conclude that there was any meaningful connection between Natividad's conviction and Price's mention of a .357.

[12] Qualified immunity protects an official from civil liability for violating a plaintiff's statutory or constitutional rights if the official's conduct does not violate a "clearly established" right "of which a reasonable person would have known." *Dennis v. City of Philadelphia*, 19 F.4th 279, 287 (3d Cir. 2021) (quotation omitted). So to determine whether qualified immunity applies, the court asks "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *Id.* (quotation omitted).

Although the plaintiff is master of his complaint and defendants cannot simply characterize a claim however they prefer, *see id.* at 290, neither is the "label" a plaintiff chose for his claim sufficient to determine whether qualified immunity applies, *id.* at 291.

13, 61:7–11).  And if his deliberate-deception claim merely duplicates his fabrication claim, it does not survive summary judgment for the reasons previously stated.

The only Third Circuit guidance on deliberate-deception claims, *Dennis v. City of Philadelphia*, 19 F.4th 279 (3d Cir. 2021), does not delineate the boundaries between a deliberate-deception claim and *Brady* claim, on the one hand, and a deliberate-deception and fabrication-of-evidence claim, on the other.[13]

A

The Third Circuit addressed whether police officers are entitled to qualified immunity for *Brady* claims in *Gibson v. Superintendent of New Jersey Department of Law and Public Safety*, 411 F.3d 427, 442–44 (3d Cir. 2005).  Gibson alleged that officers "suppressed the extent of the[] impermissible law enforcement tactics" they used when stopping the vehicle in which he was a passenger, and thereby prevented him from impeaching witnesses and obtaining a different outcome at trial.  *Gibson*, 411 F.3d at 443.  The Third Circuit held that, although *Brady* placed the duty of disclosure on prosecutors, "it would be anomalous to say that police officers are not liable when they *affirmatively conceal* material evidence from the prosecutor."  *Id.* (emphasis added).  But the court held the officers were nonetheless entitled to qualified immunity on Gibson's *Brady* claim because the right against affirmative concealment of material evidence was not "clearly established" when Gibson was convicted in 1994.  *Id.* at 443–44.  The court began its analysis by noting that the Supreme Court did not attribute

---

[13]    *Dennis* expressly declined to decide whether a distinct Fourteenth Amendment right against deliberate deception exists.  19 F. 4th at 288.  Although the panel said it would have found such a right were it to reach that question, *id.* at 288 n.31, the cases it cited concerned only fabrication-of-evidence claims, *see id.*  Because the parties here assume such a right exists, the Court considers only what the contours of a deliberate-deception claim, compared to fabrication and *Brady* claims, are.

evidence held by the police to the prosecutor until *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  *Id.* at 443.  "More importantly, the related duty of the police to disclose information to the prosecutor was not widely addressed until later."  *Id.* at 444.  As of 2000, the *Gibson* panel said, the circuit court was "only able to *assume* that police officers 'have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists.'"  *Id.* (quoting *Smith v. Holtz*, 210 F.3d 186, 197 n.14 (3d Cir. 2000)) (emphasis in original).

Gibson's holding was to a degree later contradicted in *Halsey*, where the Third Circuit held that a defendant's due process right to be free from the use of fabricated evidence had been clearly established by 1985.  750 F.3d at 295–96.  The court stated that two decades after *Brady*, "[r]easonable officers should have known" that "they could not withhold exculpatory evidence from a defendant[.]"  *Id.* at 296; *cf. Dennis*, 19 F. 4th at 290 (describing *Pyle v. Kansas*, 317 U.S. 213 (1942) as "recognizing as a due process violation . . . perjured testimony and *the deliberate suppression of evidence favorable to the accused*") (emphasis added).[14]

---

[14]    *Gibson*'s holding was limited, and doesn't squarely foreclose the possibility that at least some *Brady* claims were clearly established once *Kyles* was decided in 1995.  As *Gibson* acknowledged, in *Smith*, the Third Circuit did not have to decide this issue to resolve the case before it.  *See* 411 F.3d at 444 n.16.  And as *Gibson* also acknowledged, a right can be clearly established even when there is no prior "factually identical" case, *id.* at 443 (quotation omitted), while — as *Halsey*'s reasoning demonstrates — the logic of *Pyle*, *Brady* and *Kyles* together may have established a right against deliberate concealment of exculpatory evidence post-1994 but pre-*Gibson*.  Moreover, *Smith* assumed officers had a duty to disclose material evidence "if only by informing the prosecutor" of its existence.  *Id.* at 444 (quoting *Smith*, 210 F.3d at 197 n.14).

District courts have split over whether *Gibson* means police officers' *Brady* obligations were established in 1995 (based on *Kyles*) or 2005 (when *Gibson* was decided).  *See Hicks v. City of Philadelphia*, No. 22-977, 2023 WL 5278713, at *6 (E.D. Pa. Aug. 16, 2023) (collecting cases).  Ultimately, because Natividad asserts a deliberate-deception claim, the Court need not weigh in on this debate.

*Dennis* subsequently addressed whether the due process rights against use of fabricated evidence and deliberate deception were, in 1992, clearly established for purposes of qualified immunity. 19 F.4th at 288–92. Relying on *Halsey*, the panel affirmed the district court's denial of qualified immunity for the fabrication-of-evidence claim. *Id.* at 289.

In analyzing the deliberate-deception claim, the court said "[t]he right not to be convicted on perjured testimony used by prosecutors at trial has been clearly established" since *Mooney v. Holohan*, 294 U.S. 103 (1935), a right extended to include "perjured testimony and the deliberate suppression of evidence favorable to the accused" in *Pyle v. Kansas*, 317 U.S. 213 (1942). *Id.* at 289–90. Accordingly, the court reiterated, fabrication of evidence contravened clearly established law. *Id.* at 290. The court rejected the detectives' *Brady*-related qualified immunity argument. *Brady* and deliberate-deception claims, the court said, "are not necessarily coterminous": a *Brady* claim is, "in essence," a claim for failure to disclose material evidence, but a deliberate-deception claim "must go beyond the failure to disclose evidence and arises when imprisonment results from the *knowing* use of false testimony or other fabricated evidence or from concealing evidence to create false testimony to secure a conviction." *Id.* at 291 (emphasis in original) (citing *Mooney*, 294 U.S. at 112). Because Dennis's deliberate-deception claim included not only withholding evidence but concealing it in order "to produce false testimony," case law concerning false testimony and fabricated evidence, rather than *Gibson*, controlled. *Id.*

But a deliberate-deception claim against law enforcement officers need not be based upon fabrication of evidence. Read as a whole, *Dennis* indicates that, to survive

qualified immunity, a deliberate-deception claim must allege some form of "*Brady*-plus" misconduct: some action(s) that concealed or suppressed evidence, plus the specific intent to deceive the court and jury in order to secure a conviction, rather than an intent to "merely" conceal or withhold exculpatory evidence. *See* 19 F. 4th at 291 ("[T]o survive the qualified immunity defense, [a deliberate-deception claim] must involve a right with sufficiently clear contours that every reasonable officer would have understood that what he is doing violates that right — and a generalized notion that deliberate deception violates due process will not do.").

B

Based on this framework, the nature of Natividad's claim is one of deliberate-deception, not *Brady*. Like Dennis, Natividad "did not limit his deliberate deception claim to a mere failure to disclose" material evidence; instead, "he claims the detectives violated his due process rights to a fair trial by 'concealing and/or suppressing relevant and material evidence' as part of a larger scheme to deliberately deceive the court and frame him for [] murder." *Id.* at 290–91 (quoting Dennis's complaint).

According to Natividad, the detectives' scheme to deceive the court and jury was implemented throughout the investigation. Their conduct included manipulating Price's trial testimony and concealing or suppressing the Maculla Note and Robinson Material — concealment that began with the affidavit of probable cause supporting the warrant for Natividad's arrest, extended to withholding information from the prosecutor when turning over police files and continued throughout trial once the detectives knew this evidence was not being presented. *See* (Oral Arg. Tr. at 84:14–23, 94:18–95:5; Pl. Resp. in Opp. at 24–26). The physical evidence withheld in *Dennis*

impeached a witness's testimony to such a degree as to conclusively show her testimony was false. 19 F.4th at 284, 292 & n.56. Here, had the jurors known of the allegedly concealed evidence, they would have had to choose between competing narratives and contradictory testimony. *See Natividad*, 2021 WL 3737201, at *11 ("[E]vidence that Robinson shot and killed Campbell is mutually exclusive with the testimony of Price and necessarily would have cast the testimony into doubt. Furthermore, the Robinson material was of a similar nature and quality to the testimony of Catlett, Golatt, and Wilson. It would have undercut the Commonwealth's theory."). This evidence was never provided to the defense or presented to the jury, which never had the opportunity to decide its veracity. Securing a conviction by engaging in a course of conduct designed to deceive the court and the jury was, even in 1997, a clearly established due process violation. *See Dennis*, 19 F.4th at 290–92.

C

There is no genuine dispute of material fact with respect to Natividad's deliberate-deception claim against Raley and Mee, but his claim against Dougherty may proceed. To succeed on his claim, Natividad must show that the defendant knowingly deceived the court and jury. *See Dennis*, 19 F.4th at 291–92. At summary judgment, the plaintiff "must produce evidence supporting each individual defendant's personal involvement in the alleged violation[.]" *Jutrowski*, 904 F.3d at 289–91.[15]

---

[15]    The parties adopted the standard from *Dennis v. City of Philadelphia*, 379 F. Supp. 3d 420, 432 (E.D. Pa. 2019), requiring a plaintiff "to prove by a preponderance of the evidence that he would not have been convicted . . . in the absence of the deliberate deception." *Dennis* borrowed this standard from *Drumgold v. Callahan*, 707 F.3d 28, 49 (1st Cir. 2013). *Id. Drumgold* held that a § 1983 plaintiff seeking to recover damages for an alleged *Brady* violation must first show "a reasonable probability that he would not have been convicted but for the withholding of evidence," and then, to satisfy the requirement of factual causation, must "make the same showing by a preponderance of the evidence." 707 F.3d at 49.

1[16]

There is no evidence that Raley or Mee personally participated in conduct that could constitute deliberate deception, while Dougherty signed the affidavit of probable cause for Natividad's arrest. (Aff. of Prob. Cause, ECF No. 7.) And Dougherty, as the lead detective, was responsible for turning over the police file to the prosecutor. (Mee Dep. at 17:11–21; Dougherty Dep. at 53:15–54:8, 120:13–20); *see also* (Oral Arg. Tr. at 95:6–10).

Natividad's reliance on the fact that all three detectives worked on the investigation together, (Oral Arg. Tr. at 88:11–17), is not enough. Each detective worked on the case, sometimes together, and there is evidence that each knew enough background information about the investigation to take statements. (Dougherty Dep. at 15:13–16:23.) But the mere fact that the detectives all worked on the same case and had basic information about the investigation does not show that any one of them was *personally* involved in any act that deceived the court. *Cf. Jutrowski*, 904 F.3d at 289, 292–93 (affirming summary judgment where each officer was present when excessive force was used but there was no evidence of any officer's personal conduct); *Jacobs v. City of Philadelphia*, No. 23-1880, 2025 WL 991023, at *8 (E.D. Pa. Apr. 2, 2025) (applying this standard to a claim for inadequate medical care).

---

But the Third Circuit grounded deliberate-deception claims in the same line of cases as fabrication-of-evidence claims, *Dennis*, 19 F.4th at 292, to which it applies a reasonable-likelihood standard, *Halsey*, 750 F.3d at 294 n.19. The Court will thus apply that standard, rather than preponderance of evidence, to Natividad's deliberate-deception claim.

This reasonable-likelihood standard does not run afoul of *Heck*. *Thomas*, 2025 WL 607544, at *5 n.5 ("Finding a reasonable likelihood that a reasonable juror could have reasonable doubt is not, as the defendants contend, the same as finding reasonable doubt of guilt.").

[16] Natividad's deliberate-deception theory is also based in part on the three detectives' alleged fabrication of false trial testimony, (Oral Arg. Tr. at 94:14–24; Resp. in Opp. at 25), but because there is no evidence that this occurred, *supra* Part IV, his claim must rely on other facts.

Nor can Natividad rely on the argument that Raley and Mee deceived the court because they knew "Maculla" and the Robinson Material were not raised at trial yet failed to disclose that evidence to the prosecution or Natividad. (Oral Arg. Tr. at 84:14–21, 94:18–24); *see also* (Resp. in Opp. at 27). Even assuming police officers are obligated to disclose matters they realize were not raised at trial, Natividad must, to succeed on this argument, adduce evidence from which a jury could find that the detectives knew this evidence was never presented at trial. This he did not — and cannot — do.

To begin, Raley never testified at trial, *see* (Nov. 5, 6, 7, & 10, 1997 Trial Trs. at 2–3, ECF Nos. 62-2, -3, -4, & -5), and Natividad points to no evidence that he was present at or otherwise aware of the proceedings. Mee testified at his deposition that he does not remember the trial, (Mee Dep. at 11:6–9), and Natividad offers no evidence contemporaneous to the trial that suggests Mee had the knowledge attributed to him. In fact, the record suggests the opposite, since all trial witnesses were sequestered. (Nov. 6, 1997 Trial Tr. at 57:19–58:7.) And it is pure speculation to say that Mee knew, simply based on the questions he was asked, that McCullough or Robinson had not otherwise been mentioned at trial. With no record evidence that Raley or Mee personally engaged in deliberate deception, they are entitled to summary judgment on this claim.[17]

---

[17]    The Court's review of the record in this case did not reveal any deliberately deceptive conduct either. Mee took statements from Harris, (Harris Statement at 388, ECF No. 70-1), who testified against Natividad at trial, and Cynthia Smith, (Smith Statement at 2), whose statement was part of the undisclosed Robinson Material. But his name appears nowhere else, and no testimony, affidavits or other evidence shows that he was responsible for or involved in either creating the affidavit of probable cause or disclosing material to the prosecution.

Likewise, Raley took statements from Golatt, (Golatt Statement at 457, ECF No. 70-1), and Price, (Price Statement at 462, 466), both of whom testified against Natividad, and he also interviewed 911 callers about a different shooting that occurred the night Campbell was killed, (Nov.

2

There is, however, evidence in the record from which the jury could conclude that Dougherty withheld evidence from the prosecutor in order to deceive the court. Natividad's trial counsel never received the Maculla Note or any of the Robinson Material. Although Judge Rufe ordered disclosure of both the police and district attorney files, nothing before the Court definitively reveals which file contained what evidence. Richard Sax — the ADA who prosecuted Natividad — testified that to ensure his case files were complete, he would ask the lead detective to provide him all the paperwork he had for the case. (Sax Dep. at 15:12–18:12, ECF No. 70-1.) And when presented with part of the Robinson Material, Sax stated that he did not recall the document and would have turned it over had he known about it. (*Id.* at 81:18–85:12.) But Dougherty says he gave the prosecutor all of the evidence he had. (Dougherty Dep. at 53:15–54:8, 120:13–20); *see also* (Mee Dep. at 17:11–21) (testifying that the lead detective was responsible for bringing all documents to the prosecutor). There are genuine questions of material fact concerning Dougherty's conduct and state of mind from which the jury could, after weighing the facts and making credibility determinations, conclude that he engaged in deliberate deception by knowingly deceiving the court and jury.

Moreover, Dougherty wrote and signed the affidavit of probable cause underlying the warrant for Natividad's arrest. (Dougherty Dep. at 87:18–101:5; Aff. of Probable Cause.) And he was the lead detective on the case, responsible for coordinating

---

13 Activity Sheet at 2). His name is not on any of the Robinson Material statements provided to the Court. No evidence supports a finding that Raley was responsible for or involved in either creating the affidavit of probable cause or disclosing material to the prosecution.

detectives' work and evidence collection, knowing the statements obtained by other detectives and obtaining an arrest warrant. *See* (Dougherty Dep. at 17:5–10, 53:15–54:8, 78:1–5; Nov. 7, 1997 Trial Tr. at 125:14–126:15). The Robinson Material was created in November, long before Dougherty obtained the warrant for Natividad's arrest. He may have had good reason to disbelieve that evidence. *See* (Dougherty Dep. at 25:7–27:16, 87:18–91:23, 98:19–100:24) (explaining why he didn't believe Robinson committed the murder and wrote the affidavit as he did). But Dougherty's reasons for omitting this information and the role this action played within the larger course of his investigation are for the jury to decide.

## VI

## A

Natividad's final claim against the detectives is for civil rights conspiracy. To prevail on such a claim, a plaintiff must show that (1) two or more people agreed to deprive him of a right; (2) at least one of the conspirators performed an "overt act in furtherance of the conspiracy"; and (3) that act "injure[d] the plaintiff in his person or property or deprive[d] the plaintiff of any right or privilege of a citizen of the United States, with the added gloss under § 1983 that the conspirators act under the color of state law." *Jutrowski*, 904 F.3d at 294 n.15 (quotation omitted).

An agreement can be shown via circumstantial evidence, including "that the alleged conspirators did or said something to create an understanding, the approximate time when the agreement was made, the specific parties to the agreement, the period of the conspiracy, or the object of the conspiracy." *Id.* at 295 (cleaned up) (quotations omitted). For instance, a conspiracy between police officers could "manifest as

24

conversations between officers about the incident, allegedly distorted stories that emerged, an awareness of conflicting stories and irregularities in the series of official investigations into the incident." *Id.* (cleaned up) (quotations omitted).

B

Natividad claims that Dougherty, Mee and Raley conspired to deprive him of his right to due process and a fair trial. (Oral Arg. Tr. at 97:21–98:2.) In furtherance of this purported conspiracy, the detectives allegedly manipulated Price's testimony, omitted and concealed evidence, and provided incomplete trial testimony or failed to disclose evidence at that time. (*Id.* at 100:3–9, 102:12–103:10, 104:15–105:2.) To support his theory, Natividad points to (1) the fact that they worked together on the investigation and (2) the nondisclosure of the Robinson Material. (*Id.* at 100:9–101:1, 103:21–104:14.)

The absence of record evidence showing Raley's and Mee's individual conduct, *see supra* Sections IV.A & V.C, would not be fatal to the conspiracy claim if there were evidence of an agreement between these detectives and Dougherty. But Natividad has failed to point to any. The fact that the detectives worked on the same case is not enough to allow the jury to infer that there was a meeting of the minds to violate Natividad's rights. *See Jutrowski*, 904 F.3d at 295–96 (noting that summary judgment requires specific facts, not simply assertions or suspicions). There is no evidence the detectives discussed the case together — let alone Price or the .357, the Maculla Note, or the Robinson Material — or that the detectives' accounts of the case, as told at any

25

time, contain discrepancies indicating an intent to conceal facts.[18]  As for the argument that an agreement is evidenced by the detectives' failure to testify about the Robinson Material or disclose it when they knew it wasn't offered at trial, Natividad does not explain how a jury could infer, from that failure, an *agreement between* the detectives. Even if such failure could, in theory, support that inference, nothing in the record indicates that their non-disclosure was a failure to disclose, e.g., that the detectives were asked questions that demanded that disclosure or that they actually knew what had and had not been raised at trial.  *See supra* p.22.

VII

A

To prevail on a § 1983 claim against a municipality, a plaintiff must show that his rights were violated and that the municipality is liable for that violation. *Hightower v. City of Philadelphia*, 130 F.4th 352, 355 (3d Cir. 2025).  Municipal liability can be based upon an unconstitutional policy or custom, or upon deliberate indifference. *Id.* at 356.

In his Second Amended Complaint, Natividad lists numerous instances of alleged police misconduct in Philadelphia, drawn largely from newspaper reporting, where police purportedly manipulated evidence, coerced witnesses and concealed or suppressed exculpatory evidence.  (Second Am. Compl. ¶¶ 69–79, ECF No. 33.) Natividad contends that these and other examples show that the City of Philadelphia

---

[18]      Raley stated at his deposition that he could not recall ever working with Dougherty, (Raley Dep. at 9:2–4), but that statement alone, offered twenty-five years after the investigation, does not constitute a discrepancy or conflict indicating an intent to conceal the truth.

had a "policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations . . . ." (*Id.* ¶ 100.)

At oral argument, counsel distilled Natividad's municipal liability claim to the argument that the City of Philadelphia had an unconstitutional custom of doing "whatever it takes" to secure a conviction, meaning the City allowed police misconduct to continue unabated. *See* (Oral Arg. Tr. at 109:13–24, 111:15–112:2; Resp. in Opp. at 28–29). A custom exists where the plaintiff has "evince[d] a given course of conduct so well-settled and permanent as to virtually constitute law." *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019). But the municipality will only be liable for the plaintiff's injuries if its custom caused those damages. *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). So there must be an "affirmative link" between the custom and the alleged violation. *Id.* To satisfy this causation requirement, the plaintiff must show that the municipality "had knowledge of 'similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to [his] injury.'" *Id.* (citation omitted).

B

The "evidence" Natividad purports to rely on in support of his claim is both unusual and insufficient to create any questions for the jury to decide. He conducted no discovery focused, *per se*, on a *Monell* claim. *See* (Oral Arg. Tr. at 123:12–125:7). For example, he deposed no 30(b)(6) witness nor any high-ranking police officials or other officers in the Homicide Unit, and did not request production of, e.g., disciplinary histories, internal affairs files or civilian complaints. *Cf. McIntyre v. Liciardello*, No. 13-2773, 2020 WL 605717, at *13–15 (E.D. Pa. Feb. 7, 2020) (detailing a record replete

27

with evidence of the City's knowledge of misconduct, based upon internal police files and investigations, depositions of police officials and other members of the defendant-officers' unit and even documents from and depositions of attorneys in the District Attorney's Office).

Instead, Natividad's sole "record evidence" of the City's alleged custom is "the volume of [] cases" alleging police misconduct, which he intends to present to the jury through an expert, Timothy Dixon, who has prepared a report and plans to discuss those cases. (Oral Arg. Tr. at 112:20–25, 115:8–12, 116:12–117:24.) Counsel acknowledged the municipal liability claim is largely, if not entirely, dependent on Dixon. *See* (*id.* at 115:4–7.) But Mr. Dixon, even were he to testify at trial, does not help him. Dixon's report is mostly fluff, rife with speculation, conclusory references to "standard police practices" and devoid of a true methodology or the application of specialized knowledge to support its broad conclusions. Nearly sixty pages of the eighty-page report restate the evidence developed in the homicide investigation, the long and winding history of Natividad's prior proceedings and his current allegations. (Expert Report at 14–73, ECF No. 62-32.) A mere ten pages are devoted to what Dixon titles "Analysis," but which should be called "Conclusions." (*Id.* at 73–82.)

He begins, for example, by stating that it "is a generally accepted policing practice" that police "officers must conduct themselves in accordance with the United States Constitution," that the "policing practices during the Campbell homicide investigation caused the violation of Plaintiff's rights" and that absent the constitutional violations caused by the "flawed investigatory practices," Natividad would have never been charged, convicted or incarcerated. (*Id.* at 73.) From there he

opines, *inter alia*, on how the detectives "hand wrote" the statements of certain witnesses and that had the Philadelphia Police Department followed "generally accepted policing practices of audio and/or video recording interviews and interrogations this behavior may have been prevented." (*Id.* at 76–77.)  This leads to another conclusion that the police department's "lack of a policy" requiring the audio or video recording of witness interviews made "police misconduct like we see in this case possible and indeed foreseeable." (*Id.* at 77.)  He notes that absent undefined "safeguards," a supervisor should have noticed the detectives' "behavior and actions" and that the lack of someone "review[ing]" the detectives' work "leads one to consider that the behavior we see in this case was part of a custom, practice or de facto policy that was the culture of that unit during the time of this case." (*Id.* at 79.)  Moreover, because the murder victim was "involve[d]" in the neighborhood Town Watch, the police Homicide Unit received much public attention, which "should have caused supervisors and commanders to review all of the detectives['] work even more closely to ensure that such misconduct did not occur.  It seems that this did not occur." (*Id.* at 80.)

One of Dixon's many conclusions is actually relevant here: that evidence of unconstitutional customs and conduct was known to the City before Natividad's case. (*Id.* at 79, 82.)  But this is unsupported by any evidence or reasoning.[19]  Dixon purports to base his conclusions on his expertise, materials from the Philadelphia Police Department and District Attorney's Office, and reliable public and professional

---

[19]    Nor does Dixon ever differentiate between policy, custom, and deliberate indifference — in the form of, e.g., failure to supervise or discipline — instead lumping various terms and concepts together in a conclusory, catch-all fashion.  *See, e.g.*, (Expert Report at 79, 81, 82); *cf. McIntyre v. Liciardello*, No. 13-2773, 2020 WL 605717, at *13 (E.D. Pa. Feb. 7, 2020) (noting there is no *Monell* claim for a custom or policy of failing to supervise).

resources. (*Id.* at 11.) But he appears to have reviewed only two materials that did not arise from Natividad's own case: the U.S. Constitution and The Homicide Files, a database of police misconduct allegations published by the Philadelphia Inquirer in 2021. *See* (*id.* at 11–14.) While Dixon's conclusion about the City's "custom" relies on numerous allegations of misconduct against various homicide detectives in the form of internal investigations, civilian complaints, civil litigation, and media reports, (*id.* at 82), there is nothing to indicate that he reviewed any of the underlying cases, investigations or complaints, let alone whether the accused officers were ever found liable for misconduct. And the mere existence of allegations of misconduct — found in lawsuits, civilian complaints, or elsewhere — cannot support municipal liability. *See, e.g.*, *Wooden v. City of Philadelphia*, No. 19-1054, 2022 WL 1772442, at *4 (E.D. Pa. Dec. 15, 2022) (noting people file lawsuits "for many reasons, or for no reason at all, and evidence that they filed complaints does not indicate that" an alleged custom exists) (cleaned up); *id.* ("In the same vein, settled lawsuits are not probative of custom because there is no finding of liability."); *Pharaoh v. Dewees*, No. 14-3116, 2016 WL 2593842, at *5 (E.D. Pa. May 4, 2016) (noting that "mere recitation of the number of [internal] complaints filed" does not demonstrate custom).

Even assuming that the volume of allegations against homicide detectives sufficiently established a custom of acquiescing to police misconduct, there is no evidence of a causal connection between that custom and Natividad's alleged injury. Natividad and Dixon point to no evidence that the City knew about, yet failed to respond to, past misconduct similar to the specific kind of misconduct Natividad alleges. In short, Dixon does not raise a genuine question of material fact from which

the jury could reasonably conclude the City had a custom of "acquiescing to police misconduct" and that this custom caused Natividad's injuries. The City is accordingly entitled to summary judgment on Natividad's *Monell* claim.[20]

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
Gerald J. Pappert, J.

---

[20]    Natividad's response brief adds nothing to Dixon's report. Natividad lists over a dozen cases involving alleged misconduct, including evidence tampering, influencing or coercing witnesses, and concealing evidence. (Resp. in Opp. at 14–19.) But he never states whether the officers were found liable for the alleged misconduct; when the City knew of any proven misconduct; or how, specifically, any proven misconduct was similar to the misconduct alleged in his own case.

Nor can Natividad's *Monell* claim survive summary judgment by relying on alleged misconduct by these three detectives. *See* (Oral Arg. Tr. at 112:24–113:1, 118:7–12). First, misconduct in Natividad's case cannot, alone, create a question for the jury because the City cannot be held liable on a theory of vicarious liability. *Hightower*, 130 F.4th at 355. Second, Natividad cannot point to a custom of acquiescence to these detectives' misconduct because the only claims he has made about the other cases in which they were involved, (Resp. in Opp. at 14–15), suffer from the same deficiencies discussed above.